**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------x
In re:                                          :
                                                :  Chapter 11
CALPINE CORPORATION, et al.,                    :  Case No. 05-60200 (BRL)
                                                :
                    Debtors.                    :
                                                :
---------------------------------------------------------x
ARISTEIA CAPITAL, L.L.C.,                       :
AURELIUS CAPITAL MANAGEMENT,                    :
LP, DRAWBRIDGE SPECIAL                          :
OPPORTUNITIES ADVISORS LLC, ORE                 :
HILL HUB FUND LTD., NISSWA                      :
MASTER FUND LTD., PINES EDGE                    :
VALUE INVESTORS LTD., PINES EDGE                :  Civil Case No. [        ]
VALUE INVESTORS L.P., SILVER                    :
SANDS FUND LLC, STARK MASTER                    :
FUND LTD. AND 3V CAPITAL                        :
MANAGEMENT, LLC,                                :
                                                :
                    Plaintiffs,                 :  ORAL ARGUMENT REQUESTED
                                                :
               -against-                        :
                                                :
CALPINE CORPORATION AND ITS                     :
AFFILIATED DEBTORS AND DEBTORS                  :
IN POSSESSION,                                  :
                                                :
                    Defendant.                  :
---------------------------------------------------------x
```

**MEMORANDUM OF LAW IN SUPPORT OF 6% CONVERTIBLE
NOTEHOLDERS' MOTION TO WITHDRAW REFERENCE
WITH RESPECT TO DEBTORS' LIMITED OBJECTION**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC (the "6% Convertible Noteholders"), as beneficial owners, or managers of entities or accounts that are beneficial owners, of the 6% Convertible Notes Due 2014 (the "6% Convertible Notes") issued under that certain indenture, dated as of August 10, 2000 (the "Original Indenture"), between Calpine Corporation (together with its affiliated debtors and debtors-in-possession, the "Debtors"), as issuer, and Wilmington Trust Company, as predecessor indenture trustee (together with HSBC Bank USA, National Association, as successor indenture trustee, collectively, the "Indenture Trustee"), as supplemented by that certain second supplemental indenture, dated as of September 30, 2004 (together with the Original Indenture, the "Indenture"), jointly submit, by and through their undersigned counsel, this Memorandum of Law in support of its Motion (the "Motion"), pursuant to 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 5011-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), seeking withdrawal of the reference by this Court to the Bankruptcy Court of all proceedings relating to determining the amount and related aspects of the 6% Convertible Noteholders' claims and reserving assets on account of such claims pursuant to the Plan (as defined below) pending such determination, and respectfully represent as follows:

# I.    PRELIMINARY STATEMENT

**The "ability to review decisions of the lower courts is
the guarantee of accountability in our judicial system."[1]**

On September 27, 2007, the Bankruptcy Court entered an order (i) approving the Debtors' disclosure statement (the "Disclosure Statement"), including a provision setting *no* reserve for the claims of the 6% Convertible Noteholders now on appeal before this Court[2] and allowing the Debtors to keep the reserve at zero even if the 6% Convertible Noteholders prevail in the Appeal and (ii) setting December 18, 2007 for the confirmation hearing (the "Confirmation Hearing").  The fog has lifted, making the Debtors' intent clear:  despite their many representations to the contrary in connection with the 6% Convertible Noteholders' motion for expedited consideration of the Appeal (the "Motion to Expedite"), the Debtors are trying to moot out all appeals and eliminate effective appellate review of any subsequent Bankruptcy Court rulings regarding the substantial claims asserted on behalf of the 6% Convertible Noteholders.  If this Court reverses the Order and remands for further proceedings before the Bankruptcy Court, there may be insufficient time for a full consideration of the evidence on the merits of those claims prior to the Confirmation Hearing and, in any event, there will be

---

[1]    *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (S.D.N.Y. 2007).

[2]    The 6% Convertible Noteholders are filing this Motion contemporaneously with the filing of their reply brief in support of their appeal (the "Appeal") of the Bankruptcy Court's order, dated August 10, 2007 (the "Order"), disallowing, among other things, the 6% Convertible Noteholders' claims for compensation arising from abrogation of the right to convert the 6% Convertible Notes into cash and common stock of Calpine Corporation at any time up to maturity in 2014 (the "Conversion Right"), and do not restate herein the full factual background with respect to the issues related to the Debtors' limited objection to such claims (the "Limited Objection").  This Motion is related to the Appeal, which is currently before the Honorable John G. Koeltl.  The 6% Convertible Noteholders submit that assignment of this Motion to the Honorable Judge Koeltl would promote judicial efficiency because of his familiarity with the issues in the Appeal.

insufficient time for a full review of such decision by a judge sitting pursuant to Article III of the Constitution.

Unfortunately, the Debtors' tactics are not novel, but manifest a recent and increasingly common (and disturbing) attempt by chapter 11 debtors to utilize the confirmation process to manipulate the appellate review process so as to deny the statutory right of appeal to their adversaries.  Debtors seek to preserve for themselves the benefit of effective appellate review from rulings adverse to them (by setting sufficient reserves and appealing themselves) but to eliminate the ability of other parties to appeal from rulings favorable to the debtors by refusing to set adequate reserves and arguing that plan consummation has mooted any appeal.  Bizarrely, such tactics allow debtors to decide who may take appeals and allow Bankruptcy Courts to exempt their own rulings from appellate review.  As evidenced by this Court's comments in <u>Adelphia</u>, the District Court is rightly alarmed at the cynical gamesmanship used by debtors to deprive litigants of effective Article III review.  It is precisely because such tactics have been rewarded in the past that debtors are emboldened, with the Bankruptcy Courts' frequent approval, to do more of the same.  This Motion is brought to propose a means whereby this Court can act prudently and preventively – in the face of the Debtors' plain intent – to ensure the movants' claims will be afforded due process, while mitigating the risk of disruption to the Debtors' reorganization process.

The 6% Convertible Noteholders request that this Court withdraw the reference by this Court to the Bankruptcy Court of all proceedings relating to determining the amount of their claims and reserving assets on account of such claims pursuant to the

Debtors' Plan[3] pending such determination.  As discussed in greater detail below, the Debtors have created the need for this Motion by their refusal to establish a disputed-claim reserve sufficient to satisfy the asserted claims of the 6% Convertible Noteholders in the event they prevailed on the Appeal.

The 6% Convertible Noteholders recognize that the withdrawal of the reference in a "core" matter is an extraordinary remedy.  Such relief is necessitated in this case, among other reasons, by the Debtors' actions to game the system and construct a one-way system of appellate review for which they hold the keys to entry.   Further, this is not a case where the bankruptcy court is more familiar with the issues to be adjudicated or has greater expertise regarding the applicable law.

Typically, the general and standing orders of district courts providing for the automatic reference of  bankruptcy cases from such courts to bankruptcy courts are based on the presumption that the bankruptcy court is better equipped to hear bankruptcy matters.  Unlike other situations involving requests for withdrawal of the reference, this Court is at least as familiar, if not more so, with the pertinent issues due to the Appeal. Furthermore, in bankruptcy, the scope of a creditor's claims for contract damages is generally governed by state law, see Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000); and calculating damages for breach of contract does not involve specialized knowledge or require an extensive understanding of the Chapter 11 case.  For example, the assessment of damages for abrogation of an option such as the Conversion Right is regularly determined by district courts generally, and this Court has done so in the past. See R.A. Mackie & Co. v. PetroCorp Inc., 329 F. Supp.2d 477 (S.D.N.Y. 2004) (Koeltl,

---

[3]     Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, which is discussed in and attached to the Disclosure Statement.

J.) (employing the Black-Scholes methodology to assess damages issue for holders of perpetual warrants who sued successor entity in corporate merger where merger agreement violated holders' rights).

Accordingly, if this Court reverses the Order, it should exercise its discretion to withdraw the reference by this Court to the Bankruptcy Court of all proceedings relating to determining the amount of the 6% Convertible Noteholders' claims and to set a sufficient reserve on account of such claims pending such determination. The 6% Convertible Noteholders submit it is the most efficient and prudent manner in which to proceed in the face of the Debtors' intent to subvert the appellate process.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    6% Convertible Noteholders' Claim and Appeal

On December 20, 2005, Calpine and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the Bankruptcy Court (the "Chapter 11 Cases").[4]

Pursuant to the Bankruptcy Court's Order Establishing A Deadline For Filing Of Claim And Approving The Form And Manner of Notice Thereof on July 26, 2006, HSBC submitted proof of claim number 2821, asserting claims on account of the 6% Convertible Notes. HSBC subsequently filed its supplemental proof of claim, clarifying that its July 26, 2006 proof of claim subsumed any and all claims on account of the Conversion Right.[5] As noted in section IV.E. of the Disclosure Statement, the 6%

---

[4]    The Chapter 11 Cases are jointly administered at Case No. 05-60200 (BRL) (Bankr. S.D.N.Y.).

[5]    At Debtors' request, HSBC filed an amended supplement to its March 27, 2007 proof of claim, which replaced the supplemental proof of claim filed on July 26, 2006.

Convertible Noteholders estimate that the Conversion Right claim would have a value of $544.1 million at the high end of the Debtors' value for the existing common stock.[6]

On July 6, 2007, the Debtors filed the Limited Objection. The Limited Objection sought to deny the 6% Convertible Noteholders claim for breach of the Conversion Right. On July 27, 2007, the 6% Convertible Noteholders filed their response to the Limited Objection, evidencing the basis for their entitlement to a claim for breach of the Conversion Right, and the Debtors filed their reply in support of the Limited Objection on August 6, 2007.

On August 8, 2007, the Bankruptcy Court heard oral argument on the Limited Objection and, during the hearing, the Bankruptcy Court issued its ruling granting the Limited Objection and providing the Debtors with other relief. The Bankruptcy Court issued its Order on August 10, 2007. The 6% Convertible Noteholders filed a notice of appeal on August 14, 2007.

**B.    6% Convertible Noteholders' Motion for Expedited Review of Appeal**

Subsequent to filing the notice of the Appeal, the 6% Convertible Noteholders filed the Motion to Expedite on the basis that expedited consideration would avoid any argument by the Debtors that the Appeal was mooted through confirmation of the Plan. As noted in the Motion to Expedite, the 6% Convertible Noteholders were moving for expedited consideration because the Debtors are seeking to obtain confirmation and emergence from chapter 11 prior to the expiration of their exit financing commitment on

---

[6]    As explained in greater detail in section IV.E. of the Disclosure Statement, this claim amount estimate involves several judgments and assumptions regarding various changeable factors and was provided for illustrative purposes in the Disclosure Statement and not meant to bind any party or its professionals, consultants or experts.

January 31, 2008.  After briefing was completed, the Honorable John G. Koeltl heard oral

argument on the Motion to Expedite on August 22, 2007.

During oral argument, counsel for the 6% Convertible Noteholders emphasized

that the Court should allow expedited review because of the threat of mooting of the

Appeal due to the Debtors' financing deadline of January 31, 2007.  (Aug. 22, 2007 Hr'g

Tr. 24-25, a true and correct copy of which is attached hereto and incorporated herein as

Exhibit "A.")  In response to the 6% Convertible Noteholders' claims of potential

mootness, counsel for the Debtors responded "[u]nlike the cases cited by the noteholders,

where confirmation had already occurred, where not only was mootness certain to occur

but only days away from occurring, here ***there is no imminent risk of mootness.***"  (Id. at

33:25 – 34:1-3 (emphasis added).)  Counsel for the Debtors went on to say "the debtors

have not even scheduled a confirmation hearing" and "have not even filed a plan for

which they intend to seek confirmation."  (Id. at 34:4-7.)  Indeed, counsel for the Debtors

represented to the Court that "this case can easily last another five or six months, if not

substantially longer" (Id. at 34:16-17) and "[w]e could be years away from confirmation.

No one knows."  (Id. at 37:20-21.)

Notwithstanding the Debtors' representations to this Court and arguments about

the uncertain timing of confirmation, the Court granted the Motion to Expedite,

recognizing that the 6% Convertible Noteholders' claims were significant and should not

be mooted through confirmation of the Plan and emergence from chapter 11.  (Aug. 22,

2007 Hr'g Tr. 40:9-13 ("I am sufficiently persuaded that these are serious issues

involving hundreds of millions of dollars according to what the estimates were before the

bankruptcy court.  This isn't the rejection of run-of-the mill objections before the bankruptcy court . . .").)

The Debtors' representations about timing were belied a mere five days later, when the Debtors filed a slightly modified version of the Plan and issued a press release stating that "[w]ith this filing, Calpine remains on track to have the Amended Plan confirmed during the 4th Quarter 2007," and that its "favorable" financing commitment expires on January 31, 2008.  (Press Release, Calpine Corp., Calpine Files Amended Plan of Reorganization (August 27, 2007) (on file with author), a copy of which is attached hereto and incorporated herein as Exhibit "B.")[7]  Moreover, on September 19, 2007, the Debtors filed their Supplement (the "Supplement") to the Debtors Motion for Entry of an Order, *inter alia*, Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization (the "Solicitation Motion"), in which the Debtors requested that the Bankruptcy Court set December 18, 2007 as the beginning of the Confirmation Hearing.

It is nearly inconceivable that the Debtors' counsel did not know on August 22, 2007 that its representations to this Court were false.  The more interesting question is the motive for those misrepresentations.  As this Court observed during oral argument, the Debtors and other appellees demonstrated a desire to delay adjudication of the Convertible Noteholders' claims.  The risk of mootness is greatest when issues can be delayed until the last minute.  So, too, the Debtors now seek to manufacture arguments for mootness by refusing to post reserves that would allow the adjudication of the 6%

---

[7]     See also the Debtors' Objection to Emergency Motion of the Official Committee of Equity Security Holders of Calpine Corporation to Adjourn the Hearing on the Debtors' Motion for an Order Approving Adequacy of Proposed Disclosure Statement, dated September 24, 2007, at page 6, in which the Debtors unequivocally stated their intention to "emerge from chapter 11 prior to January 31, 2008 – when the Debtors' favorable exit financing expires."

Convertible Noteholders' claims to proceed in an orderly way and, if needed, be considered on appeal.

In accord with the Debtors' "fast-track" plan to emerge from chapter 11 prior to January 31, 2008, on September 25, 2007, the Bankruptcy Court held a hearing on the Solicitation Motion. The Bankruptcy Court granted the Solicitation Motion; approved the Disclosure Statement as containing adequate information; and set forth the schedule for confirmation. Significantly, the approved schedule sets the Confirmation Hearing to commence on December 18, 2007, and consummation of the Plan to occur not later than January 31, 2008 when, as noted above, financing commitments are due to expire.

### III.    RELIEF REQUESTED

The 6% Convertible Noteholders request that this Court withdraw the reference by this Court to the Bankruptcy Court of all proceedings relating to determining the amount and related aspects of their claims and reserving assets on account of such claims pursuant to the Plan pending such determination.

### IV.    BASIS FOR RELIEF

Original jurisdiction over bankruptcy matters is vested in the United States district courts pursuant to section 1334 of Title 28 of the United States Code. Each district court may refer all matters directly and indirectly involving a case under the Bankruptcy Code to the district court's bankruptcy judges. 28 U.S.C. § 157(a). Although Congress has given the district courts discretion to refer or not to refer cases to the bankruptcy courts, nearly every district court has provided by rule or order for automatic reference of all bankruptcy matters to the bankruptcy court, including this district pursuant to the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.

Notwithstanding the automatic reference to the bankruptcy court, district courts have the discretion to withdraw the reference, both on motion of any party and *sua sponte*. 28 U.S.C. § 157(d) ("Section 157(d)").  Section 157(d) states: "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section [to the Bankruptcy Court], on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d).  The 6% Convertible Noteholders respectfully submit that discretionary withdrawal of the reference by this Court from the Bankruptcy Court under the unique circumstances present here is appropriate.

## V.    ARGUMENT

### A.    Cause Exists to Withdraw Reference

#### 1.    "Core" Nature of Issues is Not Determinative

Section 157(d) provides a district court "broad discretion to withdraw the reference for 'cause' on its own motion or on a timely motion by any party."  Enron Corp. v. Lay (In re Enron Corp.), 295 B.R. 21, 25 (S.D.N.Y. 2003) (quoting In re Chateaugay Corp., No. 00 Civ. 9429, 2002 WL 484950, at * 6 (S.D.N.Y. Mar. 29, 2002)).  When evaluating whether "cause" exists, the Second Circuit and district courts consider, among other things: (1) whether the claim is core or non-core; (2) judicial economy; (3) uniformity of bankruptcy administration; (4) prevention of forum shopping; and (5) other related factors.  See Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993); see also S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 762 (2d Cir. 1996).

While the issues described herein represent arguably "core" matters, this factor is not "determinative" as the reference may still be withdrawn where other factors weigh in favor of withdrawal, as they do here.  See, e.g., Grant Thornton Int'l v. Parmalat

11

Finanziaria S.p.A. (In re Parmalat Finanziaria S.p.A.), 320 B.R. 46, 50 (S.D.N.Y. Jan 26,

2005) ("A core proceeding . . . may be withdrawn 'based on a finding by the Court that

the withdrawal of reference is essential to preserve a higher interest' . . . In this case,

there is a higher interest, and that is an overriding consideration of judicial efficiency."

(citations omitted)); Houbigant Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 185

B.R. 680, 686 (S.D.N.Y. 1995); Complete Mgmt., Inc. v. Arthur Andersen, LLP (In re

Complete Mgmt., Inc.), No. 02 CIV 1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27,

2002) (holding "that the considerations of efficiency and fairness favor withdrawal of the

reference of the . . . adversary proceeding" despite core nature of such proceeding);

Mishkin v. Ageloff, 220 B.R. 784, 800 (S.D.N.Y. 1998) (withdrawing reference of core

proceeding because "[i]n the final analysis, the critical question is efficiency and

uniformity").

     For example, in Burger Boys, the Second Circuit upheld the district court's *sua

sponte* withdrawal of the reference with regard to a purely core matter, i.e., whether an

extension of time to assume or reject a lease under section 365 of the Bankruptcy Code

was warranted.  94 F.3d at 762.  In so ruling, the Second Circuit held that the district

court properly exercised its discretion in withdrawing the reference as it weighed the

judicial economy involved and the delay and costs to the parties.  See id.

     Similarly, in Complete Management, the defendant moved to withdraw the

reference with regard to certain tort claims, which were arguably core.  2002 WL

31163878 at *3.  In evaluating whether to withdraw the reference, the district court

reiterated the principle that "even where a claim has been determined to be core to the

bankruptcy proceedings, consideration of [the Orion] factors may make withdrawal of the

reference appropriate in certain circumstances." See id. at *2. Based on this principle, the court found that "the other factors to be considered favor the discretionary withdrawal of the adversary proceeding." Id. at *3. Notably, the court relied on judicial efficiency and fairness to withdraw the reference because the tort claim against the defendant "would certainly still exist in the absence of CMI's bankruptcy filing" and "raises legal issues more commonly resolved by this court than the bankruptcy courts[.]" Id.

While the determination of the amounts of the 6% Convertible Noteholders' claims is arguably a core matter,[8] the other factors considered by courts in this regard support withdrawal of the reference. Specifically, and as discussed more fully below, considerations of efficiency and fairness weigh heavily in favor of withdrawal because: (1) of the Debtors' deliberate attempt to deprive the 6% Convertible Noteholders of their fundamental rights to appellate review through a compressed timeframe for confirmation and emergence and their blatant refusal to set a reserve for the potential claim; (2) this Court is intimately familiar with the 6% Convertible Noteholders' claims from the Appeal and its extensive briefing;[9] and (3) this Court is at least as well-positioned as the Bankruptcy Court to adjudicate the amount of the 6% Convertible Noteholders' claims.

> 2.    Fairness Weighs in Favor of Withdrawing Reference

Even upon reversal of the Bankruptcy Court's decision, the 6% Convertible Noteholders will still not have meaningful relief until a court determines the amount of

---

[8]    While the 6% Convertible Noteholders concede that this is arguably a core matter, the fact that it is essentially a breach of contract claim makes it analogous to Complete Management as the claim is one that would have existed outside of the bankruptcy case and typically adjudicated by a district court. See 2002 WL 31163878, at *3. Indeed, these claims are more analogous to situations where core matters and non-core matters are intertwined. In such circumstances, the principles of efficiency and judicial economy dictate that the reference be withdrawn with respect to the entire proceeding. See In re Orion Pictures Corp., 4 F.3d at 1100-01.

[9]    This assumes assignment of this matter to the Honorable John G. Koeltl, which the 6% Convertible Noteholders submits is appropriate under these circumstances and understands is likely based on the practice of this Court to typically assign related matters to one judge.

their claims.  The determination of the amount of such claims itself may be the subject of a further appeal, for which little or no time is likely to remain before confirmation and consummation of the Plan.

Forcing the 6% Convertible Noteholders to return to the Bankruptcy Court for determination of these amounts in the first instance, given the timing of the cases, creates a patent inequity between the parties with respect to any subsequent appeal and makes a mockery of the concept of a "level playing field."  Because of a scenario created entirely by the Debtors – the timing of the filing of the Limited Objection relative to their effort to confirm the Plan and emerge from chapter 11, coupled with their refusal to reserve for the 6% Convertible Noteholders' claims – only the Debtors would be afforded the opportunity for meaningful review of any decision setting the amount and other aspects of the claim.  If the Debtors are unsatisfied with the determination by any court of the claim amounts, the Debtors may reserve the full amount of the then-allowed claim pending resolution of any such appeal without distributing the reserved amount to the claimant and have a meaningful appeal.  By contrast, if the Debtors prevail below, they will exercise their discretion under the Plan to set no reserve for 6% Convertible Noteholders (or a reserve which is no greater than the damages found below) in an attempt to moot any such appeal through confirming the Plan and emergence from chapter 11; thus, making any appellate ruling that awards the 6% Convertible Noteholders increased damages meaningless as there will not be Plan assets to distribute on account of such claim.

This one-sided construct and the Debtors' deliberate attempt to circumvent appellate review even if this issue were to be remanded by this Court is inherently unfair,

reeks of manipulation, is wholly at odds with our system of judicial review (particularly review by Article III judges of decisions by Article I judges) and lends further support for withdrawal of the reference.  Courts have repeatedly held that "[t]he ability to review decisions of the lower courts is the guarantee of accountability in our judicial system."  In re Adelphia Commc'ns Corp., 361 B.R. at 342; see also Lutin v. U.S. Bankr. Court (In re Advanced Mining Sys., Inc.), 173 B.R. 467, 468-69 (S.D.N.Y. 1994) (holding appellant will suffer irreparable harm through mooting of appeal where distribution occurs under chapter 11 plan, denying appellant any recovery); Contrarian Funds LLC v. Artex, LLC (In re WestPoint Stevens, Inc.), No. 06 Civ. 4128, 2007 WL 1346616, at *5 (S.D.N.Y. May 9, 2007) (holding that "prospect of mooting an appeal has been recognized as sufficient to support a finding of irreparable harm").  As this Court recently explained,

> no single judge or court can violate the Constitution and laws of the United States, or the rules that govern court proceedings, with impunity, because nearly all decisions are subject to appellate review.  At the end of the appellate process, all parties and the public accept the decision of the courts because we, as a nation, are governed by the rule of law.  Thus, the ability to appeal a lower court ruling is a substantial and important right.

Adelphia, 361 B.R. at 342.

The Debtors' "fast-track" to confirmation – which could occur as early as December 18, 2007, the date of the Confirmation Hearing – without a reserve, could deny the 6% Convertible Noteholders this fundamental right to review by causing the issues on appeal to become moot.  The Debtors could and should easily avoid this result by committing to reserve sufficient distributions to satisfy the claims in full, pending complete appellate review.[10]  Instead, the Debtors have cynically chosen not to do so.

---

[10] Sections VI.F. of the Plan and IV.J.6. of the Disclosure Statement provide that any late filed proof of claim shall be deemed disallowed and expunged as of the effective date of the Plan and that holders of such alleged "late filed" claims may not receive a distribution on account of such

(See Solicitation Mot. Hr'g Tr. 147: 11-17, Sept. 25, 2007 ("Second of all our plan is clear that we only have to reserve the amount that a claim is, and we can either agreed [sic] to it with other party or an amount that's determined by the court.  If the court has [dis]allowed a claim, we don't have to reserve for it.  If the court has allowed a claim at a certain amount, that's what we are going to reserve."), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "C.")

The blatantly manipulative actions exhibited by the Debtors in this matter is symptomatic of what has become a widespread practice in chapter 11 cases that must be dealt with to prevent debtors from depriving their adversaries of their statutory right of appellate review.  Tolerating and rewarding such conduct would only encourage more of the same.  Thus, to protect the integrity of appellate review in the bankruptcy process, and ensure that the parties have a level-playing field with respect to availability of appellate review, this Court should withdraw the reference.[11]

---

claims.  Sections VI.C. of the Plan and IV.J.3. of the Disclosure Statement provide that claims that have been expunged from the claims register, but that either are subject to appeal or have not been the subject of a final order, shall be deemed to be estimated at zero dollars.  Finally, sections VII.C.3 of the Plan and IV.K.3.c. of the Disclosure Statement provide that the Debtors can reserve stock for disputed claims in amounts that they unilaterally elect to withhold in consultation with the creditors' committee, and any distributions on account of such claims that ultimately may become allowed are capped by that reserve amount.  Thus, even if the 6% Convertible Noteholders are provided access to the disputed claims procedures under the Plan, common stock in the reorganized debtor will not be set aside to satisfy such claims in the event the appeal is successful.

[11]     While the foregoing factors weigh heavily in favor of withdrawing the reference, the principles of uniformity of bankruptcy administration, delay, and cost to the parties also favor withdrawal of the reference.  Significantly, withdrawing the reference would not have any impact on the uniformity of bankruptcy administration as resolution of breach of contract damages turn on state law issues of contract law.  Thus, resolution of these issues will not impact the bankruptcy administration.  Similarly, withdrawing the reference will neither cause delay nor impose cost on the parties as resolution of the amount of claims by this Court will be the most efficient and expedient use of judicial resources as this Court will already be familiar with the issues *vis-à-vis* its involvement in the Appeal and, thus, will be best positioned to expeditiously adjudicate the amount of the claims the 6% Convertible Noteholders are entitled.

3.    <u>Judicial Efficiency Weighs in Favor of Withdrawing Reference</u>

Judicial efficiency weighs heavily in favor of withdrawal of the reference because (i) the resolution of all matters by one court will promote efficiency and avoid the prejudice and delay complained of by the Debtors, (ii) this Court's adjudication of the Appeal positions it well to determine the amount of the 6% Convertible Noteholders' claims and (iii) valuing claims such as those relating to the Conversion Right raises issues commonly resolved by this Court.

The decision in <u>Burger Boys</u> is particularly instructive because in that case, the district court, having become as familiar with the issue as the bankruptcy court through an appeal, withdrew the reference so that it could completely dispose of the matter to promote judicial efficiency.  <u>See</u> 94 F.3d at 762.  The Debtors are in no position to argue for a different result here:  Their persistent complaints (embraced, albeit erroneously, by the Bankruptcy Court), in connection with both the Limited Objection and Appeal, about the delay, prejudice, and distraction that would result from adjudicating the 6% Convertible Noteholders' claims plainly indicate their belief that those claims cannot be adjudicated before the Bankruptcy Court in an orderly way – let alone subjected to appropriate appellate review – prior to consummation of the Plan.  (<u>See</u>, <u>e.g.</u>, Debtors' Omnibus Reply in Support of Ltd. Objection to Convertible Noteholder Claim Nos. 2404, 2821, 6247, 6249, 6280, 6299, and 6300 at 5 ("….protracted litigation of [the 6% Convertible Noteholders' claim for the Conversion Right] will be a prejudicial distraction to the Debtors' ongoing efforts to finalize the negotiation of their reorganization Plan before their favorable exit financing commitment expires."); Debtors' Ltd. Objection Hr'g Tr. Aug. 8, 2007, 53:18-22 ("We've just heard that [the 6% Convertible Noteholders'] claim may amount to the hundreds of millions of dollars.  This, while we

are frantically attempting to put together a guaranteed distribution plan [since abandoned], hit our January 31, 2008 exit date all with the shadow of the expiration of exclusivity looming over us," a true and correct copy of which is attached hereto and incorporated herein as Exhibit "D.")

Moreover, the sum and substance of the Bankruptcy Court's exposure to the issues now pending before this Court was one round of briefing by the parties and oral argument, as no evidence was presented. Once this Court hears the Appeal, its exposure to the issues will be at least equal to that of the Bankruptcy Court. This is *not* a situation where withdrawal of the reference would move the contested matter from a court familiar with it to one that is not. Because this Court is receiving extensive briefing during the Appeal, it will be intimately familiar with the legal predicates involved with the 6% Convertible Noteholders' claims. Indeed, assuming the Appeal is successful, this Court will be better positioned to determine the amount of the 6% Convertible Noteholders' claims because this Court will have familiarized itself with the relevant issues more recently than the Bankruptcy Court. As such, judicial efficiency weighs in favor of withdrawing the reference as this Court will be most familiar with the claims and will be better situated to determine the amounts to which the 6% Convertible Noteholders may be entitled.

In addition, the claims asserted by the 6% Convertible Noteholders are, at their essence, breach of contract claims. Through the Appeal, the 6% Convertible Noteholders seek recognition of their right to damages for the wrongful termination of their contractually bargained for rights and, presuming that the 6% Convertible Noteholders are successful on Appeal, damages for abrogation of those rights. Resolution of breach

of contract claims and valuing damages are issues commonly resolved by the district courts and, in fact, this Court has prior experience in valuing similar type claims.  R.A. Mackie & Co. v. PetroCorp Inc., 329 F. Supp.2d 477 (S.D.N.Y. 2004).  As discussed more fully in the 6% Convertible Noteholders' Opening Brief in the Appeal, in Mackie, this Court previously adjudicated the value of certain "perpetual warrants" and has extensive experience with expert testimony regarding valuation of "out of the money" options.  Id. at 512-15.  Consequently, in this regard, this Court is at least as well positioned as the Bankruptcy Court to determine the amount of the claims being asserted by the 6% Convertible Noteholders – if not more so.

Lastly, this Court has previously held that judicial efficiency will be served by withdrawing the reference where the claims involve disputes that would arise outside of the bankruptcy case and are typically adjudicated by the district court.  In Complete Management, Arthur Andersen LLP ("Andersen") moved to withdraw the reference of certain tort claims brought against it by the debtor, CMI.  2002 WL 31163878, at *1.  In accordance with Orion, the district court applied the factors set forth therein to determine whether discretionary withdrawal of the reference was appropriate.  Id. at *2.  Specifically, the court noted that "CMI's claims against Andersen are based in tort, have no relation to bankruptcy law, and would certainly still exist in the absence of CMI's bankruptcy filing" and "the Andersen adversary proceeding raises legal issues more commonly resolved by this court than the bankruptcy courts."  Id. at *3.[12]

---

[12]    Indeed, district courts commonly withdraw the reference to non-core breach of contract claims as they do not involve the bankruptcy laws and could have been commenced in a district court.  See 1800Postcards, Inc. v. Morel, 153 F. Supp.2d 359, 367-68 (S.D.N.Y. 2001) (withdrawing reference where adversary proceeding brought non-core conventional breach of contract claim and core fraudulent conveyance claim).

**B.      Motion is Timely Within Meaning of Section 157(d)**

Finally, this Motion was timely filed only a few days after the Bankruptcy Court

approved (i) the Disclosure Statement, which contained *no* reserves for these claims, and

(ii) an aggressive timeline that sets the confirmation hearing for December 18, 2007, in

order to preserve the Debtor's exit financing commitments, which expire on January 31,

2007.

In evaluating timeliness, it is well accepted that no specific time limit exists for

filing a motion to withdraw the reference.  See In re Texaco Inc., 84 B.R. 911, 919

(S.D.N.Y. 1988).  Rather, timeliness is evaluated in the context of the circumstances

presented and a motion is considered timely where it is filed "at the first reasonable

opportunity" or "as soon as possible after the moving party has notice of the grounds for

withdrawing the reference."  In re Kentile Floors, Inc., Bankr. No. 92B46466, Adv. No.

94-8518A, No. 95 Civ. 2470, 1995 WL 479512, at *2 (S.D.N.Y. Aug. 10, 1995).  Courts

have typically found that, where no prejudice occurs, the filing of a motion to withdraw

the reference as long one year after the potential notice arose is not considered untimely.

See Interconnect Tel. Servs., Inc. v. Farren, 59 B.R. 397, 402 (S.D.N.Y. 1986) (holding

motion to withdraw reference was timely even though filed one year after filing of

complaint because no prejudice accrued because of delay); In re Kentile Floors, Inc.,

1995 WL 479512, at *2 ("Although nine months elapsed between the filing of the

complaint and Congoleum's motion to withdraw the reference, the motion is timely.");

see also In re Texaco Inc., 84 B.R. at 919-20 (holding motion to withdraw reference was

timely even though filed two months after notice because no prejudice arose). The cause

for this Motion only recently crystallized. The Motion was filed within days thereafter.  It

is timely.  This Court is familiar with the underlying dispute and no prejudice exists to

the Debtors.  The motion should be granted.

[*Remainder of the  page intentionally left blank*]

# VI.  CONCLUSION

**WHEREFORE**, the 6% Convertible Noteholders respectfully request that this

Court (i) withdraw the reference by this Court to the Bankruptcy Court of all proceedings

relating to determining the amount and related aspects of their claims and reserving assets

on account of such claims pursuant to the Plan pending such determination and (ii) grant

the 6% Convertible Noteholders such other relief as is just.

Dated: October 1, 2007
    New York, New York


**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By:  /s/   Matthew S. Barr
        Dennis F. Dunne (DD 7543)
        Matthew S. Barr (MB 9170)
        Andrew M. Leblanc (*pro hac vice*)
        One Chase Manhattan Plaza
        New York, New York  10005
        Telephone:  (212) 530-5000
        Facsimile:  (212) 530-5219

        -and-

**STUTMAN, TREISTER & GLATT, P.C.**
        Isaac M. Pachulski (*pro hac vice*)
        Eric D. Winston (*pro hac vice*)
        Whitman L. Holt (*pro hac vice*)
        1901 Avenue of the Stars, 12th Floor
        Los Angeles, California 90067
        Telephone:  (310) 228-5600
        Facsimile:  (310) 228-5788


        Attorneys for each of Aristeia Capital,
        L.L.C., Aurelius Capital Management,
        LP, Drawbridge Special Opportunities
        Advisors LLC, Ore Hill Hub Fund Ltd.,
        Nisswa Master Fund Ltd., Pines Edge Value
        Investors Ltd., Pines Edge Value Investors
        L.P., Silver Sands Fund LLC, Stark Master
        Fund Ltd. and 3V Capital Management, LLC

# EXHIBIT A

78mncaln

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE CALPINE CORPORATION

4                        M-47 (JGK)
    ------------------------------x
5
                        August 22, 2007
6                       10:30 a.m.

7

8   Before:

9              HON. JOHN G. KOELTL,

10                      District Judge

11              APPEARANCES

12   STROOK STROOK & LAVAN
        Attorneys for Appellants 7.75% Noteholders
13   BY:  EREZ GILAD

14   YOUNG CONWAY STARGATT & TAYLOR
        Attorneys for Appellants M & T
15   BY:  IAN S. FREDERICKS

16   MILBANK TWEED HADLEY & McCLOY
        Attorneys for Appellants 6% Noteholders
17   BY:  ANDREW M. LEBLANC
        MATTHEW S. BARR
18

19   FRIED FRANK HARRIS SHRIVER & JACOBSON
        Attorneys for Appellee Equity Committee
20   BY:  MICHAEL B. DeLEEUW

21   AKIN GUMP STRAUSS HAUER & FELD
        Attorneys for Appellee Creditors' Committee
22   BY:  LISA G. BECKERMAN
        SHAYA ROCHESTER

23

24

25

78mncaln

1                          APPEARANCES (Continued)

2    KIRKLAND & ELLIS
          Attorneys for Debtors
3    BY:  EDWARD O. SASSOWER
          STEPHEN E. HESSLER
4
     KELLY DRYE & WARREN
5         Attorneys for Trustee HSBC
     BY:  SARAH L. REID
6         JENNIFER A CHRISTIAN
          DAMON W. SUDEN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78mncaln

1          (Case called)

2          MR. LEBLANC:  Andrew Leblanc with Milbank Tweed Hadley

3    & McCloy with my partner Matthew Barr, who is moving my

4    admission pro hac, your Honor.

5          THE COURT:  OK.

6          MR. GILAD:  Erez Gilad Strook & Strook & Lavan,

7    counsel to the 7 3/4 percent noteholders appellants.

8          MR. SASSOWER:  Edward Sassower of Kirkland & Ellis on

9    behalf of the debtors.

10          MS. BECKERMAN:  Lisa Beckerman and my colleague Shaya

11    Rochester on behalf of the official creditors' committee.

12          MR. DeLEEUW:  Michael DeLeeuw on behalf of the equity

13    committee.

14          MS. REID:  Sarah Reid on behalf of the HSBC Bank USA

15    as indentured trustee, appellant.

16          MR. FREDERICKS:  Ian Fredericks on behalf of

17    Manufacturers and Traders Trust Company.

18          Your Honor, I do have one housekeeping matter, if I

19    can address that now, or if your Honor would prefer to hear

20    that later?

21          THE COURT:  Sure.

22          MR. FREDERICKS:  We did prepare formal pro hac papers

23    as well as an application for my admission to the district

24    court generally.  Unfortunately, because I could not obtain a

25    certificate of good standing prior to the hearing, I couldn't

78mncaln

1  complete the applications.  The other attorney who is a member

2  of this court informed me last night that she would not be able

3  to attend the hearing due to another hearing.

4       I would respectfully request that your Honor allow me

5  to speak today with the understanding that I will follow up

6  with formal pro hac papers as well as a formal application to

7  this Court.

8       THE COURT:  Sure.

9       MR. FREDERICKS:  Thank you.

10       THE COURT:  Mr. Gilad, would you like to move

11  Mr. Fredericks' admission to the bar of the Court.

12       MR. GILAD:  Yes, I would.

13       THE COURT:  Mr. Fredericks, you are admitted pro hac

14  vice for purposes of this case.

15       MR. FREDERICKS:  Thank you.

16       THE COURT:  Welcome.  Mr. Barr, you are admitted pro

17  hac vice for purposes of this case.  Welcome to the bar of the

18  Court.

19       MR. LEBLANC:  It is actually myself, your Honor.  Mr.

20  Barr is moving my admission.

21       THE COURT:  I'm sorry, Mr. Leblanc.

22       MR. LEBLANC:  Thank you, your Honor.

23       THE COURT:  Welcome to the bar of the Court for

24  purposes of this case.  No objections to the pro hac vices,

25  right?  Good.

78mncaln

1          I should also say that I know people in many, if not

2     all, of your firms.  Nothing about that would affect anything

3     that I do in the case.

4          With respect to Kirkland & Ellis, I have a niece who

5     is a nonshare partner in Washington, and there's nothing about

6     that that affects anything that I do.  Since she is on

7     maternity leave, I am reasonably confident that she would have

8     nothing to do with this case, but I think the people at

9     Kirkland make sure that she doesn't work on any of my cases.

10          MR. SASSOWER:  Sure.  I would be happy to confirm that

11     for you, your Honor.

12          THE COURT:  OK.  I bring all of that to your attention

13     at the outset.  Nothing about that affects anything I do.

14          With respect to the 7.1 statements, I think that I

15     have only gotten a 7.1 statement from the creditors' committee.

16          MR. FREDERICKS:  Your Honor, Ian Fredericks again.  We

17     filed ours this morning.  A copy should have been delivered to

18     chambers.  I have additional copies if you would like me to

19     hand one up.  I have one for everyone in the courtroom as well.

20          THE COURT:  There is nothing on the creditors'

21     committee 7.1 that raises any conflict.

22          MR. LEBLANC:  Your Honor, Andrew Leblanc from Milbank

23     Tweed on behalf of the 6 percent convertible noteholders.  We

24     filed ours yesterday and I believe delivered a copy to

25     chambers, but I have a copy of it with me as well.  I would be

78mncaln

1    happy to hand one copy up.  The parties have been served as

2    well.

3            THE COURT:  Thank you.

4            MR. FREDERICKS:  May I approach, your Honor?

5            THE COURT:  Sure.  Just hand them all to my clerk.

6            Thank you.

7            MR. DeLEEUW:  Your Honor, Michael DeLeeuw on behalf of

8    the equity committee.  We filed them yesterday.  I have also

9    handed one up to the clerk.

10            MS. REID:  Your Honor, also the same for HSBC.

11            THE COURT:  HSBC is HSBC, right?

12            MS. REID:  Right.

13            MR. GILAD:  Your Honor, the same goes for the 7 3/4

14    noteholders.

15            THE COURT:  What is the same?  HSBC?

16            MR. GILAD:  We also filed and served a Rule 7.1

17    statement yesterday and submitted a hard copy to chambers and

18    I've just submitted one hard copy to your assistant.

19            THE COURT:  OK.

20            MR. SASSOWER:  Your Honor, the debtors also filed and

21    served their statement yesterday, and we will be sure to get a

22    copy to chambers.

23            THE COURT:  I don't want to go through this if there

24    is -- who is on your 7.1?

25            MR. SASSOWER:  Calpine Corp.

78mncaln

1              THE COURT:  Not a problem.

2              MR. SASSOWER:  Your Honor?

3              THE COURT:  Yes.

4              MR. SASSOWER:  Edward Sassower of Kirkland & Ellis.  I

5    have just been informed that your niece has not in fact worked

6    on Calpine.  However, her husband when he was with -- her

7    husband Steven Engel, when he was with the firm did work on

8    Calpine, although not specifically this litigation.

9              THE COURT:  OK.  He's no longer at Kirkland & Ellis.

10   There's nothing about that that would affect anything that I

11   do.

12             Does anyone see a problem with that?

13             No?  OK.

14             Are you able to do that by BlackBerry.

15             MR. SASSOWER:  No they confiscated my BlackBerry

16   downstairs, but my colleague, Stephen Hessler, just recently

17   joined us in the D.C. office and so is familiar with Steve and

18   Susan.

19             THE COURT:  OK.  I have reviewed the 7.1s and there is

20   not a problem, and I've signed the pro hac vice for

21   Mr. Leblanc.  We will see that that gets filed.

22             OK.  I have read the papers and I am prepared to

23   listen.

24             MR. LEBLANC:  Thank you, your Honor.

25             Andrew Leblanc of Milbank Tweed on behalf of a group

78mncaln

1    of 6 percent convertible noteholders.

2          Your Honor, I would like to give just a little bit of

3    background because I appreciate that we filed an expedited

4    motion or a motion for an expedited appeal without any of the

5    context to it because it was important us to try to get this

6    before the Court as quickly as we could.  You may note that we

7    filed our notice of appeal on the Monday after the order was

8    entered on a Friday, and we almost immediately filed the motion

9    to expedite before this court.

10          The 6 percent convertible notes were a series of bonds

11    issued by Calpine in 2004 at interest rates that were

12    substantially below then market rates.  The holders agreed to

13    accept this below-market rate in return for a conversion right,

14    which conversion right was to extend until 2014.

15          At issue in the appeal, your Honor, is whether the 6

16    percent convertible bondholders are entitled to be compensated

17    by the debtors for abrogation of the convertible right in the

18    indenture as part of their bankruptcy reorganization.

19          That was the issue that was before the Court.  On July

20    6 of this year the debtors filed an objection to our claim for

21    damages on the breach of the conversion right, and on August

22    8 -- and I'll turn back to the issues in a moment -- but on

23    August 8 of this year, so just under two weeks ago, two weeks

24    ago the Court heard oral argument on the issue and sustained

25    the objection to our claims for breach of the conversion right.

78mncaln

1          Just for the benefit of the Court, I would like to

2     introduce what the primary issues were.  There are several

3     secondary issues, but I think it is useful.  I will attempt to

4     do so dispassionately, although I think, as you can even see

5     from the papers, it is a little bit difficult to speak

6     dispassionately about these issues.

7          THE COURT:  On both sides.

8          MR. LEBLANC:  On both sides, yes, your Honor.  The two

9     primary issues that were briefed and argued to the Court were

10    these:

11         First, whether the claim for breach of the conversion

12    right was timely filed; and, secondly, the merits of that claim

13    on the question only of liability, that is, whether the 6

14    percent convertible noteholders were entitled to damages for

15    breach of that conversion right.

16         Let me just address first the question of whether it

17    was timely filed and the issues that were addressed before the

18    Court.  I certainly don't intend here, your Honor, to

19    relitigate the merits, but I just think it is important to

20    raise a few items with respect to that.

21         There is no dispute that the indentured trustee timely

22    filed a proof of claim in the bankruptcy court on August 2,

23    2006, prior to the bar date, for claims relating to the 6

24    percent convertible debenture.  Included in that were

25    liquidated claims for principal and interest and also a claim

78mncaln

1    for other unliquidated amounts.

2            The specific words that were used, and I will skip

3    around a little bit here, but the salient words as relevant to

4    this matter is, the indentured trustee claimed for any and all

5    other amounts due or to become due under the indenture and the

6    notes, and then goes on to say, including but not limited to

7    any amount or amounts as or for compensatory damages.

8            Those were the words that the indentured trustee used.

9    The indentured trustee also attached a copy of the indenture

10    and made notice that they were claiming for any claims arising

11    under that indenture.

12            It is important to note, your Honor, at this point

13    that this claim filed by the indentured trustee was virtually

14    identical to the claims filed by all other indentured trustees

15    for every other series of bonds.  In all material respects they

16    were identical.  I'll get to that in just a moment, your Honor.

17            In January of 2007 the indentured trustee and the

18    debtors entered into a stipulation by which they stipulated to

19    the principal and interest amounts that were due and payable,

20    but reserved for later determination, either through the plan

21    or through a claim reconciliation process, the determination of

22    the unliquidated amounts that were claimed.

23            There was no objection filed by the debtor to the

24    claim for unliquidated amounts.  It was just agreed at that

25    time to be determined later.

78mncaln

1          In March of 2007, and this happened -- well, let me

2    actually just get to the claim itself.  In March of 2007 the

3    indentured trustee filed a supplement to the proof of claim.

4    It was something that was done primarily, at least from our

5    perspective, at the demand of the holders that we represented.

6    In an abundance of caution, to make clear that among the

7    unliquidated claims included in the original proof of claim was

8    a claim for breach of the conversion right, it was styled as

9    such.  It was a supplemental claim that was styled as such to

10   make clear that among the claims that were included therein

11   were a claim for breach of the conversion right.

12          THE COURT:  Why did you have do to that?

13          MR. LEBLANC:  We didn't have any obligation to do

14   that, your Honor.  I can explain a couple of reasons why that

15   is the case, but we did so in an abundance of caution.

16          We, Milbank Tweed, and these particular holders were

17   new to the case.  We wanted to make clear that when the

18   dialogue went forward to formulate a plan of reorganization

19   everybody knew what the cards were out on the table.

20   Everybody's cards were on the table.

21          THE COURT:  I'm sorry.  You were new to representing

22   the 6 percent convertible noteholders?

23          MR. LEBLANC:  We, Milbank Tweed, and the group of

24   convertible noteholders had formed only a short time before the

25   supplement was filed on their behalf.

78mncaln

1        THE COURT:  Who had filed for the 6 percent

2  convertible noteholders previously?

3        MR. LEBLANC:  The indentured trustee had, your Honor.

4  The indentured trustee also filed the supplemental proof of

5  claim to their original proof of claim.

6        THE COURT:  Was anyone representing the 6 percent

7  convertible noteholders before you?

8        MR. LEBLANC:  Well, other than the indentured trustee

9  in its capacity as agent on their behalf, no, your Honor.  To

10  the best of our knowledge, there was no organized or

11  unorganized group prior to that point.

12        Your Honor, I am not going to go through all of the

13  procedural steps but a couple of other salient points are that

14  in June of 2007, the debtors objected to claims of other

15  bondholders for what's known in the bankruptcy world as

16  make-whole damages or make-whole claim or prepayment penalty

17  claim, claim or damages.

18        Importantly, the proofs of claims filed by these other

19  noteholders, nonconvertible noteholders, were in many respects

20  or most respects identical to the degree of specificity that

21  they provided that they were claiming for make-whole or other

22  type of prepayment penalty damages, and they filed no

23  supplement.  The debtors objected to their unliquidated claims,

24  but specifically carved out the unliquidated claims of the

25  convertible noteholders.  Those claims have subsequently been

78mncaln

1    settled by the debtors.

2        the reason we raise this, your Honor, is simply to

3    point out that our original claim, which included other

4    unliquidated claims in terms substantially similar to those

5    that were filed by these nonconvertible noteholders, the same

6    language was sufficient for them, for the debtors, to

7    appreciate what was filed in theirs, and it was clear, and it

8    was clear from both the claim and the stipulation that was

9    entered in January of 2007 that there were claims in ours for

10    other unliquidated amounts that had to be decided or determined

11    by the debtors at some point.

12        In their July 6 objection the debtors contend that the

13    original claim did not include a claim for breach of the

14    conversion right, a claim with which we disagree.

15        Fundamentally, your Honor, had we not ever filed the

16    supplement, the debtors would have had to take some action with

17    respect to other unliquidated claims.  They either would have

18    had to have objected to them or they would have had to reserve

19    for those other unliquidated claims.  That issue would have

20    been joined.

21        The suggestion that our filing the supplement, which

22    made clear that the other unliquidated claims included these

23    claims for breach of the conversion right to us just seems to

24    be complete completely erroneous.  The idea that because we

25    made it more clear we suffered a harm as a result of that just

78mncaln

1      to us seems to be totally inappropriate.

2              We think, your Honor, that the judge just got this

3      wrong.  This is one of the issues that is going to be before

4      you on appeal.

5              THE COURT:  It is only the 6 percent and the 7.75

6      percent noteholders that had convertible notes?

7              MR. LEBLANC:  There are other issuers that had

8      convertible notes, your Honor.  I believe the two that are

9      before your Honor are the 6 and the 7 3/4 because -- and the

10     debtors can explain this more, but -- I'm sorry, and the 4

11     percent.

12             The reason for that primarily, as I understand it,

13     your Honor, is that the one other issuer, the 4 3/4, the

14     debtors contend and the court agreed had expired by their

15     terms, by the terms of the indenture.  Before the Court below

16     were the 6 percent, the 7 3/4, the 4 percent, and there were

17     different issues with respect to the 4 3/4.

18             THE COURT:  So all of the parties who were objecting

19     to the elimination of their convertible rights are here?

20             MR. LEBLANC:  They are, your Honor.

21             Your Honor, secondly, the Court first decided that it

22     was a late filed claim.  Then, subsequent to that, in addition

23     to it being in the court's view a late-filed claim, it wasn't

24     properly an amendment to the prior filed proof of claim.

25             Fundamentally we just disagree that it is a late-filed

78mncaln

1    claim, but even if it were a late-filed claim, we think it was

2    properly presented as an amendment to the proof of claim.  It

3    relates back to the proof of claim that was originally filed

4    and should be heard by the Court.  There was no evidence

5    presented by the debtors as to any prejudice that was suffered

6    in the plan process.

7         Everything you see before you in the debtor's

8    pleadings comes from counsel's argument.  There was no evidence

9    presented that this affected in any way the claim process.  In

10   addition to that, your Honor, the progression of how the plan

11   was formulated I think is important to note.

12        The claim was filed, the supplemental claim was filed

13   in March of 2007.  The debtors on the record before the Court

14   in May said they were formulating a plan and they were in

15   discussions with the convertible noteholders with respect to

16   their claims for the conversion right.  This is all in our

17   pleadings below.

18        Then, subsequent to that, they filed their plan of

19   reorganization, which is now set for solicitation on September

20   11 of this year, and they're shooting to get confirmation of

21   that based on financing issues by January of next year.

22        But, importantly, what we understand now -- and the

23   debtors can certainly educate the Court as to this issue as to

24   whether this is going to come to pass or not.  We understand

25   now that there has been solicitation to change fundamentally

78mncaln

1    the plan that is on the table and that the plan that was

2    proposed in May is not likely to be the plan that is proposed

3    to the creditors as it moves forward to try to close by

4    January.

5          So fundamentally we think that even if the Court were

6    to conclude that it was not included in the original proof of

7    claim, we think just fundamentally that it should be permitted

8    as an amendment, which amendments are freely granted.

9          Turning just briefly to the merits, your Honor, the

10   question we think is rather straightforward, whether these

11   particular creditors are entitled to be compensated for all of

12   their contractual rights or only some of their contractual

13   rights.

14         Our contract with the debtor included principal and

15   interest and the right to convert our debt to equity in the

16   debtor at a point up until 2014.

17         The debtors propose to pay us for the first two of

18   those agreed rights, the principal and the interest, but not to

19   compensate us at all for taking away our conversion right,

20   which was, again, to exist until 2014.

21         The Court accepted the debtor's argument that there

22   were no damages for breach of the conversion right or that

23   there was no breach under what we believe is a remarkable and

24   strained reading of the indenture, relying not on the terms of

25   the indenture, your Honor, but rather a Black's Law Dictionary

78mncaln

1    definition of word "maturity," and the form of the note

2    attached to the indenture which by its very terms is qualified

3    by the indenture itself.

4         What the Court concluded was that the event of

5    default, that was bankruptcy, which has by the terms of the

6    indenture the effect of accelerating the debt, did not only

7    accelerate the debt, but also advanced the date of maturity on

8    the notes to the date of petitioning.  The entire basis for

9    that as we see it from the debtor's pleading is that Black's

10    Law Dictionary says that maturity is when the debt becomes due

11    and payable.

12         They said, well, the acceleration means the debt is

13    due and payable.  Therefore, that is maturity.  We think that

14    is a remarkable decision, your Honor, and clearly wrong under

15    the law.

16         The debtors then look at the form note which says that

17    the conversion right expires on the day prior to maturity.

18    They say, therefore, because the petition date now is maturity,

19    the conversion right expired the day before the petition date,

20    and, therefore, there's no right to convert at all.

21         We think this is incorrect for a variety of reasons,

22    and I'm not going to go through all of them, your Honor, but I

23    just want to note a couple of ways in which this clearly is

24    inconsistent with the other terms of the indenture.

25         We cited below many ways in which the indenture

78mncaln

1   conflicted with this interpretation, which means by the very

2   terms of the form note that the terms of the form note cannot

3   control.  The indenture controls.

4         But just to give one example of the inconsistency, the

5   supplemental indenture governing the 6 percent convertible

6   notes in the event of default names an event of default for

7   the -- names as one event of default the debtor's failure to

8   pay an indebtedness, and this is a quote, when such

9   indebtedness becomes due and payable (whether at maturity, upon

10  redemption or acceleration or otherwise.)

11        So the very indenture that the form note is attached

12  to says that when such indebtedness becomes due and payable,

13  whether at maturity, upon redemption or acceleration, so that

14  very clause says that maturity and acceleration are not the

15  same thing.  Because there would be no reason to include those

16  two things in the same indenture -- if "due and payable" meant

17  "maturity," then there would be no reason to include anything

18  other than "due and payable" and certainly not "whether by

19  maturity or by acceleration."

20        Turning, your Honor, to the much more limited issue

21  that is before the Court, I'm happy to answer any questions the

22  Court has on the merits of the underlying appeal, but turning

23  just to the limited relief that we seek before the Court, we

24  don't believe we're asking for a lot from the debtors, the

25  party that's objecting here.  We accept and recognize, your

78mncaln

1    Honor, that we're imposing a burden on ourselves, but, more

2    importantly, asking the Court to take a burden on itself to

3    hear this on an expedited basis.  The parties on this side of

4    the table, the parties that lost on the motion below have all

5    agreed that the issue should be expedited and should be decided

6    as quickly as possible.

7         To that end we've proposed a schedule that cuts our

8    time substantially.  We have asked to have only 7 days after

9    the record is deemed to be filed instead of the 15 that the

10   rules provide us, and only 7 days to file a reply brief, as

11   opposed to the 10 that the rules provide us.  The schedule

12   we've proposed, though, gives the debtors 14 days to file their

13   opposition brief.  The schedule that the rules provide would

14   give them 15 days.  So we are asking to cut that by a day.

15        What we do ask, though, your Honor, is that you hear

16   this as quickly as possible.  We have asked the Court to hear

17   it on October 2 or as soon thereafter as counsel could be

18   heard.  We recognize that's a burden on the Court, because as

19   the schedule currently provides, it only has the reply briefs

20   getting to the Court on September 28.

21        We think it is appropriate to hear it as quickly as

22   the Court can, though, your Honor, because we think these

23   issues are rather straightforward.  We pointed out in our brief

24   a couple of facts that we think are important, not because they

25   suggest that due process was denied, as the debtors would have

78mncaln

1    you believe we were arguing, but instead the issues are

2    straightforward.  The bankruptcy court heard this on one

3    90-minute argument, heard no testimony, had briefs from the

4    parties, and that was it.  The final brief that the bankruptcy

5    court received, it received on Monday, August 6 at 5:00 and

6    heard argument on Wednesday, August 8, starting I believe at

7    10:00.  So the bankruptcy Court dealt with the objection

8    through objection to argument.

9            THE COURT:  Did you ask for an evidentiary hearing?

10           MR. LEBLANC:  We didn't, your Honor.  We are not

11   suggesting -- we believe these are pure legal issues that your

12   Honor will be reviewing de novo.  We agreed that the question

13   of liability was one of a pure question of law.

14           The only reason I raise these points, your Honor, is

15   to suggest that this is an issue that is amenable to being

16   decided on an expedited basis because it is just a pure legal

17   question.

18           THE COURT:  It is up to you, but -- and apparently you

19   made it clear to the bankruptcy court, because I thought that

20   there was a reference in the papers to no evidentiary hearing

21   and the party's had agreed there was no evidentiary hearing

22   that was necessary.

23           Having agreed to that, it would be difficult to make

24   an argument that the terms of the indenture are so ambiguous

25   that they have to be decided as a matter of fact and couldn't

78mncaln

1    be decided as a matter of law.

2        MR. LEBLANC:  We agree, your Honor.  We do not believe

3    the contract is ambiguous.  We believe it is clear and in our

4    favor as a matter of law.  We didn't present factual evidence

5    below nor did the debtors on the same issues of ambiguity.

6        There is no question but that there was an agreement

7    that there was not going to be presented evidence to the Court

8    below.

9        THE COURT:  Also, it is certainly not fatal, but it is

10   a little odd to argue that the briefing was completed before

11   the bankruptcy court on August 5 and that you were somehow

12   prejudiced because the bankruptcy Court heard this too quickly,

13   and the gist of your relief to me is we're going to be finished

14   with the briefing and then we want you to hear it as soon as

15   possible, even though that's not going to give you much time to

16   review the briefs or to think about it.

17       MR. LEBLANC:  Perhaps I wasn't clear.

18       THE COURT:  It seems to be inviting exactly what

19   you're complaining about from the bankruptcy court.

20       MR. LEBLANC:  Your Honor, we have no complaint that

21   the bankruptcy court dealt with this too quickly at all

22   whatsoever.

23       The debtors suggest in their response to our motion

24   that that's what we're contending, that we contend that we were

25   denied due process.  We don't contend that at all.  We wanted

22

78mncaln

1    the schedule to be as quick as it was so we could get to this

2    Court if necessary or the debtors could get to this Court.

3             We want this to be resolved.   The point I'm raising,

4    your Honor, is simply this.   The bankruptcy Court dealt with

5    this from objection to decision in something like 32 or 33

6    days.   We think these issues are straightforward enough.

7             THE COURT:   You want enough time to go to the court of

8    appeals after I decide?

9             MR. LEBLANC:   Well, I think both parties would like an

10   opportunity if necessary.   Your Honor, there is also an

11   issue -- what we agreed and decided in determining that there

12   would be no evidence is that we would save for a later point

13   the question of damages.

14            THE COURT:   I understand that.

15            MR. LEBLANC:   So when the remand comes we want to be

16   able to go back to Judge Lifland and get to a point of getting

17   a damages judgment from him as well in the time that's

18   remaining before the debtors would contend that this appeal --

19   we believe the debtors would contend this appeal would be

20   mooted by their confirmation.

21            Just to be very clear, your Honor, we don't suggest

22   that Judge Lifland acted too quickly.   We think he was

23   incorrect, and we believe clearly so.   We believe under the

24   applicable standards that are going to govern, that is, de novo

25   review, because these are pure issues of law, we think it is a

78mncaln

1    going to be quite clear to your Honor that he was incorrect,

2    but it's not an issue that he acted too quickly.  Quite to the

3    contrary, we raised these things just to point out that we

4    think -- and certainly, your Honor, we appreciate that your

5    Honor needs as much time as your Honor needs to consider the

6    briefs.  We put as aggressive a schedule as we could ask for.

7    With respect, as I said, we're imposing a burden on the Court,

8    but certainly we understand if the Court would like more time

9    to review the briefs.  That would be to all of our advantage.

10           THE COURT:  Your suggestion is that briefing be

11   finished on September 28 and that I have Saturday, the 29th,

12   Sunday, the 30th, and Monday, the 1st, before listening to you

13   on October 2?

14           MR. LEBLANC:  That's why we included or any other time

15   as counsel can be heard, meaning, your Honor, whatever time

16   your Honor would like to have with the briefs.  If you want to

17   push the argument out for a week -- what's important, your

18   Honor, in our experience in these bankruptcy matters it's

19   actually getting the case started here is what oftentimes takes

20   an awful lot of time.

21           We wanted to make sure we got the case started here;

22   that it was on an expedited basis.  But we didn't want to

23   shortchange the debtors with their briefing, and we wanted to

24   make sure that the Court has as much time as it needs to review

25   the briefs before argument is heard.

78mncaln

1          But we do think it is important, and we think the

2     cases that we cite in our brief are quite clear with respect to

3     the irreparable harm, that irreparable harm would befall us

4     here if the debtors were permitted to go forward on the basis

5     that it's quite clear from their pleadings what they intend to

6     do, that is, to moot the appeal.

7          If they are going to do anything other than that, if

8     they were going to set a reserve -- and I can assure your Honor

9     they are not going to tell you today that they'll commit to

10    setting a reserve so that we don't need to worry about the

11    mooting of the appeal.

12         If this was going to affect their financing, they

13    would want it to get done just like we would.  The fact that

14    they are opposing it should tell the Court, as it suggests to

15    us, that they do intend in fact to moot this appeal and deny us

16    the opportunity to have it be heard.

17         That's exactly the type of prejudice that Judge

18    Scheindlin in the Adelphia case concluded was a real problem

19    with an Article III bankruptcy judge sitting with the

20    ability --

21         THE COURT:  Article I.

22         MR. LEBLANC:  I'm sorry.  Article I bankruptcy Judge

23    sitting with ability to prevent his or her decisions being

24    reviewed on appeal because of this mootness issue.  That is

25    exactly the issue the Court addressed in Adelphia, and we think

78mncaln

 1    it is on all fours with this.

 2          Unless the Court has any other questions --

 3          THE COURT:  When do you think the appeal would be

 4    mooted?

 5          MR. LEBLANC:  The debtors have indicated that they

 6    have a financing deadline in January.  I believe the date is

 7    January 31.  So we would expect them to consummate a bankruptcy

 8    plan prior to that.

 9          The case would obviously, or our appeal to the extent

10    that they try to moot it in their claim that is to come, they

11    would moot it at some point prior to that, and they would seek

12    to consummate their plan so that it would in fact be mooted,

13    much like what happened in Adelphia.

14          It's difficult to say, your Honor, but at some point

15    prior to January 31, 2008, we've made it quite clear that

16    that's when they expect to emerge from bankruptcy, some point

17    prior to that.

18          There is in our view several steps that need to go

19    forward here.  We hope the next one is remand down to the

20    bankruptcy court for an evidentiary hearing on the damages, and

21    then possibly a return here if we have do.

22          THE COURT:  OK.  Thank you.

23          MR. LEBLANC:  Thank you, your Honor.

24          MR. GILAD:  Good morning, your Honor, Erez Gilad

25    Strook & Strook & Lavan on behalf of the 7 3/4 percent

78mncaln

1    equitable noteholders, appellants in this case.

2           I don't want to beleaguer the Court with repetitious

3    statements of fact or law, so I will only raise a few points of

4    emphasis to clarify some of the remarks that Mr. Leblanc made.

5           We filed a joinder in support of the motion to

6    expedite, as your Honor knows.

7           THE COURT:  Right.

8           MR GILAD:  Factually speaking, again, as we note in

9    our papers, the appeals all relate to the same core principles

10   of fact and law.  Indeed, the fact pattern as it relates to the

11   7 3/4 notes and the 7 3/4 percent indentured trustee is

12   substantially the same.

13          The indentured trustee for the 7 3/4 percent

14   noteholders filed a proof of claim similar in form to the proof

15   of claim filed by the 6 percent indentured trustee.  The

16   indentured trustee subsequently filed a supplement after the

17   bar date that also is substantially similar in form to the

18   supplement that was filed by the 6 percent indentured trustee.

19          In terms of our respective indentures, they differ in

20   respect of certain economic terms, i.e., the maturity date and

21   the conversion price.  Otherwise, the provisions in the

22   respective indentures relating to conversion are substantially

23   the same.  So my point is, your Honor, that in terms of this

24   appeal the issues of law are pretty much the same.

25          One point of fact that I want to raise is, and it

78mncaln

1    relates to the facts underlying this case.  Both the 6s and the

2    7 3/4 represent a form of contingent convertible note.  Your

3    typical convertible bond provides that you can convert, and

4    essentially you have got your principal, your principal amount

5    gets reduced, and essentially acquires the stock that you're

6    converting into.

7         These contingent convertible bonds are different than

8    your traditional converts, and we think that is a critical

9    point in this case.  Unlike a traditional convertible bond,

10   upon conversion, you are entitled to receive cash and stock,

11   cash in an amount equal to the principal amount of the notes

12   that you're tendering, plus, to the extent the stock price

13   exceeds the conversion price, you get the benefit of that delta

14   in the form of stock.

15        A bankruptcy doesn't change that.  Under our

16   indentures and the 6s' indenture, there's a provision in the

17   indenture that merely provides that upon a bankruptcy you can

18   still convert, but the company can elect to pay the

19   consideration upon conversion in the form of either cash or

20   stock.

21        We think that critical point and that critical

22   distinction speaks to the heart of the nature of our claim and

23   why we think the bankruptcy court, we respectfully believe that

24   the bankruptcy court erred as a matter of law in determining

25   that we weren't entitled to a claim on account of the

78mncaln

1    abrogation of the conversion right and that that claim should

2    be in an amount in excess of our principal and interest plus

3    indentured trustee fees.

4          We concur with the 6 percent noteholders and do

5    believe that irreparable harm will befall the noteholders if

6    expedited consideration of our appeal is not permitted.  We

7    think the debtors do have the intent to go forward at a

8    lightning pace toward confirmation.

9          The debtors do raise the argument in their papers that

10    we didn't act timely, but, again, that was one of the issues

11    that was subject to the litigation below, so to relitigate the

12    issue of whether or not we acted timely we think is not

13    appropriate at this time.  We think the debtor's suggestion in

14    a footnote that we acted in bad faith is similarly -- we don't

15    understand the basis for that statement.

16          In terms of the points made by Mr. Leblanc in terms of

17    the receipt of reply papers at 5:00 the day before the

18    bankruptcy hearing, one of the contentions that we have on

19    appeal is that the record, the transcript of the decision

20    simply does not support and in one instance is silent about

21    certain issues that were ordered in the form of order that was

22    actually entered by the Court.

23          So the point there is that we believe that the form of

24    order that was entered by the debtors is not consistent with

25    the judge's decision or is unsupported by the findings of fact

78mncaln

1    and conclusions of law contained in the transcript.

2             So we think that the notion of papers being filed,

3    again, speaking in terms of not filing papers on a timely

4    basis, papers filed you know 5:00 the night before a hearing,

5    the fact that the hearing went only 90 minutes, we think it

6    speaks more to the fulsomeness of the record and whether or not

7    the form of order is supported.

8             As Mr. Leblanc said, we think the issues that are

9    before your Honor are essentially those of law.  All parties to

10   the contested matter agreed that we would not present testimony

11   with respect to the quantum of damages.  We all agreed that

12   each side respectively viewed the indenture as unambiguous.

13            We did raise the point that the debtors had presented

14   a potential issue of fact in that they raised the issue of

15   prejudice with respect to the timeliness of the proof of claim.

16   But as the hearing transpired, we simply all stipulated you

17   might say that the claim could be potentially in the hundreds

18   of millions of dollars.

19            On a procedural note we did contact, the 7 3/4 percent

20   noteholders did contact chambers and noted that we thought

21   consolidation of the appeals was appropriate.  However, as your

22   Honor knows, the record has not yet been transmitted from the

23   bankruptcy court to the district court.  As such, we have

24   prepared our own set of papers of motion to expedite.  We did

25   not want to take the risk of filing those papers and having

78mncaln

1    those papers assigned at random to another judge, which we

2    thought would present a more rigid problem in terms of

3    ultimately consolidating the appeals.

4         So we held off filing those.  Instead we filed the

5    joinder to the 6 percent convertible noteholders' motion to

6    expedite.

7         But I think, in reviewing the relief that the 6

8    percent noteholders are seeking, the expedited schedule would

9    essentially bind all parties to the appeal.  So we think that

10   in effect they are seeking a consolidation of the appeals.  I

11   have since spoken with all the parties to the order and all

12   parties consent to the consolidation of the appeal, so it is

13   our hope that this Court will consolidate the appeals.

14        THE COURT:  Sure.

15        MR. GILAD:  Unless your Honor has any questions for me

16   that relate to the 7 3/4 notes, we respectfully request that

17   this judge grant the emergency motion filed by the 6 percent

18   noteholders.

19        Thank you, your Honor.

20        THE COURT:  OK.

21        MS. REID:  Your Honor, Sarah Reid on behalf of HSBC as

22   successor indenture trustee for both the 6 percent notes, which

23   Mr. Leblanc has already addressed, and on off behalf the 4.75

24   percent contingent convertible notes due in 2023.

25        Your Honor, I will not repeat the arguments that have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

78mncaln

1   been already made.  I'll simply note that HSBC has filed its

2   own notice of appeal, that we support the consolidation of the

3   appeals, and we would agree that the issues presented on all of

4   the various indentures in question can be decided by this Court

5   on this record.

6             If you have no questions, then that's all.

7             THE COURT:  OK.  Thank you.

8             MS. REID:  Thank you, your Honor.

9             THE COURT:  Ms. Reid, actually one other question

10  before you sit down.

11            MS. REID:  Sure.

12            THE COURT:  The effect of the expedited appeal in case

13  is very little, isn't it?  I mean, there's a day being cut off

14  the responsive brief.  You all are taking less time.  The time

15  to file the initial brief is probably accelerated just in terms

16  of the filing of the record and all, isn't it?

17            MS. REID:  Right, your Honor.

18            THE COURT:  Then the length of time before I actually

19  set it down for argument is another issue.  But that is about

20  it, isn't it?

21            MS. REID:  Yes.

22            THE COURT:  How much time is being cut off from what

23  you would normally get from what the appeals process would take

24  in terms of the initial brief?

25            MS. REID:  A week, your Honor, I believe.

78mncaln

1          THE COURT:  But usually it takes longer to file the

2     record and all, doesn't it?

3          MS. REID:  Right.  But what has been done is that the

4     notice of issues have already filed by the 6 percents and then

5     they designated the record.

6          THE COURT:  OK.

7          MS. REID:  So that pushes it.

8          THE COURT:  I have another question, which is, is

9     there any manner of practice, and the parties may disagree on

10    this, in the bankruptcy court with respect to filing a proof of

11    claim on behalf of convertible noteholders as to whether the

12    conversion right has to be specified as a separate part of the

13    claim?

14          MS. REID:  No, your Honor.

15          I am not aware of any such practice.  The form that

16    was filed by the indentured trustee in the first instance is

17    the classic form intended to sweep in absolutely everything

18    that could possibly be at issue under the indenture.

19          THE COURT:  OK.  Thank you.

20          MS. REID:  Thank you.

21          MR. GILAD:  Your Honor, if I may.  I should note that

22    the proofs of claim are both attached to the indenture.

23          THE COURT:  Yes.  I heard that from Mr. Leblanc.

24          Thank you.

25          MR. GILAD:  I apologize, your Honor.

78mncaln

1       MR. FREDERICKS:  Good morning, your Honor.

2       We also support the 6 percent convertible noteholders'

3  request for an expedited appeal and also consolidation, which I

4  believe your Honor has granted.  But other than that, unless

5  the Court has any questions --

6       THE COURT:  No.  Thank you.

7       MR. FREDERICKS:  Thank you, your Honor.

8       THE COURT:  The parties can draft an order on consent

9  with respect to working out the consolidation and give it to me

10  for signature.

11       MR. SASSOWER:  May it please the Court, Edward

12  Sassower of Kirkland & Ellis on behalf of the debtor.

13       Your Honor, the discrete issue that is before the

14  Court today is whether the noteholders will be irreparably

15  harmed if their request to expedite the appeal is not granted.

16       As Judge Scheindlin noted in Adelphia, the case relied

17  on by the noteholders, courts are divided on the issue of

18  whether mootness alone satisfies the irreparable harm

19  requirement.

20       However, for argument's sake, even if one were to

21  assume that mootness alone does satisfy the irreparable harm

22  requirement, that's not the end of the analysis.  Judge

23  Scheindlin goes on to state, and I quote, irreparable harm must

24  be neither remote or speculative, but actual and imminent.

25       Unlike the cases cited by the noteholders, where

78mncaln

1    confirmation had already occurred, where not only was mootness

2    certain to occur but only days away from occurring, here

3    there's no imminent risk of mootness.

4         Here confirmation has not occurred.  The debtors have

5    not even scheduled a confirmation hearing.  In fact, the

6    debtors have not even filed a plan for which they intend to

7    seek confirmation.

8         The only thing that's occurred in the case thus far is

9    that the debtors had filed a plan and scheduled a disclosure

10   statement hearing which has already been adjourned once.

11        Furthermore, as the noteholders are well aware and

12   have already stated, the debtors intend to revise the plan in

13   the coming days and weeks, perhaps substantially so.  The

14   disclosure statement hearing may be adjourned further as a

15   result.

16        Thus, this case can easily last another five to six

17   months, if not substantially longer.  The noteholders do not

18   dispute this.  Moreover, the noteholders have not demonstrated,

19   as is their burden, why five to six months is an insufficient

20   amount of time in which to prosecute their appeal.  Even more

21   importantly, no one can claim with any certainty what the plan

22   will provide.  It's possible that creditors could vote to

23   reject the debtor's plan.

24        THE COURT:  Is it going to include compensation for

25   the conversion rights for the noteholders who are before the

78mncaln

1    Court?

2              MR. SASSOWER:  The debtors do not intend to put

3    forward a plan that is going to provide for such compensation,

4    but someone else could file a plan that, noteholders could file

5    a plan in the coming weeks or months that does provide for that

6    compensation.

7              THE COURT:  Who would vote for such a plan in view of

8    what the bankruptcy court said?

9              MR. SASSOWER:  I think clearly the noteholders would

10   vote for such a plan.

11             THE COURT:  Do they have sufficient voting power that

12   they could -- it is just not going to happen.  The creditors

13   wouldn't agree to that, right?

14             MR. SASSOWER:  Well, they have billions of dollars of

15   claims in and of itself.  Bankruptcy is a consensus driven

16   process.  There's much negotiation still to be done.

17             THE COURT:  But the conversion rights are effectively

18   off the table.

19             MR. SASSOWER:  The conversion rights from the debtors'

20   perspective are certainly off the table.  But, for example,

21   parties are still negotiating what should be the form of their

22   consideration.  Perhaps some creditors would prefer a plan that

23   can provide for them to receive, rather than cash, equity in

24   the new company.  Maybe they would find --

25             THE COURT:  There's no reason to give at this point

78mncaln

1    the convertible noteholders anything for their conversion right

2    because the bankruptcy court has said that that right is worth

3    nothing.

4         MR. SASSOWER:  From the debtors' perspective, that's

5    accurate.  But there are a lot of other parties out there who

6    could eventually be plan proponents, and the debtor is not

7    currently aligned with all of these parties.

8         So they could have a situation where another party

9    views the noteholders as a potential ally and is prepared to

10   give them some form of consideration as a result.

11        THE COURT:  Because of the uncertainty as to whether

12   the bankruptcy judge's decision will be sustained at the

13   district court or the court of appeals level?

14        MR. SASSOWER:  Not as much that as that they're trying

15   to build a consensus for their plan, which may be different

16   from the debtor's plan.

17        So I don't think any party other than the noteholders

18   at this point reasonably believes that these conversion rights

19   have any value.  But there are a lot of different plan

20   structures that are being contemplated, and some are favored by

21   the debtors; others are favored by other parties.

22        Other parties may be trying to build consensus for

23   their plan structure and may need the noteholders as an ally,

24   and, in order to ingratiate themselves the noteholders, are

25   prepared to give them some consideration.

78mncaln

THE COURT:  One of the arguments before the bankruptcy
was that it was necessary for the bankruptcy court to decide
the objection, the limited objection, because of the
uncertainty that the possibility of the conversion rights had
and that might affect the plan.

So the bankruptcy court was told you really should
decide this now because it is necessary to take away this
uncertainty.  So now the debtor is successful.  That
uncertainty is taken away, and the parties who would have
otherwise benefitted from that say:  Review it, because it's
not fair to take away that uncertainty.  It is not an
uncertainty; it is a right that we have that's been taken away.

When do you think the appeal would be mooted
realistically in terms of time?

MR. SASSOWER:  I don't know if I can say with exact
specificity when is the day that the appeal would be mooted.
But what I can say is that under the case law post-confirmation
is within the danger zone.  We are a long way off from that.
We are, I don't know, five, six -- no one can say with any
certainty.  We could be years away from confirmation.  No one
knows.

So we are far, far from where courts have found that
mootness exists.  So I don't know if it's two days before
confirmation, two weeks before confirmation.  I certainly don't
think it's five, six months before confirmation.

78mncaln

1        THE COURT:  Can I stop you for a moment.

2        MR. SASSOWER:  Sure.

3        THE COURT:  The effect of the motion -- the only

4   motion that's before me -- is to cut off one day of your time

5   and to ask me to decide this more quickly.  Even if I agreed

6   with the motion, I could certainly listen to all of you in

7   October and hear what the schedule is.  If I didn't think that

8   there was enormous urgency any longer, I could take a little

9   more time to decide the appeal.

10       But in terms of what the practical effect is on all of

11   you, it amounts to the appellants being prepared to give up

12   their time in terms of drafting their briefs.  You give up one

13   day and I'm asked to hear the appeal a little more quickly.

14       I might do it that quickly anyway, but certainly the

15   parties can put in a request to me to hear the appeal more

16   quickly.  So what?

17       What all of you are here on is cutting off one day

18   from your time to file your responsive papers on a case that's

19   been thoroughly briefed before the bankruptcy court and is not

20   going to take all that much time for any of you to really brief

21   before me.

22       Isn't that we are talking about?

23       MR. SASSOWER:  Yes.  I've got numerous responses to

24   that question, your Honor.

25       First, this is their designation, which is over 200

78mncaln

1    documents.  I think --

2            THE COURT:  Designation of over 200 items?

3            MR. SASSOWER:  200 items.  So I think this brings to

4    light two issues.  One is that typically for a designation of

5    this length and magnitude, the parties would typically agree to

6    an extended briefing schedules, not shortened briefing

7    schedules.

8            But I would also like to say something on behalf of

9    the one party who is not here today, which is the bankruptcy

10   court, which is the noteholders have given one week to transmit

11   this record to the district court, and I am not sure that's

12   practical.

13           THE COURT:  Don't they just press a button now?

14           MR. SASSOWER:  I don't think so.

15           THE COURT:  Our bankruptcy court is completely on ECF,

16   so that all they have to do is -- I mean, it is all electronic.

17           MR. SASSOWER:  I don't think that's been our

18   experience with the prior appeals in this case, your Honor,

19   which brings me to my second point, which is that there have

20   been already several appeals in the Calpine case.

21           Incidentally, in two instances the Judge Lifland was

22   affirmed.  There will likely be several more appeals.  As we

23   get closer and closer to confirmation the appeals are going to

24   be increasing in number.  So if we give these noteholders, if

25   we expedite their appeal, then that ruling is going to have an

78mncaln

1    exponential effect, and all of the appeals from this point

2    until the end of the case are also going to be expedited.

3            THE COURT:  That's really not true.  The argument is

4    raised in your papers that there will be expedited appeals for

5    every claim that's rejected and every objection that's

6    sustained.  That doesn't necessarily follow.  The Court can

7    easily make some distinctions on matters that come up on appeal

8    from the bankruptcy court.

9            I am sufficiently persuaded that these are serious

10   issues involving hundreds of millions of dollars according to

11   what the estimates were before the bankruptcy court.  This

12   isn't the rejection of run-of-the-mill objections before the

13   bankruptcy court.  Courts can make distinctions.

14           MR. SASSOWER:  Fair enough, your Honor.

15           THE COURT:  I assume that there would be all sorts of

16   reserves established in order to deal with run-of-the-mill

17   problems that persist and that may eventually be decided

18   otherwise as the wheels of justice grind, proceeding small and

19   slow.

20           MR. SASSOWER:  I would like to respond to that comment

21   as well, but to respond to your original question, I just have

22   two other comments that I wanted to make.  One of which is the

23   fact that we're here on what can be characterized as one day

24   shaved off the timetable.  We are not the movant seeking

25   extraordinary relief.  We received an e-mail on Friday from the

78mncaln

1   noteholders asking us to agree to a schedule and giving us two

2   hours to do so.  Then by the end of the day we had an order to

3   show cause.  They hadn't exactly reached out to us.

4            THE COURT:  Fair point.

5        Do you think that now that you have all had an

6   opportunity to look at the schedule and to consider the

7   schedule, to talk, to understand how long it will take, that

8   you can simply agree upon a reasonable schedule?

9            MR. SASSOWER:  Well, this would bring me, I think, to

10   my final point, which is that the debtors are very confident

11   that they're going to prevail on appeal.  We are equally as

12   confident that if we had to live with this schedule, this

13   expedited schedule, that we would comprehensively brief the

14   issues and would still prevail.

15        To us, though, the issue seems to be that there is

16   clearly under the case law a standard.  Mootness equals

17   irreparable harm under some judges only in the instance where

18   the mootness is certain and imminent.  Here it is neither

19   certain nor imminent, and so we don't see how the noteholders

20   have met the standard.

21            THE COURT:  The equitable standards to be applied on a

22   bankruptcy appeal usually go towards the issue of whether a

23   stay should be imposed, and there's no stay being asked for.

24   They usually don't go solely to the issue of expedited briefing

25   or an expedited appeal, which in and of itself should be

78mncaln

1    something which is within the discretion of the court hearing

2    the case.

3            MR. SASSOWER:  As I said, your Honor, we can certainly

4    live with the schedule if you are so inclined to grant the

5    request, and we're comfortable that we will be able to

6    comprehensively brief the issues in that time period.

7            To us there's clearly a little bit of history here, of

8    gamesmanship, which Judge Lifland took the noteholders to task

9    for.  So that also may have something to do with our objecting

10   to this request, which we see as an effort for them to try to

11   increase their negotiating leverage in the case by having this

12   court hear it, maybe the next court hear it, and to keep the

13   issue alive so they can negotiate some form of consideration on

14   behalf of these rights which the bankruptcy court has held are

15   late, meritless, and, even if they weren't meritless, should be

16   subordinated.

17           Your Honor, I don't intend to respond to much of

18   counsel's background.  I think we can save that for oral

19   argument on the merits when it's ripe to do so.  I do think I

20   should probably respond to a couple of the points and questions

21   you had raised.

22           Whether or not it's typical for someone to break out

23   in the proof of claim someone that also says they're seeking

24   for principal, interest, and their conversion rights, that just

25   goes to the point that this is a truly novel argument, novel in

78mncaln

1    the sense that it's patently defective and so no one else has

2    ever raised this argument before.

3            So, from looking at their proof of claim including the

4    catchall saying that principal and interest and everything else

5    under the sun, that could not reasonably apprise the

6    noteholders or the other creditors in the case they were going

7    to be seeking hundreds of millions of dollars of claims on

8    behalf of this novel argument.

9            THE COURT:  Is compensation for a conversion right in

10    a convertible debenture unprecedented in the bankruptcy

11    context?

12            MR. SASSOWER:  We have not been able to find any case

13    for which a noteholder was compensated for the claim that they

14    are seeking.

15            The other question you had posed to Mr. Leblanc was

16    you seemed surprised that the noteholders had retained counsel

17    so late in the case.  I am not sure if it was a question, but

18    you seemed to be wondering why that was the case.

19            Just a couple of points of context:  One, around the

20    time of the noteholders organized and filed their supplement, a

21    couple of things happened.  One, it became clear to noteholders

22    that this may be a case where noteholders are going to be paid

23    in full in principal and interest and there may be a

24    distribution even to the old equity holders, which is a rare

25    and extraordinary result in a bankruptcy case.  So noteholders,

78mncaln

1   and not just these noteholders, started saying, well, before

2   equity gets anything, what else can I come up with that I can

3   get compensation for?  I already got principal and interest.

4   Are there any other sort of arguments that I could grab on to

5   for additional consideration?

6          Similarly, right around this time, just days before

7   they filed their supplement, Judge Lifland handed down a

8   decision awarding some measure of contract rejection damages to

9   this other group of noteholders that Mr. Leblanc referred to.

10         So the combination of the fact that it may be a full

11  payout case with Judge Lifland giving some measure of damages

12  to another group of noteholders who have an entirely different

13  claim, stars started appearing in noteholders' eyes across the

14  capital structure and people started coming out off the

15  woodwork, though none so bold as these noteholders, because

16  this claim truly did catch us entirely by surprise.  It was at

17  a time when we were trying to put together our plan.

18         So the prejudice I think was without --

19  notwithstanding the fact that they didn't have an evidentiary

20  trial, which the parties agreed to, because evidence was not

21  necessary, I think Judge Lifland was able to clearly find that

22  prejudice did occur.

23         THE COURT:  OK.

24         MR. SASSOWER:  Thank you, your Honor.

25         THE COURT:  All right.  Thank you.

78mncaln

1          MS. BECKERMAN:  Good morning, your Honor, Lisa

2     Beckerman on behalf of the official committee of unsecured

3     creditors from Akim Gump Strauss Hauer & Feld.

4          Your Honor, we filed a joinder to the debtor's

5     opposition to this motion.  We also had filed substantive

6     pleadings below in connection with the underlying objection

7     that the debtors had filed to the claims and were obviously

8     part of the parties opposing the claims at that point.

9          I just wanted to make two I guess additional points to

10    your Honor with respect to the opposition to the motion.  I

11    think if this motion hadn't been filed, your Honor, based on

12    the schedule that we're currently on, on the appeal, the

13    designations of record as Mr. Sassower pointed out to the Court

14    have been filed.  Our counterdesignation would be due August

15    30, based on when they were filed, and the court would

16    obviously then transfer the record.

17         My experience has been similar to Mr. Sassower's.  For

18    whatever it's worth, despite the fact of the electronic filing

19    my understanding, it isn't as simple as pressing a button, from

20    past appeals in this case as well as Delta Airlines and some

21    other cases I have had that have been subject to a lot of

22    appeals.  And then we have the briefing schedule, your Honor.

23         Your Honor may say, OK, if you look at that schedule,

24    we probably would be starting our briefs in September sometime

25    perhaps, if the bankruptcy court took a couple of weeks perhaps

78mncaln

1    to transfer the record, and then we would be finishing our

2    briefs and maybe we'd be in front of you sometime toward the

3    latter half of October, so why we are we up here complaining

4    about having to be in front of you in early October.  Those are

5    all very valid points.

6            THE COURT:  Thank you.

7            MS. BECKERMAN:  I think your Honor needs to understand

8    perhaps a little more what's going on in our case and what we

9    are trying to accomplish so you have a little context perhaps

10   as to why the debtors and ourselves and the official equity

11   committee, who are probably going to get up after me, have been

12   saying, no, we don't want this expedited appeal.

13           It is not that we don't think this appeal needs to be

14   to be heard on some kind of timely basis.  I am not suggesting

15   that.  What I am saying is exclusivity for plans just expired

16   two days ago.  Our judge in the bankruptcy court expects us to

17   be getting on with having plans filed by somebody, whether it's

18   debtors, my clients, other parties, and moving forward to have

19   ultimately some kind of process here, not necessarily so that

20   we are going to be out by January 31, although that's

21   everyone's aspiration because of our financing deadline, but so

22   that we can get the process started.

23           We're at a very critical phase in the case.  I think

24   that that's what Judge Lifland was sort of commenting on when

25   we were in front of him, and he was looking at the prejudice

78mncaln

1   point, because he understands that we're all trying to get to

2   the point of having plans and then start moving towards the

3   exit.

4          That's in part why I think the debtor's concerned

5   about having this on an expedited basis -- well, I'll speak for

6   myself.  We are, too.  I realize that the difference in the

7   month is not earth shattering.  I can't argue to you that it

8   is.

9          THE COURT:  You want it on an expedited basis?

10          MS. BECKERMAN:  No.  I am saying I think if this

11   weren't on an expedited basis we would be filing our briefs a

12   month later based on the time frame that we're on, and you

13   would be hearing us when you wished to hear from us subsequent

14   to that.

15          What I am saying to you is we are opposing the motion

16   for expedited relief, and I'm explaining to you that you may

17   ask me why, and it's because we have all these other things

18   going on in this case, in addition to the fact that we're at a

19   very critical juncture trying to move forward and we are

20   talking about the difference of a month if it wasn't expedited.

21   So that's in part why we are we are supporting the company's

22   request or objection.

23          THE COURT:  I am not quite sure I follow.  This appeal

24   will take too much of your time and effort while you are

25   working on other things?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

78mncaln

1          MS. BECKERMAN:  No, your Honor.  It's the whole fact

2     that we have a lot of other appeals, as Mr. Sassower said,

3     going on in this case.  We have a lot of other things going on.

4          The judge understands it is at a critical point, and

5     therefore I think that we feel that this would move along on a

6     timely enough basis that there wouldn't be a risk of mootness

7     for the other parties.

8          THE COURT:  Of course, the problem with that argument

9     is, it seems to me, there is a large issue in terms of dollars

10    which you and the debtor believe is not worth very much.  But

11    the timing of the appeal is sort of being used to take it off

12    the table by pushing it back in the process so long that it

13    won't be on the table while you negotiate other things.

14         MS. BECKERMAN:  I don't think that's correct, your

15    Honor, given the fact that they filed their designation of

16    record and our counterdesignation would be due August 30 and

17    you can bet we're not going to miss the deadline -- that's not

18    what we do in these cases -- and given how important issues

19    are.

20         THE COURT:  It happens sometimes.

21         MS. BECKERMAN:  Hopefully not too much.

22         But then there will be the bankruptcy court having to

23    put together the record in the best way that they can to get it

24    transferred over.

25         Mr. Sassower's comment is quite correct, that so far,

78mncaln

1    just based on the initial designation that there will be 200

2    items that will have to be transferred over here.

3         Let's just assume they could do it in a couple of

4    weeks, because I think that's reasonable that they could, based

5    on my experience with the bankruptcy court.

6         Then we're going to be on our briefing schedule of 15

7    days, 15 days, and the ten days.  Again, your Honor, I think

8    respectively that would still put us back in front of your

9    Honor about a month or so later than we are.

10        I don't think that that is putting this way back

11   towards the point where we're going to have an imminent harm or

12   we are going to have a confirmation process that's so far along

13   that it won't be meaningful to have this decided, and it still

14   gives your Honor sufficient time to decide it.

15        I think that's why I don't agree that we're trying to

16   put it to the back of the bus and have it decided in 2008 or

17   something, your Honor.  I don't think that's what the schedule

18   will do.

19        I just want to make one or two other points relating

20   to the merits of the appeal or the comments made about the

21   merits.

22        I just wanted to say that I echo Mr. Sassower's

23   comments that obviously we aren't aware of any case or any

24   situation where convertible noteholders have recovered for this

25   type of conversion right ever before.

78mncaln

1     I think that that's something that, the reason that

2 Judge Lifland I think was, in fact, perhaps reacting to the

3 claims in the way that he did, is because these are such novel

4 claims, and if someone was asserting them, these are claims

5 that were known at the time of the bankruptcy filing.  They

6 were certainly known by the time of the bar date.  The

7 indenture said whatever those parties are saying it said, and

8 in fact some of the outrage I think you kind of get in perhaps

9 a little bit in his decision is that you know, frankly, these

10 are things that should have been set forth clearly that in his

11 mind were not.  They were not extraordinary and were therefore

12 coming out of left field at the last minute when we're trying

13 to move along in this case.

14     I'll save the rest of my comments about the merits for

15 the time when we're up here on oral argument on the merits of

16 the appeal.

17     Thank you for hearing me, your Honor, today.

18     THE COURT:  My pleasure.

19     Mr. DeLeeuw.

20     MR. DeLEEUW:  Your Honor, Michael DeLeeuw for the

21 equity committee.  I don't think I can add anything to what the

22 debtor and creditors' committee have already stated.

23     THE COURT:  OK.

24     I appreciated the argument and the papers.  It seems

25 to me that as a matter of discretion and briefing and placing

78mncaln

1    the appeal in a state where it can be argued and decided a

2    reasonably expedited schedule is reasonable as a matter of

3    discretion without making any determinations with respect to

4    the ultimate merits of the appeal.

5         The amount of expedition that's being sought is

6    extraordinarily modest, so I don't want to do anything that's

7    unreasonable for the clerk of the bankruptcy court.

8         I generally agree with the proposal for expedition.

9    If there were specific problems with that, I would be happy to

10   adjust them.

11        For example, it is not reasonable for me to have all

12   of the briefs done by September 28 and to say, particularly

13   after all of the things that have been said about Judge

14   Lifland's hearing it so quickly, that I should then hear it on

15   October 2.  If realistically the bankruptcy court needed more

16   time, than I would extend the schedule to the bankruptcy court.

17        So I would set oral argument for October 12 at 2:30

18   p.m.

19        I have changed the order to say October 12, 2007 at

20   2:30 p.m.  If there is any reason to change any of the other

21   dates because of your conversations among yourselves, I would

22   be happy to change them now.

23        You can also provide me an order with respect to

24   consolidation.

25        If the parties have any other changes with respect to

78mncaln

1    the order that are reasonable you can discuss them among

2    yourselves and present an amendment to me.

3        MR. LEBLANC:  Your Honor, just one point:  We have

4    done this in another bankruptcy appeal.  To take the onus off

5    of the clerk of the bankruptcy court, we have in front of Judge

6    Berman deemed the record to be transmitted, because in reality

7    the transmitting the record is sort a ministerial task because

8    the Court will get an appendix.  The rules require an appendix

9    that includes all of the papers, including the docketed items

10    before the bankruptcy court, that are filed.

11        So we could simply deem the record to be transmitted

12    and then the bankruptcy court can take whatever amount of time

13    it might need to transmit from the counterdesignation point

14    forward.  That takes the onus of off them.

15        THE COURT:  I would only be reluctant to do that

16    because I am not sure that I can do that.  But if the parties

17    are all -- you can submit a supplement to me if you have an

18    easier way to do it.  I hope that the appendix that you submit

19    to me is not going to simply be the text of 220 items before

20    the bankruptcy court.

21        MR. LEBLANC:  No, your Honor.

22        The rules call for an appendix that includes only

23    those things that were cited.  The designation is obviously far

24    more voluminous, just so we have everything here if we want to

25    cite to it.  But the appendix, my understanding of the rule is

78mncaln

1   that it only includes those that are actually cited, the things

2   that you actually have to read.

3            THE COURT:  OK.  If the parties come to another

4   agreement with respect to designating the record and want to

5   give me a stipulation along with the stipulation with respect

6   to consolidation, that would be fine.  I would like to avoid

7   any burdens on the bankruptcy court.

8            Any other changes in this order right now based upon

9   all of your schedules now that you have had an opportunity to

10  look at it?

11           No.  OK.  It is not your last opportunity.

12           You are going to have to give me a proposed order with

13  respect to the consolidation and anything you want me to do

14  with respect to the record before the bankruptcy court.

15           Anything else?  OK.  Good to see you all.

16           (Adjourned)

17

18

19

20

21

22

23

24

25

# EXHIBIT B



INVESTOR RELATIONS

**Press Release**

**Calpine Files Amended Plan of Reorganization**

SAN JOSE, Calif. and HOUSTON, Aug 27, 2007 /PRNewswire-FirstCall via COMTEX News Network/ --
Calpine Corporation (OTC Pink Sheets: CPNLQ) today announced the Company and certain of its
subsidiaries have filed an Amended Plan of Reorganization (the "Amended Plan") and related Disclosure
Statement (the "Disclosure Statement") with the United States Bankruptcy Court for the Southern District
of New York. Through the Amended Plan, Calpine seeks to provide an equitable return to all stakeholders
while providing for the long-term viability of the Company. With this filing, Calpine remains on track to have
the Amended Plan confirmed during the 4th Quarter 2007.

"We believe Calpine's Amended Plan further underscores the progress we are making for Calpine to
emerge as a financially stable, stand-alone Company with an improved competitive position in the energy
industry," said Robert P. May, Calpine's Chief Executive Officer. "Since filing our Original Plan we have
been in discussions with our stakeholders and believe that our Amended Plan provides greater value to
Calpine's estate with less execution risk to our stakeholders than other alternatives presented. We
appreciate the ongoing support of our employees whose dedication and hard work are key to Calpine's
current and future success."

The Amended Plan maintains the key terms provided under the Original Plan of Reorganization (the
"Original Plan") filed by the company in June 2007, but projects greater recoveries for stakeholders in the
most likely claims scenario.

The Amended Plan remains a "waterfall" plan that allocates value to the Company's creditors and
shareholders in accordance with the priorities of the Bankruptcy Code.

Consistent with the Original Plan, assuming Calpine's Amended Plan is confirmed by December 31, 2007
and subject to the assumptions set forth in the Disclosure Statement, Calpine estimates that the
reorganized Calpine will have a midpoint reorganization value of $21.7 billion (reorganization value is
equal to total enterprise value plus estimated available cash). At emergence, Calpine estimates that its
total enterprise value will be between $19.2 billion to $21.3 billion, with a midpoint of $20.3 billion, and
estimates that distributable cash will be approximately $1.4 billion.

Under the Amended Plan, allowed claims are now anticipated to range from $20.1 billion to $22.0 billion
after completion of Calpine's claims objection, reconciliation, and resolution process. Under this range of
potential allowed claims, general unsecured creditors will receive from 95% to 100% of their allowed
claims. As a result of the continued refinement of the Company's outstanding claims, it has increased the
amount holders of existing equity are projected to receive under our updated "most likely" claims
resolution scenario. Calpine currently estimates that their return would be approximately $2.05 per existing
share of Calpine common stock (calculated assuming the midpoint of the reorganization value) -- up from
$1.80 per existing share of Calpine common stock originally projected under the Company's Original Plan.
Because disputed claims and the total enterprise value of Calpine upon its emergence have not yet been
finally adjudicated, no assurances can be given that actual recoveries to creditors and interest holders will
not be materially higher or lower.

Calpine received a commitment for an amended and upsized exit facility from Goldman Sachs, Credit
Suisse, Deutsche Bank, and Morgan Stanley. Simultaneously with the filing of its Original Plan, Calpine
filed a motion to enter into a commitment letter, pay associated commitment and other fees, and to amend
and upsize the existing debtor in possession financing facility. On July 11, 2007, the Court approved the
upsized exit facility that will provide for up to $8 billion in secured financing, some $3 billion more than the
current exit facility, on terms that Calpine views as favorable. The commitment to fund the exit facility
expires on January 31, 2008.

A hearing to consider the adequacy of the Disclosure Statement is currently scheduled for September 11,

2007. Once the Bankruptcy Court approves of the Disclosure Statement, the Company can begin the process of soliciting votes for approval of the Amended Plan. Following the voting process, Calpine will ask the Bankruptcy Court to hold a hearing to consider approval or "confirmation" of the Amended Plan. If the Court confirms the Amended Plan, Calpine would emerge from Chapter 11 shortly thereafter.

Calpine's Amended Plan and Disclosure Statement are available at http://www.kccllc.net/calpine.

This release is not intended as a solicitation for a vote on the Amended Plan.

Conference Call and Web Cast Scheduled for Today

Calpine will hold a conference call today to brief media at 6:00 p.m. Eastern Daylight Time to discuss the filing of Calpine's Amended Plan and Disclosure Statement with the United States Bankruptcy Court in the Southern District of New York. Calpine's Chief Executive Officer, Robert P. May, and Executive Vice President, General Counsel and Secretary, Gregory L. Doody, will host the call. Members of the media will have an opportunity to ask questions following the briefing.

WHEN: 6:00 p.m. EDT
Monday, Aug. 27, 2007

DIAL-IN: 877-502-9272 United States
913-981-5581 Outside the United States

WEB CAST: An audio web cast of the call can be accessed at www.calpine.com.

A telephonic replay of the conference call will be available on Tuesday, August 28, 2007, and can be accessed through August 31, 2007. The replay access number is 888-203-1112 (United States) and 719-457-0820 (outside the United States), passcode 1206543. The web cast will be archived until August 31, 2007 at www.calpine.com.

About Calpine

Calpine Corporation is helping meet the needs of an economy that demands more and cleaner sources of electricity. Founded in 1984, Calpine is a major U.S. power company, currently capable of delivering more than 24,500 megawatts of clean, cost-effective, reliable, and fuel-efficient electricity to customers and communities in 18 states in the U.S. The company owns, leases, and operates low-carbon, natural gas-fired, and renewable geothermal power plants. Using advanced technologies, Calpine generates electricity in a reliable and environmentally responsible manner for the customers and communities it serves. Please visit http://www.calpine.com for more information.

Forward Looking Statement

This news release discusses certain matters that may be considered "forward-looking" statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements regarding the intent, belief or current expectations of Calpine Corporation and its subsidiaries ("the Company") and its management and uses words such as "believe," "intend," "expect," "anticipate," "plan," "may," "will" and similar expressions to identify forward-looking statements. Such statements include, among others, those concerning the Company's expected financial performance and strategic and operational plans, as well as all assumptions, expectations, predictions, intentions or beliefs about future events. Readers are cautioned that any such forward-looking statements are not guarantees of future performance and that a number of risks and uncertainties could cause actual results to differ materially from those anticipated in the forward-looking statements. Such risks and uncertainties include, but are not limited to: (i) the risks and uncertainties associated with the Company's Chapter 11 cases and Companies' Creditors Arrangement Act proceedings, including impact on operations; (ii) the Company's ability to attract, retain and motivate key employees and successfully implement new strategies; (iii) the Company's ability to successfully reorganize and emerge from Chapter 11; (iv) the Company's ability to attract and retain customers and counterparties; (v) the Company's ability to implement its business plan; (vi) financial results that may be

volatile and may not reflect historical trends; (vii) the Company's ability to manage liquidity needs and comply with financing obligations; (viii) the direct or indirect effects on the Company's business of its impaired credit including increased cash collateral requirements; (ix) the expiration or termination of the Company's power purchase agreements and the related results on revenues; (x) potential volatility in earnings and requirements for cash collateral associated with the use of commodity contracts; (xi) price and supply of natural gas; (xii) risks associated with power project development, acquisition and construction activities; (xiii) risks associated with the operation of power plants, including unscheduled outages of operating plants; (xiv) factors that impact the output of the Company's geothermal resources and generation facilities, including unusual or unexpected steam field well and pipeline maintenance and variables associated with the waste water injection projects that supply added water to the steam reservoir; (xv) quarterly and seasonal fluctuations of the Company's results; (xvi) competition; (xvii) risks associated with marketing and selling power from plants in the evolving energy markets; (xviii) present and possible future claims, litigation and enforcement actions; (xix) effects of the application of laws or regulations, including changes in laws or regulations or the interpretation thereof; and (xx) other risks identified the risk factors identified in its Annual Report on Form 10-K for the year ended December 31, 2006, and its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007, which can also be found on the Company's website at http://www.calpine.com. All information set forth in this news release is as of today's date, and the Company undertakes no duty to update this information.

CONTACTS:
Media Relations:
Mel Scott
713-570-4553
scottm@calpine.com

Investor Relations:
Karen Bunton
408-792-1121
karenb@calpine.com

SOURCE Calpine Corporation

http://www.calpine.com

# EXHIBIT C

Calpine - Transcript of September 25 2007 Hearing.TXT

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------x

4       In the Matter of:

5                                   Case No.
                                    05-60200
6       CALPINE CORPORATION, et al.,

7                           Debtors.

8   -------------------------------x

9                       September 25, 2007
                        United States Custom House
10                      One Bowling Green
                        New York, New York 10004
11

12

13
                Hearing Pursuant to Kirkland and Ellis LLP
14
    Notice of Amended Agenda of Matters Scheduled for Hearing.
15

16

17

18
    B E F O R E:
19

20              HON. BURTON R. LIFLAND,

21                      U.S. Bankruptcy Judge

22

23

24

25

2

1   A P P E A R A N C E S:

Calpine - Transcript of September 25 2007 Hearing.TXT

2

3
                 KIRKLAND & ELLIS LLP
4
          Attorneys for the Debtors,
5                   Calpine Corporation, et al.
                    655 Fifteenth Street N.W.
6                   Washington, D.C. 20005

7         BY:    MARC KIESELSTEIN, ESQ.,
                 JEFFREY S. POWELL, ESQ.,
8
                 DAVID R. SELIGMAN, ESQ.,
9                   200 East Randolph Drive
                    Chicago, Illinois 60601
10
                 RICHARD M. CIERI, ESQ., ESQ.,
11                  153 East 53rd Street
                    New York, New York 10022
12

13

14          CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

15               Conflicts Counsel for the Debtors
                 101 Park Avenue
16               New York, New York 10178

17        BY:    STEVEN J. REISMAN, ESQ.

18

19          AKIN GUMP STRAUSS HAUER & FELD LLP
20               Attorneys for the Official Committee
21               of Unsecured Creditors
                 590 Madison Avenue
22               New York, New York 10022

23        BY:    MICHAEL S. STAMER, ESQ.,
                 PHILIP DUBLIN, ESQ.,
24               ABID QURESHI, ESQ.

25


                                                          3


1   A P P E A R A N C E S (Continued):

2

3
                 MORGENSTERN JACOB & BLUE LLC
4                     Special Conflicts Counsel for the
                                Page 2

```
         Calpine - Transcript of September 25 2007 Hearing.TXT
 5                      Creditors' Committee
                        885 Third Avenue
 6                      New York, New York 10022

 7            BY:    GREGORY A. BLUE, ESQ.

 8


 9
               PAUL WEISS RIFKIND WHARTON & GARRISON LLP
10
         Attorneys for the Unofficial Committee
11                      of Second Lien Debt Holders
                        1285 Avenue of the Americas
12                      New York, New York 10019

13            BY:    ANDREW ROSENBERG, ESQ.,
                     ELIZABETH R. McCOLM, ESQ.
14

15

16            FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

17         Attorneys for the Equity Committee
                        One New York Plaza
18                      New York, New York 10004

19            BY:    GARY L. KAPLAN, ESQ.,
                     MICHAEL DE LEEUW, ESQ.,
20                   JORDONNA NADRITCH, ESQ.

21

22

23

24

25
```

                                                                    4

```
 1   A P P E A R A N C E S (Continued):

 2

 3
               WEIL GOTSHAL & MANGES LLP
 4
                   Attorneys for M&T Bank, as Indentured
 5                      Trustee
                        767 Fifth Avenue
 6                      New York, New York 10153

 7            BY:    MARTIN J. BIENENSTOCK, ESQ.,
                     JUDY G.Z. LIU, ESQ.
```
                            Page 3

Calpine - Transcript of September 25 2007 Hearing.TXT

```
 8

 9

10        NIXON PEABODY LLP

11    Attorneys for Wilmington Trust Co. as
                 Indentured Trustee and as Collateral Agent
12               at the CalGen Level
                 100 Summer Street
13          Boston, Massachusetts 02110

14        BY:   RICHARD C. PEDONE, ESQ.,
                VICTOR G. MILIONE, ESQ.
15

16

17        YOUNG CONAWAY STARGATT & TAYLOR, LLP

18            Attorneys for Manufacturers and Traders
              Company as Indentured Trustee to the 7.75
19            and ULC II Bonds
              1000 West Street
20            Wilmington, Delaware 19801

21        BY:   IAN S. FREDERICKS, ESQ.

22

23

24

25
```

5

```
 1   A P P E A R A N C E S (Continued):

 2

 3
           WILLKIE FARR & GALLAGHER LLP
 4
       Attorneys for Quadrangle Master Funding
 5               787 Seventh Avenue
                 New York, New York 10019
 6
           BY:   MICHAEL J. KELLEY, ESQ.,
 7                THERESA A. DRISCOLL, ESQ.

 8

 9
           CADWALADER, WICKERSHAM & TAFT LLP
10
       Attorneys for Rosetta Resources
```

Page 4

Calpine - Transcript of September 25 2007 Hearing.TXT
```
11                    One World Financial Center
            New York, New York 10281
12
                 BY:    JOHN H. BAE, ESQ.
13

14

15            KELLEY DRYE & WARREN LLP

16       Attorneys for HSBC Bank, U.S.A., N.A., as
                     Successor Indentured Trustee of the ULC I
17                   Notes
                     101 Park Avenue
18          New York, New York 10178

19               BY:    JENNIFER A. CHRISTIAN, ESQ.

20

21
              BROWN RUDNICK BERLACK ISRAELS, LLP
22
                     Attorneys for Law Debenture First Lien
23                   Trustee
                  One Financial Center
24                   Boston, Massachusetts 02111

25               BY:   STEVEN B. LEVINE, ESQ.
```

6

```
1    A P P E A R A N C E S (Continued):

2

3
              ROPES & GRAY LLP
4
                     Attorneys for HSBC BANK U.S.A., as
5                    Indentured Trustee, and BANK OF NEW YORK,
                     as Administrative Agent
6                    1121 Avenue of the Americas
                     New York, New York 10036
7
                 BY:   DAVID ELKIND, ESQ.,
8                      MARK R. SOMERSTEIN, ESQ.,
                       AMY VANDERWAL, ESQ.
9

10

11            SHIPMAN & GOODWIN LLP

12                   Attorneys for U.S. Bank National
                     Association, as Trustee
13                   One Constitution Plaza
                     Hartford, Connecticut 06103
```
                     Page 5

Calpine - Transcript of September 25 2007 Hearing.TXT

```
14                    BY:   MARIE C. POLLIO, ESQ.
15

16

17            LOWENSTEIN SANDLER PC

18                Attorneys for Hawaii Structural
                  Ironworkers Pension Trust Fund
19                65 Livingston Avenue
                  Roseland, New Jersey 07068
20
                  BY:   IRA M. LEVEE, ESQ.
21

22

23

24

25
```

7

```
1    A P P E A R A N C E S (Continued):

2

3
                COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
4
            Attorneys for James Phelps / ERISA
5                     Litigation Plaintiff
                      900 Third Avenue
6           New York, New York 10022

7                BY:   JOHN H. DRUCKER, ESQ.

8

9
                JACOBS PARTNERS LLC
10
                      Attorneys for Rain Mac Fund Ltd., and
11                    Arrowhead Capital Management LLC
                      383 Main Avenue
12                    Norwalk, Connecticut 06851

13               BY:   ROBERT M. FLEISCHER, ESQ.

14

15
                STROOCK & STROOCK & LAVAN LLP
16
                      Attorneys for Ad Hoc 7.75 Convertible
                              Page 6
```

Calpine - Transcript of September 25 2007 Hearing.TXT
```
17                      Notes Committee
                        180 Maiden Lane
18                      New York, New York 10038

19           BY:    EREZ GILAD, ESQ.,
                    KRISTOPHER M. HANSEN, ESQ.
20                  HARRIS GILL, ESQ.

21

22

23

24

25
```

8

```
 1    A P P E A R A N C E S (Continued):

 2

 3
                MILBANK, TWEED, HADLEY & MCCLOY LLP.
 4
                        Attorneys for the 6 percent note holders
 5                      1 Chase Manhattan Plaza
                        New York, New York 10005
 6
                BY:    DENNIS DUNN, ESQ.
 7

 8
                SONNENSCHEIN NASH AND ROSENTHAL, LLP
 9
                        Attorneys for Fireman's Fund Insurance
10                      Company
                        1221 Avenue of the Americas
11                      New York, NY 10020

12              BY:    MICHAEL KEARNEY, ESQ.

13

14
                WARNER STEVENS, L.L.P.
15
                        Attorneys for ASM Capital, ING Capital.
16                      and Sierra Liquidity Fund
                        301 Commerce Street
17                      Fort Worth, Texas 76102

18              BY:    DAVID T. COHEN, ESQ.

19
```

Page 7

Calpine - Transcript of September 25 2007 Hearing.TXT

20
            KASOWITZ BENSON TORRES FRIEDMAN LLP
21
                    Attorneys for the ULC I Note Holders
22                  1633 Broadway
                    New York, New York 10019
23
            BY:    RICHARD KASHER, ESQ.
24

25

                                                        9

1    A P P E A R A N C E S (Continued):

2

3
            WHITE AND WILLIAMS LLP
4
                    Attorneys for The Ace Insurance Companies
5                   One Penn Plaza
                    New York, New York 10119
6
            BY:    KAREL KARPE, ESQ.
7

8

9           DIANA G. ADAMS Acting United States Trustee
            Region 2
10
            UNITED STATES DEPARTMENT OFJUSTICE
11          OFFICE OF THE UNITED STATES TRUSTEE
                    33 Whitehall Street
12                  New York, New York 10004

13          BY:    TRACY HOPE DAVIS, ESQ.,
                   PAUL SCHWARTZBERG, ESQ.,
14                                          of Counsel

15

16

17

18

19

20

21

22

                        Page 8

Calpine - Transcript of September 25 2007 Hearing.TXT
23
24
25

10

1  P R O C E E D I N G S:
2              MR. KIESELSTEIN:  Good morning, your Honor.
3              THE COURT:  Good morning.
4              I this assembly comes close to the number
5  of the U.N. general assembly this morning, which also is an
6  indication to the court that most of you have taken public
7  transportation to get here.  I took a bus on the east side
8  and almost never made it, but good for you.
9              MR. KIESELSTEIN:  Good morning, your Honor.
10             THE COURT:  Good morning.
11             MR. KIESELSTEIN:  Marc Kieselstein and
12 David Seligman on behalf Calpine Corporation and its
13 affiliated debtors.  Your Honor, we have a crowded agenda
14 and obviously a very crowded courtroom.
15             THE COURT:  There are no lights in the back
16 but if put them on it will make it even warmer.  What do
17 you folks want?  Leave it the way it is?  Okay.
18             MR. KIESELSTEIN:  You Honor, we have, as I
19 said a very crowded agenda and a very crowded courtroom,
20 and I just wanted to make one or two brief remarks before
21 we get started.
22             Your Honor, with regard to the status of
23 the restructuring generally your Honor is well aware over
24 the last 18 months the debtors have stabilized their
25 operations, engaged in multiple restructuring initiatives,

Page 9

Calpine - Transcript of September 25 2007 Hearing.TXT

11

1     formulated a comprehensive business plan, and crafted a
2     plan of reorganization which we believe is confirmable.
3                    Your Honor, the third amended plan and
4     disclosure statement that was filed in the early hours of
5     Monday September 24th are the product of extensive
6     negotiations between the debtors and its stake holders, and
7     in our view is a testament to the integrity and success of
8     the restructuring to date.  Your Honor, with that strong
9     foundation in place, we are prepared to present our
10    disclosure statement and solicit votes on the plan and take
11    the next step in our exit from Chapter 11.
12                    Your Honor, we received approximately 43
13    objections to the disclosure statement, including a number
14    of joinders, supplemental objections and the like.  Your
15    Honor, we're pleased to report that we've resolved a
16    majority of those objections, as you'll hear from Mr.
17    Seligman a little later on in the agenda.  We're also very
18    pleased, your Honor, that the creditors' committee has
19    filed a statement in which it has indicated its support for
20    approval of the disclosure statement.
21                    Your Honor, suffice to say, the debtors
22    believe that its disclosure statement is comprehensive and
23    more than adequate to satisfy the Section 1125 standards,
24    again Mr. Seligman will address that, your Honor.
25                    We have a couple of other matters up, your

12

Calpine - Transcript of September 25 2007 Hearing.TXT

1    Honor, and with that we would like to launch right into the

2    agenda if that's all right.

3                    THE COURT:  Sure.

4                    MR. SELIGMAN:  Good morning, your Honor.

5    David Seligman on behalf of the debtors.

6                    Very briefly, we have two uncontested

7    matters on this morning's agenda.  The first one is the

8    debtors' motion for authority authorizing the Santa Rosa

9    Energy Center to obtain postpetition secured financing and

10   grant adequate protection with respect thereto.

11                   Your Honor, as background, essentially this

12   relates to the Santa Rosa facility, which is a plant owned

13   by Calpine.  In order to enter into a new long term

14   agreement with the Santa Rosa Energy facility it needs to

15   be dropped no a new subsidiary that has FERC authority.  In

16   order to do that with another non debtor entity, it's now a

17   non debtor entity, we are going to put it into bankruptcy,

18   have it be a subsidiary of Calpine Corporation, a wholly

19   owned facility, and that new corporation will then own the

20   Santa Rosa Energy Center.  This non debtor entity has been

21   a shell corporation, no assets or any liabilities.

22                   We filed the other day a petition for

23   Chapter 11.  Under the DIP is a requirement that within

24   five days we have this debtor become part of the DIP

25   facility, and that's the motion that we have before you

13

1    this morning.

2                    In addition, we have filed a motion that's

3    not set forth this morning authorizing the actual

Page 11

Calpine - Transcript of September 25 2007 Hearing.TXT

4    contribution of the facility down to this new Santa Rosa

5    entity and is consummating all the transaction in

6    connection with that motion, but that's not up before your

7    Honor this morning.  So simply, this is a motion to become

8    part of the DIP on an interim basis.  And for all the

9    reasons set forth in the motion we request that your Honor

10   approve there motion.  There's been no objections to the

11   relief sought.

12                THE COURT:  This facility on not on line at

13   this time.

14                MR. SELIGMAN:  It's not on line.  It's

15   currently moth balled.  I believe it has to come on line by

16   November 1.

17                THE COURT:  Does anyone want to be heard.

18                There is no response.  Your application is

19   granted.

20                MR. SELIGMAN:  Thank you, your Honor.

21                May I approach?

22                THE COURT:  Yes.

23                I've approved the order.

24                MR. SELIGMAN:  Thank you, your Honor.

25                The next matter on the agenda is being

14

1    handled by Steven Riesman, conflicts counsel for the

2    debtors.

3                MR. REISMAN:  Good morning, your Honor.

4    Steven Riesman, on behalf of Curtis Mallet-Prevost, Colt

5    and Mosley, conflicts counsel for Calpine.

6                Before your Honor today is a motion of

Calpine - Transcript of September 25 2007 Hearing.TXT

7   Calpine Central and Decatur Energy Center to approve an

8   settlement agreement with Solutia with respect to the

9   rejection by Solutia of certain contracts with Calpine

10  Central and Decatur Energy and Solutia's bankruptcy case.

11  As your Honor is aware, Solutia is also a debtor in Chapter

12  11 in this court before Judge Beatty.

13              In May of 2004 Solutia rejected various

14  agreements with Calpine.  Back in November of 2006

15  arbitration of those substantial claims began.  The claims

16  were asserted by Calpine Central and Decatur Energy in the

17  amount of 380, 400 million dollars estimated claim as a

18  result of rejection damages.  There was extensive discovery

19  that went on in that arbitration proceeding, almost a

20  million pages of documents were produced, various expert

21  reports were presented by the parties, and the arbitration

22  was prepared to go forward in August of this year.

23              At the beginning of August, your Honor, the

24  parties -- throughout the process the parties were engaged

25  in settlement discussions.  In the beginning of August the


15


1   parties reached a settlement whereby Calpine Central and

2   Decatur Energy would have an allowed unsecured claim not

3   subject to any objection in the Solutia bankruptcy case in

4   the amount of 140 million dollars.  And there are various

5   other terms and conditions of that settlement that are set

6   forth in the settlement agreement, one of which is that

7   Calpine, subject to its fiduciary duty and in the exercise

8   of its business judgment will support Solutia's efforts to

9   reorganize before this court.
                    Page 13

Calpine - Transcript of September 25 2007 Hearing.TXT

10              Your Honor, the motion has been served in

11    accordance with your Honor's orders and of the rules of

12    this court.  There have been no objections that have been

13    received.  The settlement is the product of arms-length

14    negotiations between the parties, it is the best business

15    judgment of the debtor to enter into this settlement.

16              With me, your Honor, in courtroom today is

17    Mr. Ralph, who is senior vice president of finance employed

18    by Calpine Corporation.  Mr. Ralph was extensively involved

19    in the settlement discussions and negotiations.  He has

20    submitted an affidavit in support of this settlement and

21    why it's in the best interest of the debtor.

22              Your Honor, with that we rest on the motion

23    and the record before the court and the affidavit of Mr.

24    Ralph.

25              THE COURT:  I take it this is also subject


                                                           16


1     to the approval on the 7th floor.

2               MR. REISMAN:  It is, your Honor, and that

3     is going to take place this afternoon.

4               THE COURT:  I see.  Is there a distribution

5     scheme in place on the 7th floor.

6               MR. REISMAN:  Your Honor, there is a plan

7     and disclosure statement that's on file with the court.  We

8     do not believe that that is the plan and disclosure

9     statement that the debtor is going forward with.  The

10    disclosure statement has not yet been approved by Judge

11    Beatty.  The hearing is on for October 10th to approved the

12    disclosure statement.

                        Page 14

Calpine - Transcript of September 25 2007 Hearing.TXT

13            THE COURT:  Very well.  Does anyone want to
14  be heard?
15            There's no response.  The application is
16  granted.
17            MR. REISMAN:  Thank you, your Honor.  If I
18  may approach with the order.
19            THE COURT:  Yes, and then you can go
20  upstairs.
21            I've approved the order.
22            MR. REISMAN:  Thank you, your Honor.
23            MR. KIESELSTEIN:  Your Honor, the next
24  items on the agenda are the two trustee motions for certain
25  CalGen entities.  I believe Mr. Elkind is going to lead

17

1  that discussion, your Honor.
2            MR. ELKIND:  Thank you, your Honor.  Your
3  Honor I'm going to refer to one document that was included
4  in the two that we submitted to the court with our motion
5  but that includes a couple of additional pages,
6  specifically the February 7 10-Q filed by the debtor CalGen
7  with the certification of the debtors' management.
8            May I hand that up to your Honor?
9            THE COURT:  Sure.
10            MR. ELKIND:  Thank you very much.
11            THE COURT:  Do you want me to take time and
12  read it right now.
13            MR. ELKIND:  No, absolutely not, your
14  Honor.  I will refer to the specific pages and there are a
15  couple of sections that I will refer you to, your Honor.

Calpine - Transcript of September 25 2007 Hearing.TXT

16                    (Discussion off the record.)

17                    MR. ELKIND:   Your Honor, David Elkind,

18    partner of Ropes and Gray.  We are counsel for HSBC as

19    indentured trustee for the CalGen 640 million of CalGen

20    second lien notes and Bank of New York as administrative

21    agent for the one hundred million of CalGen second lien

22    term loans.

23                    This is a motion for the appointment of a

24    Chapter 11 trustee for Calpine Generating Company LLC and

25    Calpine Finance which I will refer to -- CalGen Finance


18


1    which I will refer to collectively as CalGen.

2                    By way of background, your Honor, CalGen

3    owns 14 plants which comprise approximately 37 percent of

4    the megawatt capacity of all of the debtors combined, it is

5    a very significant part of these debtors estates.  CalGen

6    is an indisputably highly solvent entity.  It is a

7    separately reporting agency which has filed its own reports

8    with the SEC.

9                    In March of 2004, not long ago, CalGen sold

10   more than 2.6 billion dollars of debt to the public, and it

11   sold that debt on the expectation of the public investors

12   who bought that debt that they would have the right to look

13   first to the assets of CalGen for the payment of their

14   claims before those assets were used for the benefit of the

15   other creditors.

16                    On February 7th during the course of this

17   Chapter 11 proceeding and only months ago, these debtors

18   filed a 10-Q for CalGen showing independent financial

Calpine - Transcript of September 25 2007 Hearing.TXT

19  statements for CalGen, attesting under only to the veracity

20  and reliability of those financial statements, and showing

21  that CalGen had approximately 2.6 billion dollars of

22  members or shareholder equity, which is clearly far more

23  than sufficient to pay all of the CalGen creditors in full

24  and to leave a sizable benefit to the creditors and parent

25  companies of the other estates.


19


1                   This motion for the trustee is made on

2   three separate grounds, your Honor.  As I will describe it

3   is very clear here --

4                   THE COURT:   One moment.

5                   Okay.

6                   MR. ELKIND:   Your Honor, there are three

7   principal bases for this motion, and it's been joined in by

8   other creditors of CalGen.   First, it is abundantly clear

9   that the debtors, the committee's here and its

10  professionals are all representing the interests of Calpine

11  and there is no one representing the interests of CalGen.

12  There is no independent fiduciary for CalGen in these

13  cases.   There is no one for CalGen at the negotiating table

14  negotiating the plan.   There is no one representing CalGen

15  when statements are made on CalGen's behalf to this court.

16  There is simply no one minding the store for CalGen.

17                  Secondly, in supporter of its efforts --

18                  THE COURT:   You look like a good store

19  minder.

20                  MR. ELKIND:   Your Honor, there is a

21  complete difference between having a bunch of litigants

Page 17

Calpine - Transcript of September 25 2007 Hearing.TXT

22    fighting with the debtors for access to books and records

23    and documents in order to test the veracity of what the

24    debtor says, there's a complete different in that and

25    having a fiduciary, as there is for every other

20

1    constituency in this case, who has as access to officers,

2    who has access to documents, who has the ear of the court,

3    who is participating in the formulation of a plan before

4    the end of the year when the debtor is on the eve of

5    defaults under its exit financing arrangements.  There is

6    no substitute for an independent fiduciary and CalGen

7    should have one.  Every other constituency has one.

8                  There are other grounds for appointment of

9    a trustee, your Honor.  The debtors here have repeatedly

10   made statements which are completely at odds and in

11   conflict with their sworn SEC filings, and I will be very

12   specific on this as I shall describe in a moment.  Put

13   simply, if what the debtors -- the debtors say one thing to

14   this court.

15                  THE COURT:  Do you want to take a five

16   minute recess while we set this up.

17                  MR. ELKIND:  That would be fine, your

18   Honor.  Thank you.

19                  (Brief recess taken.)

20                  THE COURT:  I'm happy to go on.

21                  MR. ELKIND:  That's fine with me.

22                  THE COURT:  Go ahead.

23                  MR. ELKIND:  First of all, there was no one

24   minding the store with respect to CalGen, and there should

Page 18

Calpine - Transcript of September 25 2007 Hearing.TXT
25    be as there is in other cases.


21


1              Secondly, in support of their efforts, the

2     debtors make repeated systematic assertions of statements

3     that are completely contradictory to their sworn SEC

4     filings.

5              THE COURT:   Go ahead, Mr. Elkind.

6              MR. ELKIND:   Thank you, your Honor.

7              Your Honor, the debtor says one thing to

8     this court and they say something completely at odds in

9     their SEC filings, and this has been a consistent pattern

10    and it applies to current management.   Simply put, if half

11    of what they say in their disclosure statement is true and

12    it's applicable to CalGen, then their SEC filing, including

13    their 10-Q filed in February of '07 is untruthful.   If half

14    of what they say in their disclosure statement is true the

15    offering prospectus upon which they sold their 2.6 billion

16    dollars of debt is simply fraudulent, and there is no

17    question about it and I will discuss the documents briefly.

18              THE COURT:   Most of the debt has been

19    repaid; is that right.

20              MR. ELKIND:   Your Honor, the principal, as

21    you know your Honor authorized the debtors to repay the

22    principal--

23              THE COURT:   It's a simple yes or no

24    question, it's not a complicated answer.

25              MR. ELKIND:   The answer is yes, the


Page 19

Calpine - Transcript of September 25 2007 Hearing.TXT

22

1   principal.

2              THE COURT:  So you are not standing here

3   protecting 2.6 billion dollars.

4              MR. ELKIND:  No.

5              THE COURT:  Go ahead.

6              MR. ELKIND:  I'm standing go here

7   protecting the unsecured claim that your Honor granted.

8              THE COURT:  This is a reality check, Mr.

9   Elkind.  Motions for trustees are very serious, they are

10  very disruptive.  They are not taken lightly, and frankly

11  I'm not sure that this motion has got all the

12  appearances -- it does not have all the appearances of a

13  wasteful diverting motion.

14              Now, with respect to your presentation this

15  morning, I assure you that I spent a good part of this

16  weekend going over all of your papers, so I'm fully

17  familiar with all of your arguments, which so far are a

18  complete repeat of all of your position.  I don't mind you

19  going through them again, but you are not giving me

20  anything new at this point.

21              MR. ELKIND:  Well, I will try to give your

22  Honor new information.

23              THE COURT:  Please.

24              MR. ELKIND:  Your Honor, when the debtors

25  filed their for their Chapter 11 petitions they did so

23

1   after having taken 308 million dollars that was pledged to

Page 20

Calpine - Transcript of September 25 2007 Hearing.TXT

2    secured creditors and being ordered by the court to return

3    the money.  That was the genesis of this case.

4                    On March 3, 2004 the debtors sold 2.6

5    billion dollars of debt to the public.  When they did that

6    they made extensive representations about the integrity of

7    their intercompany accounting, their intercompany accounts

8    receivable, and their intercompany accounts payable.  And

9    the CFO of the CalGen at that time was Charles Clark.

10   Charles Clark is still the CFO of CalGen.  He is also the

11   chief accounting officer of Calpine.

12                   Who is minding the store here for CalGen?

13   If half of what they say is true about the intercompany

14   accounts having been misstated or falsified or erroneously

15   reported for years, there is no question but that the

16   offering prospectus upon which they sold their debt was

17   fraudulent, and at the time that they did that, Charles

18   Clark, the current CFO of CalGen, was the CFO of CalGen.

19                   And we've quoted for your Honor lest there

20   be any dispute about what was represented at the time the

21   offering was done 2004, we've quoted at considerable length

22   the representations that were made at that time.  And they

23   were made for the very purpose of inducing purchasers of

24   that debt to understand and believe that they were getting

25   debt and obligations of CalGen, and that CalGen's financial


                                                        24


1    statements were maintained with integrity, and that its

2    intercompany accounting was maintained with integrity,

3    which was they at the very heart of the representations

4    that the debtors made at the time they sold their debt in

                        Page 21

Calpine - Transcript of September 25 2007 Hearing.TXT

5    2004.  And again I represent that the CFO then is the CFO

6    now.

7                Your Honor, in their disclosure statement

8    they make some breathtaking claims; we've outlined them in

9    our papers.  Included among them are claims that they can't

10   produce financial statements because the intercompany

11   accounting what is hopelessly entangled, claims that the

12   intercompany accounting has been erroneously recorded and

13   reported for years.  Claims that they reviewed tens of

14   thousands of transactions, claims that this so-called

15   hopeless entanglement involves billions and billions of

16   dollars.

17               If what they tell the court is true, the

18   representations that the current management, the current

19   management of this company has made are false.  When they

20   filed their 10-Q in February 2007, they had alternatives,

21   they could have said we are unable to sort out the finances

22   we can't file with the SEC, they could have said we are

23   unable to attest to the reliability of our financial

24   statements for reasons A, B, C and D.  They could have is

25   he said many things.  They said just the opposite, and they

                                                            25

1    said it under only under the rules applicable under 34 F

2    and under Sarbanes-Oxley.

3                What they said was that here are our

4    financial statements.  They affirmatively represented that

5    their intercompany accounting was accurate and could be

6    relied upon, and we quoted the specific provision.  They

7    made a single restatement of an intercompany account, an 18

                             Page 22

Calpine - Transcript of September 25 2007 Hearing.TXT

8    million dollar intercompany account.  This is the so-called

9    hopeless entanglement which in fact had the effect, the

10   restatement that that did had the effect of increasing the

11   assets of CalGen not decreasing the assets for the benefit

12   of Calpine.

13                  And as set forth in Exhibit 34.1, which I

14   provided to your Honor which is the certifications of

15   management.  There are certifications of Scott Davido, who

16   is the current president and corporate secretary of CalGen,

17   and the certification of Mr. Charles Clark again, the CFO

18   of CalGen and treasurer.  And in there they represent, they

19   specifically state under only that the financial statements

20   fairly present in all material respects the financial

21   condition of the CalGen entities, and that there are no

22   inaccurate facts and there are no omissions to state any

23   material facts that are necessary to make these statements

24   not misleading.

25                  Now despite all of the hyperbole to the


26


1    creditors' committee's responses to our motions, and in the

2    debtors' papers; despite all of the breathtaking talk

3    financial entanglement, about hopeless entanglement, it

4    goes on and on in the disclosure statement.

5                  When all is said and done if your Honor

6    parses through their papers, the sum total of this whole

7    entanglement are two restatements, a restatement in 2004 by

8    which they indicated that they overstated the revenues to

9    CalGen, 16 million dollars, not 16 billion, 16 million

10   dollars, and a second restatement in 2005 for the nine

Page 23

Calpine - Transcript of September 25 2007 Hearing.TXT

11  month period by which they indicate that they overcharged

12  CalGen by approximately 8.9 million.   Sum total is CalGen

13  is entitled to 2.2 million dollars more on its balance

14  sheet.

15          They were able to sort this out, they were

16  able to provide financial statements.  They testify in

17  their SEC filings to the SEC and to the public that they

18  can produce reliable financial statements and that you can

19  rely upon what they did.

20              The sum total of what they have come up

21  with after all of this talk about hopeless entanglement is

22  a 16 million and a 18 million dollar restatement which they

23  are able to discern and put in, and nothing else is stated

24  about any further inaccuracies or qualifications of their

25  financial statements.  Which is true?  What they are

27

1   telling creditors?  What they say in their papers to court?

2   Or what they say in their 10-Q?  It can't be both.   And

3   this is not past management, your Honor, this is current

4   management.  And this is also Mr. Charles Clark, who is the

5   very same individual who must have reviewed and approved

6   that offerings prospectus that was done in 2004 for CalGen

7   where it was absolutely critical for creditors to

8   understand how the intercompany accounting was done,

9   whether it was done with integrity and honesty or not.

10              Either what they said today is true what

11  they said in their 10-Q is false.  Either what they said

12  today is true or what they said in their offering

13  prospectus is fraudulent, or what they are saying to this

Page 24

Calpine - Transcript of September 25 2007 Hearing.TXT
14   court is not correct.

15                    Now the issue here is not to resolve this.

16   The reason I bring these points out, your Honor, is because

17   they get to what is the common theme here: Who is tending

18   the store for CalGen?  You have some very able advocates

19   before you for the debtor and for the creditors' committee,

20   you have them very ably advocating positions for Calpine.

21   But everything they are arguing, everything they say, they

22   say as advocates for Calpine and not as advocates for, nor

23   as disinterested fiduciaries for, CalGen.  There is simply

24   no one representing CalGen and no one representing its

25   interests.  And there are conflicts here.


                                                                28


1                    Now your Honor said quite, and I understand

2    fully, that the appointment of a trustee requires the

3    meeting of a very high burden.  I understand that.  But I

4    think it's met here.  And I think that far from disserving

5    the interest of creditors, the appointment of a trustee in

6    this case would serve the interests of creditors.  Your

7    Honor is going to have before you a plan that Calpine and

8    its representatives will no doubt laud for obvious reasons,

9    but which does not serve, and which disserves the interests

10   of CalGen and its creditors.

11                   That is a plan which was negotiated at a

12   negotiating table with an empty seat for CalGen.  There was

13   no one there to speak on behalf of CalGen.  There was no

14   one there to say the emperor has no clothes on this claim

15   of hopeless entanglement, at least as it relates to CalGen,

16   there was no one there to say you have enough to pay CalGen

                               Page 25

Calpine - Transcript of September 25 2007 Hearing.TXT

17    creditors in full, and you ought to do so, and you still

18    have enough to leave for the other creditors of the other

19    estates.  There was no one at the table.

20              And where are we going to be?  Where we are

21    going to be is they now have a plan which they propose and

22    which says that if they don't get the substantive

23    consolidation it all blows up.  And we won't know that

24    until December because they want to have that decided at a

25    confirmation hearing, they don't want to decide it ahead of

29

1    time.

2              We would welcome having it decided ahead of

3    time, your Honor.  They don't want it there.  They want to

4    present it there and then they want to tell the court and

5    they want to tell creditors crisis, crisis, crisis, our

6    exit financing depends on getting this deal done, if it

7    doesn't get this deal done everything falls apart.  They

8    want to put us under the gun, everyone under the gun.  That

9    is not serving the interests of CalGen creditors --

10             THE COURT:  I'm just going to give you a

11    few more minutes, Mr. Elkind, because you are beginning to

12    be redundant and I've read all of your papers.

13             MR. ELKIND:  For those reasons we think a

14    trustee should be appointed.

15             THE COURT:  Thank you.

16             Does anyone else want to be heard?

17             MR. PEDONE:  Yes, your Honor.  Richard

18    Pedone also a moving party for the trustee representing the

19    CalGen first lien lenders for Wilmington Trust as

Page 26

Calpine - Transcript of September 25 2007 Hearing.TXT
20  indentured trustee and Wilmington Trust as administrative

21  agent.

22              If this were a mid size case where you had

23  a debtor who filed SEC filings or other reports with the

24  court and said we're solvent, we have shareholders' equity,

25  and they did they did it again and again and again, and I

30

1  would like to submit the SEC filings that the debtors in

2  the case have filed with repeated certification, and Mr.

3  Desario will hand them up, and I am submitting with them

4  the proofs of certification.

5              May I approach with that?

6              THE COURT:  Yes.

7              MR. PEDONE:  I'll go on with those, if

8  that's okay.

9              THE COURT:  I don't know that it serves any

10  purpose other than -- no, I'm not accepting that.  I'm not

11  accepting sets of documents with thousands of pages.

12              MR. PEDONE:  Your Honor, I would then move

13  for the admission of the debtors' SEC filings and --

14              THE COURT:  Denied.  Denied.  You can refer

15  to it.  You are not going to hand up two telephone books to

16  this court and ask this court to take them in.

17              MR. PEDONE:  Your Honor --

18              THE COURT:  You've had plenty of time to do

19  that.  Make your case, sir, and then sit down.

20              MR. PEDONE:  Your Honor, the certifications

21  that would have been handed up as part of the SEC filings

22  contain attestations of the debtors' current officers

Page 27

Calpine - Transcript of September 25 2007 Hearing.TXT
23   saying that their financial records are accurate.

24              THE COURT:  I'll accept your statements as

25   to what they say.


                                                        31


1               MR. PEDONE:  Six months after the last

2    certification was filed, the debtors, the very same debtors

3    filed a disclosure statement saying that says they are

4    hopelessly entangled.  You have before you evidence, you

5    can take judicial notice of since you won't admit, of a

6    complete about face on behalf of CalGen as to its financial

7    condition.  The about face contained in the plan that was

8    filed by Calpine on behalf of CalGen, you don't have a

9    CalGen officer's signature on, filed by Calpine

10   appropriating those assets for Calpine's creditors is at

11   complete odds, complete odds for certification.  That's a

12   conflict.

13              That's the type of discrepancy with the

14   integrity of the process that calls for a trustee --

15              THE COURT:  That's the same argument Mr.

16   Elkind made.  Do you have anything further?

17              MR. PEDONE:  Your Honor, I was hoping to

18   submit many more certifications, and I will rest on my

19   papers.

20              THE COURT:  Thank you.

21              Mr. Bienenstock?

22              MR. BIENENSTOCK:  Good morning, your Honor.

23   Martin Bienenstock for M&T Bank as indentured trustee.  I

24   would like to first address the two issues that your Honor

25   raised, and then to add short measured support of the

                           Page 28

Calpine - Transcript of September 25 2007 Hearing.TXT

32

1    motion.

2              Our interests here, as your Honor inquired

3    of the others, is basically in several components.  As your

4    Honor is aware, we have a difference that's on appeal on

5    the make whole claim of over a hundred million dollars.  We

6    have default interest yet to be determined, perhaps 12

7    million as of last March 29 and running, we have interest

8    on the make whole claim, and we have the loss that might

9    occur to us if there is substantive consolidation.

10             THE COURT:  But you don't have 2.5 billion

11   or so.

12             MR. BIENENSTOCK:  No.

13             THE COURT:  Because that's already been

14   paid to your cliental.

15             MR. BIENENSTOCK:  Well, or various, yes.

16   We do have several hundred million because we do also have

17   a snap back claim where we get an additional claim if we

18   have to give some of our money to the first and second lien

19   holders.  So our claim is going to, bottom line, between 70

20   to 80 million up to over 300 million.

21             Number 2, your Honor mentioned that, for

22   instance Mr. Elkind is good advocate as someone for the

23   CalGen creditors, and clearly we agree with that.  The

24   problem is that it's one thing, as Mr. Elkind said, to be a

25   litigant, it's another thing to have the right to join in a

33

Calpine - Transcript of September 25 2007 Hearing.TXT

1    Calpine plan, the disadvantages CalGen creditors to join in

2    the Calpine pine timetable, the disadvantages to CalGen

3    creditors, and to make all of the other discretionary

4    decisions for CalGen that have been in favor of Calpine and

5    against the CalGen creditors.

6              If this were at the beginning of a case,

7    your Honor, we submit that the request for a trustee is

8    overwhelming.  It's very rare that you have existing

9    management contradicting itself in material ways to the SEC

10   and to this court, and whether it's described as fraud,

11   dishonesty or gross mismanagement, it's there using their

12   own statements.  And I won't belabor it because, as your

13   Honor pointed out, it's in the moving parties' papers.

14   They are also not late because the interest of what we

15   thought we were all over secured creditors only came into

16   question with the filing of the plan and subsequent events.

17             Nevertheless, we are mindful of the court's

18   concern.  They are trying to confirm, they have this exit

19   financing that will terminate, et cetera, et cetera.  We

20   are not looking to swat an ant with a cannon.  On the other

21   hand this is not just an ant, this is fundamental

22   unfairness to CalGen creditors.  We separately have been

23   looking for consensual remedies outside of going in front

24   of the court to see if the unfairness to CalGen creditors

25   can be corrected in a less obtrusive way, but this came on

34

1    first.  Time is important, and we think they have made a

2    case; a compelling case.

3              What we would hope is that the debtor would

Page 30

Calpine - Transcript of September 25 2007 Hearing.TXT

4  consensually agree to an independent CEO mutually

5  satisfactory for CalGen to all of us, to a creditors'

6  committee, which the U.S. Trustee is now considering.  Not

7  because they are perfect remedies for not having a trustee,

8  but because we are sensitive to where we are in the case

9  and we don't want to do something that unnecessarily is

10  obtrusive.

11        But if the debtor doesn't want to do these

12  things consensually, the only way that this case can be

13  confirmed is based on a horrible unfairness to the CalGen

14  creditors where everyone in power to make discretionary

15  decisions, the committees, and the debtors, are controlled

16  by either Calpine management or Calpine creditors.  That

17  unfairness is unacceptable.  I hope that it's unacceptable

18  to the court.

19        So, as I said before, we measurably support

20  this.  We wish the debtor would make this unnecessary by

21  agreeing to lesser relief that would cover us maybe 80

22  percent of the way.  But if they won't, we believe they

23  have made a case, and the unfairness to CalGen creditors

24  should not continue.

25        THE COURT:  Thank you.

35

1        MR. KIESELSTEIN:  Your Honor, Marc

2  Kieselstein on behalf of the debtors again, and I'm going

3  to try to be extremely brief.

4        Your Honor, it is clear that the trustee

5  motions are part of a multipronged assault that's been

6  launched against the debtor for having the temerity to seek

Calpine - Transcript of September 25 2007 Hearing.TXT

7    substantive consolidation --
8              THE COURT:  Can you speak up?  I can hear
9    you fine, but I don't know about the back.
10             MR. KIESELSTEIN:  Sure.
11             Your Honor, this is a multipronged assault
12   that's been launched against the debtors for having the
13   temerity to seek substantive consolidation with respect to
14   the CalGen debtors.  And we've seen this on a number of
15   fronts, and I think this is the crudest weapon that's been
16   employed to date, your Honor.  We think it's quite clear
17   that the standards here are not even close to being
18   satisfied and that the consequences of a trustee being
19   appointed would be grave to all concerned, including the
20   CalGen debtors and their creditors.
21             Your Honor, essentially we have a
22   confirmation battle in the offering.  We all understand the
23   CalGen lenders are firmly opposed to substantive
24   consolidation.  To the extent we end up with a solvent
25   case, it really becomes an irrelevant issue because it


36

1    would be no harm no foul.  We don't know if we are going to
2    be there yet, it remains to be seen.  Your Honor, clearly
3    the battalion of able professional that the CalGen lenders
4    have will undoubtedly be at the confirmation hearing and
5    more than ably represent their clients.
6              As to this irreconcilable conflict that
7    they side between the financial statements that have been
8    filed and the substantive consolidation that we seek in our
9    plan, candidly we don't subscribe to the view that those
                         Page 32

Calpine - Transcript of September 25 2007 Hearing.TXT

10    things are incompatible, but obviously that will be an

11    issue that will be dealt with at confirmation when we are

12    seeking to get our plain approved and this component of our

13    plan approved.

14              But, your Honor, it's very clear to us that

15    what's being done here is an attempt to socialize, if not

16    tenderize the court and all the parties to the CalGen

17    lenders loathing of the substantive consolidation doctrine

18    as it applies to them.  Your Honor, they will have their

19    day in court, they will get the discovery that they seek at

20    the appropriate time.  They will be, I'm sure, fully armed

21    when we get down to confirmation.  We are obviously always

22    open to talking to them about resolution in advance of the

23    confirmation hearing to see if we can settle these matters.

24              But, your Honor, a trustee, to use Mr.

25    Bienenstock's metaphor is a bazooka, if not for an ant, it


                                                        37


1     is certainly for a mosquito in our view, and it will cause

2     untold damage to this estate and to the creditors of all

3     the estates, and we ask that your Honor oppose their

4     motion.

5              MR. QURESHI:  Your Honor, good morning.

6     Abid Qureshi, Akin Gump Strauss Hauer and Feld on behalf of

7     the official committee of unsecured creditors.

8              Your Honor, the creditors' committee joins

9     the debtor in opposing this motion.  Your Honor, Mr. Elkind

10    does not give his colleagues enough credit for their

11    ability to act as advocates for their approximately 76

12    million dollar unsecured claim which is currently on

                          Page 33

Calpine - Transcript of September 25 2007 Hearing.TXT
13    appeal.

14            Your Honor, we believe that subject to the

15    creditors' committee's ability to object to value and also

16    to potentially other issues, we believe that the disclosure

17    statement and the plan fairly treats all of the unsecured

18    creditors, including the CalGen unsecured creditors.

19            Finally, your Honor, the movants here

20    provide no support for the proposition that their

21    opposition to substantive consolation justifies the

22    appointment of a trustee.  Your Honor, this is clearly a

23    collateral attack on the plan subconed as an evidentiary

24    issue.  It is properly dealt with at confirmation, and they

25    will have every opportunity to make that case at the right

38

1    time.

2            So with that, your Honor, we again join in

3    opposing this motion.

4            MR. KAPLAN:  Good morning, your Honor.

5    Gary Kaplan from Fried, Frank, Harris, Shriver & Jacobson

6    on behalf of the official equity committee.  We too join in

7    the debtors' objection.  I won't belabor the point.  But I

8    think your Honor noted when Mr. Elkind was arguing, the

9    size of the claim that we are dealing with.  All we are

10    dealing with is essentially a dispute claim for a make

11    whole after being paid 2.6 billion of their principal.

12            THE COURT:  Matters that are already on

13    appeal.

14            MR. KAPLAN:  Matters that are on appeal.

15    They are still arguing for a secured claim.  People are

Page 34

Calpine - Transcript of September 25 2007 Hearing.TXT

16  arguing that their claim should be zero.  And so the people

17  seeking a trustee -- it would be one thing if we had a

18  whole bunch of independent sort of real creditors standing

19  up here, a whole group of CalGen creditors, but we have the

20  litigants who are in an appeal arguing to one more

21  litigation tactic to try to extort a settlement.

22              THE COURT:  Thank you all.

23              As I reiterated, or as I will reiterate

24  now, it appears to the court that this motion coming at

25  this time is indeed perhaps a collateral attack, and it has

39

1  all the appearances of being wasteful and diverting at this

2  particular point in time when there is in place a process

3  to test whether or not the debtors can make their case at

4  confirmation or negotiate some kind of arrangement, which

5  is a very common event when you have the space of time

6  between disclosure or shortly before, and confirmation.

7              With respect to the motion, the Motion

8  before the Court requests the appointment of a Chapter 11

9  trustee for the CalGen estate.  The Indenture Trustee and

10  Administrative Agent (which I'll call the Movants) contends

11  that, "the Debtors proposed substantive consolidation plan

12  and the purported grounds upon which that proposed plan is

13  based clearly establish that the Debtors are acting in a

14  manner which is directly adverse to the interests of CalGen

15  and its creditors, and because there is no independent

16  fiduciary representing the interests of CalGen and its

17  creditors."  Motion at page 1.  The Debtors, Creditors'

18  Committee and Equity Committee have objected to the motion.

Calpine - Transcript of September 25 2007 Hearing.TXT

19          There is generally a presumption that a
20  debtor is entitled to continue managing its own affairs in
21  a Chapter 11 case, however, Section 1104(a) of the
22  Bankruptcy Code empowers a party in interest to move for
23  the appointment of a Chapter 11 trustee:   And I quote.
24          (1) for cause, including fraud, dishonesty,
25  incompetence, gross mismanagement of the affairs of debtor


                                                      40


1   by current management; or.
2           (2) if such an appointment is in the
3   interests of creditors, any equity security holders, and
4   interests of the estate...
5   11 U.S.C. Section 1104.   See United States of America
6   against Scott Cable Communications (In re: Scott Cable
7   Communications, Inc.), 2007 U.S. District Court LEXIS
8   65514, pages 7 and 8 (2d Cir. September 6, 2007).   A party
9   seeking appointment of a trustee has the burden of showing
10  cause, by clear and convincing evidence, pursuant to
11  Section 1104(a)(1), or the need for a trustee under Section
12  1104(a)(2).   In re Marvel Entertainment Group, Inc. 140
13  F.3d 463, 471 (3d Cir. 1998); In re Adelphia Communications
14  Corp., 336 B.R. 610, 655 to 56 (Bankr. S.D.N.Y. 2006); In
15  re WorldCom, Inc., 2003 Bankr. LEXIS 2192, 16 (Bankr.
16  S.D.N.Y. May 13, 2003); In re Ionosphere, 113 B.R. 164, 168
17  (Bankr. S.D.N.Y. 1990).   The appointment of a Chapter 11
18  trustee is recognized as an extraordinary remedy because
19  there is a strong presumption that the debtor should remain
20  in possession.   See In re North Star Contracting Corp., 128
21  B.R. 66, 70 (Bankr. S.D.N.Y. 1991); again Ionosphere 113
                          Page 36

Calpine - Transcript of September 25 2007 Hearing.TXT

22    B.R. at 167.   The decision to appoint a trustee in a

23    Chapter 11 proceeding is a factual determination left to

24    the discretion of the bankruptcy judge.   See Schuster

25    against Dragone (In re Dragone), 266 B.R. 268, 271

41

1    (District of Connecticut 2001).

2              The Movants do not establish any cause

3    under Section 1104(a)(1) for a Chapter 11 trustee to be

4    appointed in these cases.   Nor have the Movants

5    demonstrated any of the factors to be considered under

6    Section 1104(a)(2).   They have not substantiated the

7    allegations that put into doubt the Debtors'

8    trustworthiness, past and continued performance, prospects

9    for rehabilitation, or the confidence of the business

10    community and of the creditors in presents management.   The

11    fact that the Creditors' Committee and the Equity

12    Committee, representatives of parties with more at stake

13    here than the Movants, are in opposition to the relief

14    requested, is Significant.   Ionosphere, at 167.   Most

15    significantly, the costs of appointing a Chapter 11 trustee

16    far exceed any benefit that may be gained.   Id.   If the

17    Motion is granted, the Debtors' DIP financing would be at

18    risk, endangering the entire reorganization process.   The

19    time and money required to support a Chapter 11 trustee

20    would slow the process now underway.   These Movants have,

21    no doubt, been aware of the Debtors' contentions since the

22    beginning of these cases, that the financings of the many

23    subsidiaries are intertwined, yet they request that the

24    return date for this motion be the same day as the

Calpine - Transcript of September 25 2007 Hearing.TXT
25     disclosure hearing.   These argument are not only improper

42

1     objections to disclosure, but they also are not sufficient
2     to support a Chapter 11 trustee motion.   At risk for the
3     Movants is a possible 75 million dollars, which is the
4     subject of appeal, embellished a little bit by rhetoric
5     here at this hearing, but nevertheless, a di minimis sum
6     next to what's really at stake annexed to the 2.5 billion
7     or so that these Movants and their constituencies have
8     already received in the case, almost completely taken out
9     of the picture.
10            At risk for the Debtors, on the other hand,
11     is the entire reorganization process and their stated goal
12     of emerging from bankruptcy in a few short months, and the
13     creditors in these cases certainly have more at stake than
14     the 75 million dollars or the lawyers' hyperbole presented
15     to this court that still falls far short of a balancing
16     efforts with respect to what's at stake to all of the other
17     participants in the proceedings.
18            The Creditors' Committee pointed out in
19     their objection to the relief requested by the Movants,
20     that in a case where the Creditors' Committee and the
21     Debtors are "functioning effectively," there is not a
22     significant benefit to appointing a Chapter 11 trustee.
23     See In re The 1031 Tax Group, LLC 2007 Westlaw 2298245 at
24     page 8 (Bankr. S.D.N.Y. August 13, 2007).
25            The movants have not demonstrated a

Calpine - Transcript of September 25 2007 Hearing.TXT
                                                                    43

1    sufficient basis for the extraordinary relief they are
2    requesting.  One creditor's pushback to a debtor's reasoned
3    decision to pursue a plan of reorganization involving,
4    subject to a court's approval, substantive consolidation,
5    is not grounds to appoint a Chapter 11 trustee.  See
6    WorldCom, at 26-27; Adelphia at 619.  Additionally, these
7    Movants are not now and have not since the commencement of
8    these cases, been without zealous representation.  They
9    have been present, representing their interests at various
10   crucial junctures in these proceedings.
11              I agree with the Debtors, the Official
12   Committee of Unsecured Creditors and the Equity Committees'
13   assertions that the real issue raised by the Movants is to
14   substantive consolidation, and that is an objection for
15   confirmation of the plan, which is not before this Court
16   today.
17              The motion is denied.  It is so ordered in
18   this case.
19              MR. ELKIND:  Thank you, your Honor.
20              MR. PEDONE:  Thank you, your Honor.
21              MR. KIESELSTEIN:  Your Honor, the next item
22   on the agenda is the equity committee's 2004 motion, which
23   counsel will address.
24              MR. DE LEEUW:  Good morning, your Honor
25   Michael De Leeuw representing the official equity

                                                                    44

1    committee.
                            Page 39

Calpine - Transcript of September 25 2007 Hearing.TXT

2          Your Honor, I know you've read our papers,

3    so I'm not going to go into great length about --

4          THE COURT:  Regrettably, Sunday was a

5    perfect 10 for anybody that enjoyed weather.  I didn't see

6    it, though, yes, I did read your papers.

7          MR. DE LEEUW:  Then I apologize for our

8    papers.  But we also, late last night or yesterday

9    afternoon put in a reply paper.  I'm not sure if you've

10    seen it.

11          THE COURT:  Yes, I've sign it.

12          MR. DE LEEUW:  Okay.  So just briefly, the

13    equity committee seeks discovery under 2004 for a very

14    specific narrowly tailored purpose to discover what went

15    wrong in our negotiations with the debtors regarding a

16    rights offering proposal that we had put forward and we

17    thought we were negotiating with the debtors.  The

18    discovery see we seek a very narrow on that subject and

19    regarding the RFP process that the debtors conducted this

20    summer.

21          Without going into too much detail, the

22    rights offering proposal was a --

23          THE COURT:  Which you guys characterize as

24    a gift horse.

25          MR. DE LEEUW:  No.  Well, we characterized

                                                    45

1    it as a very effective proposal that would have had three

2    main virtues.  First of all it would have obviated the need

3    for a valuation, it would have raised cash for the estate,

4    and it would have allowed the debtors to exit on

                        Page 40

Calpine - Transcript of September 25 2007 Hearing.TXT

5   schedule -- to emerge on schedule.  So it was, we thought,

6   a brilliant plan, one that we thought was being negotiated

7   in good faith.  We met with Bob May and representatives of

8   the debtors, and they sat there and told us that if it was

9   possible to get this done, they were going to get it done

10  and push it through.

11              And yet 36 hours later they walk away from

12  the table with a two line e-mail, refused to answer our

13  calls.  It took us a long time to get the post talk excuses

14  that they finally gave us, those dribbled in over a couple

15  of weeks and they have now been presented in their

16  responsive papers as if this plan never had a shot; it was

17  a Hail Mary at the end of the game.  This was not conveyed

18  across the table to us.

19              So we think that this is clearly an area

20  that we are allowed to inquire in under the scope of 2004,

21  it relates to the act and the conduct of the debtors, and

22  it's clearly within the scope of 2004.  If they want to

23  argue ultimately about the, you know, the fringes of the

24  scopes of our request, that's fine, we will discuss that

25  with them.  But we see no reason why the 2004 motion

46

1   shouldn't be granted.

2              THE COURT:  Thank you.

3              MR. KIESELSTEIN:  Your Honor Marc

4   Kieselstein on behalf of the debtors.  Your Honor, with all

5   that went on yesterday, I wasn't even aware that a reply

6   had been filed; that's probably our fault and not counsel's

7   fault I haven't had a chance to review it.  I will say

Calpine - Transcript of September 25 2007 Hearing.TXT

8   though that --

9               THE COURT:  Would you like to look at it?

10              MR. KIESELSTEIN:  One of our team was going

11  to run and grab it, but I would love to get a look at it,

12  Judge, if that's okay.

13              THE COURT:  Well, I did read it, and I'll

14  editorialize my reaction, which is one just one word; lame.

15              MR. KIESELSTEIN:  In that case I'm not

16  going to read it, Judge.

17              Your Honor, as we've said, we entered into

18  these negotiations in good faith.  It was a creative and

19  intriguing idea.  As we went along negotiating it, we

20  raised all of these issues, everyone was aware of them.  We

21  all tried to devise creative fixes for these.  I won't say

22  that we didn't make progress, Judge, we did.  But we did

23  take a step back and say is this really something that's

24  worth bolting on to our plan.  Does the degree of

25  difficulty associated with this construct justify the

47

1   resources, the risk to the timeline, the likelihood that we

2   would end up in a valuation fight anyway.  And the debtor

3   made a reasoned conclusion that it wasn't worth the candle,

4   your Honor.  And after we told them that there wasn't

5   really a lot of point about a lot of back and forth, we had

6   other things to move on and do.  But they know full well

7   why we ultimately decided not to proceed.

8               And the use of 2004 to answer the questions

9   that have already been answered, your Honor, at this point

10  in time seems to us really more harassment than to

Page 42

Calpine - Transcript of September 25 2007 Hearing.TXT

11    generated to produce any light on the issue.  The issue has

12    been fully illuminated, your Honor, and so we think if this

13    motion had any justification, which we don't believe it

14    did, I think our response put any doubts to rest as to what

15    the process was and why we ultimately made the decision

16    that we made.  So we would ask that the motion be denied.

17                    MR. STAMER:  Your Honor, if I may briefly?

18                    THE COURT:  Sure.

19                    MR. STAMER:  For the record, Michael Stamer

20    from Akin Gump on behalf of the official committee.

21                    Your Honor, we didn't file a pleading and

22    response, I just wanted to apprise the court of a few

23    things.

24                    THE COURT:  Would you like to read the

25    response?

48

1                     MR. STAMER:  Based upon your Honor's

2     editorial I don't think it's necessary.

3                     Your Honor, we weren't involved in these

4     discussions, and we wouldn't involved in the discussions

5     because the equity committee prohibited the debtors from

6     sharing the back and forth with respect to the discussion.

7     So the court is fully aware, not withstanding the

8     representations about how there was a fulsome back and

9     forth with respect to negotiations.

10                    THE COURT:  Do you know the dictionary

11    meaning of the world fulsome?  About once a year I'm called

12    upon to call lawyers attention to it.  It's not really all

13    inclusive, it's very pejorative.  It's very negative.

Calpine - Transcript of September 25 2007 Hearing.TXT

14          MS. LIU:   It means effusive.

15          THE COURT:   It's almost nasty.

16          MR. STAMER:   Your Honor, if I may amend my

17    statement to use the word thorough.

18          THE COURT:   If you'd like I'll have

19    somebody bring a dictionary in and read it.   You would be

20    very surprised.

21          MR. STAMER:   Your Honor, after the hearing

22    I'll take your chambers up on that offer.

23          THE COURT:   This is the first time in 2007

24    I've had occasion to call attention to the use of that

25    word, but it comes up two or three times every year.


                                                          49


1          MR. STAMER:   It's my pleasure, your Honor.

2          The sum and substance, your Honor, is this

3    was not a thorough well discussed negotiation.   We were on

4    purposely kept on the outside.   Our view is, and frankly we

5    still have no idea of what went on, but our view is the

6    debtors are not actually pursuing that path.   What they are

7    doing is pursuing a path which involves what we think is an

8    appropriate waterfall plan.   That discovery is, as the

9    debtors say, designed for harassment.   And to the extent

10   they have questions, to the extent they need to ask

11   questions as part of the discovery associated with

12   confirmation then that's fine, provided it does not in fact

13   slow down the process to get from here to there, there

14   being the effective date before the exit financing expires.

15          That's all I have, your Honor.   Thank you.

16          MR. DE LEEUW:   I apologize for our lame

                    Page 44

Calpine - Transcript of September 25 2007 Hearing.TXT

17   papers they were drafted in some haste over the weekend.

18                THE COURT:  Well that was my

19   characterization, certainly not yours.

20                MR. DE LEEUW:  No, certainly not.  We don't

21   like negative reviews like that regardless.  But quickly,

22   the excuses that are in the papers that were filed by the

23   debtors are things that never came up or not important

24   drivers during our discussions.  The idea that the backstop

25   was a big issue when they never insisted that the --

50

1                THE COURT:  And the big, bad, silent SEC,

2    without an opportunity or timing to comport to the timeline

3    that's extant here is something that's not really

4    thoroughly rebutted.

5                MR. De LEEUW:  Well we had certainly

6    discussions with them about the SEC process and we agreed

7    that it would be cutoff at a very early stage if the SEC

8    raised outrageously huge or high hurdles for this to be

9    done.  It certainly has ample room for negotiation on the

10   point.

11               The third point they make is that somehow

12   the safe harbor, that they were frightened away from doing

13   this because they can't file a registration statement

14   doesn't contain false statements strikes us as being

15   somewhat alarming and certainly something we don't

16   understand.  It seems that the management that's been in

17   charge of this company for as long as it has should be able

18   to file a registration statement without any false

19   statements.

Page 45

Calpine - Transcript of September 25 2007 Hearing.TXT

20           So we didn't find the debtors' response to

21   be an adequate appraisal of what happened.  Certainly it's

22   a self-serving piece that does not answer the questions

23   that we have about what happened during the process.

24           Thank you, your Honor.

25           THE COURT:  Thank you.  Anybody else?


51


1           All in all, the request for the 2004

2   discovery under these circumstances takes us beyond the

3   real scope of 2004.  First place, it's overly broad, and it

4   really seeks justification for a business judgment decision

5   reached under the timeline and circumstances and the

6   economy, the operations of the debtor and the ability to

7   shoe horn what has been characterized as a gift horse plan.

8   And then of course, the debtor using very interesting

9   metaphors compares the gift horse to a broken down nag.  I

10  do find that an interesting metaphor, I don't necessarily

11  agree with it.  But certainly on pages 2 and 3 of the

12  debtors' response is a clear basis for the business

13  justification for turning down the suggested plan and

14  moving forward with that plan in place of the one that's

15  already gained fairly substantial approbation by all the

16  constituencies here.

17           It, in all circumstances, is not really

18  calculated to move this case forward, and I don't think

19  that the debtor has to give any further justification than

20  it already has for its reaction to the suggestion by the

21  creditors' committee.  There are many infirmities that have

22  been pointed out that this court clearly justify they are

Calpine - Transcript of September 25 2007 Hearing.TXT

23 exercising a business judgment rule and going forward in

24 another direction.

25                    It is a fact that they should not be


                                                                52


1  required 2004 to justify a path not taken.  This all can be

2  a matter for the confirmation again, but I really don't

3  know that that's the real goal of the equity committee at

4  this point in time.  It may have two different hats in

5  connection with the several motions that it has before me.

6  It has two different advocates that appear before me

7  standing up in that regard, one pro one con.  I find that

8  be interesting, too.

9                    But in any event, the motion for a 2004

10 examination is denied.

11                    MR. De LEEUW:  Thank you, your Honor.

12                    MR. KIESELSTEIN:  Thank you, your Honor.

13                    MR. SELIGMAN:  Your Honor, David Seligman.

14 The next matter on the agenda is the equity committee's

15 motion to adjourn the disclosure statement hearing, and

16 I'll turn the podium over to Mr. Kaplan.

17                    MR. KAPLAN:  It's advocate number two, your

18 Honor.  For the record, your Honor, Gary Kaplan from Fried,

19 Frank on behalf of the equity committee.

20                    Your Honor, I'm sure you are familiar with

21 our papers so I won't belabor the point.  I hope these

22 papers were better than the other once.  Your Honor, I

23 think we need to take a step back and understand what we

24 are doing here today; why we have a full courtroom and why

25 we have an overflow room where people are listening by

Calpine - Transcript of September 25 2007 Hearing.TXT

53

1    telephone.

2              What today is supposed to be is approval of

3    a disclosure statement that in essence has the debtors'

4    plan moving down the track towards confirmation.  We are

5    supposed to be at the point where the debtors have now

6    figured out their business plan, figured out, at least in

7    their view, what this company is going to look like over

8    the next several years, figured out in their view what the

9    value is, figured out what the distributions are to their

10   various constituents.  And they are now coming to your

11   Honor saying, you know what?  We spent the last 22 months

12   or so figuring it all out.  We've got it.  We are not at

13   the point where we can put it into a nice book, move on

14   with the show, and let's get on a to confirmation.  That's

15   what we are supposed to do.

16             And as everybody knows Bankruptcy Code is

17   specific with requirements about having adequate

18   information and protections for shareholders and creditors

19   to make sure that when a plan is solicited they get

20   adequate information to enable them to vote.

21             But what do where he really have today in

22   the debtors' plan and disclosure statement?  And don't

23   worry, your Honor, I'm not going to hand up anything to

24   you.

25             THE COURT:  You can try.

54

Calpine - Transcript of September 25 2007 Hearing.TXT
1              MR. KAPLAN:  I'm a quick learner, your
2     Honor.
3              Your Honor, if you look through the
4     debtors' disclosure statement which I think they said is
5     two hundred pages, you have everything that you would
6     expect to have in a disclosure statement.  You have a chart
7     at the front that says if creditors or equity holders want
8     to see what they are getting under the debtors' plan, there
9     is pretty chart you can look and say, okay, here's what I
10    think I'm getting.  If you want to see how the debtors
11    think their business is going to be they have their
12    projections at the back.
13             That's what we thought we were going to be
14    coming to up until a week or so ago.  Since June 20th
15    that's where we felt we would ultimately get to a
16    disclosure statement hearing, and we wold have a hearing.
17    We might disagree with the value and say that it's too low;
18    my friends from the creditors' committee might say it's too
19    high, but we knew what the target was.  We knew how to
20    prepare.  We knew we could tell our constituents our
21    reviews on the plan based on what we thought the plan was.
22             And a week ago, for the first time, the
23    debtors announce that forget what's in the disclosure
24    statement.  Now what's in the disclosure statement is going
25    to be rendered moots in November.  In November the debtors

                                                              55

1     are going to come out, they keep using new names for it, I
2     think the latest in their papers yesterday is not it's a
3     refresh of their valuation, A word I've never heard, but
                         Page 49

Calpine - Transcript of September 25 2007 Hearing.TXT

4    now we are talking a refresh; that the valuation that's in

5    here is going to be "refreshed," and then we will find out

6    what creditors and equity holders are going to get, if

7    anything.  Then we are going to find out, Mr. Kieselstein

8    was, you know, very forthcoming in the argument about the

9    trustee, we don't know whether or not the estate is solvent

10   or not.  I guess we will find out in November when they

11   publish their real valuation.

12              And they also explain that the reason we

13   have to wait until November to find out what their "real

14   refreshed valuation" is, is because that's when we'll have

15   an updated business plan.  That's when the debtors are

16   going to tell us what this company is actually going to

17   look like in an estate where there is about 8 billion or so

18   of equity being distributed where all unsecured creditors

19   are supposed to receive equity, where shareholders are

20   going to be receiving equity; in November they will tell us

21   what the equity is actually worth.  They will tell us what

22   the business plan is.  And then people can vote.

23              I ask you, again, what are we doing today?

24   If we are going to find that information out in November,

25   then we should be back in here in November for your Honor

56

1    to say yes that's adequate information for people to look

2    at the valuation, look at the projections, look at what

3    they're disclosing and to say that's appropriate.  That's

4    what the process is supposed to be.  That's what 1125 is

5    supposed to be.

6              It's not supposed to be a process where you

Calpine - Transcript of September 25 2007 Hearing.TXT

7    have a two hundred page book that has somewhere buried in

8    the first couple pages disregard everything of import in

9    here because it's going to change in November right before

10   you cast a ballot, that's not what 1125 is supposed to be,

11   and that's why we moved today on an emergency basis for an

12   adjournment rather than an objection.  And, your Honor,

13   this is more than simply, well, it violates 1125.

14             One of the issues here, this is obviously a

15   large case, a huge number of creditors and equity

16   holders --

17             THE COURT:  Do you think that Congress was

18   right, Mr. Kaplan, in setting forth a very camped timeline?

19   Had it not done that I don't think that you would be up

20   arguing today with respect to the imperatives created,

21   maybe artificially, by the BAPCPA legislation.

22             MR. KAPLAN:  Your Honor, I think frankly

23   exclusivity expired months ago, so whether or not they have

24   exclusivity, we've gone three months --

25             THE COURT:  It's may not have expired

57

1    absent Congress' legislation.

2             MR. KAPLAN:  No, no, I agree with that.

3             THE COURT:  I'm just wondering how you

4    feel.

5             MR. KAPLAN:  My view is it's too short,

6    that it should have been a longer period of time.

7             THE COURT:  Me too.  Go ahead.

8             MR. KAPLAN:  But might views don't get very

9    far in Congress.  I hope I have better luck in this court,

Calpine - Transcript of September 25 2007 Hearing.TXT

10    your Honor.

11                    Your Honor, the debtors lost exclusivity

12    months ago.  This isn't a race because there are four

13    competing plans on, number one, and even if it were, I

14    don't think that the fact that there is now a limit on

15    exclusivity means that we will ignore the requirements of

16    1125.  And it's not only the requirements of 1125, we also

17    have to ignore Rule 3019-1 which we talked about, which

18    says if there is a material change in the middle of the

19    solicitation you have to look at it, and if it adversely

20    effects any creditors or shareholder, then you need to go

21    and resolicit, file an amended modified plan and resolicit.

22                    Right now approximately the shareholders

23    will be receiving about 1.94 a share under their plan.  In

24    November they can come out and say that number is I say,

25    I'm making this up, 50 cents a share.  Nobody can argue

                                                            58

1    that that doesn't materially --

2                    THE COURT:  You can makeup a number both

3    ways, can't you?

4                    MR. KAPLAN:  I can absolutely make up a

5    number both ways, your Honor.  I don't think my friends on

6    the creditors committee would be championing this plan so

7    much unless they were sort of confident on which way it's

8    going, but that's a separate issue.

9                    But, your Honor, what we have is a plan

10    that changes.  And if it does go up there, your Honor, then

11    you don't have an adverse change, but maybe the creditors

12    will come in and argue it does affect them.  But that's

Page 52

Calpine - Transcript of September 25 2007 Hearing.TXT

13    precisely why you have a process under 3019-1 to come in

14    and actually have a hearing and say does it adversely

15    affect me or not?  And if it does, we have local rule that

16    requires resolicitation.

17                    And why is that?  The purpose of that is to

18    make sure that shareholders and creditors, many of whom are

19    not in the courtroom today, many of whom are not

20    sophisticated and are going to get this big book and have

21    no idea what it means and are going to look at most at the

22    front to see well, what am I getting, gee, does that sound

23    right, they are not going to see the fine print that says

24    disregard everything throw this out.  Wait because ten days

25    before you'll get something else.


59


1                     And let's look at the process.  This is a

2     huge case with huge numbers of shareholders and creditors

3     distributing out ballots and solicitation materials take a

4     lot of time.  It's not as if the debtors have a name for

5     every shareholder and every creditor, they FedEx it out,

6     they send it on Monday, they get it on Tuesday.  There's a

7     process, they have to publish, they have to get a copy of

8     whatever they are going to send, they have to send it out

9     through DTC, for shareholders it then goes through ADP, it

10    then goes through nominees through brokers, it's a process.

11    And that's why the debtors would never come in and here and

12    ask for a solicitation period of five day or ten days.

13                    But what they are saying now is the only

14    relevant information for creditors or shareholders to vote

15    is going to come out ten days before.  And the debtors have

Calpine - Transcript of September 25 2007 Hearing.TXT

16    now tried to be cute; they originally said it was going to

17    be five business days before, we said that's too short, and

18    they said ah ha, we will negotiate, we will give ten

19    regular days.  Well, considering that the Thanksgiving

20    holiday is right smack in the middle of those days, five

21    business days, ten days, doesn't make a difference.

22                    THE COURT:  Well, the court's experience

23    this week is that holidays don't really mean much.

24                    MR. KAPLAN:  It does, though, for the

25    postal service, your Honor.  And for people who are

                                                    60

1    supposed to get an updated solicitation package and

2    supposed to submit their ballots, if the postal service

3    isn't working, they can't get their ballots and they cant

4    send them back.

5                    And, your Honor, it makes it impossible for

6    us to tell the constituent what we think of the plan.  We

7    obviously can tell them we don't know, but we have no idea

8    today what they are getting.  When shareholders call

9    constantly and say what am I getting under the plan, the

10    only thing we can tell them is I don't know, check back in

11    November.  And they say, well, I thought there was some big

12    hearing going on in court with the debtors' plan.  We say

13    yeah, we know, but that's all nonsense because nothing is

14    being approved today.  Anything that's of any relevance to

15    you is going to come way later.

16                    And other points about this, besides the

17    fact that it governs insolvency and postpetition interest

18    and the like is, you know, we had a lot of talk about

                            Page 54

Calpine - Transcript of September 25 2007 Hearing.TXT

19    substantive consolidation.  And Mr. Kieselstein again said

20    well, if we have a solvent estate, that doesn't become an

21    issue.  When are we going to know that?  When are going to

22    know the debtors' position?  Under their discovery

23    timeframe, your Honor, it's going to be after discovery.

24    We have to do discovery having no idea where the debtors

25    are coming out on value, where the debtors are coming out

61

1    on the business plan.  In fact, we have to produce an

2    expert report on the exact same day that the debtors are

3    going to be telling us their value.  That means we're going

4    to be getting a new business plan, as of today we have no

5    idea what the business plan is going to say, I have no idea

6    what new valuation is going to come up.  But we have to

7    prepare an expert, we have to do fact discovery, we have to

8    take all of our depositions having absolutely no idea of

9    what the plan is going to say.  And frankly, your Honor,

10    that's not just an abuse of 1125, it not just violates the

11    local rules, but frankly it violates our due process

12    rights, because we frankly are forced to take discovery

13    having absolutely no idea what the plan proponent case is

14    going to be.  Is it solvent?  Is it insolvent?  What are

15    the issues that we are going to be fighting.  And, your

16    Honor, that is why we are seeking an adjournment as opposed

17    to some --

18                THE COURT:  I'm surprised, Mr. Kaplan.  I

19    would think you have some insight.  I have a lot of insight

20    as to what all the issues are you are going to be fighting

21    about, and I would think that certainly, you being closer

Page 55

Calpine - Transcript of September 25 2007 Hearing.TXT

22    to the ground than I, that you have a substantial insight

23    as well.

24                    MR. KAPLAN:   But, your Honor, I honestly --

25                    THE COURT:   You are able to articulate all

                                                                    62

1    of those issues right now.

2                    MR. KAPLAN:   Yeah, but, I --

3                    THE COURT:   You have a pretty good idea.

4                    MR. KAPLAN:   So then we have to take this

5    book --

6                    THE COURT:   I must tell you, you've given

7    me 17 pages of a motion referring back, because I checked

8    it and I have to deal with it, to maybe two hundred pages

9    of other items that are referred to in your moving papers

10   merely seeking an adjournment.   That was a lot of stuff

11   just to get an adjournment across.   And incidentally that

12   was served on the eve of a high holy day, which is a

13   holiday for many people.

14                   MR. KAPLAN:   Your Honor, we --

15                   THE COURT:   Seeking an adjournment of this

16   hearing that's brought an overflow capacity to this

17   court --

18                   MR. KAPLAN:   Your Honor, we apologize for

19   the timing.   We did not find out that this was going to

20   come into the plan until Tuesday of last week.   So we got

21   on file on Thursday.   We had to read it, figure out what it

22   said, figure out, you know, we do have a client that we

23   have to talk to and figure out with, and then we get in our

24   motion on Thursday night.   I understand the timing is

                    Page 56

Calpine - Transcript of September 25 2007 Hearing.TXT
25    compressed, but it wasn't because of us.


                                                              63


1              This is the first time we've learned about
2    it; never saw a draft of the plan, never get a heads up
3    that this was coming.  All of a sudden we find out about it
4    because it hits the docket, we get electronic service, and
5    so we had to respond.
6              Your Honor, going back to the fundamental
7    point.  I understand that we know that subcon could be an
8    issue.  Does that mean we have to take discovery assuming
9    every potential scenario and every potential outcome?  On
10   the business plan we are supposed to deposition the
11   debtors' management on a business plan that we don't know
12   what it's going to say?  I don't know.  Are they going to
13   make changes?  Are they not going to make changes?  What
14   are the reasons for those changes?
15             When the debtors first did their business
16   plan they had diligence sessions, I think we spent three or
17   four months on diligence sessions explaining everything.
18   They then updated it once and went through another process.
19   Now they are telling us that in the beginning of November
20   we are going to update it; you have to basically be done
21   with discovery.  And that's what they are going to move to
22   confirm on.
23             And I was looking for, you know, since this
24   process so baffled us as to how this can actually work, we
25   are looking to the debtors' response and the creditors'


                          Page 57

Calpine - Transcript of September 25 2007 Hearing.TXT

64

1  committee's response and maybe they will enlighten us.  And
2  how do they enlighten us?  They tell us a couple of things.
3  It's not material.
4           The debtors' valuation, the plan proponents
5  valuation in an all equity deal is simply, I think they
6  call it, an interesting data point.  That's all it is;
7  nothing more, nothing less.  Well, if that's all it is, why
8  don't they just take their valuation out of the plan,
9  because that is the valuation that they are going to be
10  using trying to convenience your Honor they are right.
11  That is the valuation they are going to trying to use for
12  cramdown purposes.  That is the valuation they are going to
13  try to use for feasibility purposes.  But now they
14  characterize it in opposition to this motion as simply an
15  interesting data point.
16           Your Honor, everybody knows it's a lot more
17  than that.  At the end of the day everybody has agreed and
18  the debtors have acknowledged for months.  At the end of
19  the day this case is going to come down to valuation.  And
20  for the debtors to propose a plan that provides for an
21  ambush in November for a December confirmation hearing is
22  inappropriate.  And we think, again, it's not only unfair,
23  it violates the Code.  It violates the rules.  And it
24  violates due process.
25           And one last point, another thing that they

65

1  slipped which I believe is a confirmation issue we will get
                         Page 58

Calpine - Transcript of September 25 2007 Hearing.TXT

2    to it later, the debtors' response is not only is it just

3    an interesting data point but we've sort of rewritten the

4    Bankruptcy Code to provide that, you know, even that

5    1129(b) applied whether or not people vote, so this is all

6    no harm no foul, because at the of the day the way we have

7    rewritten 1129 none of this matters.  The vote is

8    irrelevant because we are going to throw everything against

9    the wall.  We'll see which valuation the judge takes.

10   We'll let the Judge decide, absent priority rules, whether

11   or not it's technically applicable under 1129(b).

12           And so their argument is this is no harm no

13   foul because, well, so what, the judge is going to decide

14   at the end.  But at the end of the day, your Honor, unless

15   we have a business plan, unless we know what the debtors'

16   management thinks that their business can produce, it is

17   impossible for us to provide an expert report based on that

18   business plan.

19           It is not appropriate.  It's a waste of

20   resources for this court to have hearings on the business

21   plan when the debtors are switching their business plan in

22   the middle.  It's a waste of resources for parties to have

23   discovery before we actually know what the target is, and

24   all we are going to be doing is litigating dozens and

25   dozens of topics, many of which may never become an issue,


                                                     66


1    and we will not know that until the end of November.

2                THE COURT:  Thank you.

3                MR. BIENENSTOCK:  Your Honor, Martin

4    Bienenstock for M&T Bank as indentured trustee.

                         Page 59

Calpine - Transcript of September 25 2007 Hearing.TXT
 5              We did not move for an adjournment of the

 6      hearing, and I'm not supporting that motion, but we --

 7              THE COURT:  Should I say thank you and sit

 8      down?

 9              MR. BIENENSTOCK:  The reason I stood up is

10      the plan they filed in the early hours of yesterday morning

11      does raise a legal issue that's part of our objection, a

12      pure legal issue that in our view does compel the court to

13      deny their disclosure statement approval.  And I think

14      given that motion it will only take me a few seconds.  It's

15      better to just put it on the table now.

16              The issue is as follows:  It's an

17      undisputed fact that as an of today, this moment, this

18      court has not ordered substantive consolidation.  It's also

19      an undisputed fact that the proposed plan filed in the

20      early hours of yesterday in Article 3.A.1, which was

21      changed from the prior version, says that the

22      classification in this plan is all creditors of all debtors

23      against the consolidated merged entity because the plan

24      requests substantive consolidation.

25              The issue is as follows:  Can this court

                                                            67

 1      approve a plan and disclosure statement -- approve a

 2      disclosure statement for a plan today that's based on a

 3      entity that does not exist?  We submit it cannot.  We are

 4      not saying, to be very clear, we are not saying that a plan

 5      cannot possession substantive consolidation.  What we are

 6      saying is a plan that you're asking us to vote on today

 7      must be for the legal entity that exists today.  It can say

                            Page 60

Calpine - Transcript of September 25 2007 Hearing.TXT
8    that if confirmed it will result in a substantive

9    consolidation, but that's not what this plan says.

10                   This plan, and all of the mechanics the

11   court is being asked to approve as part of the disclosure

12   statement says that we are supposed to vote on a plan for

13   an entity that doesn't exist, and we're part of a class of

14   creditors not only of CalGen, in my client's case, but of

15   creditors of all the other debtor entities.

16                   There is no authority for that in the Code.

17   There's no authority for in the juris prudence.  It makes

18   no logical sense.  There is no plan and disclosure

19   statement on the table today for this court to approve.

20                   MR. SELIGMAN:  Good morning, your Honor.

21   David Seligman on behalf of the debtors again.

22                   Your Honor, responding to the equity

23   committee's motion --

24                   THE COURT:  Wrapped into those last

25   comments are classification issues in which you can trace


                                                        68


1    the lines back and forth, which essentially come down to

2    confirmation issues.

3                    MR. SELIGMAN:  Exactly, your Honor.

4                    With respect to Mr. Kaplan's motion, we've

5    laid out in our opposition that we've filed to the motion

6    our position on this, so I will try not to repeat that.

7    But essentially as we said before, we were facing your

8    Honor with the 18 month exclusivity period.  We had to file

9    a plan.  We are now facing the January 31 exit financing

10   date.  We had to put forth a plan of reorganization to get

                            Page 61

Calpine - Transcript of September 25 2007 Hearing.TXT

11  this plan out.  Everyone here, for a long period of time,

12  has recognized in the 800 pound gorilla that we've referred

13  to in our papers is valuation.

14          We tried to see if there was some way to

15  get all the parties together to agree on some kind of

16  valuation as part of filing a plan and getting the process

17  rolling, but we were not able to.  Maybe at the end of the

18  day that will happen.  In absence of that --

19          THE COURT:  Well, it's a lot like herding

20  cats; sometimes you are successful and sometimes you are

21  not.

22          MR. SELIGMAN:  Exactly, your Honor.

23          THE COURT:  And to borrow Mr. Kaplan's

24  favorite phrase, at the end of the day which hopefully you

25  are successful or maybe you're not.

69

1           MR. SELIGMAN:  Exactly, your Honor.

2           At the end of the day, and that may be a

3   reoccurring theme.  We tried to come up with what the

4   thought was an elegant solution that basically said that we

5   are going to have a straight waterfall plan that's in full

6   compliance with the absolute priority rule, and the

7   cascading of value down from the creditors to the equity

8   holders will depend on this court's determination of value.

9   Not the debtors' determination of value, the debtors

10  obviously put in their own views.  But it's the court's

11  determination of value, and everyone was able to argue

12  about what they thought the appropriate valuation was.

13          Although we came out with our views on

Page 62

Calpine - Transcript of September 25 2007 Hearing.TXT

14    valuation in the original disclosure on June 20th, we

15    always were telling people that there was a possibility

16    that that valuation could materially change.  In the June

17    20th version we said that the valuation put forth by Miller

18    Buckfire, the debtors' investment bakers, could ultimately

19    not be with what the valuation is on exit.  In the August

20    27th version of the disclosure statement and plan that

21    would be filed, I we expressly reserved the right that

22    Miller Buckfire may decide, if they thought it was

23    appropriate to do so, to refresh the valuation.  So we have

24    always disclosed about this refresh valuation issue, it's

25    not like a new issue.

70

1                    In our effort to try to and reach consensus

2    with as many people as possible, we worked with the

3    creditors' committee to try and achieve some form of

4    consensual plan.  We ultimately got their support on a form

5    of plan that basically we give them various consent rights

6    and other rights under this document and put to your Honor

7    the question of valuation.

8                    One of the things that the creditors'

9    committee asked for was they said, well, if there's going

10    to be refresh, as you've disclosed in all your prior

11    versions of your disclosure statement, we would like you to

12    be able to come up with the refresh before the voting

13    deadline so that people do have a chance to understand

14    that.  And we said fine, we will work to do that.

15                    And I won't go through the details, but we

16    set forth in our papers the reasons why the dates we chose

Page 63

Calpine - Transcript of September 25 2007 Hearing.TXT

17  on that schedule were very important.  We couldn't do the

18  refresh too early because we were waiting for the companies

19  annual budgeting process to be completed because there

20  would be updates to the business plan that would feed into

21  the valuation.  And we also couldn't do it too early

22  because part of a valuation involves comparable companies

23  analyses, and there's going to be some comparable companies

24  of the debtor coming out with earnings releases in the

25  early part of November, and makes sense to wait and see

71

1  what those earnings releases are before the refresh, but we

2  also didn't want to do it too late that it would impact our

3  ability to exit on a timely fashion.  And so we agreed to

4  this explicitly that we would have a hard date by which we

5  would refresh or valuation before the voting deadline.

6        And in the vein of no good deed goes

7  unpunished, now the equity committee comes forward and says

8  that the whole plan process should be put on hold and iced

9  for a variety of different reasons.  Their proposed

10  solution is no solution at all.  They basically say wait

11  until there can be a refresh, which if you really want to

12  wait for all the information you would maybe wait until

13  November, and then come out with a valuation that you are

14  absolutely going to positively agree never to change.

15        Well, that's not reality, as the court has

16  seen in lot's of Chapter 11 cases.  There are lots of times

17  where debtors come out with valuation, put in risk factors

18  that say valuation may be different, there may be a time

19  shortly before the confirmation that people refresh their

Page 64

Calpine - Transcript of September 25 2007 Hearing.TXT

20   valuation.  And so this is commonplace.  For us to sit and

21   wait until November to come up with a refresh and then

22   solicit, and by the way, they would probably be saying that

23   that November refresh was stale anyway and we would have to

24   update anyway.  And it's a due loop and you never get to

25   where you need to get.

72

1                 A couple of other points, your Honor, as to

2   why the motion should be denied.  Again, the point about --

3                 THE COURT:  It's unfortunate that valuation

4   experts always need comparables in order to make their

5   conclusions.  If you people would agree to waive that

6   element, but I don't know under Dalbert that I could

7   tolerate that, it would be a lot easier.

8                 MR. SELIGMAN:  Well, I'll pass that along

9   to Miller Buckfire and see what they think about that.

10   They can get together with Lazard and PWP.

11                 But again, your Honor, the equity

12   committee --

13                 THE COURT:  It almost means that valuations

14   have no real currency unless they occur slightly after each

15   quarter of the year.

16                 MR. SELIGMAN:  They may or may not, your

17   Honor.  A big component of it also is the revised budgeting

18   process that's going to happen, and we talked a lot about

19   this internally.  It wouldn't make sense to come out with

20   an updated valuation and then a week later --

21                 THE COURT:  I'm not conducting a valuation

22   hearing right now.

Page 65

Calpine - Transcript of September 25 2007 Hearing.TXT
23            MR. SELIGMAN:   Exactly.

24            Your Honor, again just a couple of points.

25  The equity committee argues that they don't have


                                                      73


1  information on how to vote.  They certainly know their

2  position.  They have their own independent duties to

3  determine their own thoughts on valuation and to advise

4  their creditors.  As we said in the language in the

5  disclosure statement, however a shareholder votes he has

6  the right to argue about valuation.  The shareholder can

7  say, you know, this is a good construct, this concept of a

8  plan that, you know, shock and surprise complies with the

9  absolute priority rule, that's a good thing, and so I want

10  to vote for the plan.

11            THE COURT:  It's shock or/and surprise.

12            MR. SELIGMAN:   Shock or/and surprise,

13  right.  Your Honor, in that situation they have the full

14  rights to argue for whatever valuation they want to argue.

15  I'm sure that if the debtors refresh their valuation and it

16  comes out significantly higher, I'm sure a lot of creditors

17  who supported the plan will say well, I now have someone to

18  fight on valuation, and vice versa for equity.  There's

19  nothing binding on the shareholder.  They can simply vote

20  for the construct, and they can from this day forward

21  announce that they are going to fight valuation and name

22  their valuation, and that's satisfy.

23            The other point I would make is, as you may

24  hear from the creditors' committee, the creditors'

25  committee was obviously okay with this construct.   They

                          Page 66

Calpine - Transcript of September 25 2007 Hearing.TXT

74

1    believed that it was reasonable and appropriate to advises
2    all of their constituents, and they have thousands of
3    constituents themselves representing multiples of issuances
4    of public debt as compared to the shareholder.
5                    And so with that, your Honor, I would rest.
6    But, again, I think that we should go forward with the
7    point that Mr. Bienenstock raised about substantive
8    consolidation, I was originally planning to take that up in
9    the context of objection.  But to address the issue now,
10   simply, your Honor, we get attacked for whatever we do.
11   First we proposed a plan that that provided for substantive
12   consolidation and reserved optionality, and that if your
13   Honor doesn't approve substantive consolidation, we would
14   go forward with it anyway.  They didn't like that.
15                   We changed its plan to say we are providing
16   a substantive consolidation plan, and that's what we are
17   providing.  And so we hear from them that because you want
18   to, as Mr. Kieselstein said, have the temerity to propose a
19   substantive consolidation plan, you could never get out the
20   door because according to them it proposes a plan for a
21   debtor that doesn't exist.
22                   Obviously there have been lots of
23   disclosure statements and plans approved that seek
24   substantive consolidation.  There's nothing wrong with us
25   saying that that's what we want, we are seeking Subcon.

75

Calpine - Transcript of September 25 2007 Hearing.TXT

1    Again, they are arguing for a plan out there.  I appreciate
2    Mr. Bienenstock's concern for us that now we are supposedly
3    proposing a plan that's not going to work and violate --
4    and not cause us to exit before January 31, but we thought
5    a lot about it internally, we discussed the matter with the
6    creditors' committee, and we believe that this is the way
7    to properly go forward.
8                    MR. STAMER:   Your Honor, just very briefly.
9    This is Mike Stammer again, from Akin Gump for the
10   creditors' committee.
11                   Your Honor, the requirement of a refresh in
12   advance of the voting deadline was critical to the
13   creditors' committee.  As we've said in I think the four or
14   five pleadings we've field in the last week or so, we
15   believe the current valuation is outdated and inaccurate,
16   that, in fact, if Miller Buckfire were to conduct their
17   analyses today, it would result in a decrease in the
18   enterprise value of the company in excess of a billion
19   dollars.
20                   Your Honor, we believe the structure of the
21   plan, the requirement of refresh, what it does is it gives
22   all parties in interest the most up to date current
23   information in order to make an educated discussion as to
24   how to vote in the plan of reorganization.
25                   If you look at why we're here today on the


76


1    motion, the equity committee's motion to adjourn, what are
2    they seeking to accomplish?  I think it's one of two
3    things, your Honor.  It's either they are seeking to lock
                      Page 68

Calpine - Transcript of September 25 2007 Hearing.TXT

4    in Miller Buckfire's current valuation, which, as we've

5    said, overstates dramatically the current enterprise value

6    of the company; we've all seen the markets have changed,

7    operating performance has come down.

8                    If that's not what they are looking for,

9    then, your Honor, what they are looking for is to, and I

10   believe to his credit, counsel for the equity committee was

11   critical of the movants for a Chapter 11 trustee, what they

12   are doing is trying to use litigation as a leverage point

13   in negotiations to gain something that we believe they are

14   not entitled to.

15                   Your Honor, we have collectively, and the

16   equity committee involved spent thousands of hours trying

17   to arrive at a disclosure statement that is fair, that is

18   reasonable, that maximizes not only value but also the

19   prospect of emerging from Chapter 11 in advance of the

20   expiration of what we all have referred to as very valuable

21   Goldman Sachs financing.  There is no reason that they have

22   articulated, the equity committee, for adjourning this

23   disclosure statement.

24                   And as you'll hear, your Honor, the

25   creditors' committee strongly supports not only going

                                                          77

1    forward with the disclosure statement this morning, but

2    approval of the disclosure statement hopefully sometime

3    this afternoon.

4                    Thank you, your Honor.

5                    MR. KAPLAN:  Your Honor, I'll be

6    extraordinarily brief just to respond to Mr. Stamer's last

Calpine - Transcript of September 25 2007 Hearing.TXT
7  comment.
8              All we are looking for is the debtors' are
9  seeking approval of a disclosure statement today, say today
10  what they think the value is.  As far as what we've been
11  told, Miller Buckfire still believes that today this is
12  their valuation and that's why it's in there, and that's
13  why it's in the book you're going to approve.  But, you
14  know, come November we'll see what we decide to do.  And
15  today we have the debtors' current business plan, based on
16  that business plan we have a valuation.  But again, come
17  November we'll see what we want to do.
18              Your Honor, nobody, neither Mr. Stamer nor
19  Mr. Seligman addressed the point of local Rule 3019,
20  neither of them, because there is no real answer to it.
21  They didn't respond.  Now we hear what was an interesting
22  data point in their response is now the 800 pound gorilla.
23  I'm not sure which, I know we think it's the 800 pound
24  gorilla.  But it's interesting how when they are trying to
25  justify and say it's not a material change, it's an


78


1  interesting data point.  Now it's the 800 pound gorilla.
2              Again, nobody addressed the discovery
3  point.  Mr. Seligman said Miller Buckfire needs to wait not
4  only for the comps to see where they trade, which I think,
5  as your Honor pointed out, sort of shows the fallacy of the
6  valuation, that every day you look at it it could change.
7  But they said equally important they need to see what their
8  revised business plan looks like.
9              Well, if Miller Buckfire needs to see what

Calpine - Transcript of September 25 2007 Hearing.TXT

10    the revised business plan looks like in November before it

11    can make a determination, how is anybody voting on the plan

12    supposed to make their determination until they see the

13    business plan?  And I'm not looking to extort leverage on

14    it, litigation.  When the first disclosure statement was

15    out there we had problems with, we filed an objection, we

16    did it the regular way.  It's an objection.  Your Honor

17    will consider it.  We talked about language with the

18    debtors.  That's when you have a regular disclosure

19    statement with a plan where we can all say we love it, we

20    hate it.  We at least know what we are fighting.

21            When we are in this situation where we are

22    going to be doing discovery blind, having no idea what the

23    business plan is, having no idea what the valuation is,

24    having no idea ability to tell our constituents what they

25    are getting, this is not an ordinary situation where we

79

1    just deal with it on the disclosure statement objection.

2    We, again, believe that the disclosure statement hearing

3    should be adjourned.

4            The only thing I would add is to the extent

5    your Honor denies our motion, we would like, for record

6    purposes, that our motion to adjourn be considered an

7    objection to the disclosure statement as well.

8            MR. BIENENSTOCK:  Your Honor, I just want

9    to emphasize that both the court and the debtor glossed

10    over the point we made in -- we submit erroneous.  It's one

11    thing to say that the classification of a debtors'

12    creditors is a confirmation issue.  It's another thing to

Calpine - Transcript of September 25 2007 Hearing.TXT

13    say that the classification of the debtors' creditors and

14    all other creditors of other debtors is nothing but a

15    confirmation issue.

16                THE COURT:  You're articulating now an

17    objection to the disclosure statement rather than truly

18    supporting the motion now.

19                MR. BIENENSTOCK:  Clearly correct.

20                THE COURT:  Thank you.

21                MR. SELIGMAN:  Your Honor, just one quick

22    quote on the discovery point.  We have stated and

23    clarified, and we will state it again, that when the

24    business plan is refreshed and the new projections come

25    out, we put in our papers that we are going to file with

80

1    the court, we are going to have a process that will

2    disclosed on a website.  We will provided it to the equity

3    committee at the same time that it goes to the Miller

4    Buckfire, so the equity committee's experts and Miller

5    Buckfire will have it at the exact same period of time to

6    prepare whatever they want in terms of valuation based on

7    the numbers.

8                THE COURT:  Well, first, not that I'm a

9    stickler, but the first time I heard Mr. Kaplan talk about

10    local Rule 3019 I didn't say anything, but he did it a

11    second time.  It's not a local rule, Mr. Kaplan, it's a

12    national rule; it's part of the Bankruptcy Rules and

13    procedures.

14                But in any event, and adopting the

15    statement "at the end of the day," really all I have is a

Calpine - Transcript of September 25 2007 Hearing.TXT

16    motion for an adjournment that comes at the very eve of a

17    broadly noticed, and given all of the objections filed,

18    objection to the disclosure statement in quantitative terms

19    of 40, or maybe now 50 since Mr. Bienenstock has

20    articulated a new objection perhaps that's not in his

21    papers.

22                I'm not usually one that deals with a

23    motion for an adjournment with a long opinion, but since so

24    much time has been consumed here over this issue, which has

25    been brought on as an emergency issue, I feel constrained

81

1    to react appropriately to it.

2                Before the Court is a Motion of the

3    Official Equity Committee of Calpine Corporation and the

4    affiliated debtors (collectively, the "Debtors") to Adjourn

5    the Hearing on the Debtors' Motion for an Order Approving

6    the Adequacy of the Debtors' Disclosure Statement.  The

7    Motion was filed late Thursday evening on the eve of Yom

8    Kippur, a high holy day date for most.  And as I indicated

9    before, the motion, although 17 pages in length, referred

10    this court to over 200 pages of material to consider in

11    connection with the motion causing me, thankfully for the

12    ECF system, the opportunity to go through the docket and

13    pull down all of the material referred to by the Equity

14    Committee in support of its Emergency Motion.  This request

15    for an adjournment is primarily based upon a contention

16    that less than a week prior to the hearing to consider the

17    adequacy of the Debtors' Disclosure Statement, the Debtors

18    have filed their Second Amended Disclosure Statement and

Page 73

Calpine - Transcript of September 25 2007 Hearing.TXT

19  Second Amended Plan "containing substantial and material

20  modifications - modifications that render meaningless the

21  Bankruptcy Code's requirements under Section 1125 and that

22  make an already defective plan process beyond repair."  In

23  actuality, a review of the blackline version of the Second

24  Amended Disclosure Statement demonstrates that very few

25  modifications have been made.  What the Committee really

82

1  objects to is the provision that Miller Buckfire will

2  publish an updated or "refreshed" valuation of the Debtors

3  "a mere five days" before the Voting Deadline.  The Equity

4  Committee seeks to adjourn the Disclosure Statement hearing

5  until after they receive an updated valuation.  The Debtors

6  and the Official Committee of Unsecured Creditors object.

7  Now that timing or dating as this hearing has suggested

8  depends upon issuance of quarterly reports, I don't know if

9  that's appropriate or not, but that does set some sort of a

10  benchmark for the request for adjournment which is not one

11  of a few days or few weeks but very substantial and cuts

12  into what Congress has given us is as a very cramped

13  timeline.

14          The key issue in connection with the plan

15  of reorganization in these cases is whether the Debtors

16  reorganized equity value is sufficient to satisfy

17  creditors' claims in full and also provide value to

18  existing interest holders.  The two critical inputs into

19  whether equity holders are in the money are the valuation

20  of the reorganized Calpine and the amount of claims against

21  the Debtors' estates.  The Debtors have been working

Calpine - Transcript of September 25 2007 Hearing.TXT

22    diligently on the claims allowance/disallowance process and

23    Miller Buckfire has issued a valuation, as of June 20,

24    2007, of 20.268 billion dollars on which the Plan is

25    predicated.


83


1            As may be expected, the Creditors'

2    Committee believes that the value of the reorganized

3    Debtors may be significantly lower than the Debtors' view,

4    and the Equity Committee believes that the valuation may be

5    significantly higher.  With the acknowledgement that

6    agreement on valuation before starting the plan process was

7    unlikely, the Debtors filed a "waterfall" plan that would

8    distribute Calpine's reorganized equity to unsecured

9    creditors until they were paid in full, with the balance,

10   if any, cascading to interest holders, in compliance with

11   the absolute priority rule.

12           In the Disclosure Statement, the Debtors

13   estimated that, based upon that valuation and their risk

14   adjusted claims estimate, there would be sufficient

15   reorganized Calpine equity to satisfy claims in full and

16   make distributions to interest holders.  However, under the

17   Debtors' Plan, the value of the reorganized equity would

18   ultimately be based upon a valuation as determined by this

19   court.

20           On September 18, 2007, the Debtors filed

21   their second amended Disclosure Statement, which stated

22   that, "Miller Buckfire shall use commercially reasonable

23   best efforts to update the Valuation Analysis no later than

24   five business days prior to the Voting Deadline to reflect

Calpine - Transcript of September 25 2007 Hearing.TXT

25    Miller Buckfire's best professional judgment as to the New

84

1    Calpine Total Enterprise Value as of that time."

2                    In seeking to adjourn the Disclosure

3    Statement hearing, the Equity Committee argues that the

4    possibility of a revised valuation five days before the

5    voting deadline (1) means that the Disclosure Statement

6    lacks adequate information; (2) violates the 25 day notice

7    requirements of Bankruptcy Rule 2002; and (3) makes the

8    Debtors' proposed discovery schedule unworkable.

9                    In an effort to respond to concerns of the

10   Equity Committee, the Debtors have agreed with the

11   Creditors' Committee to schedule the "valuation refresh" at

12   least ten business days before the voting deadline and to

13   extend the proposed voting and objection deadline to

14   November 30 from November 27.   The Debtors also agreed to

15   make clear that even if a creditor or shareholder voted for

16   the plan, they (in addition to the two official committee)

17   could still present their case on Debtors' reorganization

18   value.

19                   Under the Debtors' proposed confirmation

20   schedule, this would call for the Debtors' valuation

21   analysis - as contained in an expert report - to be

22   completed by November 19th, with a new voting deadline of

23   November 30th.   During October, the Debtors will be

24   updating their business plan projections, a process which

25   could result in revised business plan projections, which

Calpine - Transcript of September 25 2007 Hearing.TXT

85

1  are a critical input to Miller Buckfire's valuation
2  analysis.  The revised projections are expected to be
3  completed on or about November 1st.
4           The Debtors and the Creditors' Committee
5  also targeted November 19 because it was the latest date
6  that the Debtors could refresh their valuation and still
7  provide adequate time for: creditors and equity holders to
8  consider that information and cast their ballots; the
9  ballots to be tabulated; all parties to conclude discovery
10  (including expert discovery based upon parties' expert
11  reports on valuation); confirmation briefing to be
12  completed; and a confirmation hearing to commence on
13  December 18, all so that the Debtors can emerge from
14  Chapter 11 prior to January 31, 2008 - when the Debtors'
15  favorable exit financing expires.  And it's no great secret
16  that the issue of that favorable financing is one that may
17  not necessarily be replicated either today or in the
18  projected near future, a very critical element in a
19  successful emergence from Chapter 11 here.
20           According to the Debtors, the Equity
21  Committee and its professionals who have floated their own
22  proposal to the Debtors for restructing through a Rights
23  Offering have had access to the Debtors' management,
24  professionals, and tens of thousands of pages of materials
25  regarding the Debtors' business plan and valuation for over

86

1  a year and has thus far declined to take an affirmative

Calpine - Transcript of September 25 2007 Hearing.TXT

2  view on the valuation of the reorganized Debtors - other

3  than to say that the value should be higher than the views

4  set forth by the Debtors.

5           Moreover, the plan is based on a valuation

6  as determined by this Court so as to comply with the

7  absolute priority rule.  While the Debtors' own views on

8  valuation - and any refresh of that valuation prior to the

9  voting deadline - likely will be a valuable data point to

10  the Equity Committee and the Debtors' interest holders, it

11  is not binding on them or this Court, and they are free to

12  argue for a much higher valuation at the confirmation

13  hearing.

14           In addition, since the Debtors' June 20

15  filing of their plan and disclosure statement, parties in

16  interest have been on notice that Debtors' valuation could

17  materially change in the future.  Indeed, each iteration of

18  the Debtors' Disclosure Statement included a provision

19  explicitly reserving the Debtors' right to update their

20  valuation.  The only alteration to this provision in the

21  second amended Disclosure Statement was the Debtors'

22  commitment to update the valuation prior to the voting

23  deadline.

24           The Equity Committee's arguments ignore the

25  practical reality that in large Chapter 11 cases it is


                                                   87


1  typical for there to be several months between the date a

2  disclosure statement is filed and approved and a

3  confirmation hearing and thus a resulting update of

4  information including valuation, and indeed negotiation.

                         Page 78

Calpine - Transcript of September 25 2007 Hearing.TXT

5          Lastly, the Debtors' filing of the Second

6   and Third Amended Disclosure Statements, is not a violation

7   of Bankruptcy Rule 2002's requirements for twenty-five

8   days' notice of a disclosure statement and plan

9   confirmation hearing.  Rule 2002 only prohibits material

10  modifications of a plan or disclosure statement within the

11  twenty-five day notice period without Court approval.

12          The Debtors have demonstrated that the

13  valuation refresh date, the voting and objection deadline,

14  the confirmation hearing, and the discovery schedule were

15  established to ensure that creditors and shareholders would

16  have the Debtors' latest views on valuation as soon as

17  possible for voting purposes, and not so late as to hinder

18  the Debtors' ability to timely proceed with confirmation

19  and emerge from Chapter 11 with their valuable exit

20  financing in place.

21          Accordingly, for all the reasons listed in

22  the Equity Committee's motion for an adjournment, and for

23  all the reasons I have just articulated, that motion for an

24  adjournment is denied.

25          MR. KAPLAN:  Your Honor, one brief

                                                        88

1   clarification.  I apologize if I misspoke when I was saying

2   local Rule 3019, I was talking about local Rule 3019-1.

3   And since Rule 3019 deals with after the vote is closed,

4   there is a local rule that was added on --

5          THE COURT:  I thank you for the edification

6   that the local rule mimics the national rule, and please

7   forgive me for copying on the issue.

                        Page 79

Calpine - Transcript of September 25 2007 Hearing.TXT

8          MR. SELIGMAN:   Your Honor, with that we are
9    prepared to move on to the approval of the disclosure
10   statement hearing.  We are prepared to move forward; I
11   don't know if your Honor wanted to take a five minute
12   recess or lunch break, but we are prepared to move forward.
13          THE COURT:  At the end of the day I don't
14   know if five minutes means so much so we'll take a five
15   minute recess, and maybe we can find out if that other room
16   works for those that are tired of standing.
17          MR. SELIGMAN:   Thank you, Judge.
18          (Recess taken.)
19          MR. SELIGMAN:   Good morning, your Honor.
20   David Seligman for the debtors again.
21          Your Honor, we wanted to move to the last
22   motion on the agenda, which is the motion to approve the
23   adequacy of the disclosure statement.
24          Your Honor, I just want to give a brief
25   introduction.  As the court certainly recalls, the debtors

89

1    filed their original plan on June 20, which was the end of
2    the debtors' 18 month exclusivity period.  Shortly
3    thereafter on July 2 the debtors filed the motions before
4    you today seeking entry of the approval of the adequacy of
5    the disclosure statement and approving the various notation
6    procedures contained therein.  On July 17 the debtors
7    published notice of the disclosure statement hearing in
8    various major publications across North America as well as
9    serving all creditors and equity holders by mail.
10          The motion was originally scheduled to be

Calpine - Transcript of September 25 2007 Hearing.TXT

11    heard on August the 8, but as we've discussed in length the

12    debtors continued the disclosure hearing twice to order to

13    address some alternative plan structures.  And for the

14    reasons we set forth we ultimately decided to not go in

15    those directions.  But we also used that time, I think,

16    quite productively to resolve as many issues as we could

17    with the creditors' committee and the various other

18    constituents.

19              This lead to the debtors' filing of their

20    first amended plan and disclosure statement on August 27th.

21    On the objection deadline, which was reset for September

22    14th, we received over 40 objections, a number of which

23    were filed late, to the adequacy of the disclosure

24    statement hearing.

25              The debtors then filed their second amended

90

1     plan and disclosure statement hearing about a week ago,

2     last Tuesday, September 18th.  The second amended September

3     18th filing contained various what we view as not material

4     amendments including various consent and consultation

5     rights to the creditors' committee with them reserving

6     their rights to argue at valuation.

7              On September 19th the debtors filed a

8     supplement in support of their motion for the approval of

9     the disclosure statement which basic refreshed the various

10    dates that we were seeking in the original motion with

11    respect to confirmation, record date, voting date, et

12    cetera, and also requested that the court approve a

13    discovery schedule in connection with confirmation given

Page 81

Calpine - Transcript of September 25 2007 Hearing.TXT

14    the fact that we are facing a valuation hearing, likely

15    that contested valuation trial months from now, we wanted

16    to establish an organized a fair process for people to have

17    as much time as possible to conduct whatever discovery they

18    were going to file.

19              On September 21st the debtors filed their

20    omnibus reply in support of the disclosure statement.  They

21    attached a status chart listing the status of all the

22    objections to the disclosure statement, the parties

23    relative positions and resolutions as of that time.  Last

24    week, as you'll hear in from the creditors' committee, they

25    also filed a statement in support of the disclosure


                                                              91


1     statement.  In the late evening on Sunday, September 23rd,

2     actually the very early morning of Monday, September 24th,

3     the debtors filed their third amended plan and disclosure

4     statement which incorporated very minor non material

5     modifications to the plan to address various objections to

6     the plan and to the disclosure statement.  Then, your

7     Honor, the final filing was last evening, the debtors filed

8     an updated version of their status chart summarizing the

9     objections to the disclosure statement that was originally

10    appended to their response brief filed last week.

11              Your Honor, before turning to the

12    disclosure statement and the objections, I had to enter a

13    documents that we've circulated here in the courtroom, and

14    I want to hand up to your Honor.  And I just wanted to run

15    through those documents for a moment.  My colleague --

16              THE COURT:  How much does it weigh?

                          Page 82

Calpine - Transcript of September 25 2007 Hearing.TXT

17          MR. SELIGMAN:  What's that?

18          THE COURT:  How much does it weigh?

19          MR. SELIGMAN:  How much do you want it to

20  weigh, your Honor?

21          THE COURT:  Feather weight.

22          MR. SELIGMAN:  He we have copies of the

23  revised plans, they are merely to the extent that you want

24  to refer to pages as we engage in dialogue on the

25  objections.  Mr. Jim Mazzo, who is here in the courtroom


                                                            92


1  with me, we've handed out documents to everyone before the

2  hearing started, but if anybody needs a document they can

3  ask Mr. Mazzo for the document.

4          First, your Honor, we have an updated

5  disclosure statement objection status chart which we've

6  handed out to people which just reflects any additional

7  changes to the status of objections as of last night.

8  Certain objections have been resolved, down to the shaded

9  boxes resolved, and we then have received additional

10  changes and they are in italics, and I would like to hand

11  it up to your Honor in a moment.

12          Second we have a slightly amended plan and

13  disclosure statement which contains, again, what we view as

14  non material modifications to resolve various objections

15  from the previous versions of the third amended plan and

16  disclosure statement that we filed in the early hours of

17  September 23rd.  And finally we have updated proposed

18  orders approving the disclosure statement and approving the

19  various ballots.  We filed a red line of the updated

Calpine - Transcript of September 25 2007 Hearing.TXT
20  disclosure statement and proposed order last night as well,

21  and we have copies here in the courtroom as well.

22                    With that, with your permission, I would

23  just like to hand the documents up to your Honor to the

24  extent you may want to refer to them.

25                    THE COURT:  I'll entertain them.  I take


                                                                93


1  it, Mr. Seligman, I can throw these away, and that makes it

2  an even exchange.

3                    MR. SELIGMAN:  Exactly, your Honor.

4                    Your Honor, the way I would like to proceed

5  this morning, if it's acceptable to your Honor, is in

6  several parts.  First, I would like to make the most

7  briefest of statements in support of our case for the

8  approval of the adequacy of the disclosure statement.

9                    THE COURT:  I think that the pay scale for

10  reporters changes whether it's morning or afternoon, so

11  it's not this morning any more, it's this afternoon.

12                    MR. SELIGMAN:  Excuse me, your Honor.  I'm

13  sorry.  I may still be on Chicago time.

14                    I would like to, after making very brief

15  statement in support of the disclosure statement, I would

16  like to just give your Honor the latest statistics on the

17  number of objection.  And then, your Honor, to the extent

18  that your Honor wishes, I would like to briefly go through

19  some of the changes to the documents as compared to the

20  last version filed for your Honor's benefit, to the extent

21  you will entertain those.

22                    There are a couple of clarifications on the

Calpine - Transcript of September 25 2007 Hearing.TXT

23    record that we are going to read into the record that

24    resolve people's objections.  And then I would like to go

25    through the disclosure statement, the proposed order and

94

1     the ballots, and, again, highlight just some brief changes

2     to those documents.  And then finally open it up for people

3     who wish to speak in support of the disclosure statement.

4     There is a number of people who we've resolved objections

5     with and they want to make their own statements on

6     reservations of right.  And then finally turn the matter

7     over to the parties whose objections are still remaining.

8              Your Honor, with that we have said in our

9     original motion to approve the adequacy of the disclosure

10    statement as well as in our brief in of support, that the

11    disclosure statement adequately meets the standards for

12    adequate information as require under Section 1125 of the

13    Bankruptcy Code.  The court is well aware the standards and

14    I won't repeat them.

15             We have laid out in our brief the various

16    elements of a disclosure statement that courts have

17    generally required plans to contain, and we have laid out

18    how we believe that our disclosure statement complies with

19    all of those elements.  It's a very lengthy two hundred

20    page plus document that contains comprehensive information

21    about the debtors' business, its history, the myriad

22    restructuring efforts taken by the debtors since the

23    petition date, detailed risk factors relating to the

24    debtors' business, the Chapter 11 cases, and the new

25    Calpine common stock be issued under the plan.  It lays out

Calpine - Transcript of September 25 2007 Hearing.TXT

95

1    all the treatment of claims in interest under the plan, it
2    has claims estimates, it has projected recoveries, and it
3    has other pertinent information that we believe holders of
4    claims in interest would be interested in.  And finally we
5    have the debtors' liquidation and valuation analysis to
6    provide the people information with respect to the absolute
7    priority rule as well as the best interest rule.
8                 As we said before, your Honor, we've given
9    extensive notice to --
10                THE COURT:  Can Mr. Seligman be heard in
11   the back?
12                (A resounding no)
13                MR. SELIGMAN:  I apologize, your Honor.
14                THE COURT:  You can use the microphone here
15   if you want.
16                MR. SELIGMAN:  Your Honor, with respect to
17   notice, we've outlined how we've given extensive notice to
18   all the parties, both by publication and actual notice.  We
19   would also respectfully submit that the solicitation
20   procedures that we've set forth in the documents are
21   reasonable and appropriate and tailored to deal with the
22   complexity of these cases, they are, for the most part,
23   standard ballots that have been approved in other large
24   Chapter 11 cases.
25                We have works extensively with the DTC

96

Page 86

Calpine - Transcript of September 25 2007 Hearing.TXT

1  people, with the various indentured trustees, to make sure

2  that we could have a smooth a process as possible in terms

3  of soliciting publically held securities.  We have also

4  worked with the United States Trustee to resolve some of

5  this his objections with respect to the ballots.

6          Your Honor, with respect to the status of

7  the objections, there were 43 objections filed.  Again, a

8  number of those objections include joinders and what we

9  view as late objections, and we will get to those in a

10  moment.  I think the latest statistics are 26 are fully

11  resolved; the objecting party has either agreed with the

12  clarifying language that we've placed in the disclosure

13  statement or they have agreed to withdraw their objection

14  based on the language, in some cases, reserving their

15  rights to raise some of the patent unconfirmability issues

16  in connection with confirmation.

17          So that leaves, your Honor, actually, I'm

18  sorry, 28 are now resolved, so I believe that leaves 15

19  objections remaining and they basically fall into the

20  following four categories:  (1) the equity committee's

21  objections; (2) the CalGen lender's objections; (3)

22  miscellaneous what I would call single one-off interest

23  creditors who have particular parochial, not to be

24  pejorative, but parochial interests that they want

25  addressed.  And finally there was a pleading filed last

97

1  night because by the ULC I note holders for an order

2  compelling the debtors to produce certain documents, which

3  we will get into connection with the objections as well.

Page 87

Calpine - Transcript of September 25 2007 Hearing.TXT

4                As you can see, your Honor, knocking down

5      the number of objections to the number we have now, we

6      believe we have made diligent process and diligent efforts

7      in resolving as many objections as possible.  For a lot of

8      these people, if we recognized that there were disclosure

9      statement issues we've asked everyone for language.  A lot

10     of times we got language and were able to resolve the

11     matters, even the case with the main objections where we

12     asked for language we didn't receive it we proposed our own

13     language to try and solve the issues, and sometimes we put

14     that in the plan and disclosure statement regardless of

15     whether we had agreement on.  And so that's where we are.

16                Your Honor, with respect to the disclosure

17     statement and plan changes, as I stated before, we have

18     some modifications to the documents, what we view as non

19     material modifications as compared to the version filed

20     late Sunday evening, Monday morning.  Your Honor, I'm

21     prepared to proceed with highlighting those changes however

22     you want.  I can literally highlight -- again, these are

23     all red lines and they have been circulated to every one in

24     the courtroom.  I can highlight those for your Honor and go

25     through them if your Honor wishes, or again, just based on

                                                              98

1      my representation that they are non material I don't have

2      to highlight those for your Honor.

3                THE COURT:  You can do the short version.

4      I hear grumbling stomachs in the back.

5                MR. SELIGMAN:  Okay.  Your Honor, again in

6      the main they resolve, I think they resolve various

Calpine - Transcript of September 25 2007 Hearing.TXT

7  objections, a lot of the language is disclosure statement
8  language contained in the various documents and I just
9  think given your Honor's comments I won't move through them
10 one by one.

11          There are just one or two things I did want
12 to point out for your Honor and for the court.  There are a
13 couple of changes that actually are not reflected in these
14 documents, we made some resolutions here in the courtroom
15 this morning, and I just wanted to do highlight those for
16 your Honor and for the people in the courtroom.

17          The Phelps objection, I think we listed it
18 on the chart as being resolved.  They had requested one
19 additional change, they wanted us to add language in the
20 disclosure statement indicating that the court has not
21 ruled on the legality of the third party releases proposed
22 in the plan which will be addressed in connection with the
23 confirmation of the plan if necessary.

24          The second lien holders, the ad hoc
25 committee of second lien holders have requested additional

99

1  language in the terms of the plan that just makes clear
2  that professionals' fees and expenses will be made
3  consistent with the cash collateral order previously
4  approved by the court.

5          And finally in the disclosure statement and
6  plan there is on Roman five of the redline there was insert
7  requested by the equity committee we had originally had
8  agreed to make in the document.  But after further
9  consultation with the creditors' committee, we cannot

Calpine - Transcript of September 25 2007 Hearing.TXT

10  accept that change, and so it's going one of the matters we

11  are going to discuss before your Honor this morning, and

12  the objection of the equity committee had not been resolved

13  in any event.

14              Your Honor, finally, with respect also to

15  the Phelps objection, they wanted to add language in the

16  ballot that just makes clear that a vote against the plan

17  is a vote against the releases, which we certainly agree

18  with and will add to the ballot.  And they have requested

19  that certain language with respect releases be put into

20  bold as opposed to lower case which we have agreed to.

21              So with that, your Honor, those are the

22  only changes we have agreed to make.  Let me just confer

23  with my colleagues for a second.

24              (Conferring.)

25              Your Honor, there is two other small

                                                            100

1   comments in the plan, on page 16 of the plan there was a

2   definition of the KIAC and Nessaqua facilities that was

3   inadvertently omitted; the lenders with respect to those

4   facilities have pointed that out to us, and we certainly

5   have agreed to put back that definition; it was an

6   oversight.

7               Finally, to resolve the objection of the 6

8   percent invert note holders, they have asked us to include

9   language in the disclosure statement with respect to

10  characterizing the claims that they have asserted or that

11  they think they still have, and they have included some

12  language to that effect.  We have reserved our rights with

                          Page 90

Calpine - Transcript of September 25 2007 Hearing.TXT

13    that regard.  I don't believe that the creditors' committee

14    has had a chance to look at it, so I'm going to pass it

15    around, but I believe it's their position on what their

16    claims are and I don't think it will be controversial.

17            Your Honor, with that I would like to move

18    on to just make a couple of statements on the record that

19    will resolve a number of objections.  So if your Honor will

20    bear with me for a second.

21            With respect to the objection of the Law

22    Debenture Trust Company of New York, the first lien

23    trustee, the debtors have inserted a statement requested by

24    the Law Debenture Trust Company as indentured trustee for

25    the first and second lien debt into the disclosure

101

1     statement that outlines the debtors' positions on the

2     continuing accrual of interest survival of the first liens

3     post confirmation, and the debtors' obligations to

4     indemnify the indentured trustee for fees and expenses,

5     cancellation of the relevant indentures and other documents

6     post confirmation, and the entitlement of the indentured

7     trustee to allow them an indemnification claim.

8             The Bank of New of York as collateral

9     trustee for the first and second lien debts have requested

10    the following statement:  The Bank of New York as

11    administrative agent under the Calpine second lien term

12    loans has agreed to withdraw the unresolved portions of

13    their disclosure statement but reserve their right to

14    reassert objections to the plan based on the plan not

15    providing for, first, the payment of fees relating to the

Calpine - Transcript of September 25 2007 Hearing.TXT

16    disputed portion of administrative agent's claims, second,

17    survival of the administrate agent's liens, and, third,

18    payment of postpetition interest, including default and

19    compound interest.  The debtors have agreed not to object

20    to any such plan objections based on the ground that the

21    administrative agent has waived these issues by not raising

22    them at the disclosure statement hearing.

23          Thirds, HSBC as indentured trustee for

24    versus convertible notes have requested that the debtors

25    include a provision in the disclosure statement under


102


1    Article 4.G.F regarding their treatment of the original

2    issue discount claims in connection with some of those

3    notes which we have included.

4          In addition, HSBC has requested a

5    clarification and definition of make whole claim in the

6    plan, which we believe is non controversial and which we

7    have made, but debtors would note that they have added

8    certain notes, mainly as convertible notes but also some

9    unsecured notes to the definition of make whole claim to

10    address various of the parties' comments.  The inclusion of

11    in this definition is in not in any way an admission that

12    these note holders are entitled to make whole claims or

13    prepayment penalties, and in fact the debtors dispute these

14    claims.  The debtors fully reserve their rights to object

15    to these parties claims.  And I just have two more, your

16    Honor.

17          The ULC bond holders have requested the

18    following qualification which is as follows:  The third

Calpine - Transcript of September 25 2007 Hearing. TXT
19    amended plan and disclosure statement contains several
20    provisions to clarify that claims will not include
21    postpetition interest unless and until all claims for
22    principal and prepetition accrued interest have been
23    satisfied in full.  At the request of the ULC bond holders
24    ad hoc committee, the debtors would like to clarify for the
25    record that these provisions do not effect the ULC I

103

1    settlement claims, and that's because of the unique nature
2    of their claims is 1.65 times principal claims but capped
3    at actual payment of principal plus pre- and postpetition
4    interest.
5              Finally there is an clarification that
6    Quadrangle, which is one of the objecting parties, has
7    asked us to make.  Quadrangle has asked us to clarify that
8    our proposal for substantive consolidation does not effect
9    Quadrangle's separate and independent claims that they have
10   against Calpine Corporation and the CES estates, i.e.
11   Quadrangle still retains their two claims against the
12   estate in the event there is substantive consolidation, and
13   that's the construct that we have.  And that clarification
14   is also with respect not only for Quadrangle but JPMorgan
15   Chase.  Just a moment your Honor.
16             With that, your Honor, before I turn to the
17   objections I guess I would rest on and turn it over to
18   other parties who wish to speak in support of the debtors'
19   disclosure statement approval, and there may be a couple of
20   parties who also need to make a clarification or
21   reservation of rights for the record, and I would like to

Calpine - Transcript of September 25 2007 Hearing.TXT
22    try and get that out of the way before we turn to the
23    objections.
24              THE COURT:   That request is granted.
25              MR. STAMER:   Your Honor, just very briefly.


                                                         104


1    Again for the record Michael Stamer from Akin Gump for the
2    official committee.
3              Your Honor, I will be brief.  And I am
4    happy to rise this afternoon in support of approval of the
5    debtors' disclosure statement.
6              Your Honor, we filed two pleadings in
7    advance of the hearing, one a statement in support and one
8    in opposition to or respond to the objection to the equity
9    committee.  I'll just spend -- I won't burden the court
10   with the detailed arguments.  Your Honor, it took us a
11   while to get here.  It wasn't always pleasant but I'm happy
12   that we are here.  We believe that the disclosure statement
13   describes a plan that is confirmable, that it contains
14   adequate information in order to satisfy the requirements
15   of 1125, and therefore we support approval of the
16   disclosure statement.
17             As your Honor is aware from hearing the
18   argument and from reading the papers, this is only one very
19   significant hurdle and a number of hurdles to get the
20   company out of bankruptcy.  As we move forward, I don't
21   think anyone is anticipating unless a widespread settlement
22   breaks out, which we would applaud, that it will be
23   necessarily calm waters between now and the effective date.
24             The plan is a combination of factors, we
                         Page 94

Calpine - Transcript of September 25 2007 Hearing.TXT

25    are all driven towards not only getting through the cramped

105

1    timeframe set forth by Congress but also, as we've

2    discussed, the more cramped timeframe dictated by a

3    valuable asset which is the exit financing.  We believe the

4    plan is an appropriate balance.  It give gives the parties

5    the greatest amount of information in a timely fashion in

6    order to make an educated vote with respect to the plan and

7    valuation issues.  Again, we anticipate some bumps between

8    now and the confirmation hearing.

9         We are open to discussion with the various

10    parties regarding whatever issues are in dispute, but again

11    we are unequivocally supportive of approval of the

12    disclosure statement and look forward to working with

13    parties in order to get through to confirmation.

14         Thank you, your Honor.

15         MR. ROSENBERG:  Good morning -- afternoon,

16    Your Honor.  Andrew Rosenberg of Paul Wise Rifkind Wharton

17    and Garrison for the second lien committee.

18         Your Honor, we have been I guess a very

19    quiet 3.7 billion dollars of debt during this case, but

20    it's important that we lend our support to the debtor

21    today.  For some of the reasons that your Honor mentioned,

22    it's imperative that this process get underway, and that

23    this company conclude its bankruptcy before, as you

24    referred to it, the 800 pound gorilla for financing, which

25    is probably is an 8 billion dollar gorilla, while that's

Calpine - Transcript of September 25 2007 Hearing.TXT

106

1    still preserved.

2              So again we support the debtor in getting

3    this process underway and getting it concluded by January

4    31st of next year.

5              MR. ELROD:   Your Honor before we go on to

6    the objections, if it please the court, I'm David Elrod on

7    behalf of the some of the pipe lines in this case.   We

8    represent Portland Natural Gas Transmission System, Gas

9    Transmission Northwest Corporation, TransCanada Pipe Lines

10    Limited, and Nova Gas Transmission Limited.

11              We filed various objections to the

12    disclosure statement.   We are happy to announce to the

13    court that we have resolved those objections as to the

14    disclosure nature of the disclosure statement and have

15    reserved those objections that go to the confirmability of

16    the plan for plan objections, your Honor.

17              We've entered into an agreement with the

18    debtors and the creditors' committee, and there's new

19    language that will be in the order approving the disclosure

20    statement.   And essentially the disclosure statement in

21    paragraph 5 will now provide any objections to approval of

22    the disclosure statement that were not withdrawn at or

23    prior to the hearing to consider approval of the disclosure

24    statement or overruled, except as set forth in this order.

25              And then there's been a new paragraph

107

1    entered into the disclosure statement order approving it;

Page 96

Calpine - Transcript of September 25 2007 Hearing.TXT

2   it's paragraph 34 as it appears now.  And the purpose of

3   that paragraph, your Honor, provides Portland Natural Gas

4   Transmission, TransCanada Nova estimated claims for

5   purposes of voting and it sets forth the amounts that will

6   be held in reserve for the distribution of stock.  It also,

7   on behalf of those companies, preserves their objections to

8   the disclosure statement based upon plan objections and it

9   also preserves all parties' rights to pursue all the

10  claims, any objections thereto, including objection by the

11  debtor or creditors' committee to evaluation of our claims,

12  your Honor.  I just wanted to make sure that the court was

13  aware of that and that based on that we will not be

14  proceeding with our objections today.

15              THE COURT:  Thank you.

16              MR. SELIGMAN:  With that, your Honor,

17  unless your Honor has any questions, I will proceed with --

18  oh, I'm sorry there's someone here.

19              THE COURT:  I thought he was going for the

20  door.

21              MR. DRUCKER:  No.  This wishful thinking,

22  your Honor.

23              Good afternoon, your Honor.  John Drucker

24  on behalf of James Phelps, referred to in the disclosure

25  statement and the ERISA litigation plaintiffs.  Also, I'm

108

1   form the firm of Cole, Schotz, Meisel, Forman and Leonard.

2              The ERISA litigation plaintiffs are in

3   connection with certain litigation pending Federal courts

4   in California against the debtor and certain non debtor

Page 97

Calpine - Transcript of September 25 2007 Hearing.TXT

5      third party defendants which a settlement has been agreed

6      to pending approval of this court and the District Court in

7      California.

8                      I'm happy to says that the objections to

9      the disclosure statement have been resolved, as indicated

10     by counsel.  I'm rising now, however, your Honor, to

11     highlight a significant change that was made to the plan

12     and to the ballots to the effect that not only will a vote

13     with no other conformitive act by the voter in favor of the

14     plan be deemed to consent to third party releases, but in

15     addition an abstention, a failure to vote at all will be

16     deemed a consent to third party releases.

17                     It is my understanding that rather than

18     address the legality of that at this time, and although the

19     ballot will contain those provisions, that it is my

20     understanding that the legality of those provisions will be

21     addressed as part of the issues to be addressed at

22     confirmation in addition to the legality and propriety of

23     the third party releases themselves, and I'm rising to give

24     assurance to that effect.

25                     MR. SELIGMAN:  Your Honor, that's our


                                                          109


1      understanding.  Obviously the releases are ultimately a

2      confirmation issue, and do have that people who are

3      entitled to vote for the plan, we've see the ballot, they

4      will have the right to opt out of any release, but whatever

5      the language is we've agreed that this will be ultimately a

6      confirmation issue.

7                      MR. DRUCKER:  Thank you, your Honor.

                                Page 98

Calpine - Transcript of September 25 2007 Hearing.TXT
 8                  THE COURT:   Thank you.
 9                  MR. LEVEE:   Good afternoon, your Honor.
10    Ira Levee.  I represent the Hawaii Structural Pipefitter's
11    Pension Fund.
12                  Similarly we had an issue with our releases
13    and we just wanted a clarification.  We don't get to vote.
14    We are not entitled to vote because our claim has been
15    objected to and we just wanted a clarification that our
16    claims are not being released under the plain language of
17    the plan.
18                  MR. SELIGMAN:   That's correct, your honor,
19    the releases only relate to parties who are at first
20    entitled to vote.
21                  MR. KEARNEY:   Good afternoon, your Honor.
22    Michael Kearney from Sonnenschein Nash and Rosenthal on
23    behalf of Firemen's Fund Insurance Company, and we
24    recognize that --
25                  A VOICE:   Can you speak up?


                                                        110


 1                  MR. KEARNEY:   Oh, sure.  Excuse me.
 2    Michael Kearney from Sonnenschein Nash and Rosenthal on
 3    behalf of Fireman's Fund Insurance Company.
 4                  We recognize that many of the issues raised
 5    in our objection are probably best left for the
 6    confirmation hearing.  So I just wanted to clarify that we
 7    are currently in discussions to reach a settlement with the
 8    debtors and Nevada Power Company regarding certain stay
 9    litigation pending in the federal court in Nevada.  But I
10    just wanted to recognize that we do reserve all of our to
                          Page 99

Calpine - Transcript of September 25 2007 Hearing.TXT
11  raise our objections at confirmation should a settlement

12  not be provided for.  Thank you.

13              MR. SELIGMAN:  That's fine, your Honor,

14  obviously they want to reserve their rights for

15  confirmation issues, that's fine with us.

16              Does anybody else want to speak before we

17  move on?  It looks like we're all done.

18              With that, your Honor, I would move to the

19  remaining objections and I propose to proceed in accordance

20  with the amended status chart that I handed up to your

21  Honor and that I circulated in the courtroom.  We've laid

22  out in this chart a lot of objections and potential

23  responses to them rather than myself characterizing the

24  objections in the first instance, we thought it would

25  probably be most efficient to just have the objecting party


                                                           111


1   state whatever the remaining issues are on their objection

2   that have not been resolved and deal it that way one by

3   one.

4               MR. KAPLAN:  Gary Kaplan from Fried, Frank,

5   again on behalf of the equity committee.  Just so I

6   understand, do you want to go point by point or do you want

7   to get all of the points on the table?

8               MR. SELIGMAN:  I'm happy to go through all

9   of your issues and I'll address them, one party at a time.

10              MR. KAPLAN:  Okay.

11              Your Honor, the first issue is one that the

12  status chart reflects as actually been resolved.  It's one

13  that in communications with the debtor last night and they

                        Page 100

Calpine - Transcript of September 25 2007 Hearing.TXT

14    told us it was resolved.  And then we find out at 10 a.m.

15    this morning when we walk into court, gee, we didn't really

16    mean to settle this dispute, we are taking out the language

17    that yesterday was appropriate disclosure, and this point

18    goes to one of the things that I talked about in the

19    adjournment motion, is that the debtors worked into their

20    plan now a provision that says that even if you vote yes,

21    even if a class accepts, we still go into cram down mode,

22    1129(b) is still applicable even though under the Code it's

23    not applicable, the same with 1129(a)(7), even if an entire

24    class accepts it they still have a reservations that says

25    sort of we are writing those sections out of the Code.

112

1             What we ask for is, given that we

2    understand your Honor's past decisions and that your Honor

3    is going to deal with confirmation issues as opposed to

4    today; if that's a confirmation issue, which seems to us,

5    if it's an 1129 question it's the ultimate confirmation

6    issue, then we are entitled to reserve our rights on it,

7    and anybody casting their ballots should know that that

8    issue is subject to further discussion.  It's no different

9    than the releases, which even though the ballot says if you

10    check the box, if your Honor finds that they are

11    inappropriate; if your Honor decides that the, I won't say

12    at the end of the day.

13             THE COURT:  You can.  I've adopted it.  I

14    like it.

15             MR. KAPLAN:  If your Honor decides at

16    confirmation that 1129(b) doesn't apply but a class accepts

Calpine - Transcript of September 25 2007 Hearing.TXT

17    it, then we think that for the disclosure to be accurate it

18    should have our reservation that we intend to challenge

19    that provision so that there is the full and complete

20    disclosure on this point.

21              Yesterday the debtors said that disclosure

22    was fine.  Other than the creditors' committee being

23    unhappy with it, I don't know why that disclosure is

24    inappropriate.  So that's point number 1.

25              Another point, your Honor, in some of


113


1     these, I guess I'll go by the chart just to make it --

2              THE COURT:  It's okay to skip.

3              MR. KAPLAN:  I'm skipping, don't worry,

4     your Honor.

5              Your Honor, another provision is we are

6     going to reserve our rights on the patently unconfirmable

7     issues; we'll deal with that at confirmation.  A couple of

8     other points, some of which the debtors have put in

9     language but they are not actually listed on this chart.

10    So we have worked out some language with the debtors just

11    in our view is it's insufficient language.

12              One of them is both the equity committee

13    and the U.S. Trustee have both sought to disqualify PA

14    Consulting, which is one of the debtors' advisors, the

15    debtors have said they were an essential advisor for the

16    business plan.  I won't go into the details today, but

17    suffice it to say both us and the U.S. Trustee agree, and I

18    think that it's fairly clear that they are no longer

19    disinterested and their disqualification is mandated.

Page 102

Calpine - Transcript of September 25 2007 Hearing.TXT

20                    While your Honor will consider that at the

21   next hearing, what we've asked for is some disclosure as to

22   what will happen if they are disqualified.  Will it affect

23   their timetable.  Will it affect their business plan.  It's

24   not a lot of disclosure.  They have had some recent

25   resignations by some officers.  We asked for similar

114

1    disclosure.  The debtors added in provisions that say we

2    don't believe that it will effect the value or the business

3    plan.  All we are asking is if PA is disqualified in a

4    couple of weeks, does that change anything or not?  And we

5    think that, in essence, it's a risk factor, or it's not a

6    risk father, but we do think that people voting on the plan

7    should know whether the debtors are going to stand up in

8    two weeks and tell your Honor that this it throws the whole

9    case into chaos or not.  That should be in the disclosure

10   statement.

11                    Another point, your Honor, is we heard a

12   lot of talk this morning not only about the debtors

13   changing their valuation but also changes their business

14   plan.  One of the things that we have been asking the

15   debtors repeatedly and that we think is important to be in

16   the disclosure statement is what do the exit lenders hear

17   about non stop, what is their view if the debtors

18   materially change the valuation or modify their business

19   plan in a material what way.

20                    I presume the debtors would not be going

21   down this path and talking about a refresh or whatever

22   they've called it, and saying we absolutely essentially

Page 103

Calpine - Transcript of September 25 2007 Hearing.TXT

23    must update our business plan in November unless they are

24    comfortable that the lenders are going to say that's no

25    problem.  If they think there's a risk that the exit

115

1    lenders are going to say you've changed the business plan

2    and it's just mac, we should know that.  Again, it's just a

3    risk faster that says we are going to change the business

4    plan, there's a chance that the lenders are going to call

5    it a mac, at least disclose that.  That's all we are asking

6    for is have some disclosure about what the debtors believe

7    the ramifications are of those changes.

8            And, your Honor, other than reserving on

9    the releases, valuation and all those points, those are our

10    open issues on the disclosure statement, and obviously the

11    issues we argued earlier.

12            MR. SELIGMAN:  Your Honor, responding to

13    those three points, we had initially agreed to the language

14    suggested by the equity committee last night, but our

15    arrangement with the creditors' committee in order to

16    obtain their support was that we would run all issues by

17    them, obviously because they are supporting the plan.  In

18    further discussion with them and further reflexion we

19    decided it wasn't an appropriate change.

20            I don't quite understand where the equity

21    committee, I guess, is coming from.  We are saying that if

22    a shareholder votes in favor of this plan, they are free to

23    argue about valuation.  We are saying that now.  We are not

24    going to change our position.  For whatever reason the

25    equity committee wants to say that their own constituents

Page 104

Calpine - Transcript of September 25 2007 Hearing.TXT

116

1    have less rights or fewer rights than we are willing to

2    provide, they want to say wait a second if you vote in

3    favor of the plan maybe you are giving up your right to

4    argue about valuation, but we are saying, no, you have that

5    right.  After talking about it with the creditors'

6    committee we believe that to put this language in there

7    when we have other language in there that says you have the

8    freedom to vote however you want, that would just be

9    confusing to people and we don't believe it would be

10   appropriate.

11               I know our normal practice is to accept

12   reservations of right, you know, usually without question,

13   but we think that this provision would be confusing to

14   people because they wouldn't don't know their position on

15   that point, and we think that's a fairly fundamental point

16   of the proceeding.

17               The two other points with respect to the

18   motion to disqualify PA Consulting, we have added language

19   in the disclosure statement.  The U.S. Trustee and equity

20   committee filed motions in that regard.  We have stated

21   that we are preparing a response.  The objection deadline

22   has not come up.  Frankly I don't think it's appropriate

23   for us to state our position before we have to file

24   something in response, and I certainly don't think we have

25   to speculate about what may or may not happen with respect

117

Calpine - Transcript of September 25 2007 Hearing.TXT

1    to your Honor's determine of that motion and what effect it
2    may or may not have.  I think that's too speculative and
3    not appropriate.  This is an issue, obviously, initially
4    raised by the equity committee themselves.
5            The last point about what is the view of
6    the exit lenders, the exit lenders will speak for
7    themselves.  We did add language in the disclosure
8    statement that outlined some of the conditions to closing
9    of the new credit facility, including Macs, that there
10   would be normal Macs regarding business operations,
11   financial performance, et cetera, and we believe that
12   that's reasonable and appropriate.  I don't think it's
13   appropriate for us to speculate about what may or may not
14   happen if Miller Buckfire's valuation changes and what
15   effect they may know about the new credit facility, that's
16   too speculative, and we don't believe it's appropriate.  We
17   don't know, frankly, why it's so important to the equity
18   committee, but we brief believe that with respect to what
19   people need to know to vote on the plan those points are
20   not material.
21           THE COURT:  Does anybody else want to be
22   heard?
23           MR. STAMER:  Your Honor, just very briefly.
24   Just to clarify, the reason this change is not being made
25   to the plan, the first change which is to reserve the

118

1    equity committees' right to argue that your votes can be
2    used against you in a valuation fight, it's not just
3    because it's offensive to us, it's also offensive to the
                        Page 106

Calpine - Transcript of September 25 2007 Hearing.TXT

4   debtors.  We don't tell them would what to do, I wish we

5   did.

6           Your Honor, this is a waterfall plan, and

7   the fact that there's going to be a valuation fight, and

8   that all parties, including the equity committee, will be

9   free to take a position with respect to value, it is

10  fundamental to the plan.  If in fact there is a lingering

11  possibility that someone's vote will impair their ability

12  to participate, one thing will happen.  Nobody will vote

13  for the plan.

14          It would be terrific if there were a

15  Goldielocks value that the debtors could come up with that

16  everybody would agree to as being just right.  I think

17  that's highly unlikely, so our view is, consistent with the

18  framework of the plan, the issue with respect to

19  reservation of rights of all parties to participate in

20  confirmation needs to be confirmed, needs to be clarified,

21  and we feel obviously very strongly about that.

22          Thank you, Judge.

23          THE COURT:  Does anyone else want to be

24  heard?

25          MR. KAPLAN:  Your Honor, just briefly,


119


1   because of the question of why would equity care it's just

2   hurting their own constituents.  I think it's obvious, but

3   if it's not we'll say it, you only get to cramdown, you

4   only get to absolute priority, as everybody knows, in the

5   event the class votes no.  If the creditors vote yes on the

6   plan, there's no issue about equity getting a distribution

Page 107

Calpine - Transcript of September 25 2007 Hearing.TXT

7   and we can skip that.  What the creditors are saying is no,

8   no, no, we want a free option, that we want to be to

9   support this plan but still be able to evoke under 1129(b)

10  and fight about cramdown.  In our view you can't do that

11  under 1129.

12              We understand that today is supposed to be

13  a disclosure statement hearing not confirmation, and the

14  time to fight that fight is at confirmation.  But what we

15  want ius the same thing that everybody else is getting on

16  every other confirmation issue, which is a reservation to

17  be able to fight that issue and not find ourselves in a

18  situation where people say, look, it was clear on the

19  ballots, they came in and slipped it now under a black line

20  of the order that your Honor is binding it today, that's

21  binding requirements under 1129(b) today that they are not

22  applicable.

23              This isn't confirmation today.  If we want

24  to fight about confirmation issues today, then we should do

25  it, but we can't be whip sawed and told no, no, no,

120

1   confirmation issues are decided -- when they are issues

2   that we raise confirmation issues are decided at

3   confirmation, but when it's a couple of issues that the

4   debtors and creditors want then we are going to put it into

5   the order today and we're not going to have any

6   reservations for you to fight about it later.

7              THE COURT:  Anyone else?  I thank you, Mr.

8   Kaplan.  And as Anderson Cooper would say, thank you for

9   that.  But essentially the modifications and the resolution

Calpine - Transcript of September 25 2007 Hearing.TXT

10    of the objections, all of the objections of the equity

11    committee, subsuming my prior rulings are overruled.  With

12    respect to this last point, it is clear that parties are

13    not being disenfranchised from their ability to take

14    whatever position they want no matter how they vote with

15    respect to objections to confirmation.

16                    As I stated, the equity committee's

17    objection to the disclosure statement is overruled.

18                    MR. SELIGMAN:  Your Honor, the next

19    objection is by ASM Capital.

20                    THE COURT:  Where is that in your 80 page

21    document?

22                    MR. SELIGMAN:  The reservation, it is in a

23    number of different places.  I know it's in at least three

24    or four places, just give me a moment, your Honor.

25                    THE COURT:  Where is it on the status

121

1    chart?

2                    MR. SELIGMAN:  Oh, I'm sorry, ASM is number

3    2 on the status chart.  I apologize.

4                    MR. COHEN:  Your Honor, my name is David

5    Cohen of Warner Stevens appearing on behalf of ASM Capital,

6    ING Capital and Sierra Liquidity Fund.

7                    My clients hold trade claims at the

8    operating level.  We have various objection to the

9    disclosure statement, some of them I guess are deemed in

10    the nature of objections to confirmation regarding the

11    interest rate treatment of convenience class and

12    substantive consolidation.  And I'm not going to belabor

Page 109

Calpine - Transcript of September 25 2007 Hearing.TXT

13    those at this time, we'll reserve our right to object at

14    confirmation.

15              But one matter that we believe is truly a

16    disclosure as to issue, has to do with the way voting is

17    going to be conducted in this case.  As of right now these

18    cases are not consolidated.  They will not be consolidated

19    when the votes are sent out.  They will not be consolidated

20    when the votes are couched, and yet, my understanding is

21    that the ballots are all going to be sent out strictly in

22    Calpine.  Every unsecured trade creditor, for instance at

23    the operating level, will receive the same ballot, Calpine.

24    They will not be customized according to individual

25    debtors.  So the court will never be able to make a

                                                        122

1     determination about how individual debtors in these

2     unconsolidated cases feel about consolidation or the plan

3     at all.

4              I think unfortunately to make another

5     equine analogy in this case, they are putting the cart

6     before the horse.  And it's unfair and it's really the

7     improper way to judge creditors' views in this case unless

8     customized ballots are sent out and each debtor, the

9     creditors of each debtor are able to gave their views the

10    plan at substantive consolidation, otherwise, in effect,

11    you have substantive consolidation now, and that's not the

12    way it should be.

13              Customized ballots can go out.  The court

14    can determine debtor by debtor how creditors feel about the

15    plan, and the court can make a determination.  But to send

Calpine - Transcript of September 25 2007 Hearing.TXT

16    out eight class, for instance, every unsecured creditor

17    getting the same ballot, it's as if the case is

18    consolidated now.

19                   MR. SELIGMAN:  Your Honor, we're happy to

20    make that clarification on the ballots to indicate -- to

21    send out to people, make a note on each ballot what debtor

22    entity they have a claim against so that we can report at

23    confirmation those statistics; we are happy to make that

24    change.

25                   MR. COHEN:  Well, the creditors should not


                                                          123


1    have to make the note on the ballot.

2                   MR. SELIGMAN:  When the debtors send out

3    customized ballots, because everyone has filed proofs of

4    claims, so we know when we are sending out those customized

5    ballots who they were filed by, we will indicate on every

6    one's is customized ballot --

7                   THE COURT:  This is reducing itself on a

8    quibble.

9                   MR. SELIGMAN:  Exactly.  So I think we

10   agree and that we can do the ballots in the way that ASM

11   suggests, and we will be able to work that out.

12                   MR. COHEN:  Your Honor, I don't think it's

13   a quibble, I think it's an important point.

14                   THE COURT:  I think it's been resolved.

15   The objection is overruled.

16                   MR. COHEN:  Thank you.

17                   MR. SELIGMAN:  Your Honor, the next

18   objection is by Quadrangle.
     Page 111

Calpine - Transcript of September 25 2007 Hearing.TXT

19                MR. KELLY:  Good afternoon, your Honor.

20    Michael Kelly from Willkie Farr on behalf of Quadrangle.

21                Your Honor, I think with the statements on

22    the record today we've narrowed it down to one very simple

23    issues.  And in part it is a confirmation issue and we

24    recognize that it will be put off to a later date, but the

25    issue relates to the treatment of general unsecured

124

1    creditors and the entitlement to interest.

2                The general note claims, which are pari

3    passu structurally to the general unsecured claims out of

4    the box get a contractual rate of interest.

5                Our client, and clients of other people in

6    the courtroom today in the general unsecured class, have to

7    come before your Honor or get the debtors' agreement to get

8    a contract rate of interest, otherwise they are stuck with

9    the federal judgment rate.

10                And our point is very narrow, and we've

11    asked the debtor well, what are we supposed to put in the

12    motion?  What is Judge Lifland going to look for to

13    determine whether you get contract rate of interest?  Is it

14    just to show that there is a contract and that it provides

15    interest and it's not otherwise usurious?  If that's what

16    it is, put that in the disclosure statement, because a

17    motion you must be filed before confirmation and your Honor

18    has to decide it before confirmation.  What is our battle?

19                In response we are told that they are

20    reserving all rights, including bankruptcy rights.  And it

21    sounds like what they want to be able to argue is that you

Calpine - Transcript of September 25 2007 Hearing.TXT

22    don't get any interest unless you can prove that the plan

23    can't be confirmed unless you get that rate of interest.

24    And that will be a confirmation objection.  But the

25    disclosure issue is to let general unsecured creditors know

125

1    that.  They should know when they are voting yes that they

2    are getting different treatment than pari passu creditors

3    and what the challenge is going to be to get the contract

4    rate of interest.  And it's particularly important here

5    where you've got a plan where equity may get a recovery.

6                    And we are not asking your Honor to decide

7    the issues today, we are prepared to fight for our contract

8    rate of interest, but please tell us, tell the general

9    unsecured creditors what it is, what is the standard, what

10    are they reserving the rights on.  We also wonder why we

11    they are treating us differently.  It's a question we've

12    ask to the creditors' committee and haven't gotten an

13    answer to and we'll continue to ask those questions and

14    pursue it.  But at bottom, please describe to the creditors

15    how they are being treated differently and what they need

16    to come in and ask your Honor to do and how your Honor is

17    going to be judging whether you should do it.  Put it in

18    the disclosure statement.  That's our only request.

19                    MR. LEWIS:  Good morning, your Honor.

20    Arnold Lewis from Stroock and Stroock and Levan.  The same

21    claim that Quadrangle has and the same issues; I have

22    nothing to add to it.

23                    MR. SELIGMAN:  Your Honor, again, the class

24    that these creditors fall in is a class of general

Page 113

Calpine - Transcript of September 25 2007 Hearing.TXT
25    unsecured claims where the plan says that they will get

126

1    petition interest at the federal judgment rate basically
2    unless your Honor determines otherwise.  And just for
3    locking down people's interest rate and be able to make
4    distributions upon the effective date, we said that it
5    should be something determined on or before confirmation,
6    and we had asked people to file brief or whatever position
7    they want on that issue before, I believe it's before the
8    voting deadline.  I don't think we should be limited by
9    what standard.
10           We've said that we think the appropriate
11   rate is the Federal judgment rate.  They are free to make
12   whatever arguments they want as to whether it should be the
13   contract rate or any other rate.  And we've told them this
14   a number of times, I don't think it's appropriate for us to
15   agree ahead of time on what the applicable standard is.
16   There is case law on the issue that talks about what the
17   appropriate rate is.  We believe it supports our view.
18   They are free to raise whatever issues they want in support
19   for a contract rate.  I'm not going to limit anybody's
20   rights to argue whatever they want on to that issue.
21           MR. KELLY:  Your Honor, they are
22   mischaracterizing it, because, again, one, the plan says
23   unless otherwise agreed.  They haven't said what the
24   standards are for them agreeing otherwise.  We might
25   actually --

Page 114

Calpine - Transcript of September 25 2007 Hearing.TXT

127

1              THE COURT:  It might be a matter of law.
2     It might be a question of claims objection for a --
3              MR. KELLY:  Then all we are asking for,
4     your Honor, is just to please say that.  And the key is to
5     put in, and we've given them suggested language this
6     morning, put in a statement to the effect that general
7     unsecured creditors who have in there contract a rate of
8     interest may not receive that contract rate of interest
9     even though similarly situated general note claims are
10    entitled under the plan to that rate of interest.
11             That's all we are asking for the disclosure
12    statement if your Honor doesn't want to force them to
13    articulate a standard.  Let our class know that when they
14    throw the switch at the end of the day, even though their
15    contract has the same language as somebody in the general
16    note class, they may get treated differently.  That's all
17    we are asking for.
18             MR. SELIGMAN:  Your Honor, now they are
19    asking us to agree onto their argument.  We are certainly
20    happy to add language to the disclosure statement that says
21    that to the extent that these creditors are awarded the
22    federal judgment rate, certainly that will be a different
23    post petition interest rate than other classes which under
24    the plan are --
25             THE COURT:  And that they are free to

128

1     assert their claim for a contact rate --
                        Page 115

Calpine - Transcript of September 25 2007 Hearing.TXT
2                    MR. SELIGMAN:   Exactly.

3                    MR. KELLY:   Even though --

4                    THE COURT:   With that kind of modification

5    I will overrule the objection.

6                    MR. SELIGMAN:   Thank you, your Honor.

7                    Your Honor, the next objection is on page

8    12 to the chart, objection number 5, and this is a grouping

9    of about eight objections by the CalGen lenders.

10                   MR. BIENENSTOCK:   Your Honor, if it's okay

11   I'll go first.   Good afternoon, Martin Bienenstock of Weil,

12   Gotshal and Manges for M&T bank as indentured trustee.

13                   With the court's permission, Judge, to save

14   some time, I would like to incorporate the argument I made

15   in connection with the equity committee's adjournment

16   motion.   I know your Honor remembers that there is no plan

17   on the table now proposed for CalGen, and therefore there's

18   no disclosure statement proposed for CalGen and there's

19   nothing for the court to approve.   So I don't want to

20   repeat all what I said before, your Honor, can I just

21   incorporate that portion in the transcript?

22                   THE COURT:   Certainly.

23                   MR. BIENENSTOCK:   Okay.   I'm going to

24   mention one or two more issues that would preclude

25   confirmation.   All of those issues could be corrected today


                                                          129


1    or in the next few days.   If they are not, then, as I'll

2    get into a little more in a few minutes, we are going to be

3    headed down a path where your Honor agrees with any of our

4    objections to confirmation of a plan, including that the

                        Page 116

Calpine - Transcript of September 25 2007 Hearing.TXT
5   process was illegal because there was no disclosure

6   statement for CalGen, et cetera, there will not be time to

7   correct it before the financing commitment expires.   And

8   this is a repetitive theme of what the debtor is asking the

9   court to engage in and approve.   A situation where we are

10  all going to be down to the wire and there's going to be no

11  saving, no safety valve, whereas if the schedule is much

12  different than what the debtor is proposing, and I'll get

13  to that, them errors of law could be corrected so that no

14  one loses the benefits of the financing commitment.

15               The second fundamental flaw I want to

16  mention is the ballot.   As currently set up, if a creditor

17  is convinced that the financing commitment is beneficial,

18  and I don't think that's very controversial, although it's

19  far more important at the Calpine level than CalGen,

20  because CalGen ought to be very solvent regardless, but

21  still it's beneficial for everyone, including CalGen

22  creditors, so if a creditor believes the financing is

23  beneficial and wants to lock it in on time, it has to

24  accept.   But the way the ballot is set up the acceptance

25  will release third party non debtors.   That's wholly

130

1   illegal.   It puts illegal pressure on creditors to accept

2   for the wrong -- to give third party releases for the wrong

3   reason.

4               The notion of abstaining being a consent to

5   release is wholly illegal.   There's nothing in Metromedia

6   in the Second Circuit here that would condone any such

7   thing here.   And it's so easy to fix, all they have to do

Page 117

Calpine - Transcript of September 25 2007 Hearing.TXT
8    is have a separate box.  One box do you accept or reject

9    the plan.  Another box do you want to give a release to

10   third parties.  They can do it.  They don't want to do it.

11            A second example of putting this court in

12   the position in December or January of having to swallow

13   hard and approve that however illegal it is, or tell

14   everyone, sorry, no plan you lose your financing

15   commitment.  There is no valid principal basis for the

16   debtor to proceed in that manner.

17            The third category I want to mention of our

18   objections go to the adequacy of the disclosure statement.

19   And I obviously don't want to repeat everything we've put

20   in the objections.

21            One point first I need to back up.  Your

22   Honor commented a few moments ago that perhaps our

23   objection that there is no proposed plan for CalGen and

24   proposed disclosure statement for CalGen to be approved was

25   not in our first objection.  And that's correct because the


131


1    first plan that was proposed along with its proposed

2    disclosure statement was different.  It said this works as

3    a stand alone plan for each debtor.  This will work as a

4    subcon all plan, and this will work for anything

5    in-between.  The objection that I made today orally was

6    made because of the change they made yesterday morning in

7    the third amended proposed plan and disclosure statement,

8    and there's nothing ministerial about it, so we couldn't,

9    obviously, have filed an objection beforehand, and I trust

10   we won't be deemed late because we are reacting to

Page 118

Calpine - Transcript of September 25 2007 Hearing.TXT
11  something they did yesterday.

12              Also, the debtors' concession just a few

13  moments ago that it will put on the ballots which debtor

14  owes the creditor money does not solve the problem I'm

15  talking about.  The debtors' current proposed plan in

16  Article 3.A.1 provides that the -- the plan provides for

17  substantive consolidation of the estates into a single

18  estate for all purposes associated with confirmation and

19  consummation.  And the classification in this plan is

20  creditors of all debtors of certain type, trade, bond,

21  whatever in a class for that type of creditor.  So their

22  notation on a ballot doesn't change the fact that the

23  document before the court is a proposed plan and a proposed

24  disclosure statement for an entity that does not exist

25  today.  If I say any more on that I'll repeat what I said

132

1   earlier which I agreed not to do.

2               As far as the inadequacy of the information

3   in the disclosure statement, I can tic them off as follows,

4   your Honor: perhaps the most critical item of information

5   that a CalGen creditor would want to know before

6   determining whether to accept or reject, is what difference

7   does substantive consolidation make?  That means what do I

8   get on a stand alone basis if the debtor distributes to

9   CalGen based on its books and records as they exist today,

10  and what do I get if there's what we call subcon all, all

11  of the debtors are consolidated, as they propose, is the

12  only option for this court to approve in the plan.  That is

13  not there.  It's just not there.  They ought to be ordered

Calpine - Transcript of September 25 2007 Hearing.TXT
14    to put it there.

15                    This is what you lose; you lose so much

16    because there's potential insolvency, you lose so much on

17    postpetition interest, it may be the correct amount, it may

18    be the default about, but they ought to tell the creditors

19    what's the difference; the most fundamental item that

20    anyone could ask for.  Now I understand on a telecom

21    conference the court held several days ago the court

22    observed that some of this information may not be all that

23    critical because our clients know how they are going to

24    vote, and, in fact, if the creditors did know how they were

25    going to vote we would agree with that comment as mooting


133


1    most all these disclosure statement objections.

2                    The problem is we represent an indentured

3    trustee.  There are hundreds or thousands of holders, I

4    only know how some of the larger holders who have an

5    interest in calling us and making their views known intend

6    to vote.  A lot of people, as far as we know, are going to

7    make their decisions based on what this disclosure

8    statement says; at least we have no information to the

9    contrary, and we certainly don't know how they are going to

10    vote, we don't if they know how they are going to vote

11    before reading it.  So we think it is important that the

12    most fundamental information for a CalGen creditor to make

13    up its mind ought to be included, and that starts with how

14    do you end up based on today's books and records, how do

15    you end up under the plan.

16                    Valuation, the court has heard a lot about

Calpine - Transcript of September 25 2007 Hearing.TXT

17  that. I'll simply say that this is another discretionary

18  decision of the debtors made against the CalGen creditors

19  interests. Mr. Buckfire is in court today. He could be

20  put on the stand to find out what is his view as to whether

21  the valuation that he has provided the debtors in June is

22  higher or lower? By what approximate magnitude? This as

23  very important case. It would be unbelievable that Miller

24  Buckfire doesn't have a view of what's happened to

25  valuation.

134

1           THE COURT:  You want to take the

2   speculation out of it and avoid all the fun.

3           MR. BIENENSTOCK:  Yes.  Your Honor, it's

4   aimed at creditors' voting having adequate information.

5   But obviously I haven't spoken to Mr. Buckfire about this.

6   I don't know what he would say.  But one thing I do know,

7   if the debtors had said, Mr. Buckfire we're going out with

8   a disclosure statement to our creditors to vote on, give us

9   an updated valuation to put in what's sent out as a result

10  of today's hearing they would have done it.  It's not here.

11  We can all draw our own conclusions.  This wasn't

12  necessary, this was the debtors' decision, let's make

13  everyone wait until November.

14          Claim reserves, it's unclear to us in

15  reading the plan if at the end of the day when everybody's

16  appeals are done, whether the debtor will have sufficient

17  resources depending on whether our claim is deemed secured

18  or unsecured, some of each, and at what amounts, whether

19  they are reserving enough to pay that amount as would be

Page 121

Calpine - Transcript of September 25 2007 Hearing.TXT
20    required under the confirmation standards.   They ought to
21    make clear, are they reserving amounts for all the
22    potential appeals or not?   What are we at risk of losing?
23                    The plan perhaps inadvertently provides
24    that the make whole claims will be paid in the amount
25    determined by the Bankruptcy Court.   We assume they meant


135


1    after all the appeals are done and the bankruptcy court
2    adopts whatever higher courts say, which may be total
3    affirmants or adjustment, or who knows, but that ought to
4    be made clear.
5                    They don't, to our knowledge, explain to
6    the CalGen third lien creditors whether if M&T Bank's fees
7    and expenses are awarded on appeal whether there is a
8    reserve for that, whether they will be paid, and the same
9    for the default interest.   And there's no real clear
10    recitation of the conflicts of interest that the CalGen
11    management and directors really have in -- really having to
12    obey their parent rather as opposed to doing what would be
13    simply in the best interest of the CalGen creditors.
14                    Now, your Honor, I'm going to get to
15    timing.   And with the court's permission, I would like to
16    hand up, very thin and feather weight, some statements we
17    have compiled of the debtor that relate to timing.   It goes
18    to their motion to set a timetable as part of this
19    disclosure statement approval, just to talk to it, if
20    that's okay with you.
21                    THE COURT:   Have you shared that with
22    counsel?

Page 122

Calpine - Transcript of September 25 2007 Hearing.TXT
23              MR. BIENENSTOCK:   Not yet, but it's their

24   own statements.

25              THE COURT:   Why don't you share it.


                                                        136


1              MR. BIENENSTOCK:   Sure.   We have lots of

2    copies.

3              Your Honor, what we've labeled as Exhibit A

4    is simply evidence of what the court has already observed,

5    namely that the debtor has a financing commitment that

6    terminates January 31, 2008.   And as the court also

7    observed, it's considered, and I think this is also

8    uncontroversial, to be a beneficial financing arrangement,

9    which as the court observed, may not be replicated or

10   repeated, they have to be more expensive if it's available

11   at all.

12             Exhibit B, your Honor, is the debtors'

13   proposed discovery confirmation time line.   The point being

14   that if the court subscribes to that time line, there will

15   be no time to fix, to proposed a different plan, a non

16   subcon plan, et cetera, if the court determines just before

17   Christmas or maybe just after, there may be -- the court

18   may not be able to decide on the confirmation hearing

19   immediately.

20             THE COURT:   Well, I haven't been stopped in

21   the past by religious or secular holidays, so that's a non

22   stop.   This is still a 24/7 court at the end of the day.

23             MR. BIENENSTOCK:   I'm not sure how many

24   hundreds of thousands of pages of transcript and exhibits

25   the court will have to wade through to make its decision.

Calpine - Transcript of September 25 2007 Hearing.TXT

137

1              THE COURT:  I've gotten used to wading.

2              MR. BIENENSTOCK:   The point is, the debtors

3    are proposing the end of the confirmation hearing December

4    20.  If the court finds any fatal defects in the

5    confirmation process or the plan, as I mentioned earlier,

6    there's no time to fix it with a new plan by January 31.

7    This is a discretionary decision by the debtors.

8              It also has another impact, your Honor, and

9    that other impact is, and we've seen the movie before, we

10   didn't like it up until now, they want to confirm sometime

11   by the end of this year or early 2008, they are going to be

12   about to lose the financing commitment if they don't go

13   effective by January 31.  Anyone who would like Article 3

14   review of this court's confirmation order, if this court

15   confirms, will be hit with a mootness argument or an

16   obligation to post a gigantic bond.

17             We understand, and we know how advocates

18   conduct themselves and are supposed to be zealously trying

19   to get what their clients want; we understand all that.

20   But from the court's point of view, we are appealing to a

21   sense of fairness that's over and above the litigants and

22   the advocacy.  We would like to opportunity for Article 3

23   review.  It doesn't have to be this way, the way the

24   debtors set up it up.  We would like an opportunity.  We

25   may not have it if the debtors' schedule is adopted.

138

Page 124

Calpine - Transcript of September 25 2007 Hearing.TXT

1          Now Exhibit C are the debtors' statements
2   in its second amended disclosure statement at the top, and
3   the third at the bottom.  This is here, your Honor, to show
4   that the debtor has recited, and to our knowledge has not
5   said these statements were false, that it can survive, it
6   can reorganize with no substantive consolidation or with
7   partial substantive consolidation, in other words not
8   including CalGen.  The debtor has now said no need to go on
9   that basis.  This, again, is a conscious decision of the
10  debtor.  Put the parties, put the CalGen creditors, put the
11  court up against the wall; it's all or nothing or you lose
12  the financing commitment.
13          Exhibit D, your Honor, are the debtors'
14  most recent statements in its proposed disclosure statement
15  that form what we call the deemed basis of substantive
16  consolidation.  After saying that everything is hopelessly
17  intermingled and the creditors all rely on one entity, the
18  debtors then turn around and say, and you know what, Judge,
19  we are going to get an order from you saying we are going
20  to continue that way, because we are only doing this to
21  change the distributions, i.e., the CalGen creditors get
22  less so others can get more.  We won't get interest so
23  others can get more.  We won't get one hundred percent
24  payment on our make whole claims so others can get more.
25  But we are not doing it because we want to change anything,

                                                  139


1   we are entering into the world again, the exact same legal
2   entities, the same hopeless entanglement, the same reasons
3   for creditor reliance; what more of an admission could
                        Page 125

Calpine - Transcript of September 25 2007 Hearing.TXT

4   there be than this is a tactic, and I'm not here arguing

5   against subcon now, I'm here saying, Judge, they are making

6   admissions.  They don't need this time table.  This is made

7   to get a result, get out of dodge before anyone can look at

8   it.  This is the essence of unfairness.

9           And then Exhibit E is the only thing in

10  here that's not the debtors' statements.  This is our

11  clients, M&T Banks' proposed schedule, to try substantive

12  consolidation first and to try it in October.  Why?  Well,

13  it's easy.  Because if we do it that way, then if the court

14  decides that the subcon of the CalGen entities is illegal,

15  there's time to fix it.  There is also time to for parties

16  who don't agree with the court's decision to try to get

17  appellate review.  This is exactly what happened in Owens

18  Corning, and I don't mean to say that this court has to do

19  what other any other court did, I realize every case is

20  fact specific and you create your procedure according to

21  what's right for that case.  What I'm arguing is its right

22  for this case.  If there's one issue that the Second

23  Circuit has already warned all of us, it's an extraordinary

24  remedy to be given sparingly, that's substantive

25  consolidation.

140

1           In light of that, in light of what has to

2  tantalize your Honor in terms of the stand alone SEC

3  financial statements, the certifications, in light of all

4  this that make subcon at the very least not a sure thing,

5  that's what I'm asking your Honor to decide now, it's not a

6  sure thing.  Why should we bet the ranch so the debtor can

Calpine - Transcript of September 25 2007 Hearing.TXT

7   get us into December and January and again say to all of
8   us, including the court, you have no choice?
9               Every single discretionary decision has
10  been made by the debtor, and they are asking your Honor to
11  buy into it, in a manner that puts us in an unfair corner.
12  It's just wrong.  It's made to evade Article 3 review so
13  that no changes can be made, it's just unfair, it's
14  blatantly unfair.  Because they do have alternatives.  Your
15  Honor said everyone knows that they were talking about
16  subcon.  Okay, why didn't bring it on a year ago?  We
17  weren't supposed to bring it on, that's for sure.  So why
18  isn't the court's attention, stern attention, directed to
19  them?  Such a key issue with such a low probability of
20  success, at least on the surface according to what the
21  Second Circuit says and their stand alone SEC filings, why
22  are they stuffing it to us at the last minute?  That time
23  table is just wrong and unfair, and they are asking this
24  court to give it to them no matter this blatantly unfair
25  schedule.  It's not right.  It's illegal.


                                                        141


1               That's our case, Judge.
2               THE COURT:   Thank you, Mr. Bienenstock.
3               MR. BIENENSTOCK:   Thank you.
4               MR. SOMERSTEIN:   Good afternoon, your
5   Honor.  Mark Somerstein of Ropes and Gray for the CalGen
6   second lien debt representatives, HSBC and Bank of New
7   York.
8               We obviously concur with the remarks that
9   were made by counsel to the third, and we will adopt those
                          Page 127

Calpine - Transcript of September 25 2007 Hearing.TXT

10  as our own.  Thank you.

11          MR. PEDONE:  Your Honor, Richard Pedone

12  representing Wilmington Trust as administrative agent and

13  first lien indentured trustee.

14          First, with regard to the balancing issue,

15  Mr. Desidario spoke with Mr. Gettleman of K&E and

16  incorporated some additional changes to the proposed

17  ballot, and I would just like to put them into the record

18  to be sure they will be incorporated later; specifically,

19  the ballot will include a spot for holders to identify

20  which trustee of debt they hold, along with the its CUSIP

21  number and for the nominees to receive copies of the master

22  ballots as they are sent to the -- for the nominees to

23  provide copies of the master ballots to the indentured

24  trustees and administrative agents as well; and with the

25  amendments to the ballots that were previously before your


142


1  Honor with the unsecured creditors' objection that

2  addresses balloting issues, we would also like to concur

3  with M&T's objections and comments.

4          And finally, your Honor, I would just like

5  to point out that the proposed treatment in the plan, and

6  this may go to a disclosure statement issue, proposed

7  treatment wiping out the liens of the CalGen lien holders

8  directly violates the terms of your order in the DIP

9  refinancing that took place in connection with the make

10  whole trail.  At that trial the order that the debtor

11  submitted provided that the lines would remain in place to

12  support until a final determination, and now the debtors

Calpine - Transcript of September 25 2007 Hearing.TXT

13    come to court today with a disclosure statement to wipe

14    those liens out and leave us in an unsecured position.

15                Thank you.

16                MR. MILIONE:  Your Honor, good afternoon.

17    Vic Millon representing Wilmington Trust as the collateral

18    agent.

19                We are all conscious of the debt of this

20    case.  We also support the comments of Mr. Bienenstock and

21    also rely on our papers.  But to the point that Mr. Pedone

22    raised, our lien secures the expenses and fees of the

23    collateral agent until all of the debt is paid.  The

24    debtors plan in their latest iteration that was submitted

25    this morning says that the liens will not be released prior

143

1    to payment in full of the portion of the disputed secured

2    claim that is allowed as of the effective date.

3                That cuts against the language in your

4    Honor's order entered earlier in this case that provided

5    that those liens would stay in place until a final

6    allowance of those claims, and it certainly doesn't reflect

7    the contractual rights of the collateral agent under the

8    collateral agency agreement to have a lien in place until

9    such time that the secured debt is paid in full, and that

10    means resolution of the make whole premiums, appeal, and

11    other all of the other issues of an appeal.

12                We would like the language in the plan to

13    reflect that, that our lien should be unaltered if in fact

14    our claim is going to impaired or unimpaired, as the

15    disclosure statement sets outs.  And if it's not unaltered,

                        Page 129

Calpine - Transcript of September 25 2007 Hearing.TXT

16    then it should not be unimpaired it should be an impaired
17    claim entitled to vote to the plan.
18              That's our objection, your Honor.  We have
19    had no response back from the debtor on that point.
20              MR. SELIGMAN:  Your Honor, proceeding with
21    the objections raised.  Number one, the point that was
22    initially raised that we can't --
23              THE COURT:  What about the last point?  It
24    seems to me would be the easiest one to resolve.
25              MR. SELIGMAN:  Well, I'm sure we can revise


144


1     the language and make clear to whatever the repayment order
2     says.
3               THE COURT:  The lien shall remain in
4     violate until final determination.
5               MR. SELIGMAN:  Exactly.
6               THE COURT:  That's the intent.
7               MR. SELIGMAN:  That's the intent, your
8     Honor, and we will fix that.
9               MR. BIENENSTOCK:  For all first, second and
10    thirds, your Honor.
11              THE COURT:  Certainly.
12              MR. SELIGMAN:  Yes.
13              With respect to the first point raised,
14    which was basically an incorporation by Mr. Bienenstock of
15    the points raised in connection with the adjournment motion
16    about we can't proceed with subcon because there's no
17    subcon debtor out there.
18              Again, I still don't understand the
                        Page 130

Calpine - Transcript of September 25 2007 Hearing.TXT
19    metaphysical point, but the bottom line is that under that
20    theory you could never proceed with subcon because there's
21    no debtor out there that's a consolidated debtor.   And
22    again, it's a confirmation issue, you'd never get out of
23    the box.   I don't think that's an appropriate objection.
24              The next point raised about we won't have
25    time given the nature of the subsequent consolidation


                                                            145


1     request in the plan, that if it's not approved that we
2     won't have time to do before exit.   Again, I believe this
3     confirmation issue, we appreciate their concern in this
4     regard, but we have the right to propose whatever plan we
5     think is appropriate.   We put out what we think is an
6     appropriate plan and are requesting that a schedule go
7     forward.
8               There are lots of different people who are
9     objecting to this plan.   If we were to say, you know, we
10    will never proceed or we have to change our schedule
11    because there's potential objections we would never get
12    anywhere.   We shouldn't have to alter our entire schedule
13    just because you have one creditor who says I don't believe
14    your plan is confirmable.   There are lot's of different
15    people, and under that theory we would never get to the
16    confirmation issues because we would always be revising the
17    schedule because somebody says hello I may have a
18    confirmation issue.
19              Other issue of the ballots and the
20    releases, we think we fully comply with Metromedia.   We've
21    had some discussions with the U.S. Trustee who is
                        Page 131

Calpine - Transcript of September 25 2007 Hearing.TXT

22  withdrawing the objection on his part based upon our

23  reconciliation.  Metromedia talked about to what extent

24  should we even impose non consensual third party releases,

25  our plan is completely consensual.  If you vote in favor of

146

1   the plan, you are obviously giving a release because that's

2   what the plan provides.  If you don't want to give a

3   release, you can vote against the plan and still received

4   your distributions and not consent to the release.  And if

5   you decide you are not -- if you choose you don't want to

6   vote for whatever reason, there is a box for you to opt out

7   of the release.  So we think that that's entirely

8   appropriate, and again, it's ultimately a confirmation

9   issue to be raised.

10              Regarding the issues on adequate of the

11  disclosure statement.  The first issue was raised that they

12  are entitled to know whether subcon is approved or not.  I

13  think that, you know, we think that subcon is appropriate

14  for credit reliance, yes, but more importantly

15  entanglement, and we've set out all the reasons why in our

16  disclosure statement.  If we were able to produce clear

17  numbers on this issues we probably wouldn't be needing to

18  do subcon.

19              There's case law out there which basically

20  says that in the context of a substantive consolidation

21  plan, there are cases we've cited in our brief, the debtor

22  doesn't have to put on a deconsolidated liquidation

23  analyses because that would be an apple and oranges

24  comparison.  In fact, in the World Com case which was a

Page 132

Calpine - Transcript of September 25 2007 Hearing.TXT
25    Weil Gotshal debtor represented case, the court said the


                                                                    147


 1    Bankruptcy Code and applicable case law made clear that the
 2    debtors need not provide non consolidated financial
 3    information in any disclosure statement relating to a
 4    substantive consolidation plan.
 5               With respect to the valuation refresh issue
 6    raised, I don't think we need to get to that again, and
 7    we've made our point in respect of the adjournment motion.
 8               The next issue that was raised is was it's
 9    unclear on what their reserves are or what's going to be
10    reserved for a disallowed claim.  I think that's a
11    confirmation issue in the first place.  Second of all our
12    plan is clear that we only have to reserve the amount that
13    a claim is, and we can either agreed to it with other party
14    or an amount that's determined by the court.  If the court
15    has allowed a claim, we don't have to reserve for it.  If
16    the court has allowed a claim at a certain amount, that's
17    what we are going to reserve.
18               The next comment was raised about the
19    definition of make whole, they wanted clarification of the
20    make whole claim will be determined by the bankruptcy court
21    or an appellate court.  That's obviously true and I don't
22    think we are suggesting otherwise.  There were requests
23    regarding it's unclear about the fees of the indentured
24    trustee with respect to the third liens and whether there
25    will be sufficient reserves.  I certainly hope that their

Calpine - Transcript of September 25 2007 Hearing.TXT

148

1    legal fees are not going to be sufficient if there's an
2    issue about us not being able to pay them.  I would hope
3    that they would not be that high, but in any event we
4    provided in our plan that we are going to pay, as the plan
5    obligates, their attorney's fees, so I don't think that's
6    going to be an issue.  I believe that's it.
7              The next point that they raised was the
8    issue about we should have to disclose if we have a
9    conflict of interest with respect to subcon.  I don't
10   believe that's appropriate.  This is the plan we are
11   proposing.  We set out all of the reasons why we think that
12   subcon is appropriate, and I don't believe that -- I think
13   that that's an argument that should be raised at
14   confirmation.  And with that, your Honor, I don't think I
15   have anything further on that.
16             Your Honor, the last point I want to raise
17   is with respect to the argument that we are going to come
18   out of bankruptcy with the same bad accounting that's going
19   on, and that somehow it affects the subcon analyses.  One,
20   I don't think it affects subcon analyses, but you can be
21   rest assured that one of the things that the debtors have
22   done throughout the course of this case is to look at their
23   accounting and put controls in place so that when we come
24   out of bankruptcy the accounting, your Honor, is actually
25   improved.  But again, I don't think that's relevant to what

149

1    they have in a post exit world as opposed to subcon now.

Page 134

Calpine - Transcript of September 25 2007 Hearing.TXT

2   With that I'll rest, your Honor.

3              THE COURT:   Anything else?

4              MR. BIENENSTOCK:   May I reply briefly?

5              THE COURT:   Sure.   Please stick to your

6   promise of briefly.

7              MR. BIENENSTOCK:   Your Honor, I regret that

8   the debtors found my threshold objection metaphysical, but

9   the bottom line is there is not in a ethereal or

10  metaphysical about it.   CalGen is a legal entity.   They

11  filed a 10-Q for it.   It has assets liabilities and

12  particular creditors.   Today, the only plan it can propose

13  is a plan that deals with its assets and liabilities, its

14  creditors.

15             The comment that if I'm right they can

16  never have subcon is totally wrong.   There are two ways

17  they can have it, the court can decide up front and subcon

18  all the estates if they meet the standards, or the CalGen

19  creditors can vote for it in a plan, but it's not really

20  something that can be imposed simply by majority vote.   The

21  Second Circuit talks in terms of if any creditor is heard

22  you really can't have it, but they could propose it in a

23  plan, and if it's accepted and the other requirement are

24  met, then it could occur upon consummation of the plan.

25  There is nothing complicated about things.

                                                          150

1              It's amazing to hear them say that they

2   don't have clear numbers.   The people who signed the CalGen

3   certifications along with its 10-Q in February will have an

4   interesting deposition, I suppose.   And on WorldCom that

                        Page 135

Calpine - Transcript of September 25 2007 Hearing.TXT
5    they mentioned, because my firm represented the debtor, I

6    warned earlier, you don't do something just because it was

7    done in another case.  They want to use it as precedent,

8    fine.  WorldCom did not substantively consolidate the

9    separately recording WorldCom entities to the SEC.  So if

10   they want to follow it, do it the way we did it.

11               Thank you, Your Honor.

12               MR. SELIGMAN:  Just a brief point on this

13   last point.  This is a joint plan, your Honor.  If it's

14   appropriate to file a motion to request substantive

15   consolidation, I don't see why it's all of a sudden

16   inappropriate to have that same trial in the contest of

17   confirmation.  We have language in the plan that says --

18               THE COURT:  That's very often done.

19               MR. SELIGMAN:  Yes.  That's all, your

20   Honor.

21               THE COURT:  Thank you all.

22               With respect to the consolidated objection

23   of the various parties coming under the rubric of, I forget

24   the numbers, five through eight or nine, and subsuming the

25   court's prior rulings with respect to the various motions


                                                         151


1    that are on that covered the same topics to a large extent,

2    that is substantive consolidation, time line and the

3    others, I do find that, and harken back to the requirements

4    of Section 1125, which is an adequate information section,

5    that given the yielding and changes that have been

6    suggested here, that under all of the circumstances, given

7    the nature and history of the debtor, I do see information

                            Page 136

Calpine - Transcript of September 25 2007 Hearing.TXT

8   of a kind and sufficient detail as far as reasonably

9   practicable to point out to any potential voter that there

10  are risks, and essentially signing on yes or no with

11  respect to the proposed plan is a risky venture, especially

12  in view of all of the conditions that are described in this

13  enormous disclosure statement which has so many variables

14  built into it, and this is not a grocery store or even a

15  grocery store chain, it is a huge enormous complex

16  enterprise or enterprises with many problematic areas,

17  including the risk of adverse determinations that are on

18  appeal, or appropriate to the debtors' satisfaction and the

19  committees' satisfaction, resolution of matters on appeal.

20              All in all I do find that the disclosure,

21  as modified by this record, is in compliance with Section

22  1125 of the Code, except of course for those objections I

23  have not yet to hear.

24              MR. SELIGMAN:  Your Honor, there was two

25  other objections, one Rosetta, and I'm just confirming, I


152


1   think that's one of the ones that has been resolved.

2               We are going to add a statement to the

3   disclosure statement that Rosetta and the debtors reserve

4   all of their rights with respect to substantive

5   consolidation on the Rosetta avoidance.  That, I believe,

6   resolves their objection.

7               MR. BAE:  Good afternoon, your Honor.   John

8   Bae with Cadwalader on behalf of Rosetta.   That

9   representation is correct.

10              THE COURT:  Thank you, Mr. Bae.

Page 137

Calpine - Transcript of September 25 2007 Hearing.TXT

11          MR. SELIGMAN:  Your Honor, that only leaves

12    a what is styled as a supplemental objection by the ad hoc

13    committee of ULC I note holders that went to the issues of

14    requests requiring us to produce a documentation to them.

15          I don't know if you want to take that in

16    the context of a disclosure statement or treat that in a

17    separate motion that you can address.

18          MR. DUNN:  Your Honor, I feel neglected.

19    This is Dennis Dunn from Milbank on behalf of the 6 percent

20    note holders.  And if I may be heard.

21          THE COURT:  Sure.

22          MR. DUNN:  We did resolved, I believe, all

23    of our objections consensually with language changes.

24          And again for the record this is Dennis

25    Dunn from of Milbank Tweed.  We represent clients who own


                                                          153


1    or manage 6 percent convertible notes in connection with

2    their claim for damages from the loss of the convertibility

3    feature which your Honor ruled upon on August 8th and which

4    is the subject of a pending appeal.

5          There are a couple of objections that I

6    believe have been resolved, but we don't have final

7    language on it.  I just want to quickly go through that and

8    we'll polish off the language, presumably, after this

9    hearing; one of which is one is the amount of our claim.

10    We put in a claim range as part of our objection.  The

11    debtors agreed to include that.  I think we are very close

12    on the language, we just need final client sign-off on

13    that.

Calpine - Transcript of September 25 2007 Hearing.TXT

14                    That range, again, is illustrative for the

15    disclosure statement purposes.  We've agreed, obviously,

16    it's not binding on any party or their experts.  One point

17    on that is that the high end the range deals with the high

18    end of the Miller Buckfire valuation where the stock

19    holders are getting the 5 dollars and 16 cents.  So there

20    would be a huge return to equity in that scenario, and it

21    does not deal with any make whole claims, which is

22    represented.  That claim -- the notes are represented by

23    the indentured trustee, and she will speak accordingly.

24

25                    The second point is subordination.  There's


154


1    new language in the disclosure statement where the second

2    lien holders reserve their right to seek turnover funds

3    pursuant to some subordination clause with respect to the 6

4    percent convertible note holders.  We've asked for a

5    corresponding reservation of rights.  I haven't seen it.

6    Presumably that will be added, I believe the debtors have

7    agreed to do that.

8                    Lastly is the remaining objection, and I

9    will echo Mr. Bienenstock's comments if not repeat them

10    with respect to timing, fairness, setting of reserves and

11    the risk of mootness.  And this comes through in two ways;

12    one is that right now they have clearly stated they are not

13    reserving anything for the claims because you've ruled in

14    their favor, your Honor, and they presumably are setting no

15    chance of that being reversed an appeal.  So despite the

16    claim range, they are setting at that at zero.

Page 139

Calpine - Transcript of September 25 2007 Hearing.TXT

17          Mr. Bienenstock pointed out, and I echo it,

18   that I understand that if and when we get to a reversal on

19   appeal and we are dealing with that reserve issue, or not

20   and we are still dealing with the reserve issue, we could

21   have addressed those issues now, we could have entered into

22   negotiations now to set a reserve.  We didn't.  We no doubt

23   going to hear that they are running out of time on their

24   exit financing if and when these developments occur and

25   arguments set for October 12th during the time line they

155

1   have set out for this process.

2          And that's really the second point.  There

3   are a bunch of infirmities in the plan, your Honor, that

4   doesn't set in place the infrastructure for our claims, if

5   we actually have claims, if an appellate court doesn't just

6   affirm but sets out the grounds for our claims.  And we've

7   offered to enter into a dialog like that.  They've

8   resisted.  They've put their eggs all in one basket.

9          But again, we don't want to hear the

10   arguments on prejudice et cetera for having waited until

11   after the appellate court reverses and then saying you are

12   up against a January's 31st deadline.

13          And if your Honor, as I understand wants

14   to, reserve all of those issues for confirmation, we will

15   have clarity on the facts as well as the legal issues.

16          And with that, your Honor, I have nothing

17   further.

18          MR. SELIGMAN:  Just give us a moment, your

19   Honor.

Page 140

Calpine - Transcript of September 25 2007 Hearing.TXT
20              (Conferring)

21              Your Honor, I apologize.  If we could take

22     a brief five minute recess on this issue.  I don't think

23     they have as much clarity as was represented, and I

24     wouldn't want to go forward with that misimpression.

25              MR. DUNN:  I'm glad I stood up, your Honor.


                                                156



1              (Brief recess taken.)

2              MR. SELIGMAN:  Your Honor, David Seligman.

3     I apologize for that.

4              Where we are, the group of the convertible

5     notes had raised an objection to the disclosure statement.

6     I think we resolved pretty much all of it, I just want to

7     make a statement or two on the record, and counsel will

8     jump in if I get it wrong.

9              First of all we are going to add language

10     in the order approving the disclosure statement.  There was

11     language in there originally at the request of the

12     indentured trustee, that the holders will use their best

13     efforts to return the ballots to the indentured trustee or

14     whoever they have to return it to create the master ballots

15     in time for the voting deadline.  They have now withdrawn

16     the request for that language so we are going to modify the

17     disclosure statement order and take that out.

18              Secondly the parties have --

19              THE COURT:  You mean somebody doesn't want

20     to use best efforts?

21              MR. SELIGMAN:  I guess they don't want to

22     use best efforts.

                        Page 141

Calpine - Transcript of September 25 2007 Hearing.TXT

23            THE COURT:  Okay.

24            MR. SELIGMAN:  We are going to add language

25    in the --


                                                          157


 1            THE COURT:  It sounds like a step

 2    backwards.

 3            MR. SELIGMAN:  Yes.  But they are

 4    withdrawing their request.  I have nothing to say about it,

 5    I guess.

 6            We are going to add language in the

 7    disclosure statement that says there are going to be

 8    creditor subordination provisions between the various

 9    parties and the bond holders, essentially all parties,

10    these are all of their rights with respect to those

11    intercreditor subordination agreements.

12            In addition there is some language that was

13    originally provided by the note holders, commented on by us

14    with respect to their assertions of their claim in the

15    case, this is the convert claim that has been disallowed.

16    If we need to I can hand up the language to your Honor, but

17    it essentially describes their claim.  We believe it's

18    efficient and appropriate.  One of the note holders has

19    listed an estimate of their claim.  We've agreed to allow

20    the other two note holders to put their estimate of their

21    claim number in, if necessary, and otherwise we think

22    that's the plain language that they provided.  We are

23    willing to put it in, but we just want to get this thing

24    done, and we are willing to move forward on this basis, and

25    we believe there is adequate disclosure on that and if your

                    Page 142

Calpine - Transcript of September 25 2007 Hearing.TXT

158

1    Honor wants to take a look at the language I'm happy to

2    hand it up.

3                MR. DUNN:  Obviously we are fine with our

4    language, your Honor.  There is the subordination language

5    that we will have to take a look at when that comes out.

6                And my understanding is everything else,

7    including arguments with respect to jurisdiction in light

8    of the pending appeal, all that is being reserved as

9    confirmation issues.

10               THE COURT:  Hopefully the appeal will even

11   be resolved before confirmation.

12               MR. DUNN:  I agree with your Honor.

13               THE COURT:  Hopefully all of the appeals

14   will be resolved before confirmation.

15               MR. SELIGMAN:  I believe counsel just

16   wanted to make a statement.

17               THE COURT:  But that's really wishful

18   thinking.

19               MR. GILL:  Harris Gill of Stroock and

20   Stroock and Lavan on behalf of the 7 and three quarter note

21   holders.

22               The language that's either been submitted

23   or will be submitted to your Honor will be adjusted to

24   reflect not just with a claim in the amount with respect to

25   the 6 percent note holders, but also with respectively to

159

Calpine - Transcript of September 25 2007 Hearing.TXT

1    the 7 percent note holders.

2                    I also wanted to add that, yes, we've

3    otherwise addressed and resolved our disclosure statement

4    objection to the debtors following extensive negotiations.

5                    A matter of critical importance to the 7

6    and three quarter percent note holders, are the proper

7    scope and application of the subordination provisions

8    contained in our indenture.  Unlike the 6 percent note

9    holders, we are subordinate to secured debt of Calpine and

10   to the pre 2 K bonds.  More specifically, we are

11   subordinate to the senior debt at the point of the

12   indenture.

13                   The debtors have made some changes to our

14   treatment section in the plan as a result of those

15   negotiations.  So again, from a disclosure perspective, our

16   objection is resolved, but we clearly reserve all of our

17   rights with respect to the plan and confirmation and with

18   respect to subordination.

19                   And to that end we were hoping to apprise

20   the court of our current intent to come before you within

21   the coming days or weeks, asking if that subordination

22   dispute can be heard in advance of confirmation in order to

23   facilitate the confirmation process.  We think it would be

24   a dispute unlike other broader issues that are brewing in

25   that it is an intercreditor dispute that involves only a


160


1    subset of creditors, although we do believe that proper

2    application of those provisions is a core proceeding as it

3    relates to plan confirmation.
                    Page 144

Calpine - Transcript of September 25 2007 Hearing.TXT

4          Thank you, your Honor.

5          MS. CHRISTIAN:   Good afternoon, your Honor.
6   Jennifer Christian of Kelley Drye and Warren, counsel for
7   HSBC Bank USA National Association as successor indentured
8   trustee for nine series of unsecured notes, including the 6
9   percent notes and the 4 and 3 quarter percent notes.

10          I would just like to say that we concur
11  with the 6 percent note holders with respect to their
12  argument that certain provisions of the plan effectively
13  circumvent the note holders in HSBC's appeal of the
14  conversion rights.   To the extent that the court finds that
15  these issues are more appropriately addressed at
16  confirmation, then HSBC reserves all of its rights to raise
17  those issues at confirmation.

18          I would also like to address a couple of
19  other disclosure issues.   I believe Mr. Seligman referenced
20  the 4 and three quarter indenture with respect to the
21  language that he was referencing, that it be negotiated
22  with the convertible note holders.   I just want to make
23  sure that the court is aware that it was the 4 and three
24  quarter indenture that he was referring to.

25          Also, with respect to balloting, HSBC

161

1   request the debtors made certain revisions to the
2   beneficial note holder ballots for the general note claims
3   class and the senior note claims class, and I would just
4   like to inform the court that the revised ballots are
5   acceptable to HSBC.

6          And lastly we had raised an issue with
                    Page 145

Calpine - Transcript of September 25 2007 Hearing.TXT

7    respect to the definition of subordinated debt securities
8    claim budget of a plan.  The debtors have informed us that
9    any claims arising out of the convertible feature of the
10   notes would fall under the definition of subordinated
11   equity claims.  And we understand that that's a disputed
12   issue, and the debtors have proposed language that is
13   acceptable to us to being included in the disclosure
14   statement, but I would just like to inform the court that
15   the debtors have confirmed that to the extent that there
16   are portions of the claim that are subordinated, it would
17   just be the convertible aspects of the claims and not any
18   additional aspect of the claim.
19              Thank you, your Honor.
20              MR. SELIGMAN:  Just to clarify that last
21   point, it only would be the principle in interest that
22   would be the subject to subordination.
23              Your Honor, with that, it really leaves one
24   more objecting party, the ad hoc committee of ULC I note
25   holders.  The ULC I note holders essentially are requesting


                                                         162


1    that this court should order the debtors to turn over to
2    them dockets we have in connection with valuation.  We have
3    obviously proposed a discovery schedule that calls for
4    people to serve discovery on us.  We have obligations to
5    respond.
6              I would note that if they serve discovery
7    on us today it would be due under the rules of civil
8    procedure on approximately the same day, maybe one or two
9    days off, as the very schedule that we have proposed.  They
                        Page 146

Calpine - Transcript of September 25 2007 Hearing.TXT

10    seem to be asking for your Honor to order that we enter

11    into a confidentiality agreement with them and have, you

12    know, confidential discussions with them about our

13    valuation.  I don't think that's appropriate for a creditor

14    to get, even a large creditor.  We have a process laid out.

15    They can serve us with whatever discovery they want, there

16    is going to be an open process for anybody to serve

17    discovery, and that would be our views on that.

18                    MR. KASHER:  Good afternoon, your Honor.

19    Richard Kasher of Kasowitz Benson for the ad hoc committee

20    of the ULC I note holders.  I'll be brief, no one has had

21    lunch and this is a very long hearing.

22                    THE COURT:  Some of us could use the

23    dieting.

24                    MR. KASHER:  Exactly.

25                    You may recall, your Honor, that the ULC I


                                                                    163


1     ad hoc committee negotiated settlement in the ULC I claims

2     with the Canadian debtors and with the U.S. debtors, and

3     that settlement was a catalyst for the global resolution,

4     the global settlement that your Honor and Justice Romaine

5     approved in July.

6                     We wish to play a role with respect to the

7     valuation jump ball the debtors have announced last week.

8     We wish to do that recognizing that we have a lot of catch

9     up to do because there has been a lot of documents that

10    have been shared with the two major constituencies.  We are

11    going to be addressing that issue, the official committee

12    of unsecured creditors and the equity committee.  In fact

                            Page 147

Calpine - Transcript of September 25 2007 Hearing.TXT

13    the creditors' committee noted in some papers that it filed

14    in the last day or so that tens of thousands of pages of

15    documents on valuation had been made available to, or were

16    available for access by the equity committee; the point

17    being there's a lot of information that is separate and

18    independent from the updated projections and the updated

19    business plan that the debtors are going to be proposing

20    come early November.

21              The usual way that a significant

22    constituency, as your Honor knows, goes about obtaining

23    information, particularly under an expedited time frame as

24    we've got in connection with this valuation hearing, is

25    the --

164

1              THE COURT:  I thought the way they go about

2    it is to read the newspapers, the blogs and --

3              MR. KASHER:  Lately your Honor --

4              THE COURT:  And check the available gossip.

5              MR. KASHER:  Lately, your Honor, that's

6    part of the way folks get updated.  But the documentary

7    record is --

8              THE COURT:  I'm listening to you for a

9    while now, and I'm coming to the conclusion, erroneously

10    perhaps, that you are blending discovery issues into the

11    disclosure hearing.

12              MR. KASHER:  No.  The reason we are raising

13    it here your Honor.

14              THE COURT:  Well, if that's not the case,

15    please get to the point, Mr. Kasher.

Calpine - Transcript of September 25 2007 Hearing.TXT

16              MR. KASHER:   Okay.   The reason we are here,

17    your Honor, is that on September 19th the debtors filed a

18    supplement to their disclosure statement and motion.   This

19    seemed to be the appropriate time to address the court on

20    the discovery schedule that was proposed in those papers.

21    The discovery schedule, we would submit, is a cumbersome

22    way for a party that intends to hire a financial adviser to

23    get equipped with the valuation issue both in terms of

24    dialogue that inevitably is going to take place among the

25    major constituents.   And if it goes to that, to the


                                                            165


1     contested fight at confirmation.

2               So we were hopefully that we could enter

3     into a confidentiality agreement.   That's not been the

4     case, the company has declined to do that.   The dates that

5     are proposed in the supplement to the disclosure statement

6     motion are such that the documents won't begin to start

7     rolling in until October 26th, and expert reports are due

8     to be shared just over three weeks after that.

9               Again, there's a wealth of information that

10    has to be absorbed by a new constituent whose coming in to

11    play a role, hopefully a constructive role, on this issue.

12    So we have simply proposed a slight tweak, slight

13    expedition to several of the dates that have been proposed

14    by the company in their proposed discovery schedule.

15              That's what we've requested, and we think

16    it's the appropriate time to raise it here, because absent

17    raising it here, we understand that schedule will be

18    approved in the order the court is going to enter today.

Calpine - Transcript of September 25 2007 Hearing.TXT

19          MR. SELIGMAN:   Your Honor, just briefly.

20   This is an unsecured creditor.   They obviously have

21   their -- they are certainly free to fight at valuation

22   time, but they do have a fiduciary for them, the unsecured

23   creditors with their own financial advisors out there.

24   Rather than being a cumbersome process we put forth a

25   discovery schedule that we believed was fair and open for


                                                        166


1   all, setting a discovery schedule months in advance we

2   think is a logical process for anybody to have access to

3   documents.   They knew that this valuation issue was coming

4   for a long time, they could have served discovery on us

5   before, they chose not to do so before now.

6          There's certainly nothing wrong for us

7   talking to them, and perhaps we will enter into a

8   confidentiality agreement with them, perhaps we will be

9   discussing issues with them, but we just don't think it's

10   appropriate for the court to impose that on parties, they

11   that their rights under the rules of service for whatever

12   discovery is appropriate.

13          Thank you, your Honor.

14          THE COURT:   Well, I'm pleased to find that

15   my original estimate that this was a discovery issue

16   bleeding into a pure disclosure hearing matter, and it's

17   something that can be resolved in the usual way, either by

18   an accord among the parties or coming to the court at an

19   appropriate time; it's at this juncture a highly parochial

20   issue.

21          MR. KASHER:   Thank you, your Honor.

Calpine - Transcript of September 25 2007 Hearing.TXT

22                    MR. ELKIND:  Your Honor, one housekeeping

23    item related to our disclosure statement objection on

24    behalf of CalGen second lien, following up on an issue Mr.

25    Bienenstock raised.

167

1                    I would ask debtors' counsel if they could

2    state on the record whether they will or will not reserve

3    sufficient amounts to honor an order of the appellate court

4    on our appeals.  If they are not going to do that, they

5    ought to so state right now on the record so that we could

6    take appropriate action.  If they are going to do it, that

7    would be appreciated.

8                    MR. KIESELSTEIN:  Your Honor, Marc

9    Kieselstein on behalf of the debtors.

10                    The plan lays out I think quite clearly

11    whether or not, or to the extent there will be reserves set

12    aside for claims.  The way the plan reads is since this

13    claim had its day in court, your Honor made a ruling on it,

14    there's a final order with respect to this claim subject to

15    appeal, that we would reserve in the amount of the allowed

16    claim, which was 76 million dollars, your Honor.  That's

17    the way the plan works, your Honor.

18                    Alternatively, we would come under the

19    plan, file an estimation motion, and ask your Honor to

20    estimate at the amounts set form in your previous order.

21                    THE COURT:  Yes.  And if I do that, then I

22    look at the recent ninth circuit case which says I should

23    at least consider the possibilities of what might happen on

24    an appeal.  But here, for purposes of this disclosure

                        Page 151

Calpine - Transcript of September 25 2007 Hearing.TXT
25    statement hearing, what we are dealing with is speculation.


168


1    I don't know what's going to happen on appeal, and I don't
2    know that Mr. Elkind or you know; you may have all feelings
3    about it, as do I, but this is pure speculation and you are
4    asking me to fill the coffers based upon the best estimate
5    that an appellate has with respect to how the appeal might
6    have an outcome.
7              To the extent that constitutes an objection
8    or suggestion, it's overruled.
9              MR. PEDONE:  Your Honor, Richard Pedone on
10   behalf of the CalGen first lien, one outcome of that is
11   that it could be continued first lien claim.  And heading
12   into the confirmation hearing, those are not being reserved
13   for, and we believe that they should be incorporated and
14   continue to believe that it will continue on.
15             THE COURT:  Unfortunately built into our
16   system is an appellate process.  Also unfortunately built
17   into our system is a legislative process.  And I think
18   what's happened now is the legislative process in BAPCPA
19   has interfered with the appellate process in connection
20   with camped time lines for everybody.  It makes it all very
21   uncomfortable, but here we are and that's what we have to
22   deal with today.
23             MR. SELIGMAN:  Your Honor, with that I
24   believe that resolves all of the objections here this
25   morning.  And with that we would ask that your Honor


Page 152

Calpine - Transcript of September 25 2007 Hearing.TXT

1    approve the disclosure statement.

2              THE COURT:  Well, I've indicated in

3    subsuming my prior rulings, I do, to the extent discussed

4    previously on this record, I overrule those objections I

5    haven't specifically overruled.  And I do find that Section

6    1125 has been met based upon the modifications that have

7    been discussed on this record, and the adequacy of the

8    information, I do find, is in sufficient detail given the

9    kind of case this is, the complexities that there are and

10   with respect to all the case law that deals with adequacy

11   of disclosure on different levels, I do find that on this

12   level it is an adequate disclosure statement.  And I will

13   entertain an order approving it.

14             MR. SELIGMAN:  Thank you, your Honor.  We

15   obviously need to make some revisions to the order and to

16   the disclosure statement itself, so we may be able to get

17   to your Honor a document either later today or in the

18   morning.

19             THE COURT:  Or before Thanksgiving.

20             MR. SELIGMAN:  Obviously well before

21   Thanksgiving.

22             MR. GILL:  Your Honor, on behalf of the

23   equity committee, we intend to move for an interim stay

24   pending appeal of your order approving the disclosure

25   statement.  So to avoid having to have an emergency hearing


170


1    and motion, we just want to put it on the record right now

Page 153

Calpine - Transcript of September 25 2007 Hearing.TXT

2  that we respectfully request that you grant our stay

3  pending appeal.

4                THE COURT:  Does anyone want to be heard?

5                MR. KIESELSTEIN:  Your Honor, there's

6  nothing before the court.

7                THE COURT:  There is nothing before the

8  court.  And there are potential issues with respect to

9  bonding and the like, and I haven't had the benefit of

10 anybody's ability to respond to your ad hoc statement and

11 request to the court.

12               Certainly you should at least put it into

13 papers or be a lot more specific.

14               MR. GILL:  Yes, your Honor.

15               MR. DE LEEUW:  To be a little more

16 specific, this relates to the --

17               THE COURT:  Give them something to deal

18 with.  So far you've given nobody anything to deal with.

19               MR. DE LEEUW:  Okay, thank you.

20               MR. BIENENSTOCK:  Your Honor, did your

21 ruling just now on the adequacy of the disclosure statement

22 also encompass a ruling on debtors' requested timetable for

23 confirmation, or is that a separate ruling?

24               THE COURT:  No.  I'm ruling with respect to

25 the debtors' request; however, the caveat is that with


                                                     171


1  respect to all discovery timelines, that is subject to

2  modification upon appropriate application of parties so

3  that the realities of these requests are dealt with more

4  appropriately and that gives the parties the opportunity,

                    Page 154

Calpine - Transcript of September 25 2007 Hearing.TXT

5   more than traditionally, but collegially to be able to

6   adjust to each parties' suggested proposals.

7                MR. SELIGMAN:  Your Honor, and the proposed

8   order already has language saying that obviously your Honor

9   can change the discovery schedules if appropriate.

10               THE COURT:  With that, thank you all.

11               MR. KIESELSTEIN:  Thank you, your Honor.

12               MR. SELIGMAN:  Thank you, your Honor.

13               MR. STAMER:  Thank you, your Honor.

14

15

16

17

18

19

20

21

22

23

24

25

172

1                    C E R T I F I C A T E

2

3   STATE OF NEW YORK        }
                             }   ss.:
4   COUNTY OF WESTCHESTER    }

5

6                I, Denise Nowak, a Shorthand Reporter

7            and Notary Public within and for the State of

Page 155

Calpine - Transcript of September 25 2007 Hearing.TXT

8          New York, do hereby certify:

9                    That I reported the proceedings in the

10         within entitled matter, and that the within

11         transcript is a true record of such proceedings.

12                   I further certify that I am not

13         related, by blood or marriage, to any of the

14         parties in this matter and that I am in no way

15         interested in the outcome of this matter.

16                   IN WITNESS WHEREOF, I have hereunto

17         set my hand this _____ day of

18         _____, 2007.

19

20                        _____

                          DENISE NOWAK
21

22

23

24

25

Page 156

# EXHIBIT D

155223.TXT

1

1
2  UNITED STATES BANKRUPTCY COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Case No. 05-60200-brl
5  - - - - - - - - - - - - - - - - - - - -x
6  In the Matter of:
7
8  CALPINE CORPORATION,
9
10          Debtor.
11
12  - - - - - - - - - - - - - - - - - - - -x
13
14              United States Bankruptcy Court
15              One Bowling Green
16              New York, New York
17
18              August 8, 2007
19              10:55 AM
20
21  B E F O R E:
22  HON. BURTON E. LIFLAND
23  U.S. BANKRUPTCY JUDGE
24
25

2

1

155223.TXT

2  HEARING re Debtors' Motion for an Order, Pursuant to 11 U.S.C.

3  Section 363(b) and Rule 9019 of the Federal Rules of Bankruptcy

4  Procedures Approving Settlement Agreement Among Pacific Gas and

5  Electric Company, Delta Energy Center, LLC and Los Medanos

6  Energy Center, LLC

7

8  HEARING re Motion (a) to Authorize the Debtors to Assume

9  Certain Leases and Executory Contracts Relating to the Debtors'

10  Gilroy Facility; (b) Approving Certain Amendments Thereto; and

11  (c) Granting Related Relief

12

13  HEARING re Motion to Approve Settlement Agreement Between the

14  Debtors and Turlock Irrigation District

15

16  HEARING re Debtors' Motion for Authorization to Enter into

17  Stipulation with Second Lien Committee and Wilmington Trust

18  Company, as Indenture Trustee

19

20  HEARING re Debtors' Third Omnibus Objection to Proofs of Claim

21  (Beneficial Certificate Holder Claims Related to

22  Rumford/Tiverton Financing, Beneficial Noteholder Claims,

23  Equity Interest Claims, Hybrid Equity Interest/Beneficial

24  Noteholder Claims and Unspecified Equity Interest/Beneficial

25  Noteholder Claims)

3

1

2  HEARING re Debtors' Twelfth Omnibus Objection to Proofs of

3  Claim (Amended/Replaced Claims, No Liability Claims,

4  Duplicative Claims, Claims to be Adjusted, Wrong Debtor Claims

155223.TXT
```
 5   to be Adjusted, Claims Filed by the Fireman's Fund Insurance
 6   Company and PSM Management Claims)

 7

 8   HEARING re Debtors' Thirteenth Omnibus Objection to Proofs of
 9   Claim (No Liability Claims, Anticipatory Claims, Assumed
10   Contract Claims, Amended/Replaced Claims, Unliquidated Claims,
11   Claims to be Adjusted and Wrong Debtor Claims to be Adjusted)
12

13   HEARING re Debtors' Sixteenth Omnibus Objection to Proofs of
14   Claim (Claims to be Adjusted, Wrong Debtor Claims to be
15   Adjusted, Duplicative Claims, Anticipatory Claims, No Liability
16   Claims, Amended/Replaced Claims, Unliquidated Claims and
17   Assumed Contract Claims)
18

19   HEARING re Debtors' Seventeenth Omnibus Objection to Proofs of
20   Claim (Claims to be Adjusted, Wrong Debtor Claims to be
21   Adjusted, Amended/Replaced Claims and No Liability Claims)
22

23   HEARING re Debtors' Limited Objection to Convertible Noteholder
24   Claims
25
```

4

```
 1
 2   HEARING re Adversary Proceeding 1-07-01760, Calpine Corporation
 3   v. Rosetta Resources, Pre-Trial Conference
 4
 5
 6
 7
```

Page 3

155223.TXT

```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Transcribed by:   Lisa Bar-Leib
```

                                                              5

```
 1
 2   A P P E A R A N C E S :
 3   KIRKLAND & ELLIS LLP
 4        Attorneys for Calpine Corporation
 5        153 East 53rd Street
 6        New York, NY 10022
 7
 8   BY:   RICHARD M. CIERI, ESQ.
 9         HELEN HUANG, ESQ.
10
```

155223.TXT

```
11   KIRKLAND & ELLIS LLP

12        Attorneys for Calpine Corporation

13        200 East Randolph Drive

14        Chicago, IL 60601

15

16   BY:  DAVID R. SELIGMAN, ESQ.

17        MARK KIESELSTEIN, ESQ.

18        ANDREW R. MCGAAN, ESQ.

19

20

21

22

23

24

25
```

6

```
1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for Creditors' Committee

4         590 Madison Avenue

5         New York, NY 10022

6

7    BY:  MICHAEL S. STAMER, ESQ.

8         LISA G. BECKERMAN, ESQ.

9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

11        Attorneys for Official Committee of Equity

12         Security Holders

13        One New York Plaza
```

155223.TXT
```
14          New York, NY 10004

15

16     BY:   GARY KAPLAN, ESQ.

17           ADRIAN E. FELDMAN, ESQ.

18

19     MILBANK, TWEED, HADLEY & MCCLOY LLP

20           Attorneys for Individual 6% Noteholders

21           One Chase Manhattan Plaza

22           New York, NY 10005

23

24     BY:   DENNIS F. DUNNE, ESQ.

25           MATTHEW S. BARR, ESQ.
```

                                                        7


```
 1

 2     STROCK & STROCK & LAVAN LLP

 3           Attorneys for 7.75% Convertible Noteholders

 4           180 Maiden Lane

 5           New York, NY 10038

 6

 7     BY:   KRIS HANSEN, ESQ.

 8           EREZ GILAD, ESQ.

 9

10     YOUNG CONAWAY STARGATT & TAYLOR, LLP

11           Attorneys for M&T, as Indenture Trustee

12           The Brandywine Building

13           1000 West Street

14           17th Floor

15           Wilmington, DE 19801

16
```

155223.TXT
```
17    BY:    IAN S. FREDERICKS, ESQ.

18

19    KELLEY DRYE & WARREN LLP

20          Attorneys for HSBC Bank USA, N.A.

21          101 Park Avenue

22          New York, NY 10178

23

24    BY:    SARAH L. REID, ESQ.

25          JENNIFER A. CHRISTIAN, ESQ.
```

8

```
 1

 2    NIXON PEABODY LLP

 3          100 Summer Street

 4          Boston, MA 02110

 5

 6    BY:    JOHN V. SNELLINGS, ESQ.

 7

 8    CADWALADER, WICKERSHAM & TAFT LLP

 9          Attorneys for Rosetta Resources

10          One World Financial Center

11          New York, NY 10281

12

13    BY:    JOHN H. BAE, ESQ.

14

15    MAYER, BROWN, ROWE & MAW LLP

16          Attorneys for Rosetta Resources

17          700 Louisiana Street

18          Suite 3400

19          Houston, TX 77002
```

155223.TXT
```
20
21   BY:   CHARLES S. KELLEY, ESQ.
22
23
24
25
```

9

```
 1
 2   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 3         Attorneys for Unofficial Committee of Second Lien
 4         1285 Avenue of the Americas
 5         New York, NY 10019
 6
 7   BY:   ELIZABETH R. MCCOLM, ESQ.
 8         ANDREW N. ROSENBERG, ESQ.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

155223.TXT

23

24

25

10

1              P R O C E E D I N G S

2         THE COURT:  Be seated.  Congratulations.  How did you

3    all get here?  I've been traipsing since 7:30.

4         MR. CIERI:  Good morning, Your Honor.

5         THE COURT:  Almost.

6         MR. CIERI:  Yeah.  My suit looked a lot better when I

7    started out this morning than it looks now.

8         Your Honor, Rick Cieri on behalf of the Calpine

9    Corporation and its affiliated debtors.  Your Honor, if I may

10   take a few minutes and provide the Court with a brief update

11   regarding the status of planned reorganization process?

12        THE COURT:  Sure.

13        MR. CIERI:  Thank you, Your Honor.  As Your Honor is

14   aware, on June 20th, the debtors met their goal of filing a

15   plan of reorganization and disclosure statement within the new

16   eighteen month exclusivity deadline required by the amended

17   Bankruptcy Code.  And at the June 26th hearing, I reported to

18   Your Honor that the debtors plan to move forward with

19   confirmation of their plan which implements a waterfall

20   structure allocating value to creditors and interest holders in

21   accordance with the Bankruptcy Code's priority scheme.  To this

22   end, the debtors did file their motion to approve the

23   disclosure statement and related solicitation procedures on

24   July 2nd.  And, Your Honor, we initially scheduled a disclosure

25   statement hearing for today.

155223.TXT

1          During my June 26 all report to the Court, however, I

2     emphasized that we remain committed to obtaining maximum

3     stakeholder consensus with the goal of attempting to obtain

4     consensus around a guaranteed distribution plan, that being our

5     plan that would provide a guaranteed recovery both to our claim

6     holders and to our interest holders.

7          Accordingly, Your Honor, at that time, we left open

8     the possibility of adjourning this August 8 disclosure

9     statement hearing to a later date which, as the Court knows, we

10    have done so.

11         But, Your Honor, this is one of those rare cases

12    where delay is not a sign of lack of progress.  And for that

13    reason, Your Honor, I want to spend a minute this morning

14    explaining the reason why we decided to continue with the

15    disclosure statement hearing and what our current intentions

16    are with respect to the plan of reorganization process.

17         Your Honor, in the latter part of July, certain

18    parties contacted the debtors about potentially an alternative

19    plan of reorganization based on a cash investment that might

20    form the basis of a guaranteed distribution plan.  These plans,

21    Your Honor, would guarantee full payment to our creditors and a

22    guaranteed distribution to equity holders.  Thus, consistent

23    with what we view as our fiduciary duty for maximized value for

24    stakeholder in these Chapter 11 cases, the debtors decided to

25    take a brief period of time to investigate yet the possibility

155223.TXT

1    of filing an alternative plan of reorganization promised upon a

2    plan sponsorship commitment which would allow us to pay our

3    creditors in full and guarantee a distribution to equity

4    holders.

5                And to that end, Your Honor, the Court may recall

6    that on July 27th, the debtors filed a statement with the Court

7    adjourning today's originally scheduled disclosure statement

8    hearing to September 11th and generally moving back other key

9    plan solicitation and confirmation date by approximately one

10   month.

11               In the meantime, Your Honor, since that time, the

12   debtors working with their investment bankers, Miller Buckfire,

13   initiated a process to gauge potential investors' interest in

14   sponsoring such a guaranteed distribution plan.  And during the

15   week of July 16th and after consulting with their official

16   creditors and equity committee, the debtor sent a request for

17   proposals, or RFP, Your Honor, to potential investors seeking

18   proposals for a sponsorship of an executable guaranteed

19   distribution plan promised upon a post-reorganization capital

20   structure that the debtors deem to be feasible.  And as a

21   result, Your Honor, of our prior capital raising efforts

22   earlier this year, we had a robust list of potential interested

23   parties in -- that might consider moving forward with this

24   guaranteed distribution plan.

25               Indeed, Your Honor, these capital raising efforts

13

1    that we engaged in earlier this year has allowed many of the

2    potential plan sponsors rather quickly to our due diligence

3    data room.  And because, Your Honor, we had already assembled

155223.TXT

4   this information and many of the parties had already seen it,

5   they've been able to do it in a matter of days and weeks.

6          In addition, Your Honor, these parties have had the

7   benefit of the disclosure statement that we had filed earlier

8   last month.  However, Your Honor, timing remains of paramount

9   concern as the debtors must not jeopardize the favorable terms

10  of their current exit financing commitment, which commitment,

11  Your Honor, expires on January 31 of 2008.  In light of the

12  events occurring during the last several weeks that have

13  affected the credit market preserving the timing of that

14  financing is of utmost importance to the debtors.  That

15  financing, Your Honor, to put it bluntly, is a very valuable

16  asset of the debtors' estate.

17         So, Your Honor, we have told the potential plan

18  sponsors that we'd like to choose one of them by August 16th

19  and to move forward with coming before the Court, as I will

20  explain, to seek approval, perhaps a modified plan of

21  reorganization.

22         Your Honor, this time frame is now compressed.

23  However, we still do believe that it be possible to confirm

24  modified -- excuse me, guaranteed distribution plan if we

25  decide to move down that path by January 31 of '08.


                                                           14


1          Your Honor, regarding the current status of the RFP

2   process, since initiating the request for proposal process, a

3   number of interested parties have signed confidentiality

4   agreements and our conducting active due diligence in

5   connection with making plan sponsorship commitments.  And to

6   facilitate that process, Your Honor, as I noted earlier, the

155223.TXT

7    debtors have assembled the due diligence room that has over

8    9500 documents in it and literally hundreds of advisors have

9    been given access to those documents.  And the debtors, Your

10   Honor, and their professionals have also conducted multiple in-

11   person and telephonic due diligence meetings to enable

12   potential plan sponsors to familiarize themselves with key

13   aspects of Calpine's business in these reorganization cases.

14   Your Honor, they have been given the most detailed information

15   regarding business plan sensitivities, accounting and finance

16   practices and potential claims pool.

17          Your Honor, between now and August 16th, additional

18   due diligence meetings are scheduled to take place and we are

19   beginning to receive responses to our requests for proposals.

20   And we intend to negotiate those, Your Honor, quickly.  Your

21   Honor, we are trying -- attempting to keep our creditors'

22   committee and equity committees up to date on the status of the

23   RFP process and our due diligence efforts.

24          Your Honor, while we do await the results of the RFP

25   process, it is the debtors' contention that if they do not


                                                              15


1    indeed receive a plan sponsorship commitment that is clearly

2    superior to the current waterfall plan, they will file an

3    amended plan and disclosure statement consistent with such

4    commitment.  So, Your Honor, we are prepared to move forward

5    with the current waterfall plan if we do not receive a plan

6    sponsored commitment that we believe is superior to that

7    waterfall plan and that, Your Honor, does not have significant

8    execution risks.

9          Your Honor, if we do determine to move forward with
                              Page 13

155223.TXT

10    an alternative -- a guaranteed distribution plan, we would

11    anticipate filing a motion to approve bidding procedures to

12    anoint a stalking horse as the sponsor of that plan and allow

13    for the potential auction of a plan sponsorship right in the

14    future but prior to plan confirmation.  If the debtors do not

15    receive, Your Honor, a commitment they deem worthy of

16    proceeding, we're just simply going to turn off that process,

17    Your Honor, and move forward towards confirming the waterfall

18    plan of reorganization.

19            Your Honor, in any event, however, it remains the

20    debtors' goal to confirm a plan of reorganization by January 31

21    of'08 in order to preserve the valuable financing that we now

22    have in place with the syndicate of banks.

23            I'll be pleased to answer any questions the Court

24    might have regarding the process.

25            THE COURT:  Thank you, Mr. Cieri.  Anybody else want


                                                          16


1    to be heard?

2            MR. STAMER:  Your Honor, if I could, just very

3    briefly.  For the record, it's Michael Stamer from Akin Gump

4    Strauss Hauer & Feld here on behalf of the official creditors'

5    committee.  Your Honor, there's no doubt as Mr. Cieri has

6    reported, that the case is going well, that the parties are

7    making progress.  We are, as the debtors are, very focused on

8    preserving what Mr. Cieri described as a very valuable asset of

9    the estate and this is the committed exit financing.  We

10    believe that -- we understand why the debtors have put off the

11    disclosure statement, to explore what they think are potential

12    better options or higher value options.  We are very concerned,

155223.TXT

13    Your Honor, however, that by the time exclusivity expires,

14    which is August 20th, that in fact the company may not have

15    sufficient clarity on whether or not they have a sponsor that

16    is superior and that there is a small enough risk of execution.

17    Our view, the committee's view, is there's financing in place.

18    We have a plan which is the waterfall plan.  The one on file,

19    Your Honor, as we've said before, is not acceptable to the

20    creditors' committee but I'm happy to report that the debtors

21    and the creditors' committee have made substantial progress

22    towards an amended waterfall plan which addresses, I believe,

23    all the concerns the creditors' committee has -- had

24    articulated to the debtors.  That's a plan that could be filed

25    tomorrow if it had to be.  Our view, Your Honor, is that the


                                                                17


1     RFP process will play out one way or another, that responses

2     are in fact due on August 16th and exclusivity expires on the

3     20th of August.

4            We may disagree with the debtors as to whether or not

5     a proposed alternative plan structure is superior.  We may

6     disagree with the debtors as to what is a tolerable amount of

7     execution risk.  From our perspective, this case is basically

8     ready to go, that we need to do what is necessary.  We

9     collectively, and if it's not collectively the committee will

10    take what steps are necessary to move this case out of Chapter

11    11 in a way that allows the company to emerge and in fact close

12    on the valuable asset in the exit financing.  We are not

13    interested in putting at risk what we anticipate will be very

14    robust recoveries for all creditors, including unsecured

15    creditors, if in fact there is insufficient tangible evidence

155223.TXT

16    that in fact there is an alternative superior structure that

17    has tolerable execution risks.  From our perspective, in order

18    to deviate in any material way from the waterfall plan, there

19    should be no execution risks.  And the committee is not

20    confident we can get there on an alternative structure in a

21    timely fashion, if ever.

22            So again, Your Honor, consistent with what we've done

23    in the past, we agree with most of which -- most of what Mr.

24    Cieri has said but we have our concerns that we wanted to bring

25    to the attention of the Court.  Thank you, Judge.



                                                          18



1             THE COURT:  Thank you.

2             MR. CIERI:  Your Honor, just to be very clear, one is

3     we do believe we have fiduciary responsibilities to investigate

4     other alternatives and we take them very seriously,

5     particularly in attempting to get our creditors paid out in

6     full and to guarantee a recovery for equity holders.

7             Second is, though, no one in the courtroom should

8     doubt that we are committed to emerging by 1/31/08 in order to

9     preserve what is an exceedingly valuable asset of the estate.

10    Thank you, Your Honor.

11            Now I'll turn it over to Mr. Seligman, Your Honor.

12            MR. SELIGMAN:  Good morning, Your Honor, David

13    Seligman on behalf of the debtors.  I just wanted to run

14    through, Your Honor, the agenda unless Your Honor has any

15    questions.

16            THE COURT:  Everybody's going to have to speak up.

17    We're on the ECRO system and the court reporter is not here so

18    just to be sure your words are preserved, speak up.

155223.TXT

19        MR. SELIGMAN:   Thank you, Your Honor.   David Seligman

20   on behalf of the debtors, for the record, Your Honor.

21        Your Honor, turning to the agenda, taking up the

22   first several uncontested matters, the first matter on the

23   agenda is the debtors' motion for an order approving a

24   settlement agreement among the debtor PG&E, Delta Energy Center

25   and Los Medanos Energy Center.


                                                            19


1         Your Honor, just as brief background, this is

2    essentially a settlement between the three parties that resolve

3    a number of disputes stemming back to 2003 regarding a dispute

4    concerning credits for various upgrades and extension to PG&E's

5    Infalectric (ph.) grid.  The BURC had ruled on this matter in

6    2003.   The parties have been operating under that ruling but

7    everyone had appealed it to the Court of Appeals for the

8    federal circuit.  The parties have now all agreed to basically

9    withdraw their appeals and live with the ruling by Burke back

10   in 2003 with some slight modifications.   Your Honor --

11        THE COURT:   So there's nothing left before the second

12   circuit?

13        MR. SELIGMAN:   There will be nothing left before the

14   second circuit -- before the federal circuit.

15        THE COURT:   Do they know it?

16        MR. SELIGMAN:   I don't believe it's been told to them

17   yet because we need to get Court approval.   We also need to get

18   Burke approval and then once that happens I believe we'll seek

19   to withdraw the appeal.

20        THE COURT:   Go ahead.

21        MR. SELIGMAN:   Unless Your Honor has any questions,
                                    Page 17

155223.TXT

22    we've laid out all the benefits in the motion --

23         THE COURT:    No, I have no questions.    The application

24    is approved.

25         MR. SELIGMAN:    Thank you, Your Honor.    May I

                                                      20

1    approach?

2         THE COURT:    Yes, you may.    I've approved the order.

3         MR. SELIGMAN:    Thank you, Your Honor.    Your Honor,

4    the second matter on the agenda is the debtors' motion for an

5    order authorizing them to assume certain leases and contracts

6    associated with the Gilroy Facility and approving certain

7    amendments in connection with that facility.

8         As brief backgrounds, Your Honor, the company had

9    originally sought to assume a lease associated -- a real

10   property lease associated with the Gilroy Facility last year.

11   There were certain objections to that assumption basically

12   arguing that the lease and a steam contract and certain other

13   agreements were collectively one agreement and they need to be

14   assumed or rejected collectively.    The debtors tabled their

15   motion to assume while they attempted to resolve the matter and

16   now they have.    They would like to see to assume the

17   agreements -- all three agreements as modified as we've laid

18   out in the motion to approve the settlement.    There's a number

19   of benefits to the estate including decreasing Gilroy Cogen's

20   operating costs retroactive to 2006 as set forth in the

21   amendment.    There's also a waiver by ConAgra of a twenty-two

22   million dollar claim.    And the Steam Agreement -- Your Honor,

23   the Steam Agreement will enable the Gilroy facility to maintain

24   its QF status which extends certain urgent reporting

155223.TXT
25    requirements.


                                                              21


 1              So for the reasons set forth in the motion, Your
 2    Honor, we respectfully request that Your Honor grant -- or
 3    approve the order granted in the motion.
 4              THE COURT:   Does anyone want to be heard?   There's no
 5    response.   The application is granted.
 6              MR. SELIGMAN:   Thank you, Your Honor.   May I
 7    approach?
 8              THE COURT:   Yes.   I've approved the order.
 9              MR. SELIGMAN:   Thank you, Your Honor.
10              THE COURT:   Go ahead.
11              MR. SELIGMAN:   Your Honor, the third item on the
12    agenda is another motion for entry of a settlement agreement
13    between the debtors and the Turlock Irrigation System.   Your
14    Honor, this essentially resolves a claim by Turlock against the
15    debtors for approximately 6.3 million dollars.   There's also a
16    claim by the Turlock Irrigation District against the debtors
17    for approximately 16.7 million dollars that they are claiming
18    should be offset against the 6.3 million dollar claim and then
19    they would insert a claim for the balance against the estate.
20    The parties have resolved this by essentially allowing the
21    claim by Turlock Irrigation District to pay Calpine
22    approximately five million dollars.   So, essentially, it's a
23    settlement where our claim against Turlock is reduced from 6.3
24    to five and Turlock's claim is basically waived.   And we
25    believe it's in the best interest of the estate and request


                              Page 19

155223.TXT

1    Your Honor approve the settlement.

2         THE COURT:  I do find it in the best interest and I

3    will approve the settlement.

4         MR. SELIGMAN:  May I approach, Your Honor?

5         THE COURT:  Yes.  I've approved the order.

6         MR. SELIGMAN:  Thank you, Your Honor.

7         MR. KIESELSTEIN:  Good morning, Your Honor.

8         THE COURT:  Good morning.

9         MR. SELIGMAN:  Mark Kieselstein on behalf of the

10   debtors, Your Honor.  The first contested matter on the agenda,

11   item number 4, is the debtors' motion for authorization to

12   enter into a stipulation with the Second Lien Committee and

13   Wilmington Trust, as Indenture Trustee.

14        Your Honor, this is our settlement of the Second Lien

15   make whole claims.  Your Honor, before I discuss the merits of

16   the settlement itself, I wanted to advise the Court of a couple

17   of adjustments that have been made since the original motion

18   was filed.  Your Honor, one issue of controversy, particularly

19   with the creditors' committee was the reservation of rights by

20   the Second Lien committee to potentially pursue additional make

21   whole claims against certain junior creditors pursuant to

22   certain intercreditor agreements.  The creditors' committee was

23   of the view that this resolution should be a global resolution

24   or they would not support it.  We endeavor to resolve that

25   issue in discussions with the Second Lienholders.  Ultimately,

23

1    Your Honor, the Second Lienholders agreed to waive any rights

155223.TXT
2    to go after junior creditors for additional make whole claims

3    provided they were guaranteed that the forty million dollar

4    unsecured claim contemplated by the settlement actually

5    translated into forty million dollars in net proceeds.  And the

6    way that was worked out in our stipulation, Your Honor, was

7    simply a mechanism whereby the debtor in consultation or in

8    concert with the Second Lien Committee would seek to monetize

9    the unsecured claim prior to emergence from bankruptcy.  If we

10   cleared more than forty million dollars on that claim, we'd get

11   cash back.  If we cleared less than forty million dollars, that

12   difference would be added to the secured claim, the sixty

13   million dollar secured claim of the Second Lienholders.  And

14   that that was memorialized in the stipulation.

15          I'm pleased to report to the Court that that forty

16   million dollar claim has actually been in essence pre-sold --

17   subject, of course, to Your Honor's approval of the

18   settlement -- pre-sold for a total of 37.8 million dollars.

19   That sale would stand if the Court were to approve the

20   settlement and if the Court did approve, there would be an

21   additional secured claim of 2.2 million dollars.  The secured

22   claim would go from 60 to 62.2 and the monetized proceeds and

23   the forty million dollar claim would be 37.8 equaling a hundred

24   million doll -- equaling a hundred two million dollars, so that

25   there would be a two million dollar addition to the settlement

                                        24


1    and a hundred million of net proceeds for the Second

2    Lienholders.  And, Your Honor, we informed parties -- all the

3    parties of that development yesterday.  I believe the unsecured

4    creditors' committee supports that -- that resolution.

                        Page 21

155223.TXT

5  Obviously, we know we've got the objection of the equity

6  committee which I don't believe has been changed by virtue of

7  that make whole.

8         Your Honor, with that, let me discuss the motion

9  itself.  As the Court is well aware, there are a host of make

10 whole claims and controversies that have taken up much of the

11 debtors' and the Court's time over the last many months.

12 Included are those Second Lien claims, Your Honor.  We had

13 filed an objection to those claims on the eve of the hearing of

14 that objection.  We've reached a settlement, as I've described,

15 at sixty plus forty as now adjusted.

16        No party filed any objection to the settlement except

17 for the equity committee.  One of equity committee's objections

18 was this reservation of rights against junior creditors.  I

19 believe we've moved that component of their objection through

20 the adjustments to the stipulation.

21        The primary objection by the equity committee was

22 simply that the settlement is too expensive and we're

23 overpaying for these claims.  I think we all agree upon what

24 the test is for whether a settlement ought to be approved.

25 There's the Iridium factors, there's the W-2 claim case.  Just


                                                        25


1  a week or so ago or a couple weeks ago Your Honor presided over

2  the Canadian settlement and noted that it doesn't have to be

3  the best settlement; it has to, again, fall above the lowest

4  range of reasonable litigation outcomes and where we think that

5  this settlement meets that standard.

6         But to go briefly through the Iridium factors, Your

7  Honor, first, probability of success in the litigation.  And,

                             Page 22

155223.TXT
8   Your Honor, it's always somewhat awkward to come up on in the
9   guise of a settlement and praise the other side's claims.  Your
10  Honor, we remain confident that if we tried the claims to
11  conclusion and through all the rounds of appeals that we would
12  ultimately prevail.  However, that's not the -- these are not
13  the basis of whether one decides to settle or not.  We feel
14  there are material risks that the ultimate outcome here could
15  be significantly above the hundred million dollar amount that
16  we settled for.  We think there are significant risks that that
17  amount could be fully a security claim all in cash and all
18  absorbing the company's liquidity.  Your Honor, we understand
19  that the equity committee believes that the worst case scenario
20  here is approximately 120 million dollars.  It's not entirely
21  clear to us how they get to that number but if one were to, for
22  instance, extrapolate the CalGen ruling to these issuances, we
23  believe, particularly, if you look at the one issue -- the
24  9.875 issuance, that had the reserve language in it.  There is
25  case law out there that suggests that where a document is

26

1   silent among document is silent that it has that implicit no-
2   call feature.  If you assume that that law is followed by this
3   Court or a higher Court then the CalGen approach were taken to
4   putting in pre-payment and premium proxy, if you will, into the
5   document, you would have potential make whole claims.  Just on
6   the basis of CalGen with the three issuances, approximately 150
7   million dollars.
8          There are other material risks beside, Your Honor,
9   the risk that rather than the pre-payment premium that a breach
10  of contract formula could be utilized by this Court or a higher
Page 23

155223.TXT

11  Court if the pre-payment premium on the acceleration provision

12  were found to be defective here whether it's a breach of

13  contract found on some other basis as was done in the CalGen

14  decision.  You could easily have damages upwards of 250 million

15  dollars as was asserted by the Second Lien creditors.  These

16  are material risks that we can't ignore, Your Honor, and we

17  think the settlement that we entered into is at an appropriate

18  level.  We would have liked to settle for less.  I'm sure the

19  Second Lienholders would have liked to have gotten more but we

20  think the numbers are appropriate.

21          With respect to the other factors, the prospect for

22  protracted litigation here, while the equity committee suggests

23  this ought to be resolved in a number of hours, history belies

24  that assertion.  We've got the First Lien litigation out there.

25  We've got the CalGen litigation which is yet to be argued in

27

1   the district court and will likely spawn another round of

2   appeals thereafter.  So we believe it would be expensive,

3   distracting and protracted litigation on top of the risks that

4   I talked about.  And given what Mr. Cieri talked about, there's

5   a frenzy of activity going on right now while we're trying to

6   build a consensual plan of reorganization.  We candidly could

7   do without that protracted litigation.

8           Which takes me to the next element, Your Honor, the

9   paramount interest of creditors.  Here, Your Honor, there are

10  many, many process benefits for -- in settling these claims.

11  It provides greater clarity on our claims universe and is

12  timely relevant to negotiations around the guaranteed

13  distribution plan.  Your Honor, it clearly delineates our

Page 24

155223.TXT
14  liability there in terms of having to reserve cash liquidity

15  against the worst case scenario of a judgment.  And, as we all

16  know, finding cash, borrowing cash these days is more difficult

17  than it was several weeks ago so reserving cash that we think

18  is a key feature of this settlement.  And again, the entire

19  process of trying to get consensus in a short amount of time is

20  only assisted by resolving significant claims along these

21  lines.  And while every one of make whole claims are

22  substantially different from the other, we hope that this will

23  start a trend to start knocking down some of these other

24  claims.  That may be wishful thinking.  I hope not.

25          Your Honor, with regard to some of the other issues

                                                        28

1  raised by the equity committee, they suggest that they bear the

2  entire risk for what they consider an overpriced settlement.

3  But that's not actually the case, Your Honor.  The waterfall

4  plan, under our high playing scenario that's in our disclosure

5  statement, there is a possibility that unsecured claims would

6  not be meaningful.  Therefore, the risk of too rich a

7  settlement would be borne not by the equity holders in that

8  situation but by the creditors themselves.  Moreover, if we get

9  to a guaranteed distribution plan, if we're fortunate enough to

10  do that, candidly that risk would also be borne by others

11  because the equity would have a guaranteed distribution.

12          So we believe for all those reasons, this settlement

13  is clearly in the best interest of the estate.  The one last

14  issue that the equity committee raised was that this was a

15  premature settlement.  We believe whatever direction the

16  planned process goes in clarifying the claims pool is a

Page 25

155223.TXT
17    universal good in any of those scenarios.  And thus, we don't
18    actually think the premature argument makes sense.  The one
19    other argument the equity committee makes is that if this case
20    should bleed past July of 2008, the make whole calculations go
21    down substantially under the formulas that were the basis of
22    the claims and we would be overpaying that much more.
23    Candidly, we think the risk of going past July 2008 is an
24    insignificant one and given what everyone in the room has said
25    about laser focus on January 31, 2008, we don't think that

                                                                29

 1    that's a meaningful risk.
 2            I would also add that we bargain for the stipulation
 3    and the right to pay the Second Lien debt off early without
 4    disturbing the finality of the settlement.  The numbers were
 5    calculated based on a December 31, 2007 payoff of the debt.  If
 6    we were to pay the debt sooner than that, the make whole claims
 7    by the same formulas would be larger but the settlement would
 8    not be disturbed.
 9            So, taking all those factors together, Your Honor, we
10    think this settlement is well above the reasonable -- lowest
11    reasonable range of litigation and is in the best interest of
12    the estate and all the stakeholders and ought to be approved.
13    Thank you.
14            THE COURT:  Anyone want to be heard?
15            MR. KAPLAN:  Good morning, Your Honor.  Gary Kaplan
16    from Fried Frank on behalf of the equity committee.  Your
17    Honor, while we've been appearing before you on behalf of the
18    equity committee for the past year or so in this case, this is
19    actually the first time that the equity committee has actually
                                Page 26

155223.TXT

20    pursued an objection to a motion brought by the debtor in front

21    of Your Honor.  Your Honor may be wondering why on this --

22    where the creditors' committee is sitting happy and everybody

23    else in the courtroom is supporting -- why is the equity

24    committee taking a stand on this settlement.  The answer is

25    very simple.  In our view, this isn't a settlement.  This is a

30

1    capitulation.  If the debtors want to say to people, you know

2    what, whatever your claim is we'll give it to you, just call it

3    what it is.  But don't sit here and say it's a settlement

4    because of potential risk when it's not a settlement.  When you

5    look at the amounts that they're giving in the allocation

6    between the different Tranches, what they're effectively doing

7    is giving the make wholes to each Tranch.  That's not a

8    settlement.  That's a capitulation and that's just simply an

9    agreement that says we're just going to allow your claim.  And

10   if that's what they want to do, they should just call it what

11   it is.

12            And the starting point for this, Your Honor, is very

13   simple.  You have to look at the merits of the make whole

14   claim.  And I understand that for 9019 we don't have to try the

15   make whole claim but this is a very simple, straightforward

16   issue that you can look at the terms of the indenture and

17   analyze the reasonableness of this settlement.  I think the

18   starting point for that is this CalGen decision.  This isn't a

19   CalGen.  This is a very, very different issue with very

20   different indentures.  In CalGen, we're dealing with a pure no-

21   call.  And Your Honor decided there's a breach of the no-call,

22   therefore they get damages and the damages were calculated

Page 27

155223.TXT

23  based on the make whole.

24          THE COURT:  Just an aside with respect to that, I

25  think the damage claim arising out of CalGen came up -- a

31

1   theory thrown out by the Court of vast expectations which

2   everybody has seemed to have seized on.  However, that element

3   of damages are grounds -- or fair grounds for litigation to go

4   up.  And I'm the first one to admit that's a fair ground for

5   litigation.  And there is a very strong risk that the vast

6   expectation theory may be nothing more than balderdash in the

7   view of some of the people that are sitting here and possibly

8   even on appeal.  So there is a high risk with respect to that

9   concept of damages which is now popping out all over the place

10  ever since the CalGen decision, as I'm well aware.  So when

11  we're talking about the risk of litigation and to the extent

12  that a lot of people are looking to the CalGen decision for

13  support, that's a risk.

14          MR. KAPLAN:  And I understand that and respectfully,

15  I wouldn't characterize it the way Your Honor would but I

16  don't necessarily dis --

17          THE COURT:  It's not me characterizing it.

18          MR. KAPLAN:  I know.  I understand.

19          THE COURT:  That's some academics perhaps.

20          MR. KAPLAN:  Your Honor --

21          THE COURT:  Or disappointed lawyers.

22          MR. KAPLAN:  This case, however, Your Honor, is

23  simpler, if you will, than CalGen.  The provision in the

24  indenture and to the -- I think the reply that was filed by

25  Wilmington Trust in the Second Liens highlights the provision

Page 28

155223.TXT

32

1    at issue that we're dealing with in two of the indentures that
2    they are now trying to turn into a no-call provision.  They're
3    saying, look, it's just like CalGen, there's a no-call
4    provision.  But if you look at the language that they -- and
5    they quote it in their reply.  What the indentures say is that
6    "the company shall not have the option to redeem the notes
7    except at a redemption price equal to the principal amount of
8    the notes plus the applicable premium, if any, to the
9    redemption date."  It's not a no-call.  What is says is you
10   can't redeem unless you pay whatever the premium is, if any.
11   And then you have to look and say, okay, what is the premium?
12   Is there a premium due?  And these indentures, unlike CalGen,
13   specifically have a provision that talks about if there's an
14   event of default do they get their premium.  And in Section --
15   and two of the indentures that have actual language; the other
16   one's reserved.
17            The language is very specific and it talks -- it says
18   if there's an event of default there's automatic acceleration,
19   they get their principal plus secured interest.  There's then
20   another provision that says that if there's an event of default
21   and the reason for the event of default is because of a willful
22   action or inaction by the company done for the sole purpose of
23   avoiding the premium then they're entitled to a premium.  Said
24   in another way, it says if you file a Chapter 11 for the sole
25   purpose of avoiding the premium in order to pay them off, then

33

155223.TXT

1    they say, no, not so fast.  That's what the indenture says.

2    But as long as you have a Chapter 11 such as this where nobody

3    can argue was done for the purpose of -- for a bad faith

4    purpose or for a purpose of avoiding the premium -- you have no

5    premium due.  It's in the indenture.  So what they are doing is

6    they're taking the CalGen decision and they're saying, okay,

7    well, you know what?  We -- there's a breach of a no-call and

8    they're not paying it and we want our make whole.  But they're

9    not entitled to a make-whole.  We don't have to get into a

10   fight about whether there's automatic acceleration because of

11   the Bankruptcy Code and whether that brings it to maturity and

12   therefore there's no pre-payment.  We don't have to deal with

13   all of the issues that we fought with in CalGen and, frankly,

14   we don't even have to deal with a lot of the issues that we'll

15   deal with a little bit later with the convertible noteholders.

16   This was straightforward because it's the language of the

17   indenture.

18           And so, what that leads you to is under the

19   indenture, they're entitled to zero.  Now, we talked -- and Mr.

20   Kieselstein talked about it, well there's no way you can come

21   up with a 120 million dollar number.  It's actually fairly

22   straightforward.  If you look at the make wholes and the

23   debtors had their own damage estimates before the hearing, if

24   you go through the make whole numbers, two of the indentures,

25   as we said, have specific percentages for the make wholes and

34

1    you can calculate them very simply.  One of them is for the

2    eight and a half percents, you get a forty-eight million.  For

3    the 8.75 percents, you get fifty-two million.  And then you

Page 30

155223.TXT

4    have the one that's reserved.  So there's admittedly no

5    language, no calculation.  If you extrapolate and use the

6    percentage -- the make whole that would be due under the other

7    two converts, one of which -- I'm sorry -- the other two

8    issuances, one of which is at 4.2 percent, one is at 5.7.  If

9    you use the higher number, you get to 123; if you use the lower

10   number, you get to below 120.  That's where we get the 120.

11           And that, Your Honor, frankly, in our view is even if

12   Your Honor were to say somehow there is a -- somehow the

13   indenture entitles them to a prepayment premium, that's the max

14   they can get.  They have -- they've thrown out this 288 million

15   dollar number to make any settlement look reasonable.  I mean,

16   yes, if you put a high enough dollar amount on it, paying the

17   whole thing looks reasonable.  But there is no way, if you look

18   at their interpretation of the indenture, which they say, well,

19   look, it's a no-call and you look at the language they're

20   relying on, the language says you can't redeem it unless you

21   pay this premium.  It can't be under their own argument that

22   you can't make -- that if you pre-pay and you pay the premium,

23   they're still entitled to damages on top of it for some kind of

24   breach.  It can't be -- they cannot get both.  And that's,

25   frankly, what they're arguing in order to get anything in


                                                              35


1    excess of the pure make wholes is, you're giving us the make

2    wholes so you're implying with their read of the indenture and

3    then on top of that, they're somehow entitled to this greater

4    damage -- damage claim.

5            And, you know, one of the issues that Mr. Kieselstein

6    mentioned was our objection to the provision that enabled the
                            Page 31

155223.TXT

 7  Second Lienholders to go after the converts.  So how do they

 8  resolve that?  Well, they gave -- come through in a couple more

 9  million dollars.  And that goes to our argument about when it's

10  not your money, it's very easy.  What's a few million dollars

11  if it comes around in here?  That's not the way to resolve it,

12  to say, you know what, a few more million dollars here, we'll

13  monetize the claim, we'll ensure that they get everything and

14  if there's less the debtors will, you know, sort of kick in

15  some more.  That doesn't make any sense.  If there was a

16  settlement and they intended the settlement to resolve all

17  issues, they should have just taken out that provision.  But to

18  throw a few more bucks on the table in order to resolve it is,

19  frankly, inappropriate.

20          And one of the other defenses that the debtors use

21  for the settlement is well, you know, there's a fight about

22  whether it's a secured claim or an unsecured claim and look at

23  how we've split it.  And therefore it's a great settlement

24  because we resolved these issues.  But if you think about what

25  the debtors have done, they've effectively given them a secured

                                                    36

 1  claim.  They guaranteed that.  They guaranteed the Second

 2  Lienholders that they will receive a hundred million doll -- a

 3  hundred and two million dollars.  They'll get a hundred million

 4  dollars in cash.  The debtors are saying, we're monetizing the

 5  claim for you, we found a buyer, pre-sold it so you're

 6  guaranteed your unsecured claim.  You are getting cash.  And

 7  you know that today, months in advance of the plan, you have an

 8  unsecured claim, you are getting cashed out on your unsecured

 9  claim.  And they get a secured claim on top of it.

155223.TXT

10        So while they'd like to call it a settlement and say

11   well, look at this great settlement of -- you know, part of

12   it's secured, part of it's unsecured.  They're paying them in

13   cash a hundred cents, every penny that they're getting under

14   this settlement.  That's not settling a secured versus

15   unsecured claim.  That's giving them a secured claim.  Again,

16   it's not a settlement; it's capitulation.

17        So, Your Honor, the last thing I just want to add --

18   I can go through the Iridium factors but I think that in our

19   papers we hit all of them and I won't belabor my time.  I do

20   think that it's worth responding -- there was some commentary

21   that said well, the equity committee is previewing some bites

22   for confirmation and that's what this is about.  This has

23   absolutely nothing to do with it.  What this has to do with is

24   as simple as you were -- we can read the language of the

25   indentures and we've already seen from CalGen the Pandora's box

                                                      37

1    that's opened.  Once people can read into it and say, you know

2    what?  I can file a claim, I can file late, I can come up with

3    all sorts of creative theories to come in and ask for huge

4    amounts of money.  And now we have -- so we've had that risk

5    and we're basing it and dealing with it a lot today -- we now

6    have a new one, which is the debtor saying look, we were so

7    busy, we have other things to do, hopefully this will start a

8    trend and we can just start settling all of these.  And you

9    know what?  As the people whose money is at stake, that's not

10   something that we look forward to.  If there is a legitimate

11   claim, if somebody has a legitimate basis to get paid, they're

12   entitled to get paid, we supported the Canadian settlements

155223.TXT

13    because we thought it was reasonable, they've made sense and at

14    the end of the day we understand where we sit in the capital

15    structure and the right of people in front of us to get paid in

16    full.  But payment in full does not mean we want to make this

17    simple so if people come out of the woodwork with crazy

18    theories, we'll just throw money at them to go away.  Mr.

19    Kieselstein talked about well, if there's a guaranteed

20    distribution plan then the risk is solely -- you know, the risk

21    still won't be on equity.  You know, there are a lot of

22    different structures that people can think of for this case

23    where the unsecured creditors are capped at par plus accrued

24    and whatever their contractual entitlement is and that's it.

25    And any risk of claims going up is borne purely on the equity.


                                                              38


1    And given where we are in the process, number one, we suggest

2    they kick this off for a few weeks.  Let's see where we are on

3    September 11th.  Let's see who is going to bear the risk.

4    Because if it is purely us, then debtor, you should be talking

5    to us and taking it in more into our -- more of our views into

6    consideration and if something falls apart and the debtors are

7    still taking the view that it's somebody else's risk, that's

8    fine, too.  Why not wait until you have that data point to see

9    who's ox is being borne before you rush over with this

10    objection.

11            And we're here today, Your Honor, again, the first

12    motion that the equity committee has objected to in this case

13    because we see the floodgates opening with this.  We saw it in

14    CalGen and we saw the beginning of it and we all started to

15    say, oh no, what's going to come out.  And we're going to deal

155223.TXT

16    with that today.  For the debtors' statement to say well, you

17    know, hopefully this will sort of get the ball rolling to start

18    settling everything means everybody come up with your theories.

19    Your indentures silent?  Come up with a theory, throw a high

20    enough number on, you can get a settlement somewhere in the

21    middle.  Your indenture has language that says -- you know,

22    anybody can read it that says you're not entitled to anything.

23    You know, it's easier, we can just start throwing money at you.

24    And, Your Honor, that is not something that the debtors should

25    be involved in and that is something that we will continue to

39

1    oppose throughout.  So for that reason, we think the motion

2    should be denied.

3             THE COURT:  Thank you, Mr. Kaplan.  Anyone else want

4    to be heard?

5             MR. KIESELSTEIN:  Your Honor, I'll decline to adopt

6    Mr. Kaplan's notion that this is a capitulation.  Your Honor,

7    Mr. Kaplan is a very forceful advocate and it sounds a lot like

8    the briefs we filed in advance of the settlement, Your Honor.

9    Fortunately, Your Honor, things are not as necessarily as clear

10    as Mr. Kaplan portrays them.  We do have a CalGen opinion out

11    there.  Mr. Kaplan says it's distinguishable.  We don't

12    disagree that it's distinguishable.  We're settling so as not

13    to find out the answer to that issue, Your Honor.  But we don't

14    believe this is capitulation.  We think this is a prudent

15    settlement at a reasonable number.  When there are other claims

16    out there -- we all know the CalGen is on appeal and the CalGen

17    lenders themselves are arguing for much larger claims based on

18    breach of contract damages.  That's an issue here.  We have the

Page 35

155223.TXT

19  issue of a so-called Scribner's error in this case which, I

20  think, Mr. Kaplan completely discards and gives zero credit for

21  which, again, is a luxury he has sitting where he is.  We think

22  it's a prudent settlement, all things considered, and we don't

23  accept the characterization that we're a welcome mat for all

24  manner of creative claim, Your Honor.  As you know, further

25  down the agenda today, we're tenaciously opposing a claim that

40

1  we don't believe is cognizable, Your Honor.  So I don't think

2  we can be portrayed as a doormat.

3          We think the settlement is appropriate.  We think

4  it's in the best interest of the estate.

5          THE COURT:  Anyone else want to be heard?  Well,

6  before me is the motion of the debtors seeking authorization to

7  enter into a stipulation with the Second Lien Committee and

8  Wilmington Trust to resolve the Second Lien make whole claims.

9  The only party objecting to the settlement motion is the

10  official committee of equity security holders.  Under

11  Bankruptcy Rule 9019, in determining whether to approve a

12  proposed settlement, the Court's responsibility is not to

13  decide the numerous issues of law and fact implicated by the

14  settlement "but rather to canvas the issues and see whether the

15  settlement falls below the lowest point in the range of

16  reasonableness", Cosoff against Rodman, W.T. Grant, 699 F.2d

17  599, 608 (2nd Cir. 1983).

18          The settlement does not have to be "the best that the

19  debtor could have obtained but fair in light of the complexity

20  of the litigation."  In re Adelphia 2007 Bankr. Lexus, 890 at

21  239 (S.D.N.Y. January 3, 2007); Vaughn against Drexel Lambert

155223.TXT

22    Group, 134 B.R. 499, 505 (S.D.N.Y. 1991) "and indeed a Court
23    may approve a settlement even if it believes the trustee or
24    debtor-in-possession ultimately would be successful at trial."
25          Certainly, with respect to the CalGen decision,

41

1     nobody should have undue confidence that it will go one way or
2     the other and surely, there is a severe risk of litigation to
3     the extent that parties are citing to and relying on that.
4           Courts in the second circuit have developed standards
5     to evaluate if a settlement is fair and equitable based upon
6     the original framework announced by the United States Supreme
7     Court in TMT Trailer Ferry Protective Committee for Independent
8     Stockholders of TMT Trailer Ferry, Inc. -- I could have just
9     said TMT Trailer Ferry -- against Anderson, 390 U.S. 414, 1968.
10    Those interrelated factors include, (1) the balance between the
11    litigation's possibility of success and the settlements of
12    future benefits; (2) the likelihood of complex and protracted
13    litigation that's a tendon expense, inconvenience and delay
14    including the difficulty in collecting on the judgment.  The
15    delay, complexity and difficulty certainly exist in this case.
16    (3) The paramount interest of the creditors including each
17    affected classes, relative benefits and the degree to which
18    creditors either do not object to or affirmatively support the
19    proposed settlement; (4) whether other parties in interest
20    support the settlement; (5) the competency and experience of
21    counsel supporting; and (6) the settlement supporting of the
22    settlement; and (7) the extent to which the settlement is the
23    product of arms length bargaining.  Motorola, also known as In
24    re Iridium, 478 F.3d 452, 461-62, (2nd Cir. 2007); circling
Page 37

155223.TXT

25    back to TMT Trailer Ferry, 390 U.S. at 424.


                                                        42


1         The debtors' stipulation with the Second Lienholders
2    resolves the make whole litigation which involves (1) three
3    Tranches of debt, each with different indentures; (2) claim for
4    make whole premiums, call premiums and contract damages; and
5    (3) a range of damage calculations for each Tranch at issue.
6    The potential downside of the make whole litigation includes
7    the possibility of an allowed 288 million dollar Second Lien
8    make whole claim.
9         Using the pre-hearing adjustment numbers, the
10   creditors' committee argues, and the Court will respond, that
11   the Second Lienholders would not receive more than 120 million
12   dollars as a result of litigation.  This estimate is still more
13   than the debtors' proposed settlement amount of 101 -- 100
14   million dollars or so.  Moreover, the entire amount of the 120
15   million dollar claim could be deemed secured which would
16   require the debtors to pay the claim in cash.  Under the
17   proposed stipulation, however, the debtors are only required to
18   pay a portion of the settlement amount in cash thereby
19   preserving their liquidity.  The debtors recognize the inherent
20   risk in litigating the host of legal issues associated with the
21   make whole claims and contend that a settlement in these
22   circumstances is appropriate and advisable.
23        Upon modification of certain provisions of the
24   settlement agreement, the agreement also has the support of the
25   creditors' committee and the Second Lien Noteholders.


                            Page 38

155223.TXT

43

1          Moreover, the agreement was the result of arms length

2    negotiations by sophisticated counsel on both sides.  Given the

3    possibility for protracted complex litigation, the risk of

4    significant secured claims and the importance of the

5    stipulation as another step in the debtors' effort to confirm a

6    plan of reorganization, I find that the proposed stipulation is

7    fair and equitable, falls well within the range of

8    reasonableness and is in the best interest of the debtors and

9    their estates.  Submit an order approving the settlement.

10         MR. KIESELSTEIN:  Your Honor, we have an order.  If I

11   may approach?

12         THE COURT:  Yes.  If the order doesn't read it, I

13   certainly overrule the objection of the equity committee.

14         MR. KAPLAN:  I figured that part.

15         THE COURT:  I've approved the order.

16         MR. KIESELSTEIN:  Your Honor, we will submit the disk

17   with changes.

18         MR. SELIGMAN:  Your Honor, David Seligman again on

19   behalf of the debtors.  I'm going to give Mr. Kieselstein a

20   brief break before the Burke argument and take up the omnibus

21   objections.

22         Your Honor, we don't have any -- this is matters

23   number 5, 6, 7, 8, 9 and 10.  We did not file a new omnibus

24   objection for this month so these are all carried omnibus

25   objections from prior months.  We've submitted a status report

44

1    with the Court yesterday giving the status of the continued

155223.TXT

2   claims and there have been some brief changes since that status
3   report was filed.  Your Honor -- if it's acceptable to Your
4   Honor, I'd like to hand up a blacklined status report to Your
5   Honor.
6          THE COURT:  I'll accept.
7          MR. SELIGMAN:  Your Honor, I set forth in the stats
8   report, there's about fifty or so claims on the various omnibus
9   objections that have been resolved potentially with the
10  parties.  Either we've withdrawn the objection or the amounts
11  have been agreed to by the claimant.  The balance of the
12  objections on the various omnibus claim objections are
13  continued to the next hearing.  We have a number of orders,
14  Your Honor, that account for those resolutions.  If Your Honor
15  has any -- if Your Honor doesn't have any questions, I'd
16  propose to hand up those orders.
17         THE COURT:  Anybody here in response to the omnibus
18  objections?  There is none.  I note from the status report that
19  the fate of each of the claims is clearly set forth, both as to
20  adjournment and as to treatment in the case and I will
21  entertain an order that deals with the claims in accordance
22  with the status report.
23         MR. SELIGMAN:  Thank you, Your Honor.  May I approach
24  with the orders?
25         THE COURT:  Yes.


                                                          45


1          MR. SELIGMAN:  And, Your Honor, as has been our past
2   practice, we will notify all the claimants whose claims have
3   not been resolved of the continued hearing.
4          THE COURT:  I've approved the orders.
                          Page 40

155223.TXT

5          MR. KIESELSTEIN:  Your Honor, good morning again.
6    Mark Kieselstein on behalf of the debtors.  Your Honor, this
7    takes us to item 11 on the agenda, the debtors' limited
8    objection to certain of the convertible noteholder claims.
9    Your Honor, before we launch into the hearing, there are a
10   couple of speeded issues, if you will, about the appropriate
11   scope of the hearing today, which was the subject of a call
12   among the parties yesterday and unfortunately we were unable to
13   resolve the two issues.  We did resolve one of three.
14          Your Honor, the issues are these.  The debtors are of
15   the belief that now is an appropriate time to take up the
16   question of mandatory subordination under Section 510(b) of the
17   Bankruptcy Code.  That is to say, although we are not getting
18   into the quantum of damages in today's hearing, we do believe
19   it's appropriate and helpful to our process to understand the
20   Court's view on whether or not any claim that might be
21   cognizable would be at the level of one's secured claim or
22   would be subordinated pursuant to 510(b) to the level of
23   equity.  We did brief that issue in our opening brief, several
24   pages worth, and we further expanded on that in our reply.  We
25   understand the position of the convertible noteholders that it


                                                          46


1    seemed procedurally inappropriate at this time to go forth with
2    the subordination in question because that purportedly requires
3    a formal adversary proceeding.  Your Honor, in our reply we
4    cited -- actually, a case of Your Honor's where a request for
5    subordination joined a claim objection and was treated as a de
6    facto adversary proceeding.  We think that is appropriate here
7    as well.
                        Page 41

155223.TXT

8          You know, we would also note, Your Honor, that given
9      the belated nature of the filing of the claims to sort of stand
10     on procedural niceties -- and , again, we don't think they
11     apply here but to stand on procedural niceties to further
12     attenuate these proceedings only augments the prejudice to the
13     debtor and we ought to get to this question right away.
14          Your Honor, the other issue in dispute is -- the
15     scope of the hearing is the question of the size of the claim.
16     We again are not going to quant the damages for purposes of
17     today's hearing; however, the issue of prejudice in terms of
18     the belated nature of the amendment or the new claim depending
19     on how one characterizes it turns -- and we believe it's
20     impacted by the potential size of the claim.  We made a
21     reference in our brief, our reply brief, to the fact that these
22     claims could amount to hundreds of millions of dollars.
23     Candidly, the noteholders have said in their papers that they
24     believe the claims are material and substantial despite
25     repeated requests not shared with us the range of claims they

                                                        47

1      actually think exist under their theories.  Again, we think
2      it's an important and relevant issue on the question of
3      prejudice.  For lack of a better term, size matters when it
4      comes to prejudice and related claims.  So we think these
5      ref -- we think talking about this is appropriate albeit we're
6      not getting into any formal evidentiary wave of quantum
7      damages.  We're really only repeating things we've heard from
8      noteholders in non-408 segments.  So again, we think it's
9      relevant for discussion today preliminarily.
10          MS. BECKERMAN:  Good morning, Your Honor, Lisa
                        Page 42

155223.TXT
11  Beckerman on behalf of the creditors' committee.  We obviously

12  concur with Mr. Kieselstein edition here.  In our papers, we

13  have also raised the issue of the late filed nature of the

14  claims as well as whether they are untimely amendments.  And as

15  Your Honor knows, under the second circuit test that would be

16  applicable to those, one of the issues that does have to be

17  considered by the Court in determining those issues is the

18  prejudice which does look at the size of the claims.  I think

19  in our papers we have also said that the claims could be as

20  much as up to a billion dollars from our understanding, Your

21  Honor, and that therefore they're very sizable as well.

22          Our concern is that the -- what the respondents here

23  are trying to do, the convertible claim holders, is to take a

24  position that Your Honor could not rule at this point on the

25  issue that we both raised in our papers and the debtors raised

48

1  in their papers that the claim should be denied on the basis

2  that they were untimely filed, either as untimely filed new

3  claims or untimely filed amendments.  And the reason that the

4  convertible debt holders have argued that we can't refer to

5  even things as there being in a very large size range that

6  we've been told would obviously mean that they would be in a

7  position of trying to tell Your Honor that that matter would

8  have to await an evidentiary hearing or something till we show

9  you the actual amount of it.  And we find that to be a delay

10  tactic, very distressing, and we think that the burden is on

11  them under the second circuit test to come forward and

12  demonstrate that there isn't prejudice to the estate and we've

13  obviously been told that these claims are very substantial.

155223.TXT
14            I don't think that if they thought these claims were
15    one dollar, Your Honor, we would have been filing all these
16    papers and litigating about them today.  So I confer with Mr.
17    Kieselstein's point that I think we at least have to be able to
18    represent that it's our understanding that they could very
19    large and therefore quite prejudicial to the estate in the
20    argument.  And to be barred from doing that, having to await an
21    evidentiary hearing, I think they would be trying to use their
22    decision to file a claim without an amount is a shield for us
23    being able to, you know, oppose the claims on a very legitimate
24    basis that they're late filed.
25            And so we'd obviously ask that we be able to be heard

                                                                  49

1    at least to the extent of just saying that we believe the
2    claims are very substantial and could be in these ranges that
3    we're talking about.
4            MR. DUNNE:  Your Honor, may I stream on this because
5    I think we're arguing over something that's not in dispute
6    instead of hearing the same point again from Mr. Kaplan.  It's
7    really -- Your Honor, if I may, it's Mr. Dunne from Milbank
8    Tweed Hadley & McCloy on behalf of clients who hold the 6%
9    convertible notes.  We are not disputing that they can make a
10   representation that we believe at an evidentiary hearing we
11   will ultimately be able to prove damages in the hundreds of
12   millions of dollars.  We've also agreed that we're not having
13   that evidentiary hearing today.  The facts are not actually
14   before you.  They believe it's much less than a hundred million
15   dollars.  Our only point was --
16           THE COURT:  You're describing the elephant in the
                           Page 44

155223.TXT

17   room?

18           MR. DUNNE:   Right.

19           THE COURT:   Okay.   We've got an elephant in the room.

20           MR. DUNNE:   Exactly.   That --

21           THE COURT:   It's got a hundred million plus on its

22   hide.   Okay.

23           MR. DUNNE:   Exactly.

24           THE COURT:   That's what everybody wanted to know.

25   How about a billion?


                                                    50


1            MR. DUNNE:   Well, for the sixes -- it's not a billion

2    for the sixes, but hundreds of millions.

3            THE COURT:   Half a billion?

4            MR. DUNNE:   Could be.

5            THE COURT:   Could be?   Okay.

6            MR. KAPLAN:   Your Honor, the only thing I just wanted

7    to note was that in the Enron decision the second circuit

8    actually specifically addressed this and specifically said the

9    size -- at the same time, however, the size of the claim cannot

10   be irrelevant to the analysis.   And some parts are taken into

11   account whether allowance of a late claim would jeopardize the

12   success.   So the second circuit itself has looked at it and

13   said you cannot say that the size of the claim is simply

14   relevant for these purposes.

15           MR. HANSEN:   Your Honor, it's Kris Hansen at Stroock

16   on behalf of the certain seven and three-quarter percent

17   noteholders.   I think we're all in agreement here that

18   references can be made to the size of the claim.   The point

19   that we had yesterday in our conference call was that for Your

                          Page 45

155223.TXT
20  Honor to make a decision --

21       THE COURT:  You know, folks, I'm not interested in

22  your conference call.  I'm only interested in what you before

23  me.  You didn't include me in your conference call, number one.

24  Number two, you filed a ton of papers before me and I've gone

25  through them and I'm prepared to react as any judge would do

51

1   with respect to papers that have been submitted before him.

2   The gamesmanship that goes on here.  To find out just the size

3   of the elephant in the room, you should have come to that

4   conclusion on your telephone call and not burden everybody with

5   it now.  I now know I'm dealing with a very, very large sum of

6   money in the view of some of the claimants.  Eleventh hour

7   filed claims, as a matter of fact.

8        MR. DUNNE:  Your Honor, may I address the other

9   aspects of Mr. Kieselstein's remarks which went to

10  subordination and the appropriateness of getting into that

11  today?

12       THE COURT:  Well, that's been put in with all the

13  papers so I'll deal with it.

14       MR. DUNNE:  That's right.  I'm prepared to address it

15  in the order that --

16       THE COURT:  Fine.  If you put it in your papers, you

17  intend for -- to react to it.

18       MR. KIESELSTEIN:  Your Honor, with that, I'll launch

19  into my remarks which will be brief, Your Honor.  Your Honor,

20  with their other worldly convertible valued claims, these

21  creditors, Your Honor, boldly but belatedly go where no other

22  creditor has ever gone before, Your Honor.  But these claims

Page 46

155223.TXT
23    are riddled with procedural and substantive defects and you

24    received exhaustive and I'm sure exhausting briefing, Your

25    Honor, so I only intend to briefly review --


                                                              52


1              THE COURT:   Again, the court reporter is not here.

2     So I'm going to ask you to speak up.

3              MR. KIESELSTEIN:   Sure.   I apologize.

4              THE COURT:   It's a microphone that's picking you up

5     and I'm not sure it's doing its job.   Can you tell?

6              MR. KIESELSTEIN:   Well, the levels --

7              THE COURT:   The levels are all right?

8              MR. KIESELSTEIN:   Yeah.

9              THE COURT:   Okay, good.   They've gone down?

10             MR. KIESELSTEIN:   Well, they're going up and down but

11    other than that --

12             THE COURT:   Will you point to who's quiet so they can

13    raise their voice?

14             MR. KIESELSTEIN:   Your Honor, I'm going to move

15    physically closer to the microphone.   Hopefully, that will

16    assist.   I apologize for the sidelong glance, Your Honor.

17             Your Honor, as I was saying, you've received

18    exhaustive and probably exhausting briefing so I only want to

19    briefly review a few of the key issues.   First, Your Honor, on

20    the timeliness question, we've set out in our papers that there

21    obviously is an issue about whether these amendments which no

22    one disputes were filed many months after the bar date relate

23    back to the original proofs of claim that were filed or whether

24    they are entirely new claims, Your Honor.   For purposes of

25    figuring out whether or not they relate back, Your Honor, the

                          Page 47

155223.TXT

53

1    Courts have talked about whether the amendment is a
2    clarification of the original proof of claim.  Whether it was a
3    correction of an error in the original proof of claim or
4    whether it laid out an alternative theory seeking the same
5    recovery as the original claim.  Clearly, this proof of claim
6    on this novel theory or this amendment doesn't fit any of those
7    categories.  Now there's been some talk in the papers about
8    this transaction test, i.e., does the claim arise out of the
9    same transaction?  But that issue is really a proxy for whether
10   or not the debtors were put on notice that this claim was
11   coming.  And in fact, we were blind sighted by this claim
12   because such a claim has never been previously asserted, Your
13   Honor.
14          On the question of prejudice, that is, even if one
15   were to say, yes, it relates back, there's still a
16   determination of whether it's equitable to considerable the
17   claim or not.  Here, Your Honor, there is obvious prejudice.
18   We've just heard that the claim may amount to the hundreds of
19   millions of dollars.  This, while we are frantically attempting
20   to put together a guaranteed distribution plan, hit our January
21   31, 2008 exit date all with the shadow of the expiration of
22   exclusivity looming over us, Your Honor.  And as we've talked
23   about the prejudice which already exists is burgeoning on a
24   daily basis because we repeatedly asked how much is the claim
25   and we can't get a straight answer to that question.  So as we

54

155223.TXT

1    go further into these negotiations, we're further handicapped

2    by not knowing the scope of what we're dealing with or the size

3    of the elephant.

4            In terms of the other factor is what was the

5    justification for delay, here there was no justification for

6    delay.   Some of the creditors say, well, we didn't know how we

7    were going to be treated under our plan.   But it doesn't work

8    that way, Your Honor.   Creditors don't file claims based on a

9    plan.   Debtors file a plan based on claims.   And the bar date

10   matters.   It's not just a day on a bureaucrat's calendar, Your

11   Honor.   It's critically important and numerous cases have

12   recognized that.

13           Certainly, the other creditors candidly concede that

14   the increased value of the estate made it worth their while to

15   log in these claims when they did.   But the bar date is not

16   resurrected and no safe harbor is created on the other side of

17   the bar date simply because the debtors' estate is perceived to

18   having increased in value.   Under their theory, they had the

19   claim the day we filed for Chapter 11.   They had it the day the

20   original bar date became due.   They chose not to file it until

21   much, much later.

22           Your Honor, turning to the merits, I think we have to

23   return to first principles of convertible debentures.   The

24   convertible notes permit alternative forms of recovery that are

25   mutually exclusive.   Two ways of obtaining a return on one's

                                                                55

1    investment.   Either principal and interest or conversion to

2    stock, not both.   One or the other, whether in bankruptcy or

3    out.   Now, the holders argue that the inden -- there are
                            Page 49

155223.TXT

4   independent rights to both in this situation.  That is, an

5   independent right to the P&I and an independent right to the

6   conversion privilege.  But here, those rights are wholly

7   interdependent, not independent and conjoined.  Once a bond is

8   converted, it obviously no longer exists.  And the only way to

9   get stock is to convert a bond.  So these are mutually

10  exclusive.  Notwithstanding the fact that they've asserted a

11  claim for both P&I and for the conversion privilege.  That's a

12  metaphysical impossibility inside bankruptcy or out, Your

13  Honor.

14          The fact that the pre-default -- they're pre-default.

15  The bonds could be converted for a combination of cash and

16  stock -- doesn't change this basic truth.  Those rights are

17  interlinked; they don't operate independently and they don't

18  create dual claims, Your Honor.  For that reason alone, the

19  conversion privilege claims are subsumed and consumed by the

20  P&I claims previously filed by the holders and purported to be

21  allowed under our waterfall plan.  We don't dispute basic P&I.

22  Those claims are well established.

23          Your Honor, it would be different if the lender,

24  let's say, loaned a thousand dollars to a borrower, got back

25  800 dollars in bond and 200 dollars in warrants.  And we talk


                                                              56


1   about it in A Choc Full O'Nuts case, there was -- the second

2   circuit recognized, there was such a beast.  You could have an

3   instrument that had those two separate independent features.

4   But that's not our facts.  That's not what we have here, Your

5   Honor.

6               Further, even if we looked away from the timeliness
                            Page 50

155223.TXT

7   issue, even if we ignored the fundamental nature of convertible

8   indentures, here the conversion privilege expired by its terms

9   before it was ever exercised and that was because under the

10  terms of the indentures, when the debtor filed for bankruptcy

11  the maturity by contract was accelerated.  There was

12  acceleration.  All P&I was due immediately and the indentures

13  also provide that one day prior to maturity conversion

14  privilege goes away.

15          So, Your Honor, here we have automatic acceleration

16  under the agreement.  We have maturity lower case and that

17  terminates the conversion privilege.  Now the holders argue

18  that maturity doesn't mean maturity.  They argue that lower

19  case maturity should be read to mean stated maturity which is a

20  defined term in the indentures and basically means the original

21  stated maturity on the cover of the indentures, 2014, 2023,

22  whatever it is.  But if that were the case, it would have been

23  simple enough to say "stated maturity" rather than have lower

24  case maturity and we all know the common sense in the

25  dictionary definition of maturity for these purposes is when


                                                            57


1   all the principal and interest comes due and payable.  And

2   that's how these indentures operated.  So that's on December

3   20th, 2005, Your Honor.  Under the documents, the conversion

4   privilege had vaporized.

5           And what then of Section 1015(d) which the holders

6   purport to make much of, Your Honor?  That provision purports

7   to allow the conversion privilege to survive post-bankruptcy.

8   Well, in the first instance, Your Honor, the way the holders

9   interpret 10.15(d) would be to obliterate the other provisions

                        Page 51

155223.TXT

10    that I just discussed, the maturity provision, the acceleration

11    provision and we all know it's a basic rule of contract

12    instruction that when two provisions may appear to be at odds

13    with each other, it's the duty of the Court to attempt to

14    harmonize them in a way that does violence to neither, Your

15    Honor.  Here, there are -- it's not difficult at all to

16    harmonize these two provisions.  There are two ways that jump

17    to mind.  First, if but only if the pre-conditions to

18    conversion had occurred pre-bankruptcy, one could read 1015(d)

19    to say that the conversion privilege survived, albeit modified

20    to provide for conversion only to stock and not to cash and

21    stock.  Similarly, one can read 1015(d) to say that if the

22    conversion privilege was in the process of being exercised and

23    there was an intervening bankruptcy, then the conversion

24    privilege again would be honored albeit by converting to stock

25    not to cash and stock.  And I would note that the process for

58

1    actually converting the bonds is quite complicated under the

2    documents.  10.02 talks about to convert a hol -- a note, the

3    holder must complete and manually sign the irrevocable

4    conversion notes, deliver them to the conversion agent, deliver

5    the note to the conversion agent, furnish appropriate

6    endorsement and transfer documents, pay any transfer or other

7    taxes, if the note is held in book entry form, complete and

8    deliver the depositary, appropriate instructions pursuant to

9    the applicable procedures.  When all of those things are

10    satisfied, you then have the conversion date thereafter.  The

11    debtor would have four business days or not less than four

12    business days to actually go ahead and process the conversion,

Page 52

155223.TXT

13    deliver the cash, deliver the stock.

14         So one could imagine that there could be quite a

15    lengthy process and if a bankruptcy were to enter midstream,

16    one could certainly read 1015(d) to say fine, we're going to go

17    ahead and allow that process to be finished up, again, albeit

18    the currency of stock only.

19         So, Your Honor, we think it's rather easy to

20    harmonize those provisions without a disarray in the maturity

21    provision of the documents or the acceleration provision of the

22    documents.

23         I would also note that the holders here did not

24    bargain for any compensation if the conversion privilege were

25    to be terminated by the terms of the documents.  In essence,

59

1     the equivalent of a pre-payment premium for early payment.  No

2     such provision was put in the documents here; however, the

3     convertible holders would like the Court to create one for

4     their benefit.  That is to say, treat (d) like a bondholder,

5     you know, without a pre-payment premium but that got paid early

6     and therefore didn't have its expectations met.  And I think,

7     Your Honor, this goes to the phenomena we talked about a little

8     bit ago which is the noteholders want to be in the band guard

9     of the CalGen revolution, Your Honor.  They want to be at the

10    front of the dashed expectations parade and the way they're

11    doing it is to latch on to these documents and create a right

12    that does not exist anywhere within the four corners, Your

13    Honor.

14         But even if one, Your Honor, were to ignore the

15    untimeliness issue, the nature of convertible debt holders --

155223.TXT

16    debt instruments, the fact that the documents provided that the
17    conversion privilege expired by its terms, the lack of any
18    contractual provision granting such a right post-conversion,
19    there still would be no basis for a claim for damages here
20    because it's undisputed that the pre-conditions for conversion
21    never transpired.  These conversion rights were always under
22    water.  They were always out the money and pursuant to 502 of
23    the Code, when claims are fixed as of the petition date, if
24    you've got an out of the money option put/warrant thing of that
25    nature, then you have basically got a cognizable claim in

                                                          60

1    bankruptcy.  Now that is not to say that there might be some
2    third party out there that says underwater warrants with a ten-
3    year term, underwater conversion privileges with a ten-year
4    term, I'll pay money for that, that's worth something.  It may
5    even be worth more than par depending on what other comparable
6    investments are out there.
7            But that's a distinction that's critical.  What you
8    can get from the secondary market is not something you can
9    necessarily assert against the debtor.  The debtor is not a
10   backstop for the secondary market and convertible debt
11   instruments.  And the fact that the privilege has gone away or
12   is terminated and you can't go pedal that to some third party,
13   again, that gives rise to no claim against the debtor.  502
14   tells us that.  And the Einstein/Noah case, the other cases
15   we've cited stand for the proposition that an underwater equity
16   type instrument whether it's embedded in a contract or anywhere
17   else does not give rise to a claim when it's out of the water
18   on day 1.

                      Page 54

155223.TXT

19          Finally, Your Honor -- trying to edit my comments

20     down -- the subordination issue, Your Honor.  Even if one

21     ignores tardiness, the only other things I've talked about,

22     it's clear that any claim arising from this loss of the

23     conversion privilege which is, after all, is nothing more than

24     the right to buy stock with bonds.  Any damages that would

25     arise from that would clearly be subject to mandatory


                                                              61


1      subordination under Section 510(b) of the Code.  It's clear

2      from the case law that 510(b) is broadly construed.  There does

3      not have to be an actual sale or purchase of a security.  If

4      there's a contract that provides for the prospect of a purchase

5      of a security and the actions of a debtor or the intervention

6      of bankruptcy take away that right even though never exercised,

7      the damages that would arise from that clearly fall within the

8      ambit of Section 510.  As Judge Gonzales noted in WorldCom, all

9      of these instruments, puts/warrants options, conversion

10     privileges are really just the ability to participate in the

11     success of the enterprise.  And it should go without saying

12     that the converse is equally true.  One looking to have a right

13     to invest in the success of the enterprise takes a risk of the

14     failure of the enterprise as well.  That's what's transpired

15     here and it does not give rise to a cognizable claim.

16          Now you'll hear the noteholders say, wait a minute,

17     510(d) expressly excludes from its workings convertible debt

18     instruments.  But clearly, what that provision is meant is to

19     prevent, you know, aggressive, sneaky debtors from trying to

20     subordinate the entire P&I claim simply because it happens to

21     be under the umbrella of a convertible debt instrument.  It

155223.TXT

22    does not immunize the conversion privilege from being treated

23    as it is, as an equity claim or at the level of equity.

24            And, Your Honor, I suspect you won't hear much from

25    noteholders' counsel about independent rights, about the right


                                                                62


1    to P&I, right to conversion privilege when you get to the

2    subject of subordination because that puts them in a box.  If

3    it's a separate right to purchase equity with bonds, then the

4    implication is clear.  It's within the ambit, again, of Section

5    510(b).

6            Your Honor, I apologize for racing through that but

7    I'm happy to answer any questions the Court might have.

8            MS. BECKERMAN:  Your Honor, on behalf of -- Lisa

9    Beckerman from Akin Gump on behalf of the creditors' committee.

10   Your Honor, we basically think that there are three reasons why

11   these claims should be denied.  And one is that contractually,

12   we don't think that they're entitled to the claims and I think

13   our papers have dealt with that and I'll just touch on a couple

14   points that are hopefully slightly different from Mr.

15   Kieselstein's.

16           Second, we don't think that even within the ambit of

17   your CalGen decision that we have before the Court and the

18   context of expectation damages that there would be such

19   expectation damages that would be awarded here or due here or

20   should be claimed here because the contract doesn't provide

21   them with the expectation that would be necessary to allow them

22   to have such a claim.

23           And last, of course, we'll touch on the timeliness

24   issue that we've already spoken about a little bit earlier in
                              Page 56

155223.TXT

25    the hearing.


                                                        63


1          Your Honor, the indenture is very clear that when

2    there's a bankruptcy filing there is an automatic acceleration

3    and the principal and interest becomes due.  I think in a

4    circumstance like this where you have a convertible debenture

5    that that was intentional.  That the document itself limits

6    itself to the principal and interest becoming due.  It doesn't

7    suggest that there's anything else that comes due.  And it's

8    because these securities, as Mr. Kieselstein, I think, has

9    mentioned, you having a unique feature in the sense that you

10    are a debt holder and you get principal and interest and you're

11    treated like a creditor until such time as your conversion

12    privileges become great, if they ever do under your document,

13    and then if you, yourself, voluntarily elect to actually

14    convert at that point, then you exchange your note to become an

15    equity holder or, outside of bankruptcy, perhaps for cash.

16          Here, we have a situation where the indenture treats

17    them in a situation where there's a bankruptcy filing like

18    every other creditor would be.  You get principal, you get

19    interest, that's what you get.  As Mr. Kieselstein pointed out,

20    obviously the language of the indenture itself doesn't seem to

21    imply in any way that there would have been some other claim

22    that would have been available based on unripe conversion

23    rights.  And that's what we had here, Your Honor.  We had,

24    under Section 10.01, which is the actual section of the

25    indenture, that does actually deal with the right to convert or


                            Page 57

155223. TXT

64

1    not, not 10.5 or 10.4, as the case may be (d).  That section of
2    the indenture does say to you that you have to satisfy these
3    certain provisions, certain factual things, either relating to
4    the value of the stock, passage of dates, mergers and
5    consolidations, things that weren't in existence and hadn't
6    happened at the time of the bankruptcy filing.
7            So we have a situation where the contract itself is
8    very clear what happens to you if there's a bankruptcy filing,
9    there's the acceleration and principal and interest, and we
10   didn't have a situation we had any ripe conversion rights.
11   Well, that's important because pursuant to 502(b), obviously
12   everyone's claims that are involved in this proceeding are
13   fixed as the filing date and the language of the document
14   doesn't provide them with a claim for unripe conversion rights.
15   The language of the document provides them with principal and
16   interest.  The language of the document says that the
17   conversion right couldn't be exercised after maturity and you
18   had a maturity.  And the languages of the document say, along
19   with the Bankruptcy Code, that, you know, you're stuck at what
20   you had on the date of the filing.  And what they had on the
21   date of the filing were unripe conversion rights that were not
22   exercisable at that point.
23           So then, you have to look at, well, how do we
24   reconcile the fact that we have this provision that the
25   respondents, that the convertible debenture holders have

65

1    focused on, which is this 10.14(d) and 10.15(d) depending on

Page 58

155223.TXT
2  the indenture.  You know, I think that, as our papers indicate,

3  our reading of that is that if in the two indentures where it

4  discusses a situation where there is any type of default, the

5  language of that provision is limited to saying what kind of

6  form or value you would get if you did convert.  And obviously,

7  outside of bankruptcy, there's no automatic acceleration, no

8  automatic situation where the notes reach maturity outside of

9  bankruptcy and, therefore, it might obviously be possible that

10  somebody would wish to exchange in a situation -- if the

11  conversion was available to them.  And that's what that

12  provision allows for.

13          With respect to the 7.75 indenture, which obviously

14  does speak specifically in a 10.15(d)(2)(b) bankruptcy default

15  situation, our view is that we think that the only way to

16  reconcile that with the rest of the reading of the indenture

17  and make it make sense is in a hypothetical situation where

18  those conversion rights have been ripe at the time of the

19  filing.  And that wasn't our case here.

20          The way that the convertible debenture holders want

21  to read this indenture, it would mean that you're going the

22  provision saying you get -- principal and interest become due

23  and payable.  You're ignoring the situation where there's the

24  acceleration in the document.  You're ignoring the fact that

25  you don't have a ripe conversion right at the time of the

                                                        66

1  filing under 10.01 of the document.  You're ignoring the fact

2  that the document uses a term "stated maturity" to mean stated

3  maturity and therefore "maturity" must mean something else in

4  the notes, the more general (b) that we read.  And it's very

                    Page 59

155223. TXT

5    hard to read the indenture in a way that makes sense, in a way
6    that's being argued by the convertible debenture holders.  And
7    whereas we think that the reading that we've advanced or the
8    companies advanced does read the indenture the way that makes
9    sense -- yes, as you know under the case law what we all need
10   to be trying to do here.
11            In addition, because the conversion rights were not
12   ripe at the time under the cases that we've cited and Mr.
13   Kieselstein previously referred to, in Einstein and the other
14   cases, it's argued that there wouldn't be a claim that was ripe
15   at the time of the filing because it's not under -- there
16   wouldn't be a claim under the indenture and the conversion
17   rights were not ripe.  This is a situation where I think you
18   see the convertible debenture holders trying to have it both
19   ways.  On one hand, outside of bankruptcy, basically, they have
20   a choice where they get principal and interest, they can stay
21   as a noteholder for the entire term of the indenture if they'd
22   like to.  Or, at some point, if the conversion rights are ripe
23   and they then exercise their right to choose to, they could
24   exchange their position and leave being a creditor and becoming
25   either cashed out or an equity holder outside of bankruptcy.

67

1    Here they're arguing that they get something in addition to
2    their rights as a creditor.  That they get their rights as a
3    creditor, the principal and interest and what they're entitled
4    to just like every creditor is and they also get some kind of
5    claim for the lost conversion rate even though that's not set
6    forth in the indenture and it wasn't ripe and therefore it
7    wouldn't be a permissible claim under 502(b).  In essence,

Page 60

155223.TXT
8      they're trying to get better rights in a bankruptcy than they
9      would be entitled to contractually outside of a bankruptcy.
10     And I don't think the indenture can be read that way that makes
11     sense.
12             The second point is that I don't believe that the
13     CalGen decision supports their entitlement to a claim under
14     expectation damages.  First of all, this is not the situation
15     that we had in CalGen where you had somebody who had a
16     provision in their documents that provided for a payment stream
17     over time that got interrupted solely because of the bankruptcy
18     filing and the acceleration.  Here, at best, you have a reading
19     where under certain circumstances, if they ever happen and then
20     if the person actually chooses to elect at that point to
21     convert, they have a right to switch over from debt to cash and
22     equity outside of bankruptcy and equity at best inside of
23     bankruptcy.
24             As of the filing date, none of the conditions pressed
25     in any indenture were met for doing that.  And the indenture is

68

1      very clear, that you get principal and interest and you don't
2      get a claim.  Based on the language of the agreement, it's hard
3      to see how the convertible debenture will just -- could have
4      had an expectation of anything but principal and interest.  The
5      document itself just says that's what you're going to get.
6      There's an acceleration; that's what you're entitled to.  It
7      doesn't say that you always get a conversion rate.  It says
8      that you get a conversion rate if certain things happen, if
9      there isn't a maturity, if you actually choose to exercise it
10     and obviously there is no situation at the time of the filing
Page 61

155223.TXT
11    where those rights were exercisable.

12            The convertible debenture holders are sophisticated

13    parties.  Section 502(b) of the Bankruptcy Code has been in

14    existence for a lot longer than the indentures.  The case law

15    about automatic acceleration with respect to a bankruptcy has

16    been out there.  And it's clear that if the parties had wanted

17    to preserve some kind of liquidated damages claim or other

18    right or some argument that they had an expectation to get

19    something after a bankruptcy filing other than in principal and

20    interest, the document would have to support that.  And unless

21    the document supports it, I don't think your CalGen decision

22    supports the argument for that because there can't have been a

23    reasonable expectation.

24            And in addition to the contract not supporting their

25    reasonable expectation, we have a unique situation here where


                                                            69


1    unlike the CalGen creditors who had a contractual provision

2    that said you're going to get the stream of payments over time,

3    here you have a situation where the person under certain

4    circumstances might have a right to convert and every

5    individual noteholder has the right to decide if those

6    circumstances are even ripe if you would actually exercise

7    them.  And at the time of a bankruptcy filing there is the

8    maturity and obviously the situation where the principal and

9    interest comes due.  It's very hard for someone to look at the

10    reading of this contract and think that they would have had an

11    expectation of any kind of damages but furthermore to then

12    award expectation of damages assuming that every single -- that

13    these conversion rights sometime in the future would have

155223.TXT
14  become ripe, even though there's a lot of conditions to it, and
15  then to say that every person would have exercised them.  I
16  don't think that -- I think that's quite a stretch from Your
17  Honor's CalGen decision and I don't think that's supported by
18  the case law or even by the CalGen rationale.  I just think
19  that they're very distinguishable.
20        The last point that I wanted to make to Your Honor is
21  the supplemental claims, as they're so-called.  From our
22  perspective, these are clearly your late filed claims.  These
23  are not amendments clarifying claims that were stated before.
24  What you have here is claims that have never been asserted in
25  any reported decision that we could find ourselves in the

                                                        70

1   country in a bankruptcy scenario.  So they're novel claims.
2   They are claims that were known at the time of the bankruptcy
3   filing.  The conversion right, even under the arguments that
4   the convertible debenture holders are going to be making is
5   known all those facts, all those provisions of the indenture
6   that they're relying on.  That was all known at the time of the
7   bankruptcy filing.  So any claims that they wanted to put this
8   Court on notice and the debtors' estate on notice of should
9   have been in the initial claims.  Basically, when the second
10  circuit, under the Midland Cogeneration Venture Limited
11  Partnership versus Enron case looked at this and tried to
12  figure out if this is a relation back situation, the Court
13  focused on there must have been a timely assertion of a similar
14  claim or demand evidencing an intention to hold the estate
15  liable.  Well, back when there was a bar date, that didn't
16  happen.  That was not in the vague language of, you know,
            Page 63

155223.TXT
17    "other potentially liquidated amounts."  We're talking about a

18    very sizeable claim here, Your Honor.  Obviously, none of us

19    know if it's allowed as a claim, what it would be allowed in,

20    exact dollar amount and obviously that's not to be determined

21    today, as we discussed earlier, but we know that it's a very

22    large elephant as we've all said.

23         It is also an elephant that was in existence and

24    known about at the time of the plan.  And there is no

25    discussion whatsoever in any of the respondents' papers about


71


1     why they didn't -- they had this delay.  And furthermore they

2     didn't even follow the proper procedure, Your Honor, for filing

3     a late filed claim which would obviously be coming to this

4     Court and explaining why they met the standards for excusable

5     neglect under Pioneer and why they should be permitted to file

6     a late filed claim or for that matter a subsequent amended, you

7     know, on a late filed basis.  And I think given that these

8     claims should have been asserted back at the time of the filing

9     there's really no question that these are belated claims that

10    were knowable and should have been there.  And the second

11    circuit says when you're looking at the Pioneer test and the

12    circumstance that you have to focus on the delay factors being

13    the most important.  Why was there a delay, was there a real

14    reason for the delay.  The second circuit in its cases,

15    including in Midland, comments it takes a hard line on this

16    point.  And that it adopts the hard line approach.  And here

17    there just isn't any reason at all advanced -- not a single

18    reason whatsoever advanced for the delay.  I suggest to Your

19    Honor that since the burden on the other side is to explain why

155223.TXT
20  they met the standards for being able to file these claims late
21  filed, while they met the excusable delayed standards and why
22  there's a reason for the delay and they haven't put in one
23  piece of statement, one evidence about why.  Your Honor, under
24  that circumstances the claims have to be denied.
25          Even if Your Honor thought that these were just


                                                                72


 1  amendments and that they really do relate back this still does
 2  not meet the standards the second circuit applied for
 3  amendments in these types of circumstances.  The second circuit
 4  does look at things like the equities and the prejudice of
 5  parties.  Mr. Kieselstein I think has done a very good job of
 6  explaining the prejudice that would be to the estate where we
 7  are now in this process of having all of a sudden these
 8  extremely large claims coming to the forefront and being
 9  allowed.  The Court has to look at under those circumstances
10  and consider certain things including the dilatory behavior on
11  the part of the claimant which I think we clearly know here,
12  whether other creditors would receive some kind of windfall if
13  the amendment was not allowed.  I don't think that this is that
14  type of situation.  Here none of the other creditors or the
15  debtor assumed in their plan we were going to have to be
16  dealing with these types of additionally large claims.  They
17  weren't knowable; they're not cognizable under the documents.
18  There is obviously potential prejudice that would be to the
19  entire estate and other creditors whose recoveries would be
20  diminished by this and prejudice to claimants.  And there's
21  really no justification for them not being able to file this at
22  the time of the filing of the plan.

                     Page 65

155223.TXT
23          Again, even under the test for amendments I think
24    that they failed to justify why these claims shouldn't be
25    disallowed even if the Court determined that they related back.


                                                               73


1     I think that they fail that test as well and therefore based on
2     that we think that the claim should be disallowed because
3     they're not supported by case law or the terms of the contract.
4     They're not supportable expectation damages claims under the
5     CalGen decision.  And they are claims that should be denied on
6     the basis that they were late filed claims or untimely claims.
7          MR. KAPLAN:  Your Honor, Gary Kaplan from Fried
8     Frank.  We join in the arguments of the statement of Ms.
9     Beckerman not to belabor the record.  We just fully join in
10    everything that they stated.
11         THE COURT:  Anyone else want to be heard?
12         MR. DUNNE:  Your Honor, Dennis Dunne from Milbank
13    Tweed on behalf of the six percent convertible noteholders
14    which we represent.  Let me just frame the issue a bit as I see
15    it and then I'll address Mr. Kieselstein's statement and Ms.
16    Beckerman's arguments.  But before I do I wanted to address
17    some of the back and forth about CalGen.
18         I don't view us as some spawn of CalGen as Mr.
19    Kieselstein tries to characterize us.  We, in fact, were
20    working with these noteholders prior to Your Honor's CalGen
21    decision which I do think supports our position but this was an
22    argument that we were going to raise regardless of the ruling
23    in CalGen.
24         And that brings me to framing the issue.  Because I
25    think at its core, Your Honor, the matters are simple.  Should
                              Page 66

155223. TXT

74

1    convertible noteholders be compensated for the loss of all
2    their bargained for consideration or only some.   And I think as
3    we go through this it implicates kind of two key bankruptcy
4    policies.   One being the equality of treatment between a
5    similarly situated creditors and the other is kind of avoidance
6    of windfalls.   We have a theme here that his is solvent; the
7    equity is likely to receive meaningful distributions.   So if
8    you look at a world where you have two bondholders, one invests
9    in a straight bond that's nonconvertible with a higher coupon.
10   He has a tie of consideration that is principal and interest.
11   The other bondholder elects to invest in a convertible
12   instrument.   He has a pie with three slices.   He takes
13   principal less interest and he gets this right to convert over
14   time.   And that is the key here.   Because the question is all
15   right, the debtors want to eliminate the entire pie, but they
16   only want to pay principal and interest.   So the holder of the
17   straight bond will receive full compensation, the holder of the
18   convertible bond will receive less than whole, maybe two-
19   thirds, who knows what the percentage is but less than whole
20   compensation.   We think that issue is particularly acute in
21   this case, Your Honor, where the debtor is solvent and denial
22   of this claim in essence takes that value and that's not for
23   today, it's for another day to determine the quantum of
24   damages.   But it takes whatever that value is and redistributes
25   that wealth to the equity committee, who in our view, have no

75

155223.TXT

1   cause to complain about this because it was their directors,

2   their management team who was selected by their directors, who

3   went out and chose access to capital markets when they did and

4   became obligated not only to pay the lower coupon but to keep

5   this convert right outstanding until 2014.  We have a no call

6   just like the lenders in CalGen to protect our consideration.

7   Now, the currency of the consideration is different but the no

8   call is designed to protect it, it protects our pot, the

9   interest and the conversion right.  Just like it protects the

10  straight bondholders entitlement to interest over the length of

11  the bond.

12          Which brings me, Your Honor, to I think the limited

13  scope of today's hearing.  It really is, is there liability, is

14  there a breach of contract claim that is allowable as a result

15  of the aggregation of the conversion right?  It is not amounts.

16  A lot of Ms. Beckerman's comments can go to amount.  But we

17  have to discount the likelihood that you would ever actually

18  convert.  Those are things we can hear experts testify on.

19  We've retained Dr. Hull, a professor at the University of

20  Toronto who has literally written a book on how you value,

21  converts and options.  And this is not some ivory tower

22  esoteric analysis, this is how these instruments trade every

23  day and which is the value of what our clients were receiving.

24  The procedural posture here, Your Honor, is on March 27th we

25  did file a supplement to the proof of claim.  I'll address the

76

1   alleged lateness at the end of -- end of my arguments.  But

2   it's clear from Mr. Cieri's comments at the outset that that

3   predated by months their filing of the Waterfall plan which

Page 68

155223.TXT

4     incurred may not be the plan they proceed with because they are

5     not seeking a plan sponsor reorganization plan.  Ultimately,

6     Judge, the debtors don't dispute several key aspects of the

7     converts.  I don't think they dispute that they obtained a

8     lower coupon in exchange for the granting of the convert

9     feature.  I don't think they dispute that it was a fundamental

10    aspect of the bargain for consideration.  What they dispute is

11    whether they have to pay anything for it if they eliminate it

12    even in the context of a solvent case when equity is receiving

13    meaningful distributions.  And I -- I have to harp on one point

14    here, Your Honor, which is we do have an unusual convertible

15    feature which is very often you'll see a convertible bond that

16    requires the bondholders even pre-bankruptcy to take their debt

17    and use that as currency to get the stock.  So that you never

18    have a situation where they received cash for their principal

19    and interest and get the stock.  They either get cash,

20    principal and interest or they convert and have their entire

21    claim satisfied with stock, that's not our indenture.  Our

22    indenture expressly provides that when we convert we receive

23    cash for principal and interest and there's a formula that

24    basically says okay, at the time you convert it how much above

25    the strike price was the stock trading at.  And that delta is

77

1     then treated through the distribution of stock.  And the

2     noteholders have made it clear on that, Your Honor, that we're

3     willing to live with that option through 2014.  We're not

4     looking for the elimination of that option solely to run it

5     here and try to quantify it and make the claim we suggested to

6     the debtor that we should replicate that, reinstate it, do

155223.TXT

 7  something and we'll take the risk that it's never in the money.

 8  They've said that's unacceptable.  We want to cash all the

 9  creditors out, we want to lower the burden of cashing it out

10  and we'd like to do that by eliminate your convert right and

11  not compensating you for it.

12          Now, Your Honor, let me just return to some of the

13  key points that I think they've missed.  The key nature of the

14  convert is the duration.  It is not capable of being eliminated

15  on any particular day.  We have the right to decide at our

16  economic discretion what day to convert from now to 2014.  We

17  have a no call in the document to make sure that the debtors

18  can't force us to take principal and interest.  The debtors

19  make much of the notion that there's a quick right, that if

20  there's a change of control the --

21          THE COURT:  You mean, you can exercise right now and

22  join Mr. Kaplan's group, is that what you're saying?

23          MR. DUNNE:  We could.

24          THE COURT:  Okay.

25          MR. DUNNE:  Though, we can't be forced to do it.


                                                          78


 1  There's a difference between a foot and call which is key here.

 2  We could do it but they can't force us to do it.  We have a

 3  right to see how this plays out to 2014 and then decide whether

 4  to join.

 5          THE COURT:  Mr. Kaplan might be upset because then

 6  you delude his group.

 7          MR. DUNNE:  He might be but as I said it's his

 8  agents, his directors that actually negotiated this deal.  He

 9  can't complain about it.  He may be upset but he can't complain

155223.TXT

10    about it.  The key element is duration, Your Honor.  The fact

11    that there's massive vol --

12            THE COURT:  All of these are with a very wide paint

13    brush because you're going to say his directors, and it may

14    very well be that his clientele came into existence two days

15    ago.

16            MR. DUNNE:  No, but it's clear.  And I'm glad to

17    brief this issue, Your Honor, that there are many cases that

18    say in a solvent debtor when you are talking about allowing

19    claims, equity cannot be heard in many circumstances when

20    you're looking to allow claims that would give creditors the

21    full benefit of their bargain.  Because it was the directors.

22    I agree with you, secondary markets they may have traded in and

23    are out, they may not be the same people who voted in 2004 for

24    that slate of directors but they have no cause to complain.

25            The key element, Your Honor, is duration.  If you

                                                                 79

1     look at -- any court that has looked at Black-Scholls or Jump-

2     Diffusion or some of these other models other than this

3     intrinsic value model that they presuppose is the right test,

4     has rejected the intrinsic value model because you can't force

5     us.  With the no call and the other protections you can't force

6     us to put up or shut up today.  We have the right to either

7     have an extent to 2014 or be compensated for that loss.

8             Which brings me to the next key point which is

9     acceleration maturity does that move from 2014 to 2005?  On

10    that a couple of points.  I believe these are the same points

11    that came up in CalGen and in the make whole where they

12    basically said you know, this isn't a call in CalGen because

155223. TXT

13    post maturity you don't call it you just pay principal and

14    interest that's due at maturity.  So how could there be a

15    breach of the no call where we've actually metaphysically, I

16    don't know how, but we've actually past the maturity date.  And

17    that did not prevent Your Honor from ruling, correctly I

18    believe, that there was an expectation with the no call that

19    that bucket of consideration would survive to the light of the

20    security and you would need to be compensated for it.

21    Textually what they miss -- their whole argument is off of a

22    form exhibit to the indenture, the form of note, which on it's

23    face says "to the extent that there's any inconsistency between

24    the note and the indenture in the terms the indenture

25    provides."  There's also nothing in the form of note that says

80

1    maturity is moved up from 2014.  He has to resort to not only

2    expert textual evidence but Black Law dictionary.  So no

3    contemporaneous evidence that they meant anything other than

4    2014 by maturity.

5            But let's talk about some of the inconsistencies that

6    would exist if you adopt their arguments, one of which we've

7    talked about.  Which is we've expressly had and preserved and

8    bargained for the right to convert post default in the

9    indenture.  That was there for a reason so that we couldn't

10    have this rush of maturity date or defaults that would deprive

11    us of that option value.  The other is that the indenture is

12    unambiguous, that we have the right to convert, among other

13    things as a number of triggers, but one of the triggers is that

14    anytime after September 30, 2013.  It doesn't say unless

15    maturity has been moved up, it is unambiguous.  If you accept

155223.TXT

16    their reading we have an inconsistency which I submit is

17    resolved by the face of the note that says in terms of the

18    indenture provide and to prove why I don't think that Mr.

19    Kieselstein wants this reading is we have OID in these notes,

20    we have original issued discount in these notes.  And the note

21    also has on the face of it a statement that says "principal

22    amount of maturity equals 725 million dollars."  The accrued

23    amount on the petition was 547 million dollars without, unless

24    you accept Mr. Kieselstein's argument that the maturity was

25    moved up.  In which case the claim will increase by 175 million


81


1     dollars as a result of saying okay, that's what the document

2     says.  Principal amount of maturity is the amount stated on the

3     face of the form of note, 725 million dollars.  I don't believe

4     that's the case, Your Honor, because it's proving the

5     absurdity, I believe, of this textual analysis.

6          Which brings me to a related point.  Ultimately, Your

7     Honor, their whole argument assumes that they can elect our

8     remedies.  And the cases that have considered the election of

9     remedies, particularly the acceleration context, require an

10    affirmative act by the noteholders.  The put is a perfect

11    example of it, they make much of this notion that were there a

12    change of control outside of bankruptcy, we the convertible

13    noteholders, would have a right to put the securities for

14    principal and interest to the company and they would pay us

15    that amount with nothing for the convert.  They're actually

16    wrong a little on the indenture because within certain

17    parameters we actually cannot do that because it converts

18    valuable.  But put that aside that's a put, it's again our

155223.TXT

19  election.  I agree that we have the right after a default, pre-
20  bankruptcy let's say to go to state court and try to have this
21  obligation satisfied by payment of principal and interest.  But
22  that's not what we did.  And only that would constitute an
23  election of remedies sufficient to say you're not compensated
24  for your loss of consideration.  They are trying to conflate
25  the two by saying okay, the petition date's acceleration, it's

82

1   election of remedies and it's maturity date.  And (a) those
2   arguments were made before and I believe you rejected them and
3   there's just no evidence of that in the indenture.  The seventh
4   circuit in the LDH case made an important point out of this
5   where they denied a prepayment premium to the lender who had
6   exercised remedies.  The debtors cite this case because of the
7   fact that the prepayment premium was denied but it was because
8   they tried to exercise their remedies.  They elected to lift
9   the stay to foreclose on their collateral.  Again, whatever
10  they got pursuant to state court remedies.  New York law is the
11  same, Your Honor.  New York Supreme Court has held that the
12  acceleration of immediate payment to the exclusion of other
13  rights "could be brought into being only by an election to
14  accelerate affirmatively exercised by the plaintiff obligee.
15  Any other holding would take the option of accelerating or not
16  accelerating away from the person for whose benefit the clause
17  is placed in the contract in the first place.  That's the
18  Simonim case.
19      Your Honor, let me just turn now to this argument
20  about 502(b) for a second and whether or not we look at just
21  the petition date to see whether the conversion right is in the

Page 74

155223.TXT

22    money right or not.  That's not what 502(b) says.  It doesn't

23    say that you adopt some intrinsic value task.  I think it's not

24    an issue for today because that's really quantum of damages.

25    What they're saying, Judge, is yes there may be liability but

83

1     let's look at it on the petition date and let's set it at zero.

2     I submit, Your Honor, that's precisely why we should take that

3     into account and move it to an evidentiary hearing where you

4     can have the benefit of hearing from Dr. Hull on this.  It also

5     leads to some absurd ramifications.  Let's assume, Your Honor,

6     that on the petition dates our strike price is three dollars

7     and eighty-five cents compared to what Calpine stock was

8     trading at which was much south of it, would lead you to say

9     you know, I don't have to give you the money on that date even

10    though the indentures say I can't price you out on any given

11    day I'm going to do it.

12        What if Calpine stock at confirmation was trading at

13    ten dollars a share, is that still an argument that anybody

14    with a straight face would submit that you would then take that

15    value that otherwise is contractually owed to us and give it to

16    the equity.  To say, yeah, 502(b) works that kind of windfall

17    for junior classes.  There is no evidence that it does that.

18    Indeed, we all know that there are a number of exceptions to

19    502(b).  502(b) also says that if you don't get unmatured

20    interest, you don't get post-petition interest.  But we all

21    know that what you do in a solvent debtor that there are a lot

22    of situations where 502(b) simply does not operate to dictate

23    that you put blinders on as of the petition date.  Think of a

24    landlord who had a below market lease on the petition date, two

155223.TXT

25      years later it's rejected.  Would anybody contend that you


                                                84


1       could prove up that that loan had no lender had no damages

2       because you have blinders on at the petition date and you say,

3       you know what, the market was pretty good on the petition date.

4       You therefore -- I know you can't actually mitigate now but you

5       have no damages.

6               THE COURT:  This is all conjecture, Mr. Dunne.

7               MR. DUNNE:  No.  It's the --

8               THE COURT:  I've read all of your papers.  Do you

9       have anything that you don't have in your papers?

10              MR. DUNNE:  One last point because I think I also

11      don't mean this which is on the petition -- one of the key

12      elements of valuing the conversion right as duration as I've

13      talked about, we go to 2014.  As of the petition date that's

14      nine years.  As of today that's only seven.  One of the key

15      drivers of value under a Black-Scholl's model is how long does

16      that option have to run.  I don't believe that the debtors

17      truly believe that to give us an extra two years on a Black-

18      Scholl's model.

19              Which brings me to a recent Delaware case, Your

20      Honor, July 20th of this year.  It's Lillis v. AT&T, 2007 WL

21      2110587.  Where the Delaware Chancellery Court was faced with

22      the issue of whether stock options that were being eliminated

23      as part of an extraordinary transaction, in that case an

24      acquisition through a merger, where the merger price was below

25      the strike price of those stock options.  And the argument was

155223.TXT

1   exactly what the debtors and the other objectors are contending
2   here, that look you're out of time, you're out of luck, too bad
3   so sad, your strike price is above the merger price no damages.
4   The Delaware Chancellery Court said no, because that's not how
5   you value that option.  You have to look at the remaining
6   duration and they adopted a Black-Scholl's value to determine
7   the damages from the loss of that stock option.  So for
8   purposes of today, Your Honor, I submit that that's sufficient
9   for you to hold that there's liability, we'll come back and
10  we'll talk about damages.
11          Let me address subordination of the 510(b), Your
12  Honor.  A couple of points here.  I don't think anybody can ask
13  that compensation for your key bargain for consideration is
14  within the ambit of 510(b).  And by that I mean 510(b)
15  originated to deal with fraud under the securities laws.  The
16  language of it is broad, we all know that, we know how far the
17  cases have gone.  But none of them have said you know what, the
18  failure to pay your coupon, the failure to pay your interest is
19  510(b), because those are damages arising from the purchase or
20  sale of the security.  Going back to the pie analogy, Your
21  Honor, that's why it's not 510(b).  Because a straight
22  bondholder has principal and interest, we have principal,
23  interest and the conversion right which are all three buckets
24  of key bargain for consideration.  They had a no call where
25  they could not eliminate or otherwise call us of principal and

1   interest.  They could not eliminate that conversion right

155223.TXT
2  prematurity.  So the compensation for the breach of those
3  covenants and promises are key buckets of our consideration and
4  not 510(b).  A point that I don't think that the debtors
5  dispute.
6          The point about equity risks.  There are cases and we
7  cite them, this is not an equity security, not defined in the
8  bankruptcy as an equity security.  Indeed, the securities law
9  defines it differently.  But for our universe of applicable law
10 it is not an equity security, it also is not one where we have
11 the risk that the cases talk about in 510(b).  Why, because our
12 principal and interest is not at risk.  We have the debt, this
13 is only an exchange for a lower coupon rate.  We agreed to take
14 that interest in the form of the conversion right.  But unlike
15 equity holders who put their dollars in and they never get
16 their dollars out, they remain equity.  We had the debt and it
17 was never at risk.  And I won't go through the cases, Your
18 Honor, but they're in our brief.
19         The last point, which is similar to the make whole
20 and the CalGen.  I don't think the argument that it was 510(b)
21 there, that the make whole or the CalGen compensation for the
22 breach of the no call was somehow subordinateable under 510(b).
23 But it is not.  Ours is exactly the same, Your Honor.  Our
24 argument is that we are being compensated for direct
25 consideration we bargained for that they are choosing to


                                              87


1  eliminate completely under the plan.  One last point on this.
2  A lot of the cases that are cited throughout the briefs are not
3  that relevant on 510(b) given where we rank, if you accept that
4  it's 510(b).  Why?  Because a lot of those cases, the general
                         Page 78

155223. TXT

5   unsecured class, was the last class case on the vine.  So

6   whether or not those courts dropped them right below the

7   unsecured creditors carry with equity holders, somewhere else,

8   it didn't really matter because there was no skin in the game.

9   I think that the code is clear that even if it is 510(b) given

10   the definition of equity security which expressly excludes

11   converts we would be classified immediately junior to the

12   general unsecured claim but senior to the equity.

13           The last argument, the late file proof of claim.  The

14   original proof of claim filed last August, Your Honor, stated

15   that the debtors are obligated "for any and all other amounts

16   due or to become due under the indenture and the six percent

17   convertible notes whether now due or hereafter arising which

18   amounts may be unliquidated or contingent may become fixed and

19   liquidated in the future."  Here the contingent claims the

20   elimination of the conversion right under the plan constituting

21   another breach of the contract.  We also had a stipulation that

22   was entered by Your Honor in January which allowed the

23   principal and interest of the convert noteholders' claims and

24   expressly said we will reserve any litigation on contingent

25   claims for the plan process or the claim reconciliation

88

1   process.  Which Your Honor, is precisely where we are now I

2   submit.  What we did after we were retained was ask the

3   indentured trustee to clarify with detail, anticipating that

4   they would make this argument which we think should not

5   prevail, the clarification that they are -- if and to the

6   extent they seek to eliminate the conversion right, we need to

7   be compensated for that.  Your Honor, they have put on no

155223.TXT

8   evidence today about prejudice, everything is to the contrary.

9   They clearly knew about our claim in March of 2007, three

10  months before the filing of the plan.  In May of 2007 I believe

11  Mr. Kieselstein stated to Your Honor that they were on track

12  for filing a plan by June 20th, there were discussions with

13  convertible noteholder groups about potential resolution of

14  their claim for the loss of the future right to convert.  But

15  that they were still on track.  Clearly, no prejudice.  They

16  put in no affidavits, produced no testimony or witnesses to

17  prove up prejudice.  And now we hear, despite the conclusory

18  statements that plan negotiations were at an advanced stage in

19  March, we're hearing that they're in the middle of a search for

20  a plan sponsor who would raise capital and inject equity

21  investments to cash out all the unsecured debt and provide a

22  fixed recovery to the equity.  I submit, Your Honor, that that

23  belies the notion that they were in advanced stages of

24  negotiating base.

25          The Enron case -- Your Honor, I want to point out one


                                                             89


1   factual distinction there.  The second circuit (a) recognized

2   that amendments, which I don't think this is, it's a supplement

3   clarifying the proof of claim but that amendments are clearly

4   allowed.  But in Enron the facts dealt with new debtors, they

5   were guaranteeing claims that were being filed against other

6   debtors.  So the original proof of claim was again one debtor

7   but the guarantee claims had they been filed against other

8   debtors so there was no -- there were clearly completely new

9   proofs of claim against different debtors.  Who, when you ran

10  their claim register did not show any proof of claim with

                        Page 80

155223.TXT
11   respect to the debt amounts.

12          A couple of last points.  Your Honor, disallowance --

13          THE COURT:  Just one.

14          MR. DUNNE:  Okay.  One.

15          THE COURT:  You've gone way over anybody's allotted

16   time here.

17          MR. DUNNE:  And this goes to the proof of claim at

18   insolvency.  Equity here would gain a windfall by the

19   disallowance of this proof of claim.  And I submit, Your Honor,

20   that as a result even if it was an untimely late filed proof of

21   claim that otherwise shouldn't be allowed, insolvent estate

22   late filed claims are.  Section 726 says that in a liquidation

23   that late filed claims have priority over distributions to the

24   debtor and equity.  Under 1129(a)(7) the best interest test

25   says that a plan fails if we would do better in a hypothetical


                                                               90


1   Chapter 7 liquidation than we would under their plan.  That's

2   the reason frankly why post-petition interest is frequently

3   paid insolvent cases, because you have a best interest test.

4   If you look at where post-petition interest is slotted in at

5   726 it's actually below late filed claims.  So I --

6   particularly at this case in a solvent estate I don't know what

7   we're arguing about, Your Honor.  And with that unless Your

8   Honor has further questions?

9          THE COURT:  I have none.

10          MR. HANSEN:  Your Honor, I'll be very brief.  Kris

11   Hansen with Stroock & Stroock & Lavan on behalf of those

12   certain seven and three quarter percent convertible

13   noteholders.  We agree completely with Mr. Dunne's comments.

                        Page 81

155223.TXT

14    You read our papers, we have everything in the papers, Your
15    Honor.  I do want to point out for the Court that the language
16    in our indenture Section 10.15(d) that Ms. Beckerman referred,
17    that Mr. Kieselstein referred to, I want to read a little bit
18    of language for the Court because people glossed over it a bit
19    and it's critical to the analysis here.  Because our view is it
20    defeats the arguments on acceleration, the arguments on 502(b)
21    and then earlier in that provision the arguments with respect
22    to whether you have a traditional converter you have what's
23    here a contingent converter.  10.15(d) states "if an event of
24    default as set forth in Section 5.1(e) or (f) of the original
25    indentures," and those are bankruptcy events of default so the


91


1    seven and three quarters were specific.  So basically "in the
2    event of a default based upon bankruptcy has occurred and is
3    continuing, past tense, the company may not pay cash upon
4    conversion of any notes and instead will make payment only
5    through the diluted shares of common stock."  We think that's
6    critical because the other parties here have come to you and
7    said Your Honor, we don't really know exactly what it says.  It
8    can't be harmonious with the concept of if you have an event of
9    default the maturity date is brought forward and therefore you
10   no longer have the conversion right.  And so our read of this
11   even though it doesn't say it is that it must just be that
12   unique circumstance where you had a right to convert before the
13   bankruptcy and you will then take your form of consideration
14   after the bankruptcy has been filed.  That's not what the
15   provision says, the provision talks temporally it uses specific
16   language.  And I would note that unlike some of the other ones,

Page 82

155223.TXT

17    the Model T indentures for example in CalGen etcetera which

18    might have been based on ancient forms, these were negotiated

19    two years ago, this was dated June of 2005.  And so the intent

20    of these documents could be ferreted out to the extent that if

21    people don't think it's clear, we can have a further indentured

22    hearing on it.

23          But for today's purpose it says if that event of a

24    default, the bankruptcy default, has occurred and is continuing

25    the company may not pay cash upon conversion of the note.


                                               92


1    Thereby stating pretty clearly that the conversion of the note

2    can take place in the post-bankruptcy context and eviscerating

3    all of the arguments laid out before you with respect to well,

4    gee Judge, you have to evaluate it at 502(b) as of the date of

5    the petition.  And gee Judge, you have to look at this

6    acceleration decision and say hey, it's gone.  It's not gone,

7    it expressly survives under our document.

8          And the only other point I'd make, Your Honor,

9    because we have gone way over with all these arguments is when

10   you look at Section 10.15(b) of the seven and three quarter

11   percent indenture it states clearly that these bonds upon

12   conversion, and again, Mr. Dunne explained it, if you're in the

13   money provides you both the cash recovery and the conversion

14   right.  We're not asserting that it's two legally distinct

15   claims that we can strip off from one another and go out into

16   public market places, strip it out and sell it, and then we

17   should have had a recovery for this piece and a recovery for

18   that piece.  We're saying to you that it's one claim but it's

19   two forms of consideration with respect to that claim under the

                              Page 83

155223.TXT
20   terms of the indenture.  And if you're going to take that right
21   away from us, just like that right was taken away with respect
22   to the CalGen holders that we should be compensated for it from
23   a breach perspective.  And I leave it at that, Your Honor.
24          MR. FREDERICKS:  Ian Fredericks with Young Conaway
25   Stargatt & Taylor on behalf of Manufacturers and the Trader's


                                                           93


1    Trust Company as indentured trustee.  I rise only to say that I
2    join in both Mr. Hansen's statements and adopt them for the
3    reasons they said.  I respectfully request that you overrule
4    the objection.  Thank you.
5           MS. REID:  Your Honor, Sarah Reid of Kelley Drye &
6    Warren on behalf of HSBC Bank as successor indentured trustee
7    to the six percents and also for the 4.75 percent contingent
8    convertibles.  I do join in the arguments of Mr. Dunne and Mr.
9    Hansen and respectfully request that you overrule the
10   objection.  I would, however, ask that whatever decision the
11   Court makes the Court gives the party an opportunity to review
12   any order because the one that was proposed by the debtor
13   obviously was wrong in my view in terms of the law.  If that
14   were to be related to what Your Honor rules we would have some
15   serious problems because it goes beyond those sections.  Thank
16   you, Your Honor.
17          THE COURT:  Anybody want to be heard in response?
18          MR. KIESELSTEIN:  Your Honor, we'll rest on the prior
19   statements.
20          THE COURT:  Very well.  I guess, you're waiting to
21   hear from me.  Calpine and it's affiliated debtors seek the
22   entry of an order granting the debtors' limited objection
                          Page 84

155223.TXT

23    pursuant to Section 502 of the Bankruptcy Code and Bankruptcy

24    Rule 3007 to claims filed by the holders of certain unsecured

25    convertible debt.  The noteholders for that convertible debt

94

1    object.

2           Between 2000 and 2005 Calpine issue four series of

3    unsecured convertible notes.  As of the commencement of these

4    Chapter 11 cases on December 20, 2005, the petition date,

5    convertible notes were outstanding in the aggregate principal

6    amount of approximately 1.8 billion dollars and consisted of

7    approximately 1.3 million dollars four percent convertible

8    senior notes due December 26, 2006, 547 million dollars six

9    percent contingent convertible senior notes due 2014, six

10   hundred and fifty million dollars 7.75 contingent convertible

11   senior notes due 2015 and 634 million dollars 4.75 contingent

12   convertible senior notes due 2023.

13          Generally, the convertible note indentures provide

14   that prior to maturity the holders may convert the notes into

15   cash and/or common stock.  Upon the occurrence of one of a

16   number of conditions precedent.  As long as no event of default

17   has occurred and provided one of the conversion conditions has

18   transpired converting holders of the 4.75, the six percent and

19   the 7.75 percent notes are entitled to receive (a) repayment of

20   principal in cash and (b) payment of any upside different

21   between the applicable conversion price and Calpine stock price

22   in shares of Calpine common stock.  Whereupon conversion the

23   stock price is lower than the strike price the holders are not

24   entitled to full repayment of the principal and may only

25   receive their conversion value in cash.  The indentures provide

155223.TXT

95

1    that commencing a Chapter 11 case constitutes an event of
2    default.  Upon an event of default all notes shall be
3    "immediately due and payable" without any further action or
4    notice by the trustee or holders.  The debtors filing their
5    Chapter 11 cases constituted an event of default under the
6    notes indentures thus rendering the notes due and payable
7    immediately.  None of the conversion conditions were satisfied
8    on the petition date.  By order dated April 26, 2006 this Court
9    established August 1, 2006 as the bar date for filing proofs of
10   claim.
11           On or about July 19, 2006 Wilmington Trust Company,
12   as indentured trustee for the 7.5 percent notes, filed a proof
13   of claim asserting claims for (a) principal and interest and
14   (b) other unliquidated charges.  On or about July 27, 2006 HSBC
15   Bank, as successor indentured trustee for the four percent
16   notes, the six percent notes and the 4.75 percent notes filed
17   two proofs of claim asserting similar claims including "other
18   unliquidated amounts."  In connection with the four percent
19   notes and the six percent notes and the 4.75 percent notes no
20   mention was made in the original proofs of claim of any claim
21   by virtue of any loss of a conversion right.
22           On January 5, 2007 the debtors and HSBC entered into
23   a stipulation and order whereby the Court approved on January
24   30th pursuant to which the parties stipulated to allow claims
25   amounts for the principal and pre-petition accrued interest due

96

155223.TXT

1   on account of inter alia each of the four percent notes, the
2   six percent notes and the 4.75 percent notes.   The parties
3   reserve for a later date the determination of the appropriate
4   rate of post-petition interest.   On March, April and May of
5   2007 the indentured trustees for the convertible notes filed
6   "supplemental" proofs of claims seeking in addition to
7   repayment of outstanding principal and accrued interest damages
8   for "any breach" of the conversion rights, collectively the new
9   claims.
10           On June 20, 2007 the debtors filed their plan and
11  disclosure statement and under the most likely scenario with
12  midpoint valuation and midpoint claims the debtors proposed to
13  pay the noteholders the full amount of their principal and
14  accrued interest as well as post-petition interest thereon at a
15  rate to be determined by the Court together with reasonable
16  pre-petition indentured trustees fees as provided for under the
17  indentures pursuant to the plan.
18           The debtors object to the new claims first on the
19  basis that they were not timely filed.   To the extent this
20  Court allows the noteholders to pursue their new claims the
21  debtors would also object to the new claims to the extent they
22  seek payment beyond principal and interest.   The official
23  committee of unsecured creditors and the official committee of
24  equity holders join in the debtors' objection to the new
25  claims.   Are the new claims timely or untimely?   The

97

1   noteholders filed their new claims approximately eight months
2   after the bar date without first seeking Court approval.   The
3   noteholders argue that the new claims are not new claims but

Page 87

155223.TXT

4    rather amendments to the noteholders original claims, I

5    disagree.  First, the new claims are not amendments because

6    they do not relate back to the original claims.  A claim

7    relates back to a timely filed claim if it "(1) corrects a

8    defect of form in the original claim, (2) describes the

9    original claim with greater particularity or (3) pleads a new

10    theory of recovery on the facts set forth in the original

11    claim."  See Midland Cogeneration Venture Limited v. In re

12    Enron, 419 F.3d 115, 133, (2d Cir. 2005), U.S. v. Kolstadt, 928

13    Fed 2d 171, 175, (5th Cir. 1991), "amendments to do not vitiate

14    the role of bar dates.  Indeed, courts that authorize

15    amendments must ensure that corrections or adjustments do not

16    set off wholly new grounds of liability.  Courts must subject

17    post bar date amendments to careful scrutiny to assure that

18    there was no attempt to file a new claim under the guise of

19    amendment," In re Enron Corp., 419 F.3d at 133, citing In re

20    Integrated Resources, 157 B.R. 66 and 70 (S.D.N.Y. 1993).  "A

21    claimant asserting relation back bears the burden of proof," In

22    re Enron Creditors Recovery Corp., 2007 W.L. 175, 653 at 5,

23    (Bankr. New York June 13, 2007.)  No application was ever made

24    to this Court to bring before this Court the opportunity to

25    pass on these amendments or alleged amendments.


98


1        Here the new claims do not correct a form defect in

2    the original claims, they do not describe the original claims

3    with more particularity and they do not plead a new theory of

4    recovery on the facts set forth in the original claims.

5    Instead they assert entirely new claims seeking in addition to

6    100 percent of the principal and interest due under the notes a

155223.TXT

7    double recovery based on conversion rights, See Ameritrust Co.

8    v. Integrated Resources, 157 B.R. 66, 72 (S.D.N.Y. 1993), "The

9    record contains evidence that the appellee's banks amended

10   proofs of claims seek no interest in the amount of priority in

11   the bank's original claims.  This factor alone goes to support

12   three of the five factors that need to be considered when

13   balancing the equities."

14        Moreover the initial claims did not make any

15   meaningful reference to the conversion claims, See Enron 419

16   F.3d at 143, whereas the Court must determine "whether there

17   was a timely assertion of a similar claim or demand evidencing

18   an intention to hold the estate liable."  In Re Asia Global

19   Crossing Ltd., 324 B.R. 503, 508, 509, (Bankr. S.D.N.Y. 2005)

20   disallowing late amended claims because among other things the

21   initial claim asserted only a general damage claim and did not

22   provide notice of an amended claim.  Although the noteholders

23   have not quantified the new claims the debtors have been led to

24   believe that the amounts claimed could be in the hundreds of

25   millions of dollars.  In addition, the noteholders waited

99

1    nearly eight and in some cases ten months after the bar date to

2    file the new claims which to the extent they are cognizable at

3    all existed on the petition date.  See Enron 419 F.3d at 128,

4    "in determining how long is too long, Courts generally consider

5    the degree to which in the context of a particular proceeding

6    the delay may disrupt the judicial determination of the case."

7    The noteholders offer no excuse for this delay which has

8    disrupted the judicial administration of the case in multiple

9    ways.  First, the noteholders filed the new claims doing the

Page 89

155223.TXT

10    debtors' formulation of the plan and second, the timing of the

11    new claims forces the debtors to deal with them when they

12    should be focusing on the approval of the disclosure statement

13    and confirmation of the plan.  See Enron 419 F.3d at 122 citing

14    Silivanch v. Celebrity Cruises, Inc., 333 F.3d, 355, 368 (2d

15    Cir. 2003), "we and other circuits have focused on the third

16    factor the reason for the delay including whether it was within

17    the reasonable control of the movant."

18          In addition, as already noted the noteholders have

19    led the parties to believe without specifically setting it

20    forth that the amount sought under the new claims would be

21    substantial and in the hundreds of millions of dollars.  Indeed

22    they concede that the claim or claims are elephantine in size.

23    To the extent the new claims remain unresolved and unliquidated

24    as of confirmation the reorganized debtors may have to maintain

25    large reserves thereby delaying distributions to other

100

1    stakeholders who've timely filed proofs of claims and interest.

2    In addition to being time barred the new claims are without

3    merit.  A convertible debenture is an indivisible unit.  The

4    issuer has but one obligation to meet either redemption or

5    conversion, it can never be required to do both.  See Chock

6    Full O'Nuts v. U.S., 453 F.2d, 300 (2d Cir. 1971), likewise

7    the convertible notes debentures do not provide for recovery on

8    account of both debt and equity interest.  Instead like all

9    convertible debentures the convertible notes provide the

10    security of a debt instrument but allow the noteholders to

11    benefit from any future upside by converting their notes to

12    cash and common stock.  Once the noteholders have converted

155223.TXT

13    their notes, however, they no longer hold debt interest to the

14    notes that have been converted.  Accordingly, the convertible

15    noteholders cannot possibly be entitled to receive payment of

16    their debt and damages on the account of a conversion right.

17    See 11 U.S.C. 1129(B)(1)(b).  See also Chock Full O'Nuts, 453

18    F.2d at 304, "convertible debentures provide for two mutually

19    modes of satisfaction."  By repaying the noteholders principal

20    accrued interest in full the debtors are rendering the

21    alternative performance as provided in the indenture.  See

22    Chock Full O'Nuts, 453 F.2d at 304, "the alternative to

23    conversion is that the issuer will redeem the debenture or pay

24    it at maturity.  In which event the conversion privilege will

25    be terminated."  Moreover, the conversion rights were not


101


1    exercisable as of the petition date when the notes were

2    accelerated and matured.  And thus the noteholders do not have

3    allowable claims with respect to the conversion rights, See 11

4    U.S.C. 502(b), a claim filed against the estate must be

5    determined "as of the date of the filing of the petition."  In

6    re Einstein Noah Bagel Corp., 257 B.R. 499, 507 (Bankr.

7    District of Arizona 2000.)  At the time the case was filed the

8    right to receive cash would not have yet matured because the

9    put right itself had not yet become exercisable.

10           Lastly, even if the new claimants were cognizable

11    they would be susceptible to subordination pursuant to Section

12    510(b) of the bankruptcy code as claims arising from the

13    purchase or sale of a security if the debtors.  See Rembroe v.

14    Dufrain, In re Med Diversified Inc., 461 F.3d 251, 259 (2d Cir.

15    2006), "because of the binding agreement between the parties to

155223.TXT

16    turn a debt into an equity interest it is reasonably clear that
17    Rembroe's claims was in line with policy concerns underlying
18    Section 510(b)"  See in Re Enron Corp., 341 B.R. 141, 162-63
19    (Bankr. S.D.N.Y. 2006) "dealing with subordinating claims
20    arising from ownership of employee stock options and concluding
21    that the broad application of Section 510(b) is now quite
22    settled." In re BT1 Communications, 304 B.R. 601, 608 (Bankr.
23    E.D.N.Y. 2004), "holding nothing in Section 510(b)'s text
24    requires a subordinated claimant to be a shareholder."
25            In conclusion, for the reasons just set forth the new

                                                            102

1    claims were filed after the bar date and accordingly are time
2    barred.  Even were the new claims were to be allowed as timely
3    amendments the claims for damages on account of the conversion
4    rights under the indentures would be disallowed or at best
5    subordinated.  The four percent notes have already expired by
6    their turns and could not be entitled to conversion right
7    damages under any theory.  Accordingly, the debtors' limited
8    objection to the new claims is granted.  Settle an order
9    consistent with this decision.
10            MR. KIESELSTEIN:  Thank you, Your Honor.  I've given
11    counsel's comments regarding the order.  We'll puddle and
12    submit and order to Your Honor as soon as possible.
13            THE COURT:  Very well.  Do you have anything else?
14            MR. SELIGMAN:  Your Honor, the only matter that we
15    have left on the agenda was an initial conference with respect
16    to the Rosetta adversary.  We would like to take that up in a
17    chambers conference.
18            THE COURT:  Sure.  We'll do it in chambers after the
                            Page 92

155223.TXT

19    call.

20              MR. SELIGMAN:   Thank you, Your Honor.

21              (Whereupon these proceedings were concluded at 1:21

22    p.m.)

23

24

25

                                                        103

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                          PAGE      LINE

6    Debtors' motion approving settlement agreement   19        24

7    among PG&E, Delta Energy Center, LLC and Los

8    Medanos, LLC approved

9

10   Motion to authorize debtors to assume           21        4

11   certain leases and contracts re Gilroy

12   Facility approved

13

14   Motion to approve settlement agreement          22        2

15   between debtors and Turlock Irrigation

16   District approved

17

18   Debtors' motion for authorization to enter      43        8

19   into stipulation with Second Lien Committee

20   and Wilmington Trust granted

21

                    Page 93

155223.TXT

22  Matters 5 through 10 on the agenda approved in  44      22

23  accordance with status report

24

25

104

1

2                          I N D E X, cont'd

3

4                          R U L I N G S

5  DESCRIPTION                                    PAGE    LINE

6

7  Debtors' limited objection to convertible      102      10

8  noteholder claim granted

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 94

155223.TXT

25

105

1

2                C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, court-approved transcriber, certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9    _____ August 10, 2007

10   Signature of Transcriber              Date

11

12   Lisa Bar-Leib

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25