**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| Calpine Corporation, <u>et al.</u>, | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 05-60200 (BRL) |
| | ) Jointly Administered |
| | ) |
| | ) |
| Aristeia Capital, L.L.C., Aurelius Capital | ) |
| Management, LP Drawbridge Special Opportunities | ) |
| Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa | ) |
| Master Fund Ltd., Pines Edge Value Investors Ltd., | ) |
| Pines Edge Value Investors L.P., Silver Sands Fund | ) District Court Case: |
| LLC, Stark Master Fund Ltd., and 3V Capital | ) Case No. 07 CV 8493 |
| Management, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) |
| Calpine Corporation and its Affiliated Debtors in | ) |
| Possession, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEBTORS' OBJECTION TO THE MOTION OF 6% CONVERTIBLE NOTEHOLDERS
TO WITHDRAW REFERENCE WITH RESPECT TO
DEBTORS' LIMITED OBJECTION**

KIRKLAND & ELLIS LLP
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

KIRKLAND & ELLIS LLP
Marc Kieselstein, P.C.
David R. Seligman
Aon Center
200 East Randolph Drive
Chicago, IL 60601-6636
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 3

    I.      The Convertible Notes. .................................................................................. 3

    II.     The Debtors' Chapter 11 Cases. ................................................................... 3

    III.    The Convertible Noteholders' Claims. .......................................................... 4

          A.     The Original Convertible Noteholders' Claims. ........................... 4

          B.     The "Supplemental" Convertible Noteholders' Claims. ............... 5

    IV.    The Bankruptcy Court's Disallowance Order and the Convertible
              Noteholders' Appeal To This Court. ........................................................... 5

    V.     The Debtors' Plan Of Reorganization And Disclosure Statement ................ 6

    VI.    The 6% Noteholders' Motion To Withdraw The Reference. ....................... 11

ARGUMENT .................................................................................................................... 11

    I.      There is a Strong Presumption Against Withdrawing Core Bankruptcy
              Proceedings Such As Claim Estimation And Plan Confirmation. ............... 12

    II.     The Convertible Noteholders Cannot Overcome The Strong Presumption
              Against Withdrawal Of Reference To Avoid The Bankruptcy Court's Core
              Jurisdiction. ................................................................................................. 14

          A.     Withdrawal Of Reference Of These Core Proceedings Would Be
                  An Inefficient Allocation of Judicial Resources. ........................ 17

          B.     Fairness Does Not Require Withdrawal of Reference. ............... 20

    III.    The Timing Of The Convertible Noteholders' Motion For Withdrawal Of
              Reference Smacks of Forum Shopping. ...................................................... 22

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*1800Postcards, Inc. v. Morel*,
    153 F. Supp. 2d 359 (S.D.N.Y. 2001) .............................................................................. 13

*Abondolo v. GGR Holbrook Medford, Inc.*,
    285 B.R. 101 (E.D.N.Y. 2002) .......................................................................................... 14

*Bittner v. Borene Chemical Co., Inc.*,
    691 F.2d 134 (3d Cir. 1982) .............................................................................................. 15

*In re Ben Cooper, Inc.*,
    896 F.2d 1394 (2d Cir. 1990), *cert. denied*, 500 U.S. 928 (1991) .................................... 13

*In re Burger Boys, Inc.*,
    94 F.3d 755 (2d Cir. 1996) .................................................................................... 12, 14, 17

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993) ............................................................................................ 1, 9

*In re Complete Mgmt., Inc.*,
    2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) ................................................................ 13

*In re E & S Facilities, Inc.*,
    181 B.R. 369 (S.D. Ind. 1995), *aff'd, Matter of Vicars Ins. Agency, Inc.*, 96 F.3d
    949 (7th Cir. 1996) .............................................................................................................. 2

*In re Enron*,
    2004 WL 2149100 (S.D.N.Y. Sept. 24, 2004) .......................................................... 15, 19

*In re Enron*,
    2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) ........................................................... 9

*In re Houbigant, Inc.*,
    185 B.R. 680 (S.D.N.Y. 1995) ..................................................................................... 11, 14

*In re Iridium Operating LLC*,
    285 B.R. 822 (S.D.N.Y. 2002) .......................................................................................... 12

*In re Johns-Manville Corp.*,
    63 B.R. 600 (S.D.N.Y. 1986) ............................................................................................ 11

*In re Kenai Corp.*,
    136 B.R. 59 (S.D.N.Y. 1992) ............................................................................................ 16

*In re Level Propane Gases, Inc.*,
    2006 WL 3499916 (N.D. Ohio Dec. 5, 2006) ................................................................. 16

ii

*In re Manville Forest Products Corp.*,
    896 F.2d 1384 (2d Cir. 1990)........................................................................ 13

*In re Operation Open City, Inc.*,
    148 B.R. 184 (Bankr. S.D.N.Y. 1992), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994) .................. 2

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) ......................... 12, 14

*In re Pan Am Corp.*,
    163 B.R. 41 (S.D.N.Y. 1993)................................................................... 12, 14

*In re Parmalat Finanziaria S.p.A.*,
    320 B.R. 46 (S.D.N.Y. 2005)........................................................................ 14

*In re Pruitt*,
    910 F.2d 1160 (3d Cir. 1990)........................................................................ 16

*In re S.G. Phillips Constructors, Inc.*,
    45 F.3d 702 (2d Cir. 1995)........................................................................... 14

*In re VWE Group, Inc.*,
    359 B.R. 441 (S.D.N.Y. 2007)....................................................................... 23

*Laine v. Gross*,
    128 B.R. 588 (D. Me. 1991) ........................................................................ 23

*Lone Star Indus. v. Rankin County Economic Dev. Dist. (In re New York Trap Rock
    Corp.)*,
    158 B.R. 574 (S.D.N.Y. 1993)....................................................................... 23

*Matter of Vicars Ins. Agency, Inc.*,
    96 F.3d 949 (7th Cir. 1996) .......................................................................... 2

*Mishkin v. Ageloff*,
    220 B.R. 784 (S.D.N.Y. 1998)....................................................................... 14

*Robbins v. Thomson McKinnon Secruties, Inc.*,
    1997 WL 811534 (S.D.N.Y. June 11, 1997) ......................................................... 15

