# EXHIBIT 5

Edward S. Weisfelner (EW-5581)
Sigmund S. Wissner-Gross (SW-0001)
May Orenstein (MO-2948)
BROWN RUDNICK BERLACK ISRAELS LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Joseph F. Ryan
Steven B. Levine
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| --------------------------------------------------------: | |
| In re: | : |
| | :     Chapter 11 |
| CALPINE CORPORATION, et al., | :     Case No. 05-60200 (BRL) |
| | :     (Jointly Administered) |
|        Debtors. | : |
| --------------------------------------------------------: | |
| | : |
| LAW DEBENTURE TRUST COMPANY | : |
| OF NEW YORK, solely in its capacity | : |
| as Indenture Trustee, | : |
| | :     Adversary Proceeding |
|        Plaintiff, | :     No. 06-01461-BRL |
| | : |
|        v. | : |
| | : |
| CALPINE CORPORATION, et al., | : |
| | : |
|        Defendants. | : |
| --------------------------------------------------------: | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO THE MOTIONS BY DEBTORS, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND THE OFFICIAL COMMITTEE OF
<u>EQUITY SECURITY HOLDERS FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

ARGUMENT ....................................................................................................... 4

I.       THE MAKEWHOLE PROVISION APPLIES TO THE DEBTORS'
REDEMPTION OF THE FIRST LIEN NOTES .................................................. 4

      A.      The Makewhole Provision Was Triggered by the Debtors'
Redemption of the First Lien Notes Prior to October 2009 .................................. 4

              1.      Bankruptcy Acceleration Does Not Make Subsequent
Redemption "Involuntary" ...................................................... 5

              2.      The Debtors' Failure to Comply with the Notice Requirement
of the Makewhole Provision Does Not Mean that the
Redemption Was Involuntary ................................................... 7

              3.      The Debtors' Claimed Inability to Reinstate the First Lien
Notes Without Modification Does Not Make Redemption Involuntary .............. 9

              4.      The Acceleration Clause of the First Lien Indenture Did Not
Compel the Redemption ......................................................... 11

      B.      No "Rule Of Explicitness" Is Applicable to Makewhole Premiums ................... 12

      C.      The Acceleration Clause Itself Contemplates Premium Payments
Following Acceleration ........................................................................... 17

II.      THE FIRST LIEN TRUSTEE'S DECELERATION OF THE FIRST
LIEN NOTES DID NOT VIOLATE THE AUTOMATIC STAY ...................... 19

III.     THE FIRST LIEN TRUSTEE'S RIGHT TO INDEMNIFICATION
DOES NOT DEPEND ON THE OUTCOME OF THE FIRST LIEN
NOTEHOLDERS CLAIM FOR A MAKEWHOLE PREMIUM ....................... 27

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aardwoolf Corp. v. Nelson Capital Corp.,
861 F.2d 46 (2d Cir. 1988)................................................................................ 6

Booth v. Cleveland Rolling Mill Co.,
74 N.Y.15 (1878) ................................................................................ 16, 18

D.I.S., LLC v. Sagos,
38 A.D.3d 543, 832 N.Y.S.2d 581 (2d Dep't 2007)............................................. 6

Hooper Assocs., Ltd. v. AGS Computers, Inc.,
74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989) ........................................................ 29

In re 433 S. Beverly Drive,
117 B.R. 563 (Bankr. C.D. Cal. 1990)................................................................ 9

In re AE Hotel Venture,
321 B.R. 209 (Bankr. N.D. Ill. 2005) ............................................................... 15

In re Adelphia Commc'ns Corp.,
342 B.R. 142 (Bankr. S.D.N.Y. 2006)............................................................... 15

In re Adu-Kofi,
94 B.R. 14 (Bankr. D.R.I. 1988)...................................................................... 26

In re Anchor Resolution Corp.,
221 B.R. 330 (Bankr. D. Del. 1998) ................................................................ 15

In re Brunel,
54 B.R. 462 (Bankr. D. Colo. 1985) ................................................................ 28

In re Burgess,
234 B.R. 793 (D. Nev. 1999) .......................................................................... 24

In re Caldor, Inc.,
240 B.R. 180 (Bankr. S.D.N.Y. 1999),
aff'd sub nom. Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,
266 B.R. 575 (S.D.N.Y. 2001)......................................................................... 21

In re Calpine Corp.,
365 B.R. 392 (Bankr. S.D.N.Y. 2007) ............................................................... 6

In re Chateaugay Corp.,
116 B.R. 887 (Bankr. S.D.N.Y. 1990)................................................................. 6

In re Chateaugay Corp.,
102 B.R. 335 (Bankr. S.D.N.Y. 1989)................................................................. 21

In re Flynn,
143 B.R. 798 (Bankr. D.R.I. 1992)................................................................... 24

In re Imperial Coronado Partners, Ltd.,
96 B.R. 997 (B.A.P. 9th Cir. 1989).................................................................. 9

In re Ionosphere Clubs, Inc.,
134 B.R. 528 (Bankr. S.D.N.Y.1991)................................................................ 14

In re Joens,
No. 03-02077, 2003 WL 22839822 (Bankr. N.D. Iowa Nov. 21, 2003)...................... 21

In re Kingsboro Mortgage Corp.,
514 F.2d 400 (2d Cir. 1975)........................................................................... 14

In re Kroh Bros. Dev. Co.,
88 B.R. 997 (Bankr. W.D. Mo. 1988)................................................................ 29

In re LHD Realty Corp.,
726 F.2d 327 (7th Cir. 1984) ................................................................. 12, 13, 26

In re Prudential Lines, Inc.,
107 B.R. 832 ( Bankr. S.D.N.Y. 1989)........................................................... 23, 24

In re Public Serv. Co. of N.H.,
114 B.R. 813 ( Bankr. D.N.H. 1990)................................................................ 7

In re R.H. Macy & Co.,
67 Fed. Appx. 30 (2d Cir. 2003)..................................................................... 21

In re Ridgewood Apartments of DeKalb County, Ltd.,
174 B.R. 712 (Bankr. S.D. Ohio 1994)......................................................... 10, 15

In re Skyler Ridge,
80 B.R. 500 (Bankr. C.D. Cal. 1987)................................................................ 7

In re Texaco, Inc.,
81 B.R. 804 (Bankr. S.D.N.Y. 1988)................................................................ 26

In re Texaco Inc.,
73 B.R. 960 (Bankr. S.D.N.Y. 1987) ........................................................................ 8, 11, 13, 25, 26

In re Vanderveer Estates Holdings, Inc.,
283 B.R. 122 (Bankr. E.D.N.Y. 2002) ........................................................................ 15

In re West Elecs., Inc.,
158 B.R. 37 (Bankr. D.N.J. 1993) ........................................................................ 28

Law Debenture Trust Co. of New York v. Calpine Corp. (In re Calpine Corp.),
356 B.R. 585 (S.D.N.Y. 2007) ........................................................................ 11

Moody v. Amoco Oil Co.,
734 F.2d 1200 (7th Cir.), cert. denied, 469 U.S. 982 (1984) ........................................................................ 22

Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.,
11 Misc.3d 980, 816 N.Y.S. 2d 831 (N.Y. Sup. Ct. 2006) ........................................................................ 6

Padilla v. Wells Fargo Home Mortgage, Inc. (In re Padilla),
Nos. 04-42708 & 05-30917, 2007 WL 2264714 (Bankr. S.D. Tex. Aug. 3, 2007) ........................................................................ 22

Pension Benefit Guar. Corp. v. LTV Corp. (In re Chateaugay Corp.),
87 B.R. 779 (S.D.N.Y.1988), aff'd, 875 F.2d 1008 (2d Cir. 1989),
rev'd on other grounds, 496 U.S. 633 (1990) ........................................................................ 22, 23, 24

Salahuddin v. Goord,
467 F.3d 263 (2d Cir. 2006) ........................................................................ 1

Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,
691 F.2d 1039 (2d Cir. 1982) ........................................................................ 16, 17

Stander v. Fin. Clearing & Servs. Corp.,
718 F. Supp. 1204 (S.D.N.Y. 1989) ........................................................................ 16

SO/Bluestar, LLC v. Canarsie Hotel Corp.,
33 A.D.3d 986, 825 N.Y.S.2d 80 (2d Dep't 2006) ........................................................................ 6

United States v. Michalek,
54 F.3d 325 (7th Cir. 1995) ........................................................................ 27

**Other Authorities**

3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy (15th ed. rev. 2007) ........................................................................ 20

# PRELIMINARY STATEMENT

The First Lien Trustee's[1] entitlement to summary judgment could not be clearer and the submissions on reply by the Debtors and the Committees further underscore that the First Lien Trustee's cross-motion for summary judgment should be granted and the summary judgment motions of the Debtors and Committees must be denied.