**Statutes**

28 U.S.C. § 157(b)(2)(B) ................................................................................. 12

28 U.S.C. § 157(b)(2)(L) ................................................................................. 13

28 U.S.C. § 157(d) ..................................................................................... 11, 22

**Rules**

Fed. R. Bankr. P. 5011(c) ............................................................................... 21

FED. R. BANKR. P. 7015 .............................................................................................................. 5

FED. R. CIV. P. 15(a) ................................................................................................................... 5

K&E 12129632.17

## PRELIMINARY STATEMENT

The Convertible Noteholders' motion to withdraw the reference of purely "core" bankruptcy proceedings is the latest gambit by a bondholder group whose fanciful, late-filed "conversion right" ("Conversion Right") claims were resoundingly rejected on multiple bases by the Bankruptcy Court. Once they recognized that the Calpine bankruptcy cases might provide for a full payout to unsecured creditors, the Convertible Noteholders belatedly fashioned claims well beyond what they possibly could have supported outside of bankruptcy. The Convertible Noteholders commenced these efforts with their eleventh-hour "supplement" to their proofs of claim to allege damages for the Debtors' purported "breach" of the Convertible Noteholders' right to convert their notes into stock. The Debtors objected to these "supplemental" Conversion Right claims, and the Bankruptcy Court sustained the Debtors' objection on all grounds. The Convertible Noteholders appealed the Bankruptcy Court's decision to this Court.

Unsatisfied with the appellate rights Congress has given them, the Convertible Noteholders now have invoked the unique and seldom used procedural device of withdrawal of reference in an attempt to strip "all proceedings relating to determining the amount and related aspects of their claims and reserving assets on account of such claims pursuant to the Plan…." from the Bankruptcy Court that saw no merit in their Conversion Right claims in the first place. The Convertible Noteholders likely have calculated their chances of convincing the Bankruptcy Court to force the Debtors to reserve stock for their disallowed Conversion Right claims in the context of plan confirmation hearings as slim at best. Reserving substantial amounts of equity and reducing and delaying distributions to holders of timely, legitimate claims would indeed be inappropriate as "neither the Bankruptcy Code nor tenets of due process require that the reorganized company in effect bond an appeal by a losing claimant." *In re Chateaugay Corp.*, 10 F.3d 944, 961 (2d Cir. 1993). The Convertible Noteholders' efforts to find a less inhospitable

1

forum than the Bankruptcy Court that so squarely rejected their alchemy are hardly surprising. They are also hardly convincing.

Faced with the virtually insurmountable fact that the proceedings for which they seek withdrawal of reference are undeniably "core," the Convertible Noteholders cobble together perhaps their most quixotic argument to date. Without citing to any case remotely on point, the Convertible Noteholders assert that the withdrawal of reference they request would somehow promote fairness and judicial efficiency. The Debtors are at a loss to understand how the removal of particular provisions of the Debtors' proposed plan of reorganization from the purview of the court presiding over that plan and the upcoming confirmation trial associated with that plan would be fair or efficient. Piecemeal decisions from two separate courts on the Debtors' proposed plan of reorganization at the behest of dissatisfied claimants would be far from fair to the Debtors' other creditors or an efficient use of judicial resources. *See In re E & S Facilities, Inc.*, 181 B.R. 369, 374 (S.D. Ind. 1995), *aff'd*, *Matter of Vicars Ins. Agency, Inc.*, 96 F.3d 949 (7th Cir. 1996) (refusing to withdraw the reference because "concentrating all related claims before the bankruptcy court...minimize[s] confusion and avoid[s] piecemeal litigation"); *In re Operation Open City, Inc.*, 148 B.R. 184, 186 (Bankr. S.D.N.Y. 1992), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994) ("The bankruptcy court is the forum in which all parties resolve disputes regarding distribution of estate assets."). The bottom line is that the Convertible Noteholders are not entitled to skip over the Bankruptcy Court so that they may have a separate, tailor made, estimation or confirmation hearing in the district court. This Court should see the Convertible Noteholders' withdrawal request for the forum shopping that it is and reject it outright.

# BACKGROUND[1]

## I.    The Convertible Notes.

Between 2000 and 2005, Calpine Corporation ("Calpine") issued the following four series of unsecured convertible notes (collectively, the "Convertible Notes"):

- $736,000,000 6.00% Contingent Convertible Senior Notes Due 2014 (the "6% Convertible Notes"), issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004, and the Third Supplemental Indenture, dated as of June 23, 2005, the "Indenture");[2]

- $1,200,000,000 4.00% Convertible Senior Notes Due 2006 (the "4% Convertible Notes"), issued by Calpine pursuant to the Indenture;

- $650,000,000 7.75% Contingent Convertible Senior Notes Due 2015 (the "7.75% Convertible Notes"), issued by Calpine pursuant to the Indenture; and

- $900,000,000 4.75% Contingent Convertible Senior Notes Due 2023 (the "4.75% Convertible Notes"), issued by Calpine pursuant to a certain Indenture, dated as of November 14, 2003, which was superseded by that certain Amended and Restated Indenture dated as of March 12, 2004 (the "4.75% Notes Indenture" and, together with the Indenture, the "Indentures").[3]

## II.    The Debtors' Chapter 11 Cases.

On December 20, 2005 (the "Petition Date"), Calpine Corporation and 273 of its direct and indirect affiliates (collectively, the "Debtors") each filed voluntary petitions for relief (the "Chapter 11 Cases") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "Bankruptcy Code"). As of the Petition Date, approximately $1.8 billion of the Convertible Notes remained outstanding.

---

[1]    Citations to "App. Tab __" in this objection are to the Record Appendix that accompanied the *Brief of the Debtors-Appellees* in case number 07-CV-07830 currently pending in this Court.

[2]    Orig. Indenture and 1st Supp. (App. Tab 2); 2d Supp. (App. Tab 3); 3d Supp. (App. Tab 4).

[3]    4.75% Indenture (App. Tab 5).

III.    **The Convertible Noteholders' Claims.**

A.    **The Original Convertible Noteholders' Claims.**

By order dated April 26, 2006, the Bankruptcy Court established August 1, 2006, which was approximately eight months after the Petition Date, as the bar date for filing proofs of claim (the "Bar Date"). On or about July 19, 2006, Wilmington Trust Company ("WTC"), as Indenture Trustee for the 7.75% Convertible Notes, filed a proof of claim ("Claim 2404") asserting claims for (a) principal and interest and (b) other unliquidated charges. On or about July 27, 2006, HSBC, as successor Indenture Trustee for the 4.75% Convertible Notes and the 6% Convertible Notes, filed two proofs of claim asserting similar claims, including "other unliquidated amounts," in connection with the 4% Convertible Notes and the 6% Convertible Notes ("Claim 2821"), and the 4.75% Convertible Notes ("Claim 2823," and collectively with Claim 2404 and Claim 2821, the "Original Claims"). None of the Original Claims made mention of any alleged Conversion Right claim or any similar claim.