As the Debtors and the Committees do not dispute, the First Lien Trustee at no point sought repayment of the First Lien Notes, and, in fact, as this Court is well aware, opposed such repayment, and the repayment of the First Lien Notes ultimately on the Debtors' motion in late May and June 2006 over the vigorous objection of the First Lien Trustee. See, e.g., Plaintiff's Statement of Undisputed Material Facts ¶¶ 17-21, 28-30, 32, and Joint Response of the Debtors and the Official Committee of Unsecured Creditors to Plaintiff's Statement of Material Facts and Statement of Additional Material Facts. Moreover, neither the Debtors nor the Committees dispute that the Makewhole Premium sought by the First Lien Trustee is reasonable under Section 506(b) of the Bankruptcy Code, nor have they presented any evidence to dispute the calculation of the amount of such Makewhole Premium that should be paid.[2]

---

[1]    All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Plaintiff's Memorandum of Law in Support of its Cross-Motion for Summary Judgment and In Opposition to the Motions by Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders for Summary Judgment ("Plaintiff's Opening Brief"). As in Plaintiff's Opening Brief, except where otherwise noted, references to the positions and arguments of the Debtors are directed to the Committees as well.

[2]    The First Lien Trustee calculates the amount of the Makewhole Premium due as follows: $97,220,027.42 plus, assuming the Makewhole Premium is paid in full on September 30, 2007, interest due in the further amount of $12,711,770. See Plaintiff's Opening Brief at 12-13 & n.8. While the Debtors apparently concede that the Makewhole Premium is "over $97 million" (Debtors' Reply Brief in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Debtors' Reply Brief") at 2), the Court should accept the First Lien Trustee's figures and enter summary judgment in favor of the First Lien Trustee in such amount. On summary judgment, the Debtors and Committees are required to lay bare their proof and have presented no evidence to dispute the specific calculations by the First Lien Trustee of the amount of the Makewhole Premium that is due. See Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006). In any event, the First Amended Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Amended Disclosure Statement") states that the applicable Makewhole Premium potentially due the First Lien Noteholders is up to $124.80 million, a sum greater than even that which the First Lien Trustee advances in its cross-motion for summary judgment. Amended Disclosure Statement at 103 [Docket No. 5702].

The Court can and should grant the First Lien Trustee summary judgment based on, inter alia, (i) the plain and unambiguous language of Section 3.05 of the First Lien Indenture, which applies to any repayment by Calpine of "all or part of the Notes" prior to October 1, 2009 and is not limited to payments made prior to a bankruptcy filing, (ii) the fact that Calpine's repayment was completely optional, and (iii) the Debtors' and the Committees' concession that the First Lien Noteholders did not seek repayment and that the Makewhole Premium is reasonable under Section 506(b).

Instead of seriously addressing the plain language of the First Lien Indenture and the substantial body of bankruptcy law supporting the First Lien Trustee's position (and rejecting the analyses urged by the Debtors and the Committees), both the Debtors and the Creditors' Committee devote most of their respective reply briefs to the fatally flawed argument that the waiver by the First Lien Noteholders in early May 2006 of any contractual Event of Default and rescission of any contractual acceleration under Section 6.02 (the "Waiver and Rescission") of the First Lien Indenture violated the automatic stay. The Debtors and the Creditors' Committee actually devote twenty pages of briefing to this issue. This inordinate emphasis is due to these parties' mistaken belief that negating the legal effect of the Waiver and Rescission will enable them to perpetrate the legal fiction that in repaying the First Lien Notes, the Debtors did so under a legal compulsion.

Despite the energies lavished on a novel and entirely unsupported extension of the automatic stay to the waiver and relinquishment of contractual creditor rights, the right of the First Lien Noteholders to a Makewhole Premium does not depend on the legal effect given to the Waiver and Rescission. Due to the automatic stay of bankruptcy and other features of the Bankruptcy Code, notably Section 365(e)(1) which makes contractual "ipso facto" clauses, i.e.,

bankruptcy acceleration provisions, such as that contained in Section 6.02 of the First Lien Indenture, entirely unenforceable, there can be no question that the Debtors' payment of the First Lien Notes was wholly voluntary.[3]

While the Debtors and the Creditors' Committee acknowledge that contracting parties are free to agree that a premium will be due in the event of repayment following acceleration, they nonetheless insist that indenture provisions requiring a premium are "generally" not triggered after bankruptcy and that an agreement to pay a premium after debt has been accelerated is subject to a heightened requirement of explicitness which the drafters of the First Lien Indenture somehow failed to meet. Both of these assertions are made entirely without legal authority. To be clear, despite having now filed four briefs altogether, the Debtors and the Committees <u>are unable to cite to even a single case in which the acceleration of bankruptcy (contractual or statutory) has been the basis for a court's ruling that a makewhole provision was not applicable to a prepayment made during bankruptcy.</u> And, while the Debtors and the Creditors' Committee insist that a heightened explicitness is required before an indenture will be construed to require payment of a makewhole following acceleration, they have cited no cases propounding such a special rule of contract interpretation applicable to prepayment premiums.[4] The First Lien Indenture provides, in any event, in Section 3.05, that Calpine <u>must</u> pay a premium if it redeems the First Lien Notes prior to October 1, 2009. Since there is no rule disfavoring, or presumption against, a makewhole coming due following a bankruptcy acceleration, and because under the terms of the Makewhole Provision, the obligation to pay a Makewhole Premium is not

---

[3]    In support of their automatic stay arguments, the Debtors' rely heavily on <u>In re Texaco, Inc.</u>, 73 B.R. 960 (Bankr. S.D.N.Y. 1987), a case also cited by the Creditors' Committee in its summary judgment motion. In <u>In re Texaco</u>, the court held that bankruptcy default clauses such as Section 6.02 of the First Lien Indenture are precluded by the <u>ipso facto</u> prohibition of Section 365(e). As applied here, the court's decision in <u>In re Texaco</u> entirely eliminates any argument regarding contractual compulsion and thus moots the issue of the legal effect of the Waiver and Rescission.

[4]    As discussed, in section I.B. <u>infra</u>, a "Rule of Explicitness" applicable to makewhole premiums following acceleration does not exist.

conditioned on the non-occurrence or cure of an Event of Default, a Makewhole Premium is due to the First Lien Noteholders.

As discussed _infra_, all of the remaining arguments by the Debtors and the Creditors' Committee are without merit. The Court should grant the First Lien Trustee's cross-motion for summary judgment, and deny the motions for summary judgment of the Debtors and the Committees.[5]

## ARGUMENT

**I.    THE MAKEWHOLE PROVISION APPLIES TO THE DEBTORS' REDEMPTION OF THE FIRST LIEN NOTES.**

**A.    The Makewhole Provision Was Triggered by the Debtors' Redemption of the First Lien Notes Prior to October 2009.**

The Makewhole Provision provides that a makewhole is due if Calpine redeems the First Lien Notes prior to October 1, 2009. Calpine may not otherwise redeem the First Lien Notes prior to October 1, 2009. This is made clear by the First Lien Notes themselves, which provide that, except on the terms of the Makewhole Provision, "[Calpine] shall not have the option to redeem the Notes prior to October 1, 2009." See Exhibit A[6] at A-3.[7] The Debtors do not dispute

---

[5]    While not technically germane to the issues before the Court on the cross-motions for summary judgment with regard to the Makewhole Premium due under the First Lien Indenture, we note that the Debtors recently settled (after initially opposing) claims asserted with respect to Calpine's 8.5% Second Priority Senior Notes Due 2010 for up to approximately 90% of the claimed makewhole. An order by this Court approving that settlement was entered on August 8, 2007 [Docket No. 5567]. Given that the repayment by Calpine of the First Lien Notes here was clearly voluntary and was done by Calpine just a few months into this bankruptcy proceeding, and that neither the Debtors nor the Committees dispute that the First Lien Makewhole Premium is reasonable or that the First Lien Noteholders at any relevant time sought repayment, it is puzzling that the Debtors are even opposing First Lien Noteholders' cross-motion for summary judgment.