On January 5, 2007, the Debtors and HSBC entered into a stipulation and order (the "HSBC Stipulation"), which the Bankruptcy Court approved on January 30, 2007 [Docket No. 3501], pursuant to which the parties stipulated to allowed claim amounts for the principal and prepetition accrued interest due on account of, *inter alia*, each of the 4.75% Convertible Notes and the 6% Convertible Notes.[4] The parties reserved resolution of unliquidated claims for the plan of reorganization process and/or the claims reconciliation process.

---

4    (App. Tab 13).

K&E 12129632.17

B.      The "Supplemental" Convertible Noteholders' Claims.

In March and April 2007—approximately eight months after the Bar Date—the indenture trustees for the Convertible Notes filed "supplemental" proofs of claim seeking, *in addition* to repayment of outstanding principal and accrued interest, unprecedented damages in an unliquidated amount for breach of alleged Conversion Rights.[5]  The indenture trustees did not seek Bankruptcy Court approval to file the New Claims.[6]

IV.     **The Bankruptcy Court's Disallowance Order and the Convertible Noteholders' Appeal To This Court.**

The Debtors filed a limited objection to all of the Convertible Note claims, including the Conversion Right claims, beyond claims for principal and interest and trustee fees, and the official committees of unsecured creditors and equity holders joined the objection.  After conducting a non-evidentiary hearing, the Bankruptcy Court entered an order granting the objection in all respects (the "Disallowance Order").  First, the Bankruptcy Court ruled that the

---

[5]    On or about March 23, 2007, HSBC filed a proof of claim ("Claim 6247") "supplementing" Claim 2821.  (App. Tab 15).  On or about March 29, 2007, HSBC filed a proof of claim ("Claim 6249") "supplementing" Claim 2823.  (App. Tab 16).  On or about April 23, 2007, M&T (as successor Indenture Trustee for the 7.75% Noteholders) filed a proof of claim ("Claim 6280") "supplementing" Claim 2404 on the same basis.  (App. Tab 17).  On or about May 22, 2007, HSBC filed proofs of claim amending and replacing Claim 6247 ("Claim 6299") and Claim 6249 ("Claim 6300," and collectively with Claim 6247, Claim 6249, Claim 6280, Claim 6299, and Claim 6200, the "New Claims").  (App. Tabs 18 and 19).  Each of the New Claims states claims for:

> (i) the rights provided to the holders of the [Notes] in Article 10 of the [applicable] Indenture (the "[Conversion Right]"), which [Conversion Right], upon information and belief, was an integral part of the consideration provided in return for the extension of credit to the Debtor evidenced by the [Notes], (ii) all damages, including any accrued prior to the commencement of the Case, arising from any breach of the terms of, and covenants set forth in, the Indenture, including the [Conversion Right], whenever arising, including all damages arising from the loss, whether pursuant to a plan of reorganization for the Debtor or otherwise, of the [Conversion Right]...

See Claim 6280 ¶ 4 (emphasis added); Claim 6299 ¶ 4 (emphasis added); Claim 6300 ¶ 4 (emphasis added).

[6]    Federal Rule of Civil Procedure 15(a), as incorporated by Federal Rule of Bankruptcy Procedure 7015, provides a process for amending proofs of claim.  The Convertible Noteholders ignored that process.  FED. R. BANKR. P. 7015; FED. R. CIV. P. 15(a).

New Claims, which include the Conversion Right claims, did not relate back to the Original Claims and thus were untimely.  <u>Second</u>, the Bankruptcy Court evaluated the merits of the Conversion Right claims and appropriately denied them on the grounds that, under the terms of the Indentures, any Conversion Rights terminated upon the Debtors' bankruptcy filing and, even more fundamentally, on the grounds that allowing claims for alternative remedies of repayment and conversion would result in an impermissible double recovery on account of the Convertible Notes.  <u>Third</u>, the Bankruptcy Court ruled in the alternative that, even if allowed, the Conversion Right claims would be subordinated to the level of common stock under section 510(b) of the Bankruptcy Code because the very essence of the Conversion Rights is the opportunity for noteholders to access the potential upside and concomitant downside of equity ownership.

On or about August 14, 2007, certain holders of 6% Convertible Notes (collectively, the "<u>6% Noteholders</u>"), certain holders of 7.75% Convertible Notes (collectively, the "<u>7.75% Noteholders</u>"), HSBC Bank USA, N.A., ("<u>HSBC</u>"), as indenture trustee, and Manufacturers & Traders Trust Company, as successor indenture trustee ("<u>M&T</u>," and collectively with the 6% Noteholders, the 7.75% Noteholders, and HSBC, the "<u>Convertible Noteholders</u>"), appealed the Disallowance Order to this Court.  The case was assigned to District Court Judge Koeltl and docketed as civil case number 07-CV-07830.  The Convertible Noteholders' appeal has been fully briefed and oral argument is scheduled for October 15, 2007.

## V.    The Debtors' Plan Of Reorganization And Disclosure Statement.

On June 20, 2007, the Debtors filed their joint plan of reorganization (as amended, the "<u>Plan</u>," a copy of which is attached hereto as <u>Exhibit A</u>.) [B.C. Docket No. 5015] and accompanying disclosure statement (as amended, the "<u>Disclosure Statement</u>," relevant excerpts from the Disclosure Statement are attached hereto as <u>Exhibit B</u>) [B.C. Docket No. 5016].  Shortly thereafter, the Debtors filed their motion to approve the Disclosure Statement,

solicitation procedures, and related ballots and notices and scheduled a hearing to determine whether the Disclosure Statement provided adequate information (the "Disclosure Statement Motion").    After filing the Plan, an intense period ensued in which the Debtors devoted considerable time and resources to exploring and negotiating alternative plan structures that might permit a guaranteed distribution to the Debtors' existing equity security holders.[7]    On August 27, 2007, the Debtors filed their first amended Plan [B.C. Docket No. 5698] and accompanying Disclosure Statement [B.C. Docket No. 5702].    On September 18, 2007, the Debtors filed their second amended Plan [B.C. Docket No. 5993] and accompanying Disclosure Statement [B.C. Docket No. 5995].