[6]    The Exhibits referenced herein are Exhibits to the Declaration of May Orenstein dated July 30, 2007 (i) In Support Of Plaintiff's Cross-Motion For Summary Judgment On Plaintiff's First Amended Complaint And (ii) In Opposition To The Motion By Debtors And The Creditors' Committee In Which The Equity Committee Has Joined, For Summary Judgment Dismissing Plaintiff's First Amended Complaint.

[7]    The First Lien Notes and the First Lien Indenture also contain separate provisions, not at issue here, for a call premium payable for redemptions occurring after October 1, 2009.

that they sought Court authorization, over the First Lien Trustee's vigorous objection, to repay the First Lien Notes in April 2006 and, having obtained such approval on May 10, 2006, caused the First Lien Notes to be redeemed during May and June 2006. Joint Response of the Debtors and the Official Committee of Unsecured Creditors to Plaintiff's Statement of Material Facts and Statement of Additional Material Facts ¶¶ 28, 32, 34.

Having redeemed the First Lien Notes prior to October 1, 2009, the Debtors now seek to evade their obligation to pay the resulting Makewhole Premium. The gist of the Debtors' arguments is that the prepayment transactions which occurred in May and June 2006 were not the "sort of" transactions that trigger a makewhole premium obligation. This is so, according to the Debtors, solely because such transactions were not "optional" on the part of Calpine. Debtors' Reply Brief at 19. The Debtors offer a series of disingenuous arguments, addressed below, in support of the proposition that the Redemption was "not optional."

1.    Bankruptcy Acceleration Does Not Make Subsequent Redemption "Involuntary."

First, the Debtors resort to the empty and formalistic syllogism that because (A) the First Lien Notes were accelerated as a matter of law by virtue of the Debtors' bankruptcy filing, and (B) accelerated debt is "due and payable," it therefore must follow that (C) the repayment of that debt at the election of the Debtors after the Debtors' bankruptcy filing was "involuntary." The Debtors cite no bankruptcy case applying this syllogism and, not surprisingly, relegate to a footnote a handful of distinguishable non-bankruptcy cases purportedly demonstrating that this formula is applied outside of bankruptcy. Debtors' Reply Brief at 21 n.1. In fact, these non-bankruptcy cases do not control the legal issues presented here for disposition on these motions

(and are all otherwise clearly distinguishable from this proceeding).[8]  This is so because, inter alia, non-bankruptcy cases do not take into account the fundamental alteration of the legal compulsions and the legal prerogatives that result from a bankruptcy filing.

As noted above, neither the Debtors nor the Creditors' Committee have identified a single bankruptcy case in which a court has denied a makewhole based on bankruptcy acceleration, either statutory or contractual.  Indeed, due to the bankruptcy automatic stay and other features of the Bankruptcy Code, notably Section 365(e)(1) which precludes the effect of an "ipso facto" contractual clause, i.e., bankruptcy acceleration provision, such as is found in Section 6.02 of the First Lien Indenture, the very notion of a bankruptcy debtor being under a compulsion to pay pre-existing obligations during the administration of the estate is oxymoronic.  See In re Chateaugay Corp., 116 B.R. 887, 896 (1990) ("With respect to the administration of the estate, the purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue.").  For this reason, bankruptcy courts, including this Court in In re Calpine Corp., 365 B.R. 392 (Bankr. S.D.N.Y. 2007) ("CalGen") have, time and again, expressly or impliedly, rejected the formulaic approach advanced by the Debtors.  In CalGen, this rejection took the form of holding that the

---

[8]       In fact, two of the four cases cited by the Debtors do not even support the Debtors' stated proposition as a matter of non-bankruptcy state law.  In Aardwoolf Corp. v. Nelson Capital Corp., 861 F.2d 46, 47-48 (2d Cir. 1988), cited by the Debtors, no acceleration had occurred, and the court granted the borrower recovery of prepaid interest because the terms of the loan agreement permitted prepayment of the loan balance without penalty.  Likewise, SO/Bluestar, LLC v. Canarsie Hotel Corp., 33 A.D.3d 986, 987, 825 N.Y.S.2d 80, 81 (2d Dep't 2006), also cited by the Debtors, affords no support for the proposition that lenders lose the right to prepayment premiums upon acceleration since, in that case, the court in fact enforced the terms of the parties' agreement to uphold a prepayment premium in a foreclosure action.  Even the two cases cited by the Debtors in which the courts declined to award a premium did so based on more than mere contractual acceleration.  In Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs., 11 Misc. 3d 980, 984-88, 816 N.Y.S.2d 831, 836-38 (N.Y. Sup. Ct. 2006), the court indicated that it was the commencement of the mortgage foreclosure action, not the occurrence of an event of default and acceleration, that precluded a premium payment.  Notably, in denying the premium, the court in Northwestern Mutual was careful to state its reliance on non-bankruptcy authority, thereby indicating that the legal relationships altered by a bankruptcy petition could have yielded a different outcome.  12 Misc. 3d at 990-91, 816 N.Y.S.2d at 839-40.  Similarly, in D.I.S., LLC v. Sagos, 38 A.D.3d 543, 544, 832 N.Y.S.2d 581, 582 (2d Dep't 2007), a premium was denied based on the affirmative action taken by the lender to foreclose upon commercial property owned by the debtor and to collect the debt.

6

issuer's prepayments prior to the expiration of no-call periods were breaches under the indentures governing the debt and thus gave rise to a claim for damages.  Id. at 399-400. Because the no-call provisions proscribed only "voluntary" and "optional" repayments and redemptions, and because the CalGen debt had been accelerated to maturity by the filing of bankruptcy, had the Court applied the syllogism espoused by the Debtors on these cross-motions (i.e., that a payment of a bankruptcy-accelerated debt is necessarily involuntary), it would have been impelled to conclude that repayment of the CalGen debt was involuntary and, therefore, not a breach of the no-call provisions.   The Court did not so hold and, accordingly, must be understood to have rejected the Debtors' formulaic approach.

Since acceleration in bankruptcy does not make every payment after a bankruptcy filing involuntary, "[t]he automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium." In re Skyler Ridge, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987); Plaintiff's Opening Brief at 16-17 (citing cases).  As demonstrated in Plaintiff's Opening Brief, instead of equating bankruptcy acceleration with a legal compulsion to pay, bankruptcy courts have instead engaged in a fact specific inquiry into whether, taking into account the bankruptcy context and the procedural context of a particular prepayment, the prepayment at issue was, in reality, optional on the part of the debtor.  See In re Public Serv. Co. of N.H., 114 B.R. 813, 818 (Bankr. D.N.H. 1990); Plaintiff's Opening Brief at 17 (citing cases).  On this factual issue, this is not a close case.  The actual circumstances of the Redemption that occurred here compel the conclusion that it was the entirely voluntary act of the Debtors.

 2. The Debtors' Failure to Comply with the Notice Requirement of the Makewhole Provision Does Not Mean that the Redemption Was Involuntary.

The Debtors next argue that the Redemption was not optional based upon the requirement, in Section 3.05 of the First Lien Indenture, that Calpine give notice prior to an early

redemption made under the Makewhole Provision. Debtors' Reply Brief at 19-20. The Debtors argue that because Calpine did not in fact comply with this notice requirement, it therefore follows that its repayment of the First Lien Debt cannot have been made thereunder and, furthermore, cannot have been optional. This frivolous argument is entirely circular in that the mere fact that Calpine failed to comply with the notice requirements of the Makewhole Provision prior to redeeming the First Lien Notes does not demonstrate that such requirements were not applicable.[9] Nor, does such non-compliance demonstrate that any subsequent payments were involuntary.