On or about September 14, 2007, the Convertible Noteholders each objected to the Disclosure Statement Motion arguing, among other things, that the Disclosure Statement was inadequate because it did not disclose sufficient information regarding the nature of the Conversion Right claims or the hypothetical effect of this Court's potential reversal of the Disallowance Order.    The Convertible Noteholders also argued that the Disclosure Statement should not be approved, asserting that the Plan as constructed is patently unconfirmable.    In particular, the Convertible Noteholders objected to various aspects of the Plan's claim estimation

---

[7]    The hearings on the Debtors' objection to the Conversion Right claims and the Convertible Noteholders' request for an expedited appeal occurred during that time, and the Debtors and their professionals were painfully aware that these highly questionable, unquantified, but extremely sizable claims would greatly undermine any likelihood of success in their pursuit of a potential guaranteed distribution plan.  Ultimately, for myriad reasons, the Debtors set aside this pursuit, but tabling the alternative plan process did not reduce the prejudice to the Debtors from belated consideration of the New Claims.  It would be a waste of the Court's time for the Debtors to reply to every accusation, criticism, and attack lodged by the Convertible Noteholders in regard to statements made before this Court regarding the adverse effects of the Conversion Right claims on negotiating a consensual plan and the uncertainty such claims would have on the confirmation schedule. Suffice it to say that the Debtors' representations to this Court were accurate.  Nonetheless, as this Court pragmatically noted, "I could certainly listen to all of you in October and hear what the schedule is.  If I don't think that there is enormous urgency any longer, I could take a little more time to decide the appeal."  (Tr. Aug 22, 2007 Hrg. at 38:6-9, a copy of which is attached hereto as Exhibit C.)

and reserve mechanism arguing that the mechanism impaired the Convertible Noteholders'
appellate rights.  Nowhere in the more than eighty pages of objections to the Disclosure
Statement filed by the Convertible Noteholders did they mention the need for withdrawal of
reference, even though the claim estimation and reserve mechanism (subject to certain
modifications) appeared in every single version of the Plan and Disclosure Statement dating back
to June 20, 2007.

    On September 21, 2007, the Debtors filed an omnibus reply in support of the Disclosure
Statement Motion wherein the Debtors directly addressed the Convertible Noteholders'
objections regarding the Plan's claim estimation and reserve mechanism.  Among other things,
the Debtors described the various procedural safeguards available to creditors who disagree with
the amount of assets that the Debtors choose to reserve on account of disputed claims or
disallowed claims.  For example, while the Plan provides that the Debtors, in consultation with
their official unsecured creditors' committee, will determine an appropriate amount to set aside
for contingent or unliquidated claims, a creditor who does not wish to have the reserve for its
claim established in this manner has the option to: (A) ask the Bankruptcy Court to estimate the
claim or (B) reach a consensual agreement with the Debtors on the reserve amount.  (*See* Ex. A
at 52, Art. VII.C.3.)  Similarly, and particularly applicable here, the Plan's estimation provision
provides that claims that have been disallowed and expunged will be deemed estimated at zero
for reserve and distribution purposes, underlining otherwise ordered by the Bankruptcy Court.  (*Id.* at
49, Art. VI.C.)  The Debtors believe that the claim estimation and reserve mechanism strikes an
appropriate balance between the need to resolve claims efficiently and fairly and to make
distributions to holders of allowed claims as expeditiously as possible while preserving the
Debtors' limited resources and is consistent with applicable law.  *In re Chateaugay Corp.*, 10

8

F.3d 944, 961 (2d Cir. 1993) ("[N]either the Bankruptcy Code nor tenets of due process require that the reorganized company in effect bond an appeal by a losing claimant.").  Indeed, as the Convertible Noteholders themselves agree, the Plan's claim estimation and reserve mechanism is consistent with the reserve and estimation mechanisms used in other large chapter 11 cases.  *See, e.g.*, *In re Enron*, 2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006).

On September 24, 2007, the Debtors filed their third amended Plan [B.C. Docket No. 6087] and accompanying Disclosure Statement [B.C. Docket No. 6089].  At the request of the Convertible Noteholders and in an attempt to resolve the Convertible Noteholders' objections to the Disclosure Statement, the Debtors included in the third amended Plan and Disclosure Statement, among other things, additional disclosure regarding the Conversion Right claims and the underlying litigation.  However, despite countless requests from the Debtors, the Convertible Noteholders refused to specify any estimates of the dollar amount of damages they are seeking on account of the Conversion Rights.  Even when pressed by the Bankruptcy Court and even while complaining about a potential shortfall in the claims reserve, the Convertible Noteholders continued to be coy about the dollar amount of their alleged damages.[8]  In fact, only at the September 25, 2007 hearing to approve the Disclosure Statement (and after the submission of appellee briefs for which estimates of claim amounts would have been relevant although potentially prejudicial to the Noteholders) did the 6% and 7.75% Noteholders finally "quantify" their aggregate Conversion Right claims as ranging from $258 million to $1.2 billion depending

---

[8]    (Tr. Aug. 8, 2007 Hrg. at 49-51, a copy of which is attached hereto as Exhibit D.  ("The gamesmanship that goes on here.  To find out just the size of the elephant in the room, you should have come to that conclusion on your telephone call and not burden everybody with it now.  I now know I'm dealing with a very, very large sum of money in the view of some of the claimants.  Eleventh hour filed claims, as a matter of fact."))

upon the Bankruptcy Court's determination of the reorganized Debtors' total enterprise value. Astonishingly, the 4.75% Noteholders still to this day have not quantified their alleged claims.