The Debtors' argument also gains no strength from the observation that the Acceleration Clause provides that, upon the filing of a bankruptcy petition, the First Lien Notes are due and payable "without further notice." The "without further notice" language of the Acceleration Clause has no relevance to the notice obligations of Calpine found elsewhere in the First Lien Indenture and merely serves to relieve the First Lien Trustee of the requirement of giving notice to Calpine of acceleration. In reality, of course, Calpine's non-compliance with the notice provision of the Makewhole Provision was simply a function of the fact that, in the context of these Chapter 11 proceedings, the notice and other ministerial aspects of the Makewhole Provision were supplanted by the notice and filing procedures required to submit the Redemption Motion to the Court and by the directives of the Court set forth in the Redemption Order, when issued. In any event, as discussed elsewhere in this Reply Brief, under In re Texaco (a case upon which the Debtors prominently rely on reply), the ipso facto clause in Section 6.02 is a nullity and is unenforceable.

---

[9]    The Debtors' failure to comply with the notice provision of Section 3.05 of the First Lien Indenture simply represented a further breach of Calpine's obligations under the First Lien Indenture and cannot serve as the basis to absolve Calpine of its obligation to pay the Makewhole Premium.

3.    The Debtors' Claimed Inability to Reinstate the First Lien Notes Without Modification Does Not Make Redemption Involuntary.

The Debtors next dispute the applicability to them of the analysis adopted by several bankruptcy courts that the right of a Chapter 11 debtor ultimately to reinstate accelerated debt pursuant to a plan of reorganization means that payments made during the pendency of the bankruptcy are voluntary for purposes of triggering prepayment premiums. Debtors' Reply Brief at 20; see Plaintiff's Opening Brief at 16-17 (citing cases adopting this analysis). Of the several cases cited in Plaintiff's Opening Brief that engage in this analysis, the Debtors attempt to distinguish only In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989). Debtors' Reply Brief at 21. The Debtors argue that, whereas the debtor in Imperial Coronado "actually had the option to pay the loan in full or to reinstate the debt," the Debtors, in contrast, could not have reinstated the First Lien Notes without violating financial covenants that would have placed them back in default.[10] Id. In fact, the debtor in Imperial Coronado claimed, similarly to the Debtors here, that it did not have the financial means to reinstate the debt at issue and argued on such basis that its prepayment of the loan was not voluntary. The court in Imperial Coronado rejected this approach, since "the question is not whether [the debtor] could, as a practical matter, afford to exercise its right, but whether it had the right to reinstate the loan." Imperial Coronado, 96 B.R. at 1000; see also In re 433 S. Beverly Drive, 117 B.R. 563, 568-69 (Bankr. C.D. Cal. 1990) (cited in Plaintiff's Opening Brief but omitted from mention by either the Debtors or the Creditors' Committee) (adopting the analysis in Imperial Coronado to a similar claim that financial inability to reinstate debt makes a payment of that debt "involuntary").

---

[10]    The Debtors' assertions regarding their inability to reinstate the First Lien Notes, in addition to being legally irrelevant, are made without support from the record on these motions for summary judgment. To the extent the Debtors and the Committees have made other factual statements or representations not supported by the record before this Court, such statements should be disregarded by the Court.

Even assuming, <u>arguendo</u>, that the First Lien Notes could not be reinstated by the Debtors without modification of its covenants, the financial inability to reinstate the First Lien Notes does not support the conclusion that the Redemption was therefore involuntary. Had the Debtors not chosen to redeem the First Lien Notes, the Debtors could have negotiated with the First Lien Trustee for a waiver of the covenants at issue and the extension of the obligations over a multi-year period after confirmation. Even without the consent or cooperation of the First Lien Noteholders, modifications to the First Lien Indenture covenants could have been achieved by the Debtors even over the objection of the First Lien Noteholders based upon a judicial finding that such modifications were fair and equitable under Section 1129(b). In sum, the argument that the Redemption was involuntary because the First Lien Notes could not have been reinstated is entirely simplistic and disingenuous. Such an argument, moreover, overlooks the fact that, as this Court has noted, "the essence of bankruptcy reorganization is to restructure debt and adjust debtor-creditor relationships." <u>CalGen</u>, 365 B.R. at 397 (quoting <u>In re Ridgewood Apartments of DeKalb County, Ltd.</u>, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) (internal quotation marks and ellipsis omitted)).

In this case, restructuring efforts have included redeeming the First Lien Notes partially with new funds available to the Debtors on more favorable terms.

The record is clear and undisputed, in short, that the Debtors' successful effort to obtain authorization for the Redemption of the First Lien Notes was wholly unrelated to their being placed under any legal compulsion to do so or to any action actually undertaken by the First Lien Trustee or First Lien Noteholders, but rather was for the sole purpose, done at the time entirely of the Debtors' choosing just several months after commencement of their bankruptcy cases, of easing the Debtors' interest expense burden and to stop the "unnecessary loss of funds." <u>Id.</u> at 397-98. It is precisely for this reason that, on the First Lien Trustee's appeal from the

Redemption Order, the District Court affirmed this Court's findings that the Redemption was "an appropriate use of cash under sections 363(b) and 105(a) [of the Bankruptcy Code]." Law Debenture Trust Co. of N.Y. v. Calpine Corp. (In re Calpine Corp.), 356 B.R. 585, 597 (S.D.N.Y. 2007).

    4.    The Acceleration Clause of the First Lien Indenture Did Not Compel the Redemption.

In a sea of disingenuous arguments, perhaps the most disingenuous is the Debtors' final contractual argument that the Redemption was involuntary because the First Lien Indenture "compelled" the Debtors, through its contractual automatic acceleration upon bankruptcy provision, to make immediate payment of the First Lien Notes. Debtors' Reply Brief at 21. According to the Debtors, this contractual automatic acceleration clause "allows the noteholders to end-run the broad, preclusive effect of the automatic stay, without taking any action at all." Id. The Debtors insist that the inclusion of the automatic acceleration clause in the First Lien Indenture requires the First Lien Trustee to "accept all of the consequences of acceleration under this clause – not just the benefits." Id. at 21-22. Of course, as the Debtors are aware, it is well settled that the legal impact of automatic acceleration clauses of this kind is completely negated by the automatic stay as well as, where an executory contract is at issue, by operation of Section 365(e)(1)(B) of the Bankruptcy Code. See In re Texaco Inc., 73 B.R. 960, 969 (Bankr. S.D.N.Y. 1987) (cited by Debtors) (observing that the contractual default under the indenture resulting from commencement of Chapter 11 cases was precluded by the ipso facto prohibition of Section 365(e)(1)(B) of the Bankruptcy Code). In reality, the First Lien Noteholders derived no "benefit" at all from the automatic bankruptcy acceleration clause, and the Debtors' arguments lack any credibility. The Debtors also ignore that the very same First Lien Indenture provision, which contains the automatic acceleration provision (Section 6.02), gives the First Lien Noteholders the right to rescind the acceleration "and its consequences." Thus, the Debtors

transparently seek to have the acceleration provisions applied selectively for the purpose of prejudicing the First Lien Trustee's rights and evading the payment of a Makewhole Premium.

The Debtors improperly cite to In re LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984), for the proposition that, based on the automatic bankruptcy acceleration clause, the First Lien Trustee should be treated as having irrevocably elected, by the inclusion of such clause in the First Lien Indenture, the accelerated payment upon filing of bankruptcy.  As the decision in LHD Realty makes clear, contractual provisions alone are insufficient to manifest such an election of remedies following default.  To establish such an election to accelerate debt and waive a prepayment premium instead requires overt and unequivocal post-default acts by the creditor.  In the bankruptcy context, this generally requires an effort to lift the automatic stay of bankruptcy or other overt acts to force payment and/or foreclose the possibility of reinstatement.  Id. at 331.  As demonstrated in Plaintiff's Opening Brief and not refuted by the Debtors, even under state law, a lender loses its right to seek a premium only when it acts affirmatively to accelerate or takes affirmative action to foreclose or otherwise enforce collection of the entire debt.  See Plaintiff's Opening Brief at 20 (citing cases).  Here, it is undisputed that neither the First Lien Trustee nor the First Lien Noteholders at any time took any such affirmative steps.  Indeed, the First Lien Noteholders did just the opposite by waiving the automatic acceleration.