On September 25, 2007, the Bankruptcy Court held a hearing on the adequacy of the Disclosure Statement.  At that hearing, counsel for the 6% Noteholders argued that the Debtors should be required to set up a reserve for the Conversion Right claims, but never indicated that the 6% Noteholders planned to move for withdrawal of reference.  (*See* Tr. Sept. 25, 2007 Hrg. at 152:18-161:19, a copy of which is attached hereto as Exhibit E.)  Ultimately, the Bankruptcy Court approved the Disclosure Statement, subject to certain minor amendments discussed at the hearing, as containing "adequate information" and overruled all remaining objections including the Convertible Noteholders' confirmation-related objections.   The Bankruptcy Court also approved the Debtors' proposed solicitation procedures and schedule of hearings and discovery deadlines related to Plan confirmation.  On September 26, 2007, the Bankruptcy Court entered an order approving the Disclosure Statement, solicitation procedures, and confirmation schedule. In particular, the Bankruptcy Court scheduled a confirmation hearing to begin on December 18, 2007.[9]  On September 27, 2007, the Debtors filed their fourth amended Plan [B.C. Docket No. 6139] and accompanying Disclosure Statement [B.C. Docket No. 6140] incorporating the minor amendments approved by the Bankruptcy Court at the September 25, 2007 hearing.  On October 5, 2007, the Debtors began mailing solicitation packages to tens of thousands of stakeholders who are entitled to vote to accept or reject the Plan.  Subject to various caveats including a refreshed valuation, the Debtors currently project in the Disclosure Statement that unsecured creditors will recover between 95% and 100% on the dollar.  (*See* Ex. B at 6, Art. I.D.3.)

---

[9]     The Bankruptcy Court has since rescheduled the confirmation hearing to begin on December 17, 2007.

VI.    **The 6% Noteholders' Motion To Withdraw The Reference.**

On October 1, 2007, the 6% Noteholders moved (the "Motion") this Court for withdrawal of reference of "all proceedings relating to determining the amount and related aspects of their claims and reserving assets on account of such claims pursuant to the Plan pending such determination."  On October 4, 2007, the 7.75% Noteholders filed a joinder to the Motion, but did not offer any further support for the relief requested in the Motion.  On October 10 and 11, 2007, respectively, HSBC, as indenture trustee for the 4.75% Convertible Notes and the 6% Convertible Notes, and M&T, as indenture trustee for the 7.75% Convertible Notes, also filed joinders to the Motion, again not offering any further support for the relief requested in the Motion.  For the reasons discussed below, the Debtors respectfully request that the Court enter an order denying the Convertible Noteholders' Motion.

## ARGUMENT

A district court may withdraw the reference to the bankruptcy court by either (1) mandatory withdrawal or (2) permissive withdrawal.  *See* 28 U.S.C. § 157(d).  The Convertible Noteholders do not even attempt to argue (nor could they) that mandatory withdrawal is appropriate here.[10]  Instead, the Convertible Noteholders base their entire argument for withdrawal of reference on the permissive withdrawal standard.

Permissive withdrawal only can be granted for "cause."  The Second Circuit has set forth a two-part test for determining whether cause exists to grant permissive withdrawal.  <u>First</u>, the court must make a threshold determination of whether the matter is core or non-core.  *In re*

---

[10]  It is well-settled that mandatory withdrawal of reference is only appropriate where there is substantial and material consideration of non-title 11 federal statutes which involve more than mere application of the non-title 11 statutes to a particular set of facts.  *In re Houbigant, Inc.*, 185 B.R. 680, 683-684 (S.D.N.Y. 1995); *In re Johns-Manville Corp.*, 63 B.R. 600, 603 (S.D.N.Y. 1986).

K&E 12129632.17

*Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994). If the proceeding is core, there is a <u>strong presumption against</u> withdrawal that can only be overcome by establishing "that the withdrawal of reference is <u>essential</u> to preserve a higher interest." *In re Pan Am Corp.*, 163 B.R. 41, 43 (S.D.N.Y. 1993) (internal citations and quotations omitted) (emphasis added). <u>Second</u>, the court must weigh: (a) questions of the efficient use of judicial resources, (b) delay and costs to the parties, (c) uniformity of bankruptcy administration, (d) the prevention of forum shopping, and (e) other related factors. *Orion*, 4 F.3d at 1101; *see also In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir. 1996). Despite their torturous reading of the law and hyperbolic characterizations of the Debtors' Plan, the Convertible Noteholders simply cannot demonstrate that there is any "cause" for this Court to withdraw the reference.

## I.    There is a Strong Presumption Against Withdrawing Core Bankruptcy Proceedings Such As Claim Estimation And Plan Confirmation.

The most important and primary factor for determining whether there is cause for permissive withdrawal is whether the proceeding to be withdrawn is a "core" bankruptcy proceeding. *Burger Boys*, 94 F.3d at 762. "Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function." *In re Iridium Operating LLC*, 285 B.R. 822, 830 (S.D.N.Y. 2002).

Hearings to estimate claims for confirmation or to confirm a plan of reorganization are quintessentially core proceedings.[11]    *See* 28 U.S.C. § 157(b)(2)(B) ("core proceedings

---

[11]    The Convertible Noteholders are vague as to the proceeding sought to be withdrawn as "all proceedings relating to determining the amount and related aspects of the 6% Convertible Noteholders' claims and reserving on account of such claims pursuant to the Plan … pending such determination." (6% Convertible Noteholders Br.
(Continued…)

include…estimation of claims or interest for purposes of confirming a plan under chapter 11…"); 28 U.S.C. § 157(b)(2)(L) ("core proceedings include…confirmation of plans…").  They arise only in the context of chapter 11 and do not exist outside of chapter 11.  Moreover, the Second Circuit has been clear in holding that proceedings related to a proof of claim are core proceedings within the authority of the bankruptcy court even if state law is involved.  *See, e.g.*, *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1389 (2d Cir. 1990) ("the mere fact that "a creditor's claim raises issues of state law does not preclude a holding that the adversary proceeding is core"); *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1399 (2d Cir. 1990), *cert. denied*, 500 U.S. 928 (1991) (noting "bankruptcy courts are not precluded from adjudicating state law claims when such claims are at the heart of the bankruptcy estate").  Thus, the Convertible Noteholders cannot argue credibly that the proceedings at issue here—*i.e.*, estimation of claims filed against the Debtors and plan confirmation—are non-core.

The Convertible Noteholders feebly attempt to counter the unambiguous statutory characterization of these matters as core by relying on *In re Complete Mgmt., Inc.*, 2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002), and *1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359 (S.D.N.Y. 2001).  This reliance is misleading at best.  The Convertible Noteholders' supposed breach of contract claims against the Debtors are the exact opposites of the counterclaim at issue in *Complete Management* and the breach of contract claims in *1800Postcards*, which, in both cases, involved claims by the debtors.  *See Complete Management*, 2002 WL 31163878 (counterclaim by debtor for state law tort is non-core); *1800Postcards*, 153 F. Supp. 2d at 360

---

at 2.)  Nonetheless, this description would be encompassed within proceedings to estimate claims for confirmation and confirm a plan.