**B.    No "Rule of Explicitness" Is Applicable to Makewhole Premiums.**

The Debtors concede a makewhole premium can be payable, even in connection with a payment after the acceleration of debt, to the extent that the parties have so contracted.  Debtors' Reply Brief at 1.  This should be the end of this analysis because by its plain language the Makewhole Provision applies, without limitation or condition, to all redemptions by Calpine prior to October 1, 2009 and does not exclude from its application redemptions following a statutory acceleration created by a bankruptcy filing or any other acceleration.  The Debtors

argue, however, that the First Lien Noteholders are not entitled to a neutral, plain language construction of the Makewhole Premium but, rather, that the right to be paid a premium after acceleration is subject to particular drafting requirements requiring a "specific" reference of the Makewhole Premium in the Acceleration Clause. See id. at 15 (characterizing the absence of a specific reference in the Acceleration Clause to the Makewhole Premium as a "glaring drafting omission" that is "fatal to the Trustee's claim for a premium"). According to the Debtors: "[T]he Trustee bargained for an acceleration provision that does not provide for a makewhole premium and should not be heard to ask for such damages now that the debt was repaid according to its terms." Id. at 1. Similarly, the Creditors' Committee asserts that indentures containing prepayment premium provisions, which were intended to be enforceable notwithstanding a bankruptcy-induced automatic acceleration, must incorporate "express language in the indenture's remedies provisions to say exactly that." Committee's Reply Brief at 14 (emphasis added). The gist of the Debtors' position is that in view of these "omissions," and notwithstanding the apparent unenforceability of the contractual acceleration under Section 6.02 under In re Texaco (the very case upon which the Debtors heavily rely on reply), the Court should presume that the intentions of the parties were that the Makewhole Provision would be inoperative at any time after Event of Default, and accordingly, should read into the Makewhole Provision the limiting condition (nowhere found in the First Lien Indenture) that Calpine could not redeem following an acceleration.

Contrary to the Debtors' and the Creditors' Committee's arguments, there is no presumption disfavoring the enforcement of makewhole premiums either before or after the acceleration of debt. Indeed, courts have frequently noted the valid purpose served by makewhole premiums and the enforceability of provisions requiring their payment. See, e.g., LHD Realty Corp., 726 F.2d at 330 ("[P]repayment premiums serve a valid purpose in

compensating at least in part for the anticipated interest a lender will not receive if a loan is paid off prematurely. Among other things, a prepayment premium insures the lender against loss of his bargain if interest rates decline."). As sole support for the supposed existence of particularized drafting requirements for the enforceability of a makewhole after bankruptcy acceleration, the Creditors' Committee makes reference to the judicially-developed "Rule of Explicitness" which applies to arrangements (not at issue here) that subordinate the principal claims of junior holders to the post-bankruptcy interest claims of senior holders. See Committee's Reply Brief at 15. As explained by this Court in In re Ionosphere Clubs, Inc., 134 B.R. 528, 533-35 (Bankr. S.D.N.Y. 1991), this "Rule of Explicitness," adopted by the Second Circuit in In re Kingsboro Mortgage Corp., 514 F.2d 400 (2d Cir. 1975), is a judicially-developed rule imposed in the intercreditor context to counter the presumption of the parties' intent, which would otherwise arise due to the fact that, under the Bankruptcy Code, interest on unsecured debt ceases to accrue upon the filing of a bankruptcy petition. The Rule of Explicitness applies only to this specific issue in the interpretation of intercreditor subordination agreements and has no relevance whatsoever here to makewhole premiums.

While the Creditors' Committee proclaims, in yet another reference to facts nowhere found in the record, that due "to the evolution in the corporate finance marketplace . . . , parties to indentures and credit agreements came to understand" that entitlement to a premium would depend upon "explicit language," these assertions are entirely unsupported. Committee's Reply Brief at 15. The cases cited by the Debtors and the Creditors' Committee in support of what "parties to indentures and credit agreements . . . understand" simply construe the contracts at issue in accordance with their respective terms and are not support for any special "Rule of Explicitness" respecting enforcement of makewhole premiums following accelerations. None of the cases states that the language employed in the agreements therein being interpreted was

necessary, or was the exclusive means, for the expression of the parties' intention that a makewhole premium be payable. In <u>In re AE Hotel Venture</u>, 321 B.R. 209 (Bankr. N.D. Ill. 2005), cited by the Creditors' Committee, the court concluded no more than that the particular note in question provided for a prepayment premium following acceleration. <u>Id.</u> at 218-19. The Debtors' other authorities offer no more persuasive proof of a special rule or "the evolution in the corporate finance marketplace." <u>See</u> <u>In re Anchor Resolution Corp.</u>, 221 B.R. 330, 333, 335-38 (Bankr. D. Del. 1998) (construing a note purchase agreement which provided for payment of a makewhole premium upon an event of default); <u>In re Vanderveer Estates Holdings, Inc.</u>, 283 B.R. 122, 126 (Bankr. E.D.N.Y. 2002) (construing note providing for premium "whether the prepayment is voluntary or involuntary . . . "). Other cases cited by the Debtors and the Creditors' Committee lend even less support to the Debtors' and the Creditors' Committee's views. For example, in support of its position, the Creditors' Committee quotes from <u>Ridgewood Apartments</u>, 174 B.R. at 720, as follows: "Had [the lender] intended the penalty to be payable upon acceleration, the Addendum [governing prepayment] should have stated that specifically." This quotation, as excerpted by the Creditors' Committee is utterly misleading since at issue in <u>Ridgewood Apartments</u> was not whether a prepayment premium could arise after acceleration (that much was presumed) but whether the lender's proof of claim could properly include the prepayment premium even though <u>the debtor had not prepaid the debt</u>. The scant other authority to which the Debtors and the Creditors' Committee cite in support of the supposed existence of a heightened explicitness requirement is also irrelevant. <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 342 B.R. 142, 151-154 (Bankr. S.D.N.Y. 2006) (finding significant omission of language providing for default rate of interest applicable to one type of covenant in view of express provision for default rate interest with respect to another covenant in the same contract).

In sum, there is no general rule that makewhole premiums do not accrue during the administration of a bankruptcy estate. A "Rule of Explicitness" applicable to makewhole premiums does not exist and is simply the self-serving fabrication of the Debtors and the Creditors' Committee. Accordingly, the First Lien Noteholders are entitled to the benefit of the general principles of <u>neutral</u> contract interpretation. Under long-established, frequently relied upon and unchanging principles of New York contract law, "[t]here is no particular formula of words, or technical phraseology, necessary to the creation of an express obligation to do, or forebear to do, a particular thing or perform a specified act." <u>Booth v. Cleveland Rolling Mill Co.</u>, 74 N.Y. 15, 21 (1878). Rather, under New York law, words are interpreted in accordance with their plain meanings in order to arrive at an interpretation that will realize the parties' reasonable expectations. <u>See</u> Plaintiff's Opening Brief at 21. Even considerations of public policy (which are, in any case, not present here when simple contract construction is involved) cannot justify the implementation of an "overriding assumption regarding every parties' intent in all contracts of a certain type[.]" <u>Stander v. Fin. Clearing & Servs. Corp.</u>, 718 F. Supp. 1204, 1208 (S.D.N.Y. 1989) (holding that it would be improper to go beyond construing the parties' intentions from their contractual language in order to further federal arbitration policies).

"The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity." <u>Sharon Steel Corp. v. Chase Manhattan Bank, N.A.</u>, 691 F.2d 1039, 1053 (2d Cir. 1982). In construing the First Lien Indenture, the Court must reject any approach that carries with it a presumption in favor of the unenforceability of the Makewhole Provision and, instead, interpret the terms of the First Lien Indenture neutrally and in accordance with the plain meaning of the language employed and which gave effect to the parties' intentions as expressed in plain and unambiguous terms. Since no "Rule of Explicitness" is applicable to makewhole premium provisions and since the Makewhole Provision by its terms applies, without

limit or restriction, to any redemption by Calpine prior to October 1, 2009, regardless of the occurrence or continuation of a bankruptcy Event of Default, it can only be construed as requiring the payment of a Makewhole Premium based upon the Debtors' redemption of the First Lien Notes.