(claim <u>by debtor</u> for breach of contract is non-core).  Claims <u>by a debtor</u> against a party <u>who has not filed a proof of claim and submitted to the bankruptcy court's jurisdiction</u> may not be finally adjudicated by a non-Article III judge such as the Bankruptcy Court.  *Orion*, 4 F.3d at 1102. However, once a proof of claim has been filed against the debtor—as is the case here, the claimant has submitted to the bankruptcy court's jurisdiction and the bankruptcy court may enter a final order regarding that proof of claim.  *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 707 (2d Cir. 1995) (by filing a proof of claim the petitioner submits to the bankruptcy court's equitable jurisdiction).

## II.    The Convertible Noteholders Cannot Overcome The Strong Presumption Against Withdrawal Of Reference To Avoid The Bankruptcy Court's Core Jurisdiction.

For the reference of these core proceedings to be withdrawn, the Convertible Noteholders "must…overcome the presumption that bankruptcy courts, and not district courts, should determine core matters."  *See Abondolo v. GGR Holbrook Medford, Inc.*, 285 B.R. 101, 113 (E.D.N.Y. 2002) (citing *Burger Boys*, 94 F.3d at 762, and *Orion*, 4 F.3d at 1101); *Pan Am*, 163 B.R. at 43 (noting that "there is a <u>strong presumption against</u> the withdrawal of core bankruptcy proceedings from Bankruptcy Court, [but] that presumption can be overcome based on a finding by the Court that the withdrawal of reference is <u>essential</u> to preserve a higher interest") (internal citations and quotations omitted) (emphasis added).[12]    Even without

---

[12]    The Convertible Noteholders cite various cases where district courts have withdrawn the reference of core proceedings.  However, unlike in the case at bar, each of those cases presented extraordinary facts warranting withdrawal.  *See, e.g.*, *Houbigant*, 185 B.R. at 685-868 (proceeding withdrawn by consent and remand denied because district court had invested considerable time in the case such that judicial efficiency and forum shopping concerns militated against remanding the case); *In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50-51 (S.D.N.Y. 2005) (district court judge charged by the Judicial Panel on Multidistrict Litigation with the orderly administration of the pretrial proceedings in a securities fraud action); *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (where related proceeding is subject to <u>mandatory</u> withdrawal it is more efficient to adjudicate all cases in one forum due to the "overlapping and interlocking nature of these proceedings").  To say this handful of cases is far removed from the facts at bar is a severe understatement.

14

considering their chronic last minute litigation tactics, the Convertible Noteholders cannot overcome that presumption.

The Convertible Noteholders have appealed the Bankruptcy Court's disallowance of their Conversion Right claims and that appeal is proceeding on an expedited basis. Moreover, the Convertible Noteholders may seek estimation of their claims and the establishment of reserve amounts, but have not done so, likely because they fear the outcome, that the appellate court would apply a more deferential abuse of discretion standard on appeal, or that the estimation order would be interlocutory. *See Robbins v. Thomson McKinnon Secruties, Inc.*, 1997 WL 811534, *2 (S.D.N.Y. June 11, 1997) (bankruptcy court's choice of method for estimating claims is reviewed for abuse of discretion) (citing *Bittner v. Borene Chemical Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982)). However, the Convertible Noteholders cannot be allowed to short circuit the plan confirmation process and avoid the Congressionally-mandated bankruptcy appellate process by asking this Court, which would preside over any appeals from the Bankruptcy Court, to play the role of trial court and initial arbiter over specific Plan provisions that the Convertible Noteholders contest. By the Convertible Noteholders' logic, this Court should hold a special confirmation trial for them and only them, while thousands of other creditors with claims against the Debtors' estates must submit to the Bankruptcy Court. That is not only inefficient—it is untenable. As this Court recognized in the context of the Enron bankruptcy, withdrawing the reference at this point in the Debtors' bankruptcy cases would set the stage for any other parties whose claims against the Debtors have been disallowed to seek withdrawal of the reference and thereby obtain a second bite at the apple. *See In re Enron*, 2004 WL 2149100, at *3 (S.D.N.Y. Sept. 24, 2004) ("granting withdrawal could create a flurry of motions from other…creditors seeking to avoid the current bankruptcy proceedings"); *see also In re Pruitt*, 910 F.2d 1160, 1168

15

(3d Cir. 1990) ("allowing the [movants] a second opportunity to adduce the facts will encourage forum shopping, dissipate the parties' resources, and prolong the bankruptcy process").

The Convertible Noteholders' attempt to use withdrawal of reference here is nothing more than an attempt to avoid the forum that already denied the Conversion Right claims for which they hold out hope in this Court.  With their outlandish claims already disposed of by the Bankruptcy Court, the Convertible Noteholders have shrewdly assessed the uphill battle they may face in convincing that same court to force the Debtors to create a material reserve, let alone the hundreds of millions (if not billions) of dollars that the Convertible Noteholders finally have estimated these discredited claims to be worth.  Indeed, just the possibility of getting a court that has not yet evaluated the merits of their claims to set a bloated reserve to the detriment of all other creditors apparently compelled the Convertible Noteholders to "take a flyer" on withdrawing the reference of these quintessentially core proceedings.  Such forum shopping must not be countenanced.  *See In re Kenai Corp.*, 136 B.R. 59, 61 (S.D.N.Y. 1992) (withdrawal of reference must be used "judiciously in order to prevent it from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court.").

Given these circumstances, the Convertible Noteholders' argument that withdrawal of reference here would somehow promote judicial efficiency is disingenuous at best.  At bottom, the Convertible Noteholders' request here boils down to nothing "more than forum shopping, and counsels strongly against withdrawing the reference." *See In re Level Propane Gases, Inc.*, 2006 WL 3499916, at *1 (N.D. Ohio Dec. 5, 2006) (internal quotations omitted).

A.      **Withdrawal Of Reference Of These Core Proceedings Would Be An Inefficient Allocation of Judicial Resources.**

Withdrawing a core proceeding requires extraordinary considerations, and no such conditions exist in this case.  As a result, the Convertible Noteholders' argument on the basis of judicial efficiency must fail.