## C.    The Acceleration Clause Itself Contemplates Premium Payments Following Acceleration.

In their opening brief, in a mistaken attempt to underscore the supposed mutual exclusivity of acceleration and the obligation to pay a Makewhole Premium, the Debtors erroneously reported that the Acceleration Clause did "not contain the word premium." Debtors' Mem. at 16. The Debtors are now forced to acknowledge their error and somehow seek to explain away each of the various references in the Acceleration Clause and elsewhere in Article 6 (Defaults and Remedies) to a premium. This effort fails because it is clear from the remedies provisions of the First Lien Indenture that rights accruing upon acceleration are explicitly cumulative to, and non-exclusive of, any other rights and remedies available to the First Lien Trustee, including the right to enforce the payment of a Makewhole Premium. Section 6.03 of the First Lien Indenture states: "If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture . . . . All remedies are cumulative to the extent permitted by law." (Emphasis added.) Where acceleration provisions provide for cumulative remedies, an event of default is no bar to the enforcement of other covenants and provisions found in the indenture. See Sharon Steel Corp., 691 F.2d at 1053 (rejecting the argument that the default provisions of an indenture barred the specific performance of redemption provisions where the debtor caused the debentures to become due and payable by its voluntary actions).

As explained in Plaintiff's Opening Brief, the acceleration and remedies provisions of the First Lien Indenture do not purport to govern the amount of principal, the applicable rate of interest due following acceleration or, most pertinently here, whether a premium is then due, but rather simply accommodate the possibility of a post-acceleration premium and refer all issues regarding amounts due following acceleration for determination pursuant to other, more specific, provisions of the First Lien Indenture and the First Lien Notes wherein such matters are expressly addressed.  The Debtors now acknowledge this when they state that Section 6.03 (Other Remedies) of the First Lien Indenture "clearly contemplates that a premium might not accrue in the case of some Events of Default."  Debtors' Reply Brief at 17 (emphasis added).  Indeed, the Debtors now point out that the First Lien Trustee "may pursue a makewhole premium upon an Event of Default in any number of other situations."  Id.  This admission entirely defeats the Debtors' arguments that an acceleration clause must specifically provide for the payment of a particular premium upon acceleration as no specific premium is identified in the acceleration provision.  Nor is there any requirement that more specific cross-references had to have been made.  As pointed out supra, New York law does not impose on contracting parties the "particular formula" that they must use to express their agreements.  See Booth, 74 N.Y. at 21.

The Debtors also entirely miss the point made by Plaintiff with respect to the impermissibility of interpreting the First Lien Indenture by reference to other indentures referenced in other cases.  As stated in Booth, "[t]he interpretation of one agreement will seldom aid in the construction of another, except as it may illustrate some general rule of interpretation applicable to both."  Id.  While Plaintiff does not dispute the relevance of case law regarding the interpretation of prepayment premium provisions, the relevance of other courts' interpretation of other contracts is necessarily lessened to the extent that such courts have decided cases based on

18

contract language that is materially different.  Yet the Debtors ask the Court to draw inferences regarding what the parties to the First Lien Indenture intended from the language of other indentures precisely because such other indentures are materially different from the First Lien Indenture.  Such an interpretative technique impermissibly disregards the parties' own choice of contractual language in the particular agreement whose interpretation is at issue – namely, the First Lien Indenture, and, in any event, is specifically prohibited by the First Lien Indenture itself.  See Exhibit A at Section 12.09.

## II.    THE FIRST LIEN TRUSTEE'S DECELERATION OF THE FIRST LIEN NOTES DID NOT VIOLATE THE AUTOMATIC STAY.

In opposition to the motion of the First Lien Trustee, the Debtors assert the novel and misguided argument that the First Lien Noteholders' contractual rescission of the acceleration of the First Lien Notes, which is provided for under Section 6.02 of the First Lien Indenture, was an act "to collect" a Makewhole Premium in violation of Section 362(a)(6) of the Bankruptcy Code, or alternatively, an exercise of "control over the property" of the estate in violation of Section 362(a)(3) of the Bankruptcy Code.  Despite the extensive attention paid to this issue by the Debtors and the Creditors' Committee in their reply briefs, the First Lien Noteholders' right to a Makewhole Premium does not depend upon the legal effect of the Waiver and Rescission.  Under the terms of the First Lien Indenture, the right to a Makewhole Premium accrues upon a redemption by Calpine prior to October 1, 2009, regardless of the contractual status of the obligations as either accelerated or not.  The Debtors' and the Creditors' Committee's undue emphasis on the legal effect of the Waiver and Rescission is a function of their equally undue reliance on the legal fiction that the Debtors were "compelled" to repay the First Lien Notes when they chose to do so.  In any case, despite the best efforts of the Debtors and the Creditors' Committee, their arguments for the extension of the automatic stay provisions to a creditor's waiver of a default are both unpersuasive and unsupported by relevant legal authority.

19

Debtors admit that "deceleration, on its face, does not look like a typical collection action," and they do not purport to cite any case in which a deceleration or any other act to preserve a makewhole premium was actually found to have violated the automatic stay statute. Debtors' Reply Brief at 11. They argue, however, that, in this case, deceleration violated the automatic stay because it was intended by the First Lien Noteholders to deprive the Debtors of the ability to characterize their repayment of the First Lien Notes as one compelled by the First Lien Indenture. Thus, the essence of the Debtors' position is that the automatic stay of bankruptcy can be invoked to maintain the legal fiction that they acted under a compulsion when they redeemed the First Lien Notes. The Debtors' argument is a silly one that distorts and trivializes the automatic stay protections of the Bankruptcy Code.

The Waiver and Rescission simply cannot be shoehorned into the ambit of the prohibitions of either of the provisions of the automatic stay statute upon which the Debtors rely. Section 362(a)(6) is limited to "acts to collect, assess or recover claims against the debtor that arose before the commencement" of the bankruptcy case. The Debtors have identified no authority that supports their assertion that an act, regardless of its form, can come within the proscription of the stay based upon the subjective intent of the acting party to "color" the perceptions of a court as to the merit of a claim or to "bolster" a parties' legal arguments in future litigation. Such a construction would extend the automatic stay to a potentially wide range of conduct bearing no relationship to the acts which, by convention and under existing precedent, have been held to violate the stay of collection activity. See 3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 362.03[8][a] (15th ed. rev. 2007) (describing acts considered to be for collection purposes as ranging from "informal" efforts, such as telephone calls and dunning letters, to "more formal judicial and administrative proceedings"). And, while the Bankruptcy Code definition of claim extends to contingent and unmatured claims, outside of

bankruptcy, there is no sense in which a creditor can act to "collect, assess or recover" claims that are not matured and absolutely owing.

Yet at the time of the alleged "collection activity," i.e., the sending of the Waiver and Rescission, the First Lien Noteholder had no claim for a Makewhole Premium. Had the Debtors chosen not to redeem the First Lien Notes, no claim for a Makewhole Premium would have ever arisen. No case cited by the Debtors or the Creditors' Committee applies the Section 362(a)(6) proscription on collection activity to a creditor's acts in relation to an unmatured or contingent claim, nor are any such cited cases remotely factually or legally apposite. See In re Chateaugay Corp., 102 B.R. 335, 353 (Bankr. S.D.N.Y. 1989) (determining priority of contingent claim that matured post-petition; not construing or applying Section 362); In re Caldor, Inc., 240 B.R. 180, 183, 192 (Bankr. S.D.N.Y. 1999) (discussing time when contingent administrative claim accrued; not construing Section 362), aff'd sub nom. Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001); In re R.H. Macy & Co., 67 Fed. Appx. 30, 32 (2d Cir. 2003) (unpublished) (finding contingent claim that matured post-petition was barred due to untimely filing; not construing or applying Section 362); see also In re Joens, No. 03-02077, 2003 WL 22839822, at *3 (Bankr. N.D. Iowa Nov. 21, 2003) (holding that mailing of invoice constitutes act of collection in violation of the stay).