The most that the Convertible Noteholders can muster in terms of the judicial economy of withdrawing the reference is that because the withdrawn proceeding will be assigned to the same District Court judge that is hearing its appeal of the Disallowance Order, the District Court judge's "exposure to the issues will be at least <u>equal</u> to that of the Bankruptcy Court" and <u>if</u> the sppeal succeeded, the District Court would be "better positioned to determine the amount of the 6% Convertible Noteholders' claims" based on having heard the issue more recently.  (6% Convertible Noteholders Br. at 13 n.9, 18.)  However, the clarion call of "<u>equal</u> familiarity" is hardly sufficient to overcome the strong presumption against withdrawal of a core proceeding.[13] Even if equal familiarity was a compelling basis for <u>increased</u> judicial efficiency (which by definition, "equal familiarity" is not), the Convertible Noteholders' suggestion that the appeal would prepare this Court to value the claim ignores two key considerations.

<u>First</u>, the issues on appeal are "pure legal issues" of whether the New Claims were late filed, whether the Original Claims contained adequate information to put the Debtors and other parties in interest on notice that the Convertible Noteholders were asserting claims for

---

[13]   The Convertible Noteholders cite the Second Circuit's decision in *Burger Boys* to suggest that <u>equal</u> familiarity with an issue is sufficient to support a finding that judicial efficiency weighs in favor of withdrawal. (Convertible Noteholders Br. at 17-19.)  However, *Burger Boys* does not support this contention.  In *Burger Boys*, the district court had found that "remand on this appeal would serve no useful purpose except to create further delay and additional over-lawyering" given that arguments as to whether an extension was appropriate had provided the necessary background for the added step *sua sponte* to quantify the extension of time.  94 F.3d at 759, 762-63.  Thus, *Burger Boys* does not stand for the proposition that equal familiarity is sufficient to justify withdrawal of the reference in a core proceeding scenario.

conversion rights above and beyond their claim for principal and interest, and possibly, whether any such conversion rights would be subordinated to claims asserted by other claimants. (Ex. C at 20:11, 25:19-21, 29:8-12; Ex. D at 101:25-102:7.) As such, this Court sitting in its appellate capacity will not have received any factual evidence to value the claims in the context of the Convertible Noteholders' appeal from the Disallowance Order. Because the relevant facts and evidence for valuing or estimating the claims will not have been briefed or argued, it is difficult to fathom how withdrawing the reference of the core proceeding would be judicially efficient, let alone so much more efficient as to overcome the strong presumption against withdrawal.

Second, despite the Convertible Noteholders' attempt to obfuscate the need for familiarity with the Bankruptcy Code to value the alleged Convertible Right claims through their use of the vague phrase "exposure to the issues," the Convertible Noteholders previously suggested to the Bankruptcy Court that they would be seeking to establish an exception to section 502(b) of the Bankruptcy Code and special considerations associated with a possible solvent debtor case in determining the amount of the Conversion Right claims. (Ex. D at 82:19-83:4, 83:18-84:6.)[14] The Convertible Noteholders' assertion that "calculating damages for breach of contract does not involve specialized knowledge or require an extensive understanding of the Chapter 11 case" is equally disingenuous and does not comport with the arguments that would be necessary to give value to their claim. (*See* 6% Convertible Noteholders Br. at 5.) Indeed, the Convertible Noteholders have suggested that the primary factor for determining the value of their Conversion Right claims could be the total enterprise value for the reorganized Debtors—a determination that will be made by the Bankruptcy Court in the context of

---

[14] Section 502(b) of the Bankruptcy Code states in pertinent part "…the court … <u>shall</u> determine the amount of such claim … as of the date of the <u>filing of the petition</u>…."

confirmation.  (*See* Ex. A at 17, Art. I.A.141; Ex. B at 176-177, Art. V.C.2.f.)   This is unquestionably a topic over which the Bankruptcy Court has greater familiarity and which will be the central issue of the multi-day confirmation hearing scheduled to commence on October 17, 2007.  Numerous competing valuations are likely to be asserted at the trial by various parties in interest.  Thus, the Bankruptcy Court will have, far and away, the greatest knowledge of valuation-related issues, which by the Noteholders' own admissions, bear heavily on the value they ascribe to their claims.

Simply put, this Court's consideration of the Convertible Noteholders' appeal of the Disallowance Order would not provide this Court with the specialized knowledge of the Bankruptcy Code or familiarity with the particularized facts of the Convertible Noteholders' Conversion Right claims.   Moreover, given that the Convertible Noteholders have other objections to confirmation of the Plan unrelated to estimation or setting reserves for their Conversion Right claims—*e.g.*, whether the Plan meets the best interests of creditors test—will require the Convertible Noteholders to appear in the Bankruptcy Court in any event.[15] Accordingly, withdrawal of the reference of these core proceedings has not been—and cannot be—justified on the grounds of efficiency.  The precedent of disappointed claimants using their appeals as a springboard to withdraw the reference on all core bankruptcy matters that subsequently may bear directly or indirectly on their claims is unmanageable and unsupportable. *See Enron*, 2004 WL 2149100, at *3 ("Upset with a bankruptcy court's decision…, a party could

---

[15]   Interestingly, the 7.75% Noteholders have filed a motion in the Bankruptcy Court seeking to have a <u>non-core</u> (at best) inter-creditor subordination dispute resolved in the Bankruptcy Court prior to or in connection with confirmation of the Plan.  *See Joint Motion of Manufacturers & Traders Trust Company, as Successor Indenture Trustee, and the 7.75% Convertible Noteholders for Order In Aid of Confirmation, Pursuant to Sections 105(a) and 105(d) of the Bankruptcy Code, Establishing Pre-Confirmation Process to Resolve Contractual Subordination Dispute* [B.C. Docket No. 6271].

simply seek to withdraw the reference, hoping for better results in a case heard by the district court, rather than on appeal.").[16]

### B. Fairness Does Not Require Withdrawal of Reference.

The Convertible Noteholders also suggest that principles of "fairness" require withdrawal of the reference because the compressed time frame for consideration of their Conversion Right claims is "a scenario created entirely by the Debtors" that allegedly deprives the Convertible Noteholders of meaningful appellate review.    (Convertible Noteholders Br. at 14.)    The Convertible Noteholders' plaintive cries for fairness border on the pathological — the predicament they complain of is a product of their own actions.