Due to the lack of supportive authority and the dubiousness of the novel proposition that a waiver of a default is a "collection of debt" within the contemplation of the statutory language, the Debtors and the Creditors' Committee alternatively focus on the argument that the Waiver and Rescission violated the "control" provisions of Section 363(a)(3). The Debtors make the argument that, because the Debtors' property includes their rights under the First Lien Indenture, the Waiver and Rescission was a prohibited attempt to control such property. This argument overlooks that the substantive content of the Debtors' property rights in the First Lien Indenture

is necessarily defined by and limited to the terms of that agreement. The Debtors have no right under the First Lien Indenture to force the continuation of an acceleration of the First Lien Notes against the will of the majority of the First Lien Noteholders. See Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir.), cert. denied, 469 U.S. 982 (1984) ("The filing of the chapter 11 petition cannot expand debtors' rights as against [the creditor] . . . [since] whatever rights a debtor has in property at the commencement of the case continue in bankruptcy – no more, no less."). Since such a right does not exist, it is also not "property" of the Debtors' estate, and the First Lien Trustee cannot have violated the stay by attempting to "control" the Debtors' exercise of a non-existent contract right.

The Debtors also argue that the Waiver and Rescission was a forbidden exercise of control over the general assets of the Debtors because, if given legal effect, it could result in a potential future liability to pay a Makewhole Premium. Debtors' Reply Brief at 8-9. This argument misapprehends the meaning of "control" under Section 362(a)(3). "Control" over property under that provision means the actual exercise of control and not acts which could potentially cause the estate to incur a liability which potentially could then become the subject of a future enforcement proceeding which could, ultimately, result in the transfer of debtor property in satisfaction of such a liability. The purpose of Section 362(a)(3) is not to shield the debtor from incurring liabilities for its acts but to protect the estate from "direct action taken by creditors against a debtor's personal or real property, and to prevent an uncontrolled scramble to liquidate the estate." Pension Benefit Guar. Corp. v. LTV Corp. (In re Chateaugay Corp.), 87 B.R. 779, 801 (S.D.N.Y. 1988) (internal quotation marks and emphasis omitted), aff'd, 875 F.2d 1008 (2d Cir. 1989), rev'd on other grounds, 498 U.S. 633 (1990); Padilla v. Wells Fargo Home Mortgage, Inc. (In re Padilla), Nos. 04-42708 & 05-30917, 2007 WL 2264714, at *16 (Bankr. S.D. Tex. Aug. 3, 2007) ("Section 362(a)(3) is essentially an 'anti-grab-law' statute."). The

ambit of the "control provision" of Section 362(a)(3) has been defined and limited by these underlying purposes. In re Prudential Lines, Inc., 107 B.R. 832, 843 (Bankr. S.D.N.Y. 1989). Consistently therewith, the salient characteristic of a violation of the "control provision" is the exercise of actual control over the property of a debtor.

The limitations of Section 362(a)(3) are illustrated by In re Chateaugay. See supra at 22. In In re Chateaugay, the court considered whether the Pension Benefit Guaranty Corporation ("PBGC") had violated the automatic stay by sending a notice to the debtor restoring to operation pension benefit plans that had been terminated following the commencement of Chapter 11 reorganization proceedings by the debtor. The PBGC's restoration notice informed the debtor that the plans which had been terminated were to be deemed "ongoing . . . for all purposes, including . . . minimum funding obligations[.]" 87 B.R. at 792. The debtor contended that the liability that it incurred as benefits accrued under the restored plans transferred or exercised control of its property under Section 362(a)(3) and thereby operated as a violation of the automatic stay. The court rejected the debtor's arguments and held that "[t]he liability that [the debtor] incurs as [plan] benefits accrue does not transfer or exercise control over [the debtor's] property." Id. at 801. The court observed in this regard that the restoration notice alone could not result in any "immediate involuntary payments" from the debtor's assets to meet plan funding requirements but that to compel such payments would require a separate enforcement action. Id. at 802.

These same principles apply here. The liability Calpine incurred upon the Redemption did not transfer control over assets of the estate from the Debtors to the First Lien Trustee. Such a transfer of control could not be achieved by the First Lien Trustee without commencement of a formal enforcement proceeding (i.e., the Amended Complaint in this adversary proceeding, which was filed after the repayment was made) and such proceeding's successful prosecution.

Moreover, the relationship between the First Lien Trustee's conduct and an act of control over the property of the Debtors is, significantly, even more attenuated than the relationship between the PBGC's restoration notice and property of the debtor in In re Chateaugay. Assuming, arguendo, that the automatic acceleration clause of the First Lien Indenture had accelerated the maturity of the First Lien Notes as a contractual matter (and is not unenforceable under In re Texaco), the limited legal effect of the Waiver and Rescission would simply have been to restore, as a contractual matter, the First Lien Notes to their pre-filing status under the First Lien Indenture. Had the Debtors not chosen to repay the principal and interest on the First Lien Notes, but had instead allowed such obligations to remain outstanding and to be addressed upon reorganization, no Makewhole Premium would have been triggered. Thus, the Waiver and Rescission not only did not result in any property coming under the control (a prerequisite for a violation of Section 362(a)(3)) of the First Lien Trustee, but it did not even cause the liability for a Makewhole Premium to accrue. As stated supra, the purpose of Section 362(a)(3) is to prevent "dismemberment" of estate property by "direct action" by creditors against estate property. It is not to shield the debtor from incurring a potential future liability under a subsisting contract under which it may then become the subject of subsequent enforcement action.

The cases upon which the Debtors rely to demonstrate the breadth of Section 362(a)(3) all illustrate examples of the actual exercise, by a creditor's direct action, of control over assets of the debtor. See In re Flynn, 143 B.R. 798, 801 (Bankr. D.R.I. 1992) (placing of a freeze on the debtor's bank account); Prudential Lines, 107 B.R. at 842-43 (destroying debtor's ability to carry forward net operating losses that were property of the estate); In re Burgess, 234 B.R. 793, 799 (D. Nev. 1999) (revoking debtor's license to operate). Each of these cases deals with actual acts to control or destroy the property of the debtor, not with acts resulting in the imposition upon the debtor of a liability under a legal obligation to which the debtor was subject or bound.

In support of their position that the Waiver and Rescission was a violation of the automatic stay, the Debtors cite numerous cases holding that debt cannot be accelerated without relief from the automatic stay. Debtors' Reply Brief at 7. The Debtors then declare that "[t]the same result should apply to a creditors' attempt to exercise control of the estate's property by decelerating debt." Id. Beyond this specious equation of acceleration and deceleration, the Debtors rely principally on In re Texaco Inc., 73 B.R. 960 (Bankr. S.D.N.Y. 1987). The Court's decision in In re Texaco is instructive, but not for the principle for which it is apparently cited by the Debtors. In In re Texaco, the governing indenture, issued by Texaco Capital Inc., like the First Lien Indenture, provided for acceleration upon bankruptcy. Following the commencement of a voluntary case, the petitioners filed a motion for an order modifying the automatic stay to allow the indenture trustee to deliver a formal notice of acceleration of the notes to the debtor. Such a notice was intended by the indenture trustee to have the effect of locking in a higher interest rate on the outstanding obligations. Id. at 967-69. Under the Texaco Capital indenture, the sending of such a notice was permissible only after an event of default. Id. at 962. At the time of the motion by the indenture trustee, there had been no payment default, and the trustee relied solely upon the occurrence of a bankruptcy filing to satisfy the pre-condition for service of the notice. The In re Texaco court denied the motion on the grounds that the indenture's ipso facto bankruptcy default clause was invalid by operation of Section 365(e)(1)(B), and, due to such invalidity, could not satisfy the condition precedent for a notice of acceleration. Id. at 968-69. The court ruled that "the movants may not accelerate the principal and accrued interest under the Indenture and the Notes to be due and payable immediately under Section 6.02 of the Indenture because they may not rely upon the debtors' commencement of their voluntary cases under the Bankruptcy Code as an 'Event of Default', as expressed in Section 6.01(4)(A) of the Indenture. This ipso facto clause may not modify the rights and obligations of Texaco Capital

Inc. under the Indenture." Id. at 965. In a second decision in the Texaco bankruptcy, In re Texaco, Inc., 81 B.R. 804 (Bankr. S.D.N.Y. 1988) ("Texaco II"), the court ruled that the trustee's issuance of a notice of acceleration became permissible after the debtors' failure to pay interest on the obligations resulted in an event of default independent of the automatic acceleration of bankruptcy. In so ruling, the court stated that noteholders should not be prevented by the automatic stay from "preserving whatever rights they might have . . . pursuant to their original contract." Id. at 806.