<u>First</u>, any assertion that the Debtors somehow caused the compressed time frame for consideration of the Convertible Noteholders' claims is patently false.  As the Bankruptcy Court noted during the hearing on the Debtors' objection to the Conversion Right claims, the Convertible Noteholders "waited nearly eight and in some cases ten months after the bar date to file the [N]ew [C]laims which to the extent they are cognizable at all existed on the petition date."  (Ex. D at 98-99 (internal citations omitted).)  Any need for urgency is entirely of their own making.

<u>Second</u>, the Convertible Noteholders conveniently ignore the statutory mechanisms available to preserve the status quo.  For example, the Convertible Noteholders never mention that they could have sought a stay of the Disallowance Order pending appeal.  Nor do they explain why the ability to obtain a stay of the confirmation order pending appeal is inadequate

---

[16]  As discussed above, withdrawing the reference also would have a significant detrimental effect on the uniform administration of the Chapter 11 Cases and almost certainly would cause additional delay and costs because withdrawal would require the Debtors and their official committees to participate in multiple proceedings in multiple courts regarding the exact same issues with potentially divergent results.

protection for their appellate rights.  Nor do they mention their ability, right now, to seek estimation from the Bankruptcy Court.

Third, the Convertible Noteholders' argument that the Plan's claim estimation and reserve mechanism is unfair and prejudicial to their appellate rights misses the mark.  Implicitly, the Convertible Noteholders ask this Court to assume that the Bankruptcy Court will ignore their Plan objections at confirmation and are, in effect, seeking appellate review of an adverse decision that has not yet been rendered but which the Convertible Noteholders' anticipate.  There is no such concept of judicial "prior restraint."  Moreover, the Convertible Noteholders provide no basis for believing that the Bankruptcy Court will apply the law unfairly when considering whether to confirm the Plan and even if the Bankruptcy Court were to do so, the remedy is an appeal and/or a stay after not before it were to happen.

Once again, it is apparent that the Convertible Noteholders' Motion to withdraw the reference is nothing more than a litigation tactic to avoid the Bankruptcy Court.  The Convertible Noteholders' attempt to cast themselves as helpless victims of a scheme by the Debtors to deprive them of their appellate rights is remarkable.  The Convertible Noteholders chose the belated timing of filing of the New Claims, they chose to file the claims without obtaining court approval, they elected not to seek a stay of the Disallowance Order pending appeal, and they elected not to seek a stay pending withdrawal of the reference.[17]  The Convertible Noteholders now hope to achieve the effect of a stay without having to comply with the requirements for obtaining one.  Through the Motion, the Convertible Noteholders also would have one believe

---

[17]  The Convertible Noteholders cited no authority for using withdrawal of reference as a method of obtaining a stay of the Disallowance Order pending appeal, but that is a clear aim.  In fact, the plain language of Bankruptcy Rule 5011(c) expressly provides that a motion to withdraw the reference "shall not stay the administration of the case or any proceeding therein before the bankruptcy judge."  See FED. R. BANKR. P. 5011(c).

K&E 12129632.17

that they will have no voice in determination of the value of their disputed claims and no opportunity to challenge an estimation or reserve. The Convertible Noteholders are not the victims they would have this Court believe. Simply put, the Convertible Noteholders' withdrawal of reference motion must be seen for what it is—a headlong flight from the Bankruptcy Court in search of greener legal pastures.

## III. The Timing Of The Convertible Noteholders' Motion For Withdrawal Of Reference Smacks of Forum Shopping.

As the Convertible Noteholders stated in their Motion, a request for permissive withdrawal of the reference may be granted *sua sponte* or upon a timely motion. *See* 28 U.S.C. § 157(d). The Convertible Noteholders argue that the "Motion was timely filed only a few days after the Bankruptcy Court approved the Disclosure Statement, which contained no reserves…for [the Conversion Right] claims…" (Convertible Noteholders Br. at 20.) However, the timing of the Convertible Noteholders' Motion actually provides further support for denying that Motion.

As discussed above, one of the Convertible Noteholders' primary reasons for seeking withdrawal of reference is that the Plan's claim estimation and reserve mechanism allegedly impairs their appellate rights. The claim estimation and reserve mechanism (subject to certain modifications) has existed in each and every version of the Plan and Disclosure Statement dating back to June 20, 2007. Moreover, each and every version of the Plan and Disclosure Statement has quite clearly provided that the Debtors did not intend to reserve any assets on account of claims that have been disallowed and expunged. Nevertheless, the Convertible Noteholders sought withdrawal of reference only after the Bankruptcy Court approved the Disclosure Statement over the Convertible Noteholders' objections regarding issues related to confirmation—none of which even hinted of any arguments for withdrawal of reference. The Convertible Noteholders' untimely Motion is yet another indication of the Convertible

22

Noteholders' blatant forum shopping. *See In re VWE Group, Inc.*, 359 B.R. 441, 446 (S.D.N.Y. 2007) (noting that even short delays are suspect where there are "very clear indications of tactical delays and forum shopping after the bankruptcy judge made intermittent findings adverse to the moving party"); *Lone Star Indus. v. Rankin County Economic Dev. Dist. (In re New York Trap Rock Corp.)*, 158 B.R. 574, 577 (S.D.N.Y. 1993) ("Forum shopping efforts pursued by awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer should not be rewarded with success"); *Laine v. Gross*, 128 B.R. 588, 589 (D. Me. 1991) ("Only after the Bankruptcy Court denied their motion to dismiss, having invested a significant amount of time and energy, did Defendants try another tack and seek withdrawal of the reference.").

23

## <u>CONCLUSION</u>

WHEREFORE, for the reasons discussed above, the Debtors respectfully request that the

Court enter an order denying the Motion.

Dated: October 12, 2007                                 Respectfully submitted,
       New York, New York

                                                        /s/ Edward O. Sassower
                                                        KIRKLAND & ELLIS LLP
                                                        Richard M. Cieri (RC 6062)
                                                        Edward O. Sassower (ES 5823)
                                                        Citigroup Center
                                                        153 East 53rd Street
                                                        New York, New York  10022-4611
                                                        Telephone:    (212) 446-4800
                                                        Facsimile:    (212) 446-4900

                                                        KIRKLAND & ELLIS LLP
                                                        Marc Kieselstein, P.C.
                                                        David R. Seligman
                                                        Aon Center
                                                        200 East Randolph Drive
                                                        Chicago, IL  60601-6636
                                                        Telephone:  (312) 861-2000
                                                        Facsimile:   (312) 861-2200

                                                        *Counsel for the Debtors-Defendants*

K&E 12129632.17