The court's decision in In re Texaco, which does not address deceleration, obviously lends no support to the Debtors' theory that the deceleration of debt to preserve a contractual right to a makewhole premium violates the automatic stay. Thus, the principal relevance of the court's decision in In re Texaco to this case is for its holding that an acceleration clause of an indenture is subject to the ipso facto prohibition of Section 365(e)(1)(B). In sum, application of the court's decision in In re Texaco to this case would strip from the Debtors the legal fiction that the Redemption was involuntary, and all related arguments by the Debtors and the Committees based on this false predicate.

The Debtors and the Creditors' Committee also fail meaningfully to address authorities which have assumed that a debtor retains the prerogative to decelerate debt during bankruptcy in order to preserve a contractual right to a makewhole premium. In In re Adu-Kofi, 94 B.R. 14, 15-16 (Bankr. D.R.I. 1988), the debtors argued that when the creditor began foreclosure proceedings and then, after bankruptcy, sought relief from the automatic stay, it became bound by its election to accelerate. The bankruptcy court held that, to the contrary, the lender was free to revoke its acceleration and regain its right to a premium at any time prior to the detrimental reliance by the debtor. The same issue was addressed by the court in LHD Realty Corp., 726 F.2d at 331 n.4 (analyzing the right to a prepayment premium in bankruptcy and noting that

"[e]ven after acceleration, a lender may be able to regain its right to a premium by revoking its acceleration and reinstating the mortgage prior to detrimental reliance by the borrower on the acceleration").

In summary, the Debtors' and the Creditors' Committees' theory that a deceleration to preserve the right to a premium in the event of a future redemption is a violation of the automatic stay is asserted without a shred of support either in the Bankruptcy Code or relevant authority.[11] In any event, the Debtors' focus on deceleration is a mere diversion from the fact that the First Lien Indenture requires a Makewhole Premium to be paid upon any redemption of the First Lien Notes by Calpine prior to October 1, 2009, without qualification as to whether a bankruptcy event of default has occurred.

## III. THE FIRST LIEN TRUSTEE'S RIGHT TO INDEMNIFICATION DOES NOT DEPEND ON THE OUTCOME OF THE FIRST LIEN NOTEHOLDERS CLAIM FOR A MAKEWHOLE PREMIUM.

In further support of their position, the Debtors and Creditors' Committee largely repeat their contentions that this Court has already ruled on the First Lien Trustee's right to indemnification. Debtors' Reply Brief at 24; Creditors' Committee Reply Brief at 22-23. Yet, as noted in the Plaintiff's Opening Brief, the ruling upon which the Debtors and the Creditors' Committee rely addressed solely the rights of the First Lien Trustee to receive current payment of its fees and expenses and was not issued as a final adjudication of the First Lien Trustee's claim for fees and expenses. In fact, the Debtors and the Creditors' Committee expressly noted that distinction at the hearing in support of this modification. Specifically, Debtors' counsel addressed the Court with the following remarks:

---

[11]    The Debtors and the Creditors' Committee also argue that the Waiver and Rescission violated Section 6.02 of the First Lien Indenture, which permits the holders of the right to rescind a default only "if the rescission would not conflict with any judgment or decree." This circular argument depends on the meritless notion that the Waiver and Rescission violated the automatic stay. In any event, it should be noted that the automatic stay is arguably neither a "judgment" nor a "decree." See United States v. Michalek, 54 F.3d 325, 333 (7th Cir. 1995) (cited by the Creditors' Committee) (noting that the "automatic stay" is not imposed "by judicial decree").

> And to the extent that there's a[n] obligation under Section 506(b) of the
> Bankruptcy Code or an entitlement to a claim for postpetition fees and
> expenses incurred on behalf of the secured creditors there, it's more
> appropriate to be determine[d] in connection with a hearing on that claim
> and pay it at the end of the case or at some later time, but not appropriate to
> be part of an adequate protection package offered by us. . . . So this is really
> a motion as it relates to the modification of the cash collateral order only.

Transcript of Oral Argument, In re Calpine Corp., No. 05-60200 (June 21, 2006), at 25, 27.

Statements made on record by counsel to the Creditors' Committee reflect the same understanding that the Court's ruling would be independent of a final adjudication of the Trustee's claim for fees and expenses. Id. at 29 ("[I]f in fact the first lien holders are . . . entitled to an allowed claim for professional fees under Section 506(b), . . . the debtors' motion should still be granted."). Finally, this Court also observed that its ruling was not an adjudication of the First Lien Trustee's 506(b) claim. Id. at 48-49 (noting that it was "not the time" for consideration of requests for professional fees).

The Debtors and the Creditors' Committee also reiterate on reply their argument that the First Lien Trustee's indemnification claim is tied to the ultimate success of the First Lien Trustee's Makewhole Premium claim. Debtors' Reply Brief at 24; Creditors' Committee Reply Brief at 22-23. They fail, however, to support this position with any authority or to distinguish the contrary persuasive authority cited on this point by the First Lien Trustee. As noted in Plaintiff's Opening Brief, "[s]uccess in bankruptcy litigation is not a prerequisite for an award of reasonable attorney fees to an oversecured creditor pursuant to Section 506(b)." In re Mills, 77 B.R. 413, 418 (Bankr. S.D.N.Y. 1987); see also In re West Elecs., Inc., 158 B.R. 37, 40 (Bankr. D.N.J. 1993) ("Fees will not be denied solely because a reasonable motion is unsuccessful."); In re Brunel, 54 B.R. 462, 466 (Bankr. D. Colo. 1985) ("The Court cannot, however, as Debtors request, create a per se rule that an oversecured creditor who unsuccessfully seeks relief from stay will be denied recovery of the fees incurred in that proceeding."). The Debtors also fail to

respond to the fact that the Delaware Court of Chancery (in a proceeding commenced by Calpine against, inter alia, the First Lien Trustee, which preceded and led to the Debtors' bankruptcy filing right after Calpine lost its appeal in that case) has already recognized the enforceability of the indemnification provisions of the First Lien Indenture regardless of the First Lien Trustee's success on the merits, holding that Calpine was required to indemnify the First Lien Trustee for certain litigation costs even where the Chancery Court ultimately found that the First Lien Trustee lacked standing to assert any counterclaims.  See Exhibit B ¶¶ 29-33 and Exhibit A thereto at 42-43.[12]

Under New York law, which governs the First Lien Indenture, the New York Court of Appeals has held that attorneys' fees are ordinarily "incidents of litigation" and that a contractual obligation to indemnify a party for attorneys' fees should exist if the intention to indemnify "is unmistakably clear from the language of the promise."  See Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 367 (1989).  Moreover, legal action taken and fees and expenses incurred to protect a creditor's security interest, including enforcement of its rights under loan documents, has been deemed necessary and reasonable for Section 506(b) purposes.  See In re Kroh Bros. Dev. Co., 88 B.R. 997, 1003 (Bankr. W.D. Mo. 1988) (disallowing prepayment premium but allowing attorneys' fees for litigation thereof).

---

[12]    The Delaware Supreme Court subsequently modified the Chancery Court's ruling in part on the standing issue.  However, Calpine did not appeal the Chancery Court's ruling on the indemnification issue.  See Exhibit B at Exhibit B thereto.

## CONCLUSION

For the reasons stated, this Court should grant Plaintiff's motion for summary judgment and deny the Debtors' and the Committees' summary judgment motions.

Dated: August 27, 2007                     Respectfully submitted,


**BROWN RUDNICK BERLACK ISRAELS LLP**


By:___/s/  Sigmund S. Wissner-Gross_____
    Edward S. Weisfelner (EW-5581)
    Sigmund S. Wissner-Gross (SWG-0001)
    May Orenstein (MO-2948)
    Seven Times Square
    New York, NY  10036
    (212) 209-4800

    Steven B. Levine
    Joseph F. Ryan
    One Financial Center
    Boston, MA  02111

    Counsel to Law Debenture Trust Company of New
    York, solely in its capacity as indenture trustee under
    the Calpine First Lien Indenture

8167006 – v.